1   Mary McNamara, SBN 147131
    August Gugelmann, SBN 240544
2   SWANSON & McNAMARA LLP
    300 Montgomery Street, Suite 1100
3   San Francisco, California 94104
    Telephone: (415) 477-3800
4   Facsimile: (415) 477-9010

5   Attorneys for Defendant
    AMER ALHAGGAGI

6

7

8

9

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12

13   UNITED STATES OF AMERICA,              Case No.  CR 17-0387 CRB

14                          Plaintiff,

15          vs.                             **DEFENDANT'S SENTENCING
                                            MEMORANDUM**
16   AMER SINAN ALHAGGAGI,

17                          Defendant.

18

19

20

21

22

23

24

25

26

27

28

1

### TABLE OF CONTENTS

2    I.    Introduction ................................................................................................... 1

3    II.   Mr. Alhaggagi's history and characteristics ................................................ 4

4    III.  Overall factual background ......................................................................... 11

5          a.    The online trolling in 2016 and getting enmeshed with federal agents ............. 11

6          b.    Mr. Alhaggagi's interactions with the CHS .......................................... 12

7          c.    Mr. Alhaggagi's interactions with the UCE ........................................ 14

8          d.    Surveillance reveals Mr. Alhaggagi's credit card identity theft ........................ 16

9          e.    Mr. Alhaggagi cuts off contact with the UCE and CHS .................................. 16

10         f.    Mr. Alhaggagi's online activity after fleeing from the UCE ............................ 19

11         g.    The offense conduct .................................................................... 22

12         h.    Mr. Alhaggagi's arrest and search of his home ...................................... 24

13   IV.   The Probation Officer correctly calculated the guidelines ............................. 25

14   V.    The sentence recommended by Probation avoids unwarranted sentencing disparity ..... 26

15   VI.   Conclusion ................................................................................................... 28

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendant's Sentencing Memorandum**
*United States v. Alhaggagi*, CR 17-0387 CRB

# TABLE OF AUTHORITIES

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................................2n.1

*United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001) ......................................................25

*United States v. Jumaev*, 2018 WL 3490886 (D. Colo. July 18, 2018).....................................27

*United States v. Natsheh*, CR 16-0166 RS..................................................................................27

**Defendant's Sentencing Memorandum**
*United States v. Alhaggagi*, CR 17-0387 CRB

## I.   Introduction

Amer Alhaggagi is not a terrorist.  He is neither radicalized nor dangerous.  Rather, as prominent radicalization expert Dr. Marc Sageman has found, the entire catalogue of his online output constituted the made-up imaginings of an immature prankster who felt trapped in a strict and traditional home.  He believed none of what he said, was surprised when anyone took him seriously and, in fact, is something of a coward.  He is truly remorseful for (and mortified by) his atrocious online behavior and what he has put everyone through.  He recognizes that he needs help in setting up an independent life with structure, a real job, and mental health treatment.  As the Court has seen at his change of plea appearance, he has the unstinting support of his entire community, a community that knows him for the unserious and immature, but generous and kind person that he truly is.  Nobody who knows Mr. Alhaggagi thinks that he is dangerous. Everyone thinks that he needs help.

What tends to get lost in the odious spew of what Mr. Alhaggagi said is that his actual crime was not his speech, but rather the opening up of a handful of social media accounts for ISIS sympathizers.  There is no crime in saying deplorable things.  For this reason, the government mounted an elaborate sting operation against Mr. Alhaggagi.  The government gave him shopping lists for bomb components he never bought, ferried him around in a car to consider targets that he kept changing, tried to keep him focused on committing an attack when he got sidetracked into thoughts of  "beating people" up, all the while surveilling him 24/7 for months. None of it worked to prod him to action.  Instead, Mr. Alhaggagi cut off contact with the government agent as soon as the agent showed him purported bomb-making material.  After weeks of Mr. Alhaggagi's refusing to respond to the undercover agent or the cooperator who had cultivated him online, the FBI grew impatient and sent the agent to track him down.  When the agent cornered Mr. Alhaggagi on a street in Oakland, he ran away.  Months of further surveillance revealed he was doing nothing to advance any terrorist plot, although he was buying himself fancy clothes using stolen credit cards.  Finally, the government arrested him on the stolen credit card charges.

1

It was only after Mr. Alhaggagi's arrest that the government found the social media accounts on his phone.  Mr. Alhaggagi had opened these at the request of two individuals who suggested that they were sympathetic to or were supporters of "the Caliphate."  As is clear from his contemporaneous online chats with fellow trolls, Mr. Alhaggagi's motive in opening the accounts had nothing to do with sympathy for a terrorist cause, however.  Rather, he was engaged in juvenile feud with other Telegram users, in which each party was trying to get the other's account blocked from the platform.  In an effort to exploit the Sunni-Shia schism in Islam and provoke chatroom members to block the accounts of his antagonists, Mr. Alhaggagi posted their handles in the ISIS supporters' chatroom, falsely claiming the users were Shiite followers of Islam – and he posted the same names in Shiite chatrooms, claiming the users were Sunni ISIS sympathizers.  He thought the whole thing hilarious and had no motive other than victory in his childish flame war, but apparently some of the ISIS supporters believed he was a "brother" who shared their world view and asked him to open social media accounts.

Mr. Alhaggagi acquiesced to their request without for a moment understanding his actions to be criminal and without reflecting on the fact that, however *de minimis* the assistance, he was helping a despicable group of people.  As he writes in his statement to the Court, he fully understands the gravity of his actions now, and he sincerely regrets them.  It is worth noting, however, that while he is guilty of the crime, his actions meet the elements of material support of terrorism on a purely technical level.  Mr. Alhaggagi opened the accounts and did so at the request of terrorist sympathizers; thus he acted in coordination with them, as required by the statute.[1]  But he did not believe in their cause.  He posted no messages on those accounts.  Nor did he respond when the ISIS supporters asked for more help; he ignored them and wandered off to troll other people.  And, at the end of the day, the accounts were used for posting news, not to call for violence or anti-government conduct.  His actions are thus quite unlike others who have

---

[1] Under the Supreme Court's holding in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), any "support," no matter how small, constitutes material support if given in coordination with a terrorist organization.

**Defendant's Sentencing Memorandum**
*United States v. Alhaggagi*, CR 17-0387 CRB

1  been charged with material support, i.e., actual bombers or persons who travel to Syria to take up

2  arms with ISIS.

3         The government's view of the case takes no account of any of this.  It seeks to paint Mr.

4  Alhaggagi as a sophisticated terrorist who opened the accounts as part of a months-long

5  campaign to assist ISIS.  Thus, its argument focuses mostly on the *non-criminal* things Mr.

6  Alhaggagi said online and to undercover government agents, long before opening the accounts.

7  The trouble with the government's theory is that it ignores all the other evidence of Mr.

8  Alhaggagi's actual intentions, or more accurately, his lack of intentions.  The government cannot

9  say why someone it claims was so hellbent on helping ISIS ended up doing so very little, despite

10 the agent's sustained efforts to encourage him to do so much more.  And the government's

11 explanation for why Mr. Alhaggagi broke off contact with the undercover agent – that Mr.

12 Alhaggagi realized he was with the FBI – is simply not supported by the record.  Although Mr.

13 Alhaggagi made a quip to the cooperator who was cultivating him online that the agent might be

14 an undercover (a suggestion the cooperator laughed off), Mr. Alhaggagi continued to meet with

15 the agent three additional times, spewing ever more far-fetched ideas for carnage.  The truth of it

16 was that Mr. Alhaggagi thought the undercover was likely as much a liar as he himself was.  He

17 had been told that the agent had lost his job for being Muslim and was "pissed," and he believed

18 the agent was just posturing with claims of revenge.  It was only when the agent showed Mr.

19 Alhaggagi bomb-making chemicals that Mr. Alhaggagi realized that this fellow might be serious.

20 That is when he broke off contact.  To suggest that Mr. Alhaggagi was sophisticated enough to

21 sniff out an undercover agent, and then go underground and hatch a plot to help ISIS via opening

22 up a handful of social media accounts, seems far-fetched when one considers that (1) Mr.

23 Alhaggagi barely made it through high school; (2) his neuropsychological testing puts him at

24 average intelligence; and (3) multiple witnesses state his persona from childhood has been that of

25 a prankster and that his words in this case are consistent with that persona.

26        As the PSR recommends, the sentence in this case should reflect the essence of what

27 actually happened: an immature young man engaged in outrageous bragging as a result of the

28 coping mechanisms he developed as a child to deal with his family.  Those coping mechanisms

1   – never taking anything seriously, playing for laughs, provoking, and constant one-upsmanship –

2   backfired once he started to spend all his time on the internet while out of a job, smoking

3   marijuana and living at home with strict parents who could not understand their Americanized

4   son.  As the examining neuropsychologist has explained, the crime occurred at a time when Mr.

5   Alhaggagi's pre-frontal cortex was still developing, in other words, before he had fully grown

6   up.  Mr. Alhaggagi has spent two years in jail, more than half of which was in isolation, for his

7   crime and has done some growing up.  As the radicalization expert has convincingly found, he is

8   less dangerous than an average American.  The sentence recommended by the Probation Officer

9   of 48 months in custody, to be followed by supervised release with intensive mental health and

10  drug treatment programming, meets the statutory purposes set forth in 18 U.S.C. § 3553.

11  **II.     Mr. Alhaggagi's history and characteristics**

12          As the facts of this case make clear, Mr. Alhaggagi is young man who is willing to

13  engage in outlandish and foolish behavior for the sheer perversity of it.  But he is not a terrorist,

14  he is not radicalized, and he does not present a danger to the public.

15          Mr. Alhaggagi was born in Lodi, to Yemeni parents.  His childhood was uneventful and

16  happy until 9/11, when he was six years old.  He did not know about the event at the time, but he

17  remembers neighbors acting hostilely.  Not long after, his mother moved him and his siblings to

18  Yemen.  Sageman Report, 2; PSR ¶ 74.  His father stayed behind in the United States.  This

19  started a pattern of Mr. Alhaggagi's being sent back and forth between Yemen and the U.S.,

20  alone, without his siblings.  He was a hyperactive child who tested his parents' patience.  They

21  would switch him back and forth between them, between two different countries, throughout his

22  childhood.

23          In Yemen, things were initially difficult for Mr. Alhaggagi.  Fighting is very common

24  there, and because he was an American he was frequently targeted as an outsider, but he

25  gradually integrated.  Sageman Report, 2.  Mr. Alhaggagi's mother, who also had Mr.

26  Alhaggagi's five siblings to deal with, found him too much to handle.  When he was 10, she sent

27  him back to live with his father in the U.S.  This was a very difficult transition.  Mr. Alhaggagi's

28  father was very strict, and he and Mr. Alhaggagi had always had a "terrible relationship."  PSR ¶

4

75. As Mr. Alhaggagi reported to Probation, his father did not allow him to have friends, and Mr. Alhaggagi was so afraid of his punishments that if he missed the school bus he would hide in the park all day rather than tell his father. *Id.* "This was a hard period ….." *Id.* His father sent him back to Yemen in 2006, when Mr. Alhaggagi was 11.

The move back to Yemen was more difficult this time. Mr. Alhaggagi had fallen behind in school while he was away, and his mother was almost as strict as his father. He feared telling her when he got hurt (PSR ¶ 76) and, at the age of 11 or 12, witnessed a friend get killed when he picked up a cell phone that turned out to be an improvised explosive device. Sageman Report, 3. Mr. Alhaggagi told Dr. Sageman and the Probation Office that these events marked a turning point for him, and he made a conscious decision to stop taking life seriously. PSR ¶ 76. And indeed, Mr. Alhaggagi's subsequent history is marked by a failure to take life seriously, most notably, with respect to the conduct that brought him before the Court.

Mr. Alhaggagi moved once more when he was 14, back to the United States to be with his father. Although Mr. Alhaggagi loved being back and the relative freedom he enjoyed here, his relationship with his father was worse than ever. He was required to go to the mosque immediately after school and wait there until 9:00 p.m., when his father would arrive home. Sageman Report, 3. He was "bored out of his mind" and chafed at the constant strict supervision. And then his father went to Yemen for several months, leaving Mr. Alhaggagi alone. As soon as his father was out of the picture, Mr. Alhaggagi stopped going to school entirely, eventually failing ninth grade. *Id.* at 4.

This pattern continued, with Mr. Alhaggagi's father coming back to the country and forcibly reining Mr. Alhaggagi in, and then leaving again. When his father was in town, for example, Mr. Alhaggagi was forbidden to have friends of his own. "His father made him hang out with his own friends, who were in their forties, vulgar and constantly chewed qat. To this day, Mr. Alhaggagi has not forgiven his father for forcing him to be bored out of his mind with his father's friends." *Id*. But then his father would leave for Yemen, the reins would come off, and Mr. Alhaggagi would run wild.

Mr. Alhaggagi's social persona developed in this environment.  Chafing under the extraordinarily strict conditions at home, he became the opposite of his father.  "He said that, at that time, he craved attention from peers and looked for entertainment or something to do in the evening.  He started to become a 'bullshit artist,' with a very sarcastic sense of humor." *Id*.  He also started leading an extensive online life, where his father had no visibility into his activities.  "He found the Internet very entertaining, allowing him to kill his boredom. When he had nothing to do, which was often, he spent time on the Internet.  His attitude was, 'I love to waste your time, if you let me.'  It's how he got 'his kicks: it didn't hurt him and didn't hurt others.'  He explained that he liked teasing people and seeing how they reacted." *Id*.[2]

Mr. Alhaggagi's online teasing, while mostly harmless, reflected a smug sense of superiority.  People he thought were stupid were ready targets.  "As example of stupid people, he said, 'You don't go on the Internet to buy drugs or weapons.'  So, he would set them up for drug or weapons deals and not show up, leaving them 'high and dry.'  He explained that he only did this online and never face to face because he risked being punched out." *Id.* at 5.  He got the greatest pleasure out of trolling people he viewed as pretentious or overly self-serious.  This "started when he watched videos on YouTube and noticed that people commented on them, criticizing or defending them.  This gave him the idea to create mayhem by taunting both sides. He continued this behavior of playing both sides against each other on Facebook, Twitter, Whisper, and finally Telegram.  He said that it made him feel more intelligent than the person that he tricked.  It was a story to tell his buddies, like a joke, when they hung out together smoking joints." *Id*.

> In retrospect, he believed that his online behavior became part of his character.  "I developed a sarcastic character.  People didn't know whether I was joking or not." His view of the world was ironic: he laughed at everything.  People never knew whether he was serious or not.

*Id*.

---

[2] Mr. Alhaggagi was careful to shield his online life from his family, but on one occasion someone showed his father images from Mr. Alhaggagi's Facebook profile.  His father "was furious and . . . made Mr. Alhaggagi throw out all his clothes, except those that his father approved."  Sageman Report, 6.

**Defendant's Sentencing Memorandum**
*United States v. Alhaggagi*, CR 17-0387 CRB

Mr. Alhaggagi's trollish joking was not limited to his online life.  He was very popular, but his friends' letters repeatedly describe his sometimes off-putting sense of humor.  Abdul writes that he "was so goofy at times he would say the most randomest thing just to get a reaction.  Or sometimes he would say the most uncomfortable thing in a room, and because I knew him I'd wait for him to laugh while everyone else had a confused face."  Abdul letter, Exh. B at 3.  Ali complains that although they were close friends, sometime he "couldn't bear his constant pranks, jokes and sarcasm, I would so openly sit there and express to him a hardship that I am facing and he would simply respond with jokes . . . He is someone who sees the best in people, but he continuously made it a challenge for others to take him serious."  Ali Letter, Exh. B at 6.   Hamad describes how Mr. Alhaggagi would use his friends' discomfort to push a joke further, all because "he simply enjoys the shock of someone thinking he is serious":

> He was a total character.  Although he was funny, to his dismay, the humor could be found cynical and to those who didn't know him, even troubling.  If you debated his jokes, he was able to tactfully feed off the energy to further his satire. He might have seemed convincing, but in reality, he is not the guy to carry out what the best of him knows is a delusional thought.  He simply enjoys the shock of someone thinking he is serious.

Hammad Letter, Exh. B at 10.

Those who know Mr. Alhaggagi well were stunned to hear of his arrest, and especially to read press accounts of the his vile statements.  But after their initial shock, they thought they understood:

> I stood there at work in disbelief reading one [article] after another, still not convinced that the person I was reading about was my friend . . . After reading those articles and convincing myself that it was my friend Amer that I was reading about, I came to realize that with his kind of personality and young age, I could see him fooling around with a sensitive topic and not thinking much of it. Because to him it's all fun and games at the end of the day and he would never hurt anyone of any kind, near or far.

Abdul Letter, Exh. B at 3-4.  As Hammad writes, "In my humble opinion, his boisterous comments and talk about hurting people seems like one of his uninformed delusional jokes from high school, but this time it just went too far and to the wrong audience."  Hammad Letter, Exh. B at 10.

Indeed, Mr. Alhaggagi's friends know this is not the first time Mr. Alhaggagi's trollish joking has gotten the better of his common sense.  Homza describes how Amer mouthed off to a police officer:

> Another memory of Amer was the time I got my first speeding ticket. . . .  As the officer pulled up to my window he asked for my license and registration.  I was very nervous since this was the first time I have ever been pulled over.  So many things were crossing my mind.  So I was having trouble figuring out where exactly is my registration.
>
> The officer sees that and was quick to assume we were ''high''.  So he asks me do we have any "illegal drugs in the car".  Amer sarcastically responds, "Yes officer we have lots weed with us, do you smoke?"
>
> At that moment I just wanted to strangle Amer.  I'm over here nervous and scared that I'm getting my first ticket and he's over here laughing and joking with the officer.  I quickly tell the officer that Amer is being a "dumbass" and thinks everything is a joke.  I tell the officer that we do not smoke nor do we have any drugs and that he can search if he would I like because we have nothing to hide.

Homza Letter, Exh. B at 12-13.

In addition to highlighting how Mr. Alhaggagi will always reach for a joke without thinking of the consequences, Homza's anecdote also reveals the trait that has made Mr. Alhaggagi so well-loved by his friends and his community: his unhesitating kindness and generosity to friends and strangers alike.  When he got that speeding ticket, Homza had been taking his friends to school.  The rest of the story is revealing: "Amer . . . tells me that since I was doing them a favor it's only fair if everyone helps out on the ticket and that if no one wants to do that he's willing to pay half of my ticket."  He continues:

> That's a side that no one really sees in Amer except people that's close to him and know him pretty well.  Everyone sees the prankster or childish Amer that sometimes doesn't know when he's crossing the line.  But deep down Amer is a caring person that wouldn't hurt a fly.

*Id.*

Indeed, Mr. Alhaggagi's kindness is discussed in every letter.  Ibrahim describes how Mr. Alhaggagi would gather food after large community gatherings to distribute to the homeless: "On certain occasions, the weather was rainy and cold and he would insist that I give him a ride to deliver the food for the homeless before the food gets cold.  I got to admit, sometimes I was lazy but his persistent made me do it.  We drove block to block and make sure all plates were

8

delivered."  Ibrahim Letter, Exh. B at 15-16; *see also* Lee letter, Exh. B at 8 ("I know of a story of him when during a holiday celebration, as the dinner was laid out, he took the greater portion of it and headed outside, down the street, giving it to homeless people.  In fact, I have heard of many instances of him feeding the homeless.").

Mohamed writes that it was only because of Mr. Alhaggagi that he became a successful boxer.  After Mohamed spent some time in juvenile hall, Mr. Alhaggagi took it upon himself to mentor him, encouraging him to take up boxing as a way "to properly 'release' energy and gain the needed confidence where I could adequately defend myself in case of trouble":

> I immediately signed up at the Pacific ring sports boxing gym, 2015, stayed with the gym unit this day and have since participated in Golden Gloves local and statewide tournaments, securing several medals. . . .  Amer, a boxer himself for a while, kept checking on me[.] . . . Amer also always stressed the need for me to stay out of trouble.

> As a teenager with a frequently traveling father (who does humanitarian work overseas), and a mother who could not enter the U.S. due to Trump's Muslim Ban, I only had Amer to rely on as a trusted mentor, counselor and a source of moral and psychological support. . . . Had it not been for Amer's help and guidance, I would not have been able to be the person I now am and would most likely have ended up in deep trouble and would most probably have not completed even high school.

Mohamed Letter, Exh. B at 19-20.

Ibrahim and Lee share the story of Mr. Alhaggagi's unexpected assistance to Lee, who could not afford to get married:

> Lee and me had a conversation regarding his financial problem and how it will negatively determine the success of his marriage, Lee began to lose hope.  I and Amer were hanging out in my car and I shared with him Lee's situation and how he met his wife on a airplane by accident at Frankfort airport, a very interesting story, and now he can't marry her because he needs at least five thousand dollars.  Amer looked at me and said "I'll help him."

Ibrahim Letter, Exh. B at 16-17.  Lee writes: "While we were not close (I imagine I'm about seventeen years older than him), . . . I asked him if I could borrow some money without knowing how long it would take to pay him back.  Without hesitating he offered to help me, asking me how much I needed.  That same day he gave me five thousand dollars with a big smile, telling me I could pay him back whenever I could.  My heart almost leapt out of my chest, I cannot describe the feelings of surprise and joy I had that moment."  Lee Letter, Exh. B at 8-9.

9

Huda says he "will never forget how Amer stood by my family and me when I learned of my cancer. He was with us during that difficult time, catering to our needs and supporting us in any way that he could. And when everyone returned to their work and busy lives, he humbly offered to take me to Stanford Hospital for additional testing that could not be done locally." Huda Letter, Exh. B at 14. Ibrahim recalls how Mr. Alhaggagi volunteered to care for a handicapped relative who was paralyzed from the waist down:

> I recall when Amer would physically carry him up to the 2nd floor (there apartment location) on his back and it required a lot of work. He would entertain his handicap relative by taking him to restaurants, Movie Theater, parks, and cafes. Amer had to take time-off from work, and other responsibilities so he can take care of his handicap relative for as long as he was with him.

Ibrahim letter, Exh. B at 17. In short, Mr. Alhaggagi "is someone who is close to everyone and is loved and respected by everyone around him; neighbors, friends, teachers and relatives. He draws joy in the faces of the young and the old and he never hesitates to provide assistance and support to those who need it and without expecting anything in return from others. His kindness and caring for others does not take any effort from him, because it is so natural to who he is." Huda letter, Exh. B at 14.

In so writing, Huda does just not speak for himself, or even just for those who have written letters. The Court has witnessed firsthand the extraordinary breadth of support for Mr. Alhaggagi in the local Yemeni community. This support is not lightly given. The accusations in this case are extremely serious, and Mr. Alhaggagi's words were despicable and have been thoroughly publicized. Mr. Alhaggagi's community knows well how damaging it would be if they were seen to be accepting of radicalism or sympathetic to a terrorist. But they know who Mr. Alhaggagi is, and more importantly they know who he is not. As Mr. Alhaggagi's sister writes, "I am sure if any of them had witnessed any inimical behavior from him they would not have been there. They understand the sensitivity of the case and how a case such as this one can affect the whole community, yet they are willing to support him because they believe in him." Alhaggagi letter, Exh. B at 2.

### III.    Overall factual background

Mr. Alhaggagi's conduct in this case, both during his interactions with the cooperating witness and the undercover agent, and later while opening the social media accounts, is that of an immature young man whose boredom and trollish instincts told him to push the envelope in ways that were outrageous, crude, and finally resulted in his mixing himself up with real online bad actors.

#### a.    The online trolling in 2016 and getting enmeshed with federal agents

The relevant history starts in April 2016, when Mr. Alhaggagi accompanied his sister to Saudi Arabia for her wedding.  Mr. Alhaggagi quit his job before leaving, and while he was away, his hopes for returning to set up a marijuana grow fell apart.  Instead, he returned from Saudi Arabia to his parents' home.  He had a fraught relationship with his parents, particularly his father.  His parents were strictly religious and did not understand his Americanized ways.  PSR ¶¶ 79, 81.  He had no prospects and, instead of making new plans, retreated from the world and went on the internet.  He started staying up late, smoking a lot of marijuana, and immersing himself in online chat groups, eventually with an app called Telegram.  Alhaggagi Statement (Exh. A), 1.  Telegram is a messaging platform that allows users to participate in group chats, read information in channels (to which only a single user contributes while others receive the feed), and also it allows users to have one-on-one conversations via private messaging.[3]

Curious about the Middle East, Mr. Alhaggagi started to look at ISIS channels on Telegram.  What he found there was a mix of material, from the radical Sunni preaching of extremist clerics, to battlefield maps of ISIS and how their territory was expanding in Iraq and Syria, to group chats featuring ISIS sympathizers, to polemical materials, to satire.  He was curious about bomb-making and explosives, and explained to the undercover agent that he had even attempted to obtain bomb-making instructions through Telegram (as discussed below).

He also found a great deal that had nothing to do with ISIS – jokes, chats about girls, all the random detritus of the internet.  All of it was fodder for his trollish sense of humor.  As he

---

[3] As Mr. Alhaggagi explained to Dr. Sageman, he liked Telegram for its "randomness" – users could be added without notice to all sorts of chatrooms, making for more diverting entertainment than other platforms.  Sageman Report (Exh. C), 8.

11

1  wrote to the Court: "This is just the kind of thing that I liked to do on Telegram and in real life

2  too, I talk shit and try to see how long I can go."  Alhaggagi Statement, 3.

3        **b.**       **Mr Alhaggagi's interactions with the CHS**

4        Around the time he turned 21, Mr. Alhaggagi participated in a Telegram chat called

5  "Against the War Coalition."  There, a user called Abu Ali claimed he had weapons to sell, and

6  Mr. Alhaggagi  pretended he wanted to buy.  Abu Ali vanished when Mr. Alhaggagi took

7  screenshots of their chats, but on July 21, 2016, someone posing as a Canadian messaged Mr.

8  Alhaggagi to follow up on the conversation.  That person was cooperating with the FBI (a

9  "confidential human source" or "CHS").  The FBI promptly started round-the-clock surveillance

10  on Mr. Alhaggagi (including aerial surveillance) which lasted until his arrest in November of

11  2016.  The wall-to-wall monitoring yielded not a scrap of evidence of terrorist activity.

12        When approached by the CHS, Mr. Alhaggagi promptly changed personas, pretending to

13  be selling, rather than purchasing, weapons.  When asked by the radicalization expert why he

14  engaged with the CHS, Mr. Alhaggagi explained:

15        [H]e was leading him on to see what the CHS would say or do – he might even be

16        stupid enough to send Mr. Alhaggagi money.  Mr. Alhaggagi said he also sought
      admiration or fear from the CHS because he had the impression that the CHS was
      a skinny Canadian kid, a weakling dreaming of being a jihadi.  Mr. Alhaggagi

17        wanted the CHS to look up to Mr. Alhaggagi as a bad-ass!

18  Sageman Report (Exh. C), 10.

19        The conversation quickly turned to ISIS and then rapidly descended into ever more

20  outrageous territory.  The exchanges are vile, but read in context they are hard to take seriously.

21  The texts featured emojis (smiley faces) and the argot of teenagers on the internet ("LOL" for

22  laugh out loud, "LMAO" for laughing my ass off) in response to claims of carnage and savagery.

23  Mr. Alhaggagi commented that he felt "sorry for anyone who takes social media too seriously."

24  Exh. E, at 7608.  He made claims of massive body counts, of wiping out half the city, of

25  bombing gays, Jews, the city of San Francisco.  He boasted that he could "get 10,000 ppl" and

26  that he would be "hitting up China Town, down towns, main streets, mission Blvd every club

27  and underground club in the city.  I know I'll probably get near the 500 but my goal is 10,000.

28  Areas here are very crowded.  There's lot of traffic everywhere."  *Id.* at 7603-04.  When the CHS

responded to this set of claims with "[t]hat's awesome bro," Mr. Alhaggagi responded with "Uhhhh wallah I can't wait." *Id.* His claims got more and more grandiose and included outrageous and despicable comments about causing "millions of dollars worth of damages and insha'allah 100's of bodies," placing a "a bomb in a gay club" in San Francisco, the "gay capital of the world," sending the "whole bay area . . . up in flames," and "redefining terror." *Id.* at 7595, 7601-05.

Mr. Alhaggagi also claimed to have ordered strychnine online, which he said he would mix with cocaine and then distribute. "First day I'm pretty sure I could get up to 20ppl on Halloween I could get about 100 or more . . . New years ... countless." *Id.* at 7634. On July 28, he boasted that he would make a video of bayat (an oath of allegiance to ISIS) with San Francisco in the background. But when the CHS encouraged him, he immediately started offering transparent excuses for not doing so. First he said he had no camera; when the CHS pointed out he could use his phone, he said he had no one to hold it. When the CHS asked him why he couldn't just set up the camera against something, he responded "I'll put it against the car! Like on the windshield," but then said he could not because he didn't have a mic. When the CHS pointed out that he could simply use the mic on the phone, Mr. Alhaggagi changed the subject to a discussion of Saudi Arabia's incarceration of "scholars." *Id.* at 7671-75. He then sent the CHS a photograph of a credit card and false driver's license that he claimed to have used to purchase strychnine online. *Id.* at 7677-79. Mr. Alhaggagi never swore bayat and never bought strychnine with the false credit card – but, as discussed below, he did use that and other stolen cards to buy clothes for himself.

Ever seeking to up the ante, Mr. Alhaggagi claimed to be able to obtain rocket-propelled grenades, and when the CHS expressed incredulity and awe at such an amazing acquisition ("Whaaaat??? That's awesome but I would be so lost holding one if these lol"), Mr. Alhaggagi responded 'hell nah Aki wallah it's 100 times easier than you may think." *Id.* at 7682-83. The CHS and Mr. Alhaggagi joked that Alhaggagi could be called "Abu bazooka," a moniker said he thought "sounds dope." *Id.* at 7685. As with the claims regarding strychnine and guns, Mr. Alhaggagi never sought to buy RPGs, nor did he have the faintest idea how to go about doing so.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      **Mr. Alhaggagi's interactions with the UCE**

From Mr. Alhaggagi's perspective, his conversations with the CHS were "all pure bullshit and full of absurdities and contradictions from beginning to end, like some how during the mix I decided to pretend to be a weapons salesmen when I was just a customer five mins ago." Alhaggagi Statement, 3.  But the CHS kept Mr. Alhaggagi engaged by revealing sympathetic personal details about himself, such that his father was dying, that his mother was a "mess" because of it, what it was like for the CHS to live in Canada.  Mr. Alhaggagi was more than happy to play along: "This is just the kind of thing that I liked to do on Telegram and in real life too, I talk shit and try to see how long I can go!"  *Id.*

Meanwhile, although 24-hour surveillance had revealed nothing more than the online talk with the CHS, the FBI mounted a sting operation, hoping to catch Mr. Alhaggagi acting on some of his outrageous claims.  To that end, the CHS told Mr. Alhaggagi that he had a cousin in Salt Lake City who "hates the Kuffar [derogatory term for non-Muslims] bro and he is like all about the Dawla [a reference to the Islamic State]." Exh. E, 7641.  This "cousin" was in fact an undercover FBI agent (UCE).  The CHS told Mr. Alhaggagi that his cousin had lost his job and wanted to travel to California to meet Mr. Alhaggagi.  *Id.* at 7687.  (Mr. Alhaggagi would later learn from the UCE that he was supposedly fired for being Muslim.)

On July 28, the CHS told Mr. Alhaggagi that his cousin wanted to come to California and asked when Mr. Alhaggagi could find a safe house.  Mr. Alhaggagi said "[i]n like a month it's going through escrow right now."  *Id.* at 7688.  In fact there was no safe house, no escrow, and no plans for a safe house; Mr. Alhaggagi was living at home with his parents at the time and had neither the wherewithal nor any plan to move out.  The CHS knew from their chats that Mr. Alhaggagi lived in Oakland, was Muslim, and could be found in the vicinity of the local mosque. On July 28, the CHS told Mr. Alhaggagi that the cousin would arrive the very next day to meet him at the mosque.  *Id.* at 7691-92.

Mr. Alhaggagi had misgivings about the meeting.  He was "very concerned because this was the first time he was going to meet with a victim of his trolling.  The Internet was safety because trolling face to face could have dire consequences, like a broken nose."  Sageman

14

Report, 10.  But at the same time, he could think of no way to avoid it without losing face.  "I felt like I was between a rock and a hard place since I had stupidly told [the CHS] I was in Oakland and the meeting was arranged the next day.  I could not think of a way to get out of it since the 'cousin' was driving all the way from Utah to meet me and I did not want to admit that my whole conversation with [the CHS] had been fake."  Alhaggagi Statement, 3.

Early in the morning on July 29, 2016, the CHS told Mr. Alhaggagi that his cousin was driving to Oakland, and later that day the undercover employee ("UCE") and Mr. Alhaggagi met. The UCE told Mr. Alhaggagi that he had learned to use explosives while fighting with al Qaeda against the United States.  They drove around in the UCE's car, with Mr. Alhaggagi talking a mile a minute about the same sorts of attacks that he had bragged about undertaking with the CHS.  He pointed out various possible targets in the Berkeley Hills, in and around the University of California-Berkeley campus, and other locations in the East Bay, "adding some stuff here and there that I thought of as were driving around."  Alhaggagi Statement, 3.  He told the UCE that he went by the name "bazooka."  He lied about owning a Boost Mobile store and claimed to have sold it (in fact, he had been an employee who had quit).  He claimed to have a "hook up" for guns such as AKs and M-16s and to have a friend in Las Vegas who help him traffic in guns. None of it was true.

The next day, the CHS asked Mr. Alhaggagi how things had gone with the "cousin" and prodded him to plan funding for their operation.  Mr. Alhaggagi stated "I don't know what we need to create the bombs so I can't tell you either lol," and then made the ludicrous comment that "I heard that ppl who use meth are good at math and calculating stuff so ima start using meth." Exh. E, 7718.  He went on to boast that he was getting a place for the operation that "is close to my boys house, there [sic] the ones who will be supporting us with guns and ammunition."  *Id*. at 7723.  Of course, there was no such place, and Mr. Alhaggagi had no "boys" who could support him with guns and ammunition.  Mr. Alhaggagi then claimed that he would be hired as a police officer and would make "5k a month, then we also have money coming in from cocain[e]."  *Id*. at 7724.  While Mr. Alhaggagi did apply to be an Oakland Police Officer, he did not sell cocaine.

1   When CHS asked how much equipment they would need from his "boys," Mr. Alhaggagi – who

2   of course did not know – replied "maybe none, maybe pleanty [sic]." *Id*. at 7727.

3          **d.      Surveillance reveals Mr. Alhaggagi's credit card identity theft**

4          Mr. Alhaggagi never purchased any bomb-making material, weapons, poisons, or

5   anything else that could have been used for attacks, despite his many claims to the contrary.

6   However, FBI surveillance revealed that he was using stolen identities to buy himself clothes.

7   On August 1, 2016, agents watched Mr. Alhaggagi approach a UPS truck and return from the

8   truck carrying a large box from the online clothing retailer, Trunk Club.  Agents ultimately

9   determined Mr. Alhaggagi had obtained approximately $5,000 worth of clothes by fraudulently

10  using the credit card of Victim #1.  Exh. H (search warrant affidavit), at 14-15.

11         **e.      Mr. Alhaggagi cuts off contact with the UCE and CHS**

12         On August 6, 10, and 14, the UCE and Mr. Alhaggagi continued to discuss the supposed

13  attacks that they would carry out together.  During their second meeting, on August 6, the UCE

14  showed Mr. Alhaggagi a storage facility where they would store bomb-making materials, and the

15  two continued to discuss purported plans to conduct terrorist attacks.

16         The third meeting, on August 10, took Mr. Alhaggagi by surprise.  "I've been ignoring

17  his calls for a while and I was going to ignore it again but I was smoking weed with some friends

18  . . . and one friend decided to answer my phone with-out my consent and brought it to me saying

19  'hey this guy said come meet him by yourself hes down the street.'"  Alhaggagi Statement, 4.

20  When they met, UCE told Mr. Alhaggagi he had obtained detonators and the timing for their

21  plans was accelerating.

22         On August 14, they met again.  This time, the UCE brought Mr. Alhaggagi to the storage

23  facility and showed him barrels of purported bomb-making material.  This was a turning point

24  for Mr. Alhaggagi, who, for once, was shocked.  "It only hit me that moment that I've been

25  talking to these people for too long and had no idea what I've gotten myself into and now I'm

26  kinda freaked out. . .  I never took it seriously and I never realized how serious he was until he

27  was ready to make a bomb (so I believed at the time) which I wanted no part of!"  *Id.*  He

28  immediately began trying to think of a way to escape.  As he recounted it to Dr. Sageman:

Mr. Alhaggagi was surprised and remembered thinking, "what the fuck is this?" He knew that [the UCE] expected to leave for hajj in two or three weeks and was running out of time to build the bombs before his departure. [The UCE] asked Mr. Alhaggagi to get half of the supplies needed to make bombs for an attack. To stall [the UCE], Mr. Alhaggagi volunteered, "No, I'll get them all." He had no intention of getting them. He reasoned that, since [the UCE] was a stranger, he would not have time to locate and buy all the necessary supplies in the short time before his departure. Without them, [the UCE] would not have the time to build the bombs, and the dangerous situation Mr. Alhaggagi found himself in would finally disappear.

Sageman Report, 11-12.

Upon his return from that meeting, Mr. Alhaggagi cut off contact with the UCE and the CHS. He did not attend a planned "dry run" of the attacks on August 19. "After I got dropped off that day I was still freaked and I stopped really responding to any messages or phone calls, I was leaving home alot less frequently, but the undercover kept trying to contact me (him and his cousin) but I wouldn't respond." Alhaggagi Statement, 4. Mr. Alhaggagi was waiting until the agent left the country for Hajj, as the UCE had told him was his plan. *Id*.[4]

The government's theory is that Mr. Alhaggagi cut off contact with the UCE only because he realized he was in fact working for the government. It is true that, following the second meeting on August 9, Mr. Alhaggagi told the CHS that "I had the sense that he was an informant when we first met . . . cuz he told me he worked for alqaeeda . . . I was like damn he probably got caught and now trying to catch ppl." Exh. E, at 7740-41. The government's theory might make sense if Mr. Alhaggagi had cut off contact after that first meeting, when he says he had these suspicions. But he dug in for more. The CHS laughed off the suggestion of the agent's working for the government, and Mr. Alhaggagi went on to meet with the undercover on three further occasions, during which he freely discussed his supposed ideas for an attack, and he continued to exchange texts with the UCE and the CHS about those ideas. What is closer to the mark is that Mr. Alhaggagi thought that the agent was a "wannabe who liked to talk big and was maybe pissed off for losing his job." Alhaggagi Statement, 3. The breaking point for Mr.

---

[4] After seeing the supposed bomb-making material, Mr. Alhaggagi "thought about contacting the police but did not do so because he realized that both [the UCE] and the CHS had texts on their phones from him to prove that he was part of the conspiracy. He believed that he already had become too compromised with them and might go to jail." Sageman Report, 13.

17

Alhaggagi came only when he saw the apparent bomb-making material.  The possibility that the UCE might actually be contemplating an attack is what drove Mr. Alhaggagi away, not the suspicion that he might be a government agent.

After Mr. Alhaggagi cut off the agent and the CHS, the CHS contacted him on August 15, 22, 23, 25, and 29, trying to cajole and pressure him to respond.  On August 31, the CHS claimed he and the UCE feared that Mr. Alhaggagi was working for the government, prompting Mr. Alhaggagi to send him a text to assure them this was not the case.  ("I'm back.  Smh [shaking my head].  The government huh lmao [laughing my ass off]."  Exh. E, 7756.)  That was the last message Mr. Alhaggagi sent the CHS.  On September 1, the CHS asked if he was ok; Mr. Alhaggagi did not respond.  The CHS texted again on September 7, 11, 18, and 21, all with no response.  On September 22, the CHS texted: "Hey bro please call right away, it's very important."  Mr. Alhaggagi did not call.

The UCE had no better luck.  He texted Mr. Alhaggagi on August 19, 20, 23, 24, 25, and 26, attempting to continue their engagement.  Mr. Alhaggagi did not respond.  On August 27, the UCE turned up the pressure: "This is the second weekend you have not even responded.  **You told me death before dishonor.  Where is the honor in your actions**?"  Exh. F, 11481 (emphasis added).  That got Mr. Alhaggagi to answer.  He defended his honor, explaining his long absence by one-upping once more, this time claiming he had been busy obtaining funds, was in possession of $150,000, and that he had obtained or could obtain a vehicle.  *Id.*  But he was lying, as the UCE well knew.  "Agents who were conducting constant physical surveillance on ALHAGGAGI during this time period observed no activity that was consistent with either of those claims."  Exh. H (search warrant affidavit), 17.  After that, Mr. Alhaggagi stopped responding entirely, refusing to answer a flurry of messages from the UCE on September 1, 2, 13, 15, 19, and 23.

During the period that Mr. Alhaggagi was not responding to the UCE or the CHS, he was not secretly working on the government's theoretical masterplan of going underground and helping ISIS through surreptitious means.  Instead, FBI agents observed him in plain sight continuing to carry out identity theft activities near his home by intercepting UPS and postal

18

packages, including from Trunk Club.  As before, the items that Mr. Alhaggagi purchased using the stolen credit cards were clothes.  *Id.*

But, the UCE was still at work.  Finally, on September 23, the UCE tracked Mr. Alhaggagi down as he was walking on the street and asked if they could drive somewhere to have a meal.  Mr. Alhaggagi made an excuse that he had to get something, and then he ran away from the UCE.  Alhaggagi Statement, 4.  There was no further contact between Mr. Alhaggagi and the UCE or CHS.  And although FBI surveillance continued until Mr. Alhaggagi's arrest on November 29, he took no steps to further any supposed terrorist plot.

**f.     Mr. Alhaggagi's online activity after fleeing from the UCE**

The "unexpected meeting with [the UCE] scared Mr. Alhaggagi, who . . . was afraid that he had finally gotten over his head.  Specifically, he was afraid that [the UCE] might surprise him again and become physical with him for letting [the UCE] down or wasting his time." Sageman Report, 12.  To avoid further encounters, Mr. Alhaggagi stayed largely at home, meaning he was now with his family 24/7.  But his relationship with his family was terrible – although they lived in the same house, Mr. Alhaggagi barely spoke to his brother and did everything he could to avoid his father.  It was not long before he sought social interaction online again.  He "felt very disengaged from the world and very lonely.  He missed the Internet community.  It was an escape.  He felt liberated online, where no one knew him.  He gradually returned to Telegram to troll and have a laugh." *Id.* at 13. Although most of his online activity had nothing to do with ISIS or terrorism, he also returned to ISIS-related content and viewed anti-ISIS material, such as the "Shiia Electronic Army" chat.

Mr. Alhaggagi participated in Telegram chats using two phones and a variety of handles, including Barud ("gunpowder"), Qaswara ("lion"), Qurat Al Ayn ("delight of the eye," which is a female persona), and Zain.  He participated in numerous group chats and private messages, and he created his own, entirely social forum, which he called Samarat Al-Arabiya (or "Arabian Nights").  His real goal was to find women he could antagonize and/or flirt with:

> On Telegram again I join some groups, started to troll and spam again, even had a
> 3 people crew of 'online imps' who would always join me whenever they were
> needed, that included Sultan, Khaled and especially YMN.  The ultimate goal was

to create a fun group with mostly women that would be lewd and entertaining. But still, I would be on other groups 'screwing around' and trying to steal their members, especially women (or at least they had female names but so did I sometimes, so you never really know) to add to my group.

Alhaggagi Statement, 4-5.

Mr. Alhaggagi's private message conversations with YMN (a moniker for someone from Yemen) reveal the most about his online activities. Mr. Alhaggagi and YMN engaged in a running commentary on what they were getting up to in the group chats. A good example of this is Chat 31, attached as Exhibit I.[5] None of this running commentary in the private messages had anything to do with ISIS or terrorism. It was a profanity-laden set of real-time joking about their efforts in group chatrooms to find girls to talk to them (*see* Exh. I at 16-19, 20, 24, 25-26, 28-30, 33, 48-49, 53, 59, 63, 88-89, 90-97); wondering if the girls they were seeing were really boys (*e.g.*, *id.* at 2, 25, 27, 54); joking about who was a "nut job" (*id.* at 8), who was an "idiot" (*id.* at 7), or who they would tease (*id.* at 31); and the pair's endless feuds with other users, which resulted in their fear of being thrown out of chats or blocked from further participation (*id.* at 3, 35, 43, 60, 64). Mr. Alhaggagi and YMN spent an inordinate amount of time searching out the names of female users to invite to their own Samarat Al-Arabiya chat. *See*, *e.g.*, *id.* at 50, 82-83. As for other chat groups that they joined, most of them ended in one or both getting kicked out for persistent flouting of chatroom etiquette (breaking chatroom rules against obscenity or foul language or contacting women, for example). Users from those chats would then "block" Mr. Alhaggagi's account. *See id.* at 5, 11-12, 13, 15, 34, 35, 36, 42, 57, 96 (Mr. Alhaggagi and YMN bemoaning multiple instances when they got "kicked out" or "blocked"). When enough users complained about him, the Telegram app would automatically suspend Mr. Alhaggagi's abilities to post or view messages.[6]

---

[5] Even though Exhibit I is 98 pages long, it is only a portion of the private messaging activity that Mr. Alhaggagi was constantly carrying on with YMN and others in his crew of "imps."

[6] Mr. Alhaggagi had frequent chats with the "Spam Info Bot," which repeatedly informed him that his account had been suspended because "some Telegram users found your messages annoying." Mr. Alhaggagi complained that was unfair because "I got into an argument in a public group and the person who I was arguing with got his friends to report me" and because "ppl are reporting my account because of dumb argument we have in 'group chats' then they ask all there friends to report me!"

1   Mr. Alhaggagi and YMN vowed to block others in retaliation (*e.g.*, *id.* at 77, 79), but Mr.

2   Alhaggagi found himself at a disadvantage: his opponents had large numbers of followers who

3   would join together to block his account at their request, and he did not.

4   That resulted in me getting blocked and reported by a mass number of people,
    which led to my account being "limited" numerous times (meaning I was not able
5   to participate in any chats for a limited period of time).  It was frustrating at the
    time and I wanted to retaliate which was all part of the "game". The only problem
6   was that I didn't have an online army of followers that would do what I bid them
    to do which was how so many people were blocking me.

7

8   Alhaggagi Statement, 5.  His solution to this problem was, he thought, ingenious: he decided to

9   "take advantage of this online drama between two groups of people, the Shia and Sunni

10  Muslims, who are always in a fierce online battle to get each other blocked from Telegram."  *Id.*

11  He would post the names of his blockers in Sunni chats, claiming they were Shia, and in Shia

12  chats, claiming they were Sunni:

13  What I would do is get the name of the administrators, who had posted my handle
    on their groups and ask their followers to report my account (for whatever "bad"
14  thing I did in their group), and do the same to them.  But instead of posting their
    names on my own group, which had a puny number of 100 members and only 20
15  of them were active, I would post their names on both pro ISIS-chats and anti-
    ISIS chats, on the latter I would claim that they are ISIS supporters and on the
16  former I would claim that they're anti-ISIS advocates, Shiaas, and Houthis.  That
    way I had a "standing army" of online trolls that I could rally up to do my bidding
17  whenever I'm being blocked.

18  *Id.* at 5.  Indeed, Mr. Alhaggagi's posts in pro-ISIS groups were frequently claims that another

19  user was Shia.  For example, on the "Allah is with those who endure" chat, Mr. Alhaggagi wrote

20  "Saudi using bad language against the Mujahideen, crush him @shiyab" and "@om_fah crush

21  the rejectionist."  (The term "rejectionist" refers to an adherent of Shia Islam, and "crush" refers

22  to blocking a user.)  In other pro-ISIS groups, Mr. Alhaggagi repeated some of the same posts

23  and also flagged other users, writing "@aueed is a despicable rejectionist, crush his account" and

24  "@alhdam filthy Houthi."  It was all part of the joke, which he shared with YMN, telling him on

25  November 21, 2016: **"I took their identifiers to the Dawa'ish [ISIS fighters/followers] [chats]**

26  **and told them these are Shiites, block them, and took it [the identifiers] to the Shiites and**

27  **told them these are Dawa'ish, block them."**  Exh. I, at 65 (emphasis added).

28

1      In some pro-ISIS chats, Mr. Alhaggagi did no more than post names of people he wished

2  to "crush" and ask other members to help him lift the block on his own account.  But in others,

3  he also posted messages sympathetic to ISIS.  In the "Allah is with those who endure" forum, he

4  posted a message in praise of "a media publisher of the Caliphate State" and linked to the

5  channel for "A'amaq agency on Telegram," a reference to an ISIS publishing arm.  As he

6  explained, "in order for my machination to work I had to play a roll [sic], so in one way or

7  another I would contribute to a chat by copy and pasting stuff from other groups or engaging in

8  some innocuous conversation here and there to add authenticity to my claim/personality."

9  Alhaggagi Statement, 5.  This was his way of gaining credibility with the ISIS supporters so that

10  he could convince them to assist him by blocking the supposed Shiites.

11      Mr. Alhaggagi's efforts to "out" supposed Shiite (or non-Sunni) Muslims attracted the

12  attention of real ISIS supporters.  Apparently believing to have found someone sympathetic to

13  their cause, these supporters then approached him with the request that he open social media

14  accounts on their behalf.

15      g.      The offense conduct

16      Up to this point, Mr. Alhaggagi had broken the law only in respect of his identity theft

17  activities, not in any other way.  His online and offline activity with the CHS and UCE had

18  amounted to no more than "trash talk" and a failed sting.  But, in late October and November

19  2016, his Telegram activity also included three instances in which he did break the law by

20  opening social media accounts at the request of persons he understood to be affiliated with ISIS.

21  This is the only activity that constitutes attempted material support of terrorism.

22      One of the chatroom participants that Mr. Alhaggagi had attempted to recruit in his

23  efforts to block users with was "Bank Al Ansar."  Afterwards, Al Ansar asked him in a private

24  chat to open some accounts.  *See* Sageman Report, 14.  On October 31, 2016, in his persona as a

25  "brother" who had recruited members of the group chat to block his enemies, and feeling like he

26  owed Al Ansar, Mr. Alhaggagi sent Al Ansar message saying he was "ready to create accounts."

27  Al Ansar stated that he should "create two and send them."  Mr. Alhaggagi then sent usernames

28

1   and passwords for two Facebook accounts and two Gmail accounts.  Al Ansar asked if Mr.

2   Alhaggagi supported the Caliphate, and Mr. Alhaggagi responded that he did.  PSR ¶ 24.

3       Another person who had helped Mr. Alhaggagi was "Munasir Lal-Khilafah" (Supporter

4   of the Caliphate).  "In a private chat that again was not preserved in the discovery material,

5   Munasir told Mr. Alhaggagi that someone would contact him who needed his assistance . . . Mr.

6   Alhaggagi felt that he needed to stay on Munasir's good side in order to keep using him and his

7   friends in this retaliatory game."  Sageman Report, 14.  On November 14, 2016, "Abu Muharib

8   Iraqi" contacted Mr. Alhaggagi, saying he had been referred by Munasir.  At Muharib's request,

9   Mr. Alhaggagi sent usernames and passwords for three Gmail accounts and the usernames for

10  three Twitter accounts.  Later that day, Mr. Alhaggagi sent usernames and passwords for two

11  additional Gmail accounts and two additional Twitter accounts.  Mr. Alhaggagi posted the

12  Twitter accounts in a script provided by Muharib, which Muharib explained would "publish

13  these accounts directly," meaning that the script would allow Muharib to publish content via the

14  Twitter accounts opened by Mr. Alhaggagi.

15      The following day, Muharib contacted Mr. Alhaggagi again.  He told him "we have a

16  very big invasion," meaning a social media campaign, and said "I think you read about the

17  invasion that I want, brother."  Mr. Alhaggagi responded "No, I did not read about it."  Muharib

18  instructed him to "add the largest number of accounts that you can, brother," but Mr. Alhaggagi

19  did not create any additional accounts.  On November 16, Muharib again asked Mr. Alhaggagi to

20  "add the largest number of accounts."  Mr. Alhaggagi again did not respond.  On November 18,

21  Muharib contacted Mr. Alhaggagi again, but Mr. Alhaggagi did not respond.  On November 22,

22  Muharib contacted Mr. Alhaggagi a final time, and once more Mr. Alhaggagi did not respond.

23      Mr. Alhaggagi had nothing more to do with the accounts he opened.  However, some of

24  them were later used from locations in Iraq and Syria.  None was used to call for terrorism, anti-

25  government action or any other kind of violence, but instead they disseminated the following:

26  • Praise of senior ISIS leader Abi Muhammad Al-Farqan after his death;

27  • An image with the message "Persist, oh supporters of the caliphate;"

28

- A news report on the fourth day of the battle of Mosul, describing numbers of combatants killed and equipment destroyed;

- A news report that a Turkish tank and armored vehicle had been destroyed by missiles;

- A message stating that someone had broadcast the location of ISIS forces, resulting in the death of ISIS fighters, and warning supporters not to reveal ISIS troop locations;

- Advertisements for an ISIS radio station and an ISIS video;

- An image (without caption) of President Barack Obama, Iranian President Hassan Rohani, and former Saudi Arabian king Abdullah bin Abdulaziz Al Saud.

### h.    Mr. Alhaggagi's arrest and search of his home

On November 29, 2016, three months after he stopped responding to the UCE and CHS, Mr. Alhaggagi was arrested and his house was searched.  According to the search warrant affidavit, agents expected to find firearms, explosives, "chemical weapons such as strychnine," combat training and instruction materials, military clothing and equipment such as body armor and ghillie suits, and camping and survival gear.  Exh. H, 24.  They found none of it.  Instead, they found only material related to identity theft – false credit cards, a credit card skimmer, and other access device-making equipment – and Mr. Alhaggagi's phones, which contained the Telegram app and, on later inspection, revealed that he had opened social media accounts.  Mr. Alhaggagi's devices also contained other material he had gotten through Telegram, including jihadi videos and images.

Agents also recovered an image of an Arabic-language document, purportedly written by "Abu Harb Al-Yamany" (a name that Mr. Alhaggagi invented for the purpose of sending this document).  The document claimed an intention to carry out the same terrorist attacks Mr. Alhaggagi described to the CHS and UCE, including use of strychnine, arson in the Berkeley Hills, and explosives in Oakland, San Francisco, and Berkeley.  Mr. Alhaggagi explained the origin of this document to Dr. Sageman:

> One time, on a chat group sympathetic to the Islamic State, out of curiosity, he asked how to make bombs.  This was around the time when he met the FBI confidential human source (CHS) online.  Someone . . . contacted Mr. Alhaggagi in a private chat.  During the conversion, the new person asked about Mr. Alhaggagi's background and then told him that he would not give him a bomb making manual until he knew how Mr. Alhaggagi was going to use it.  Mr. Alhaggagi escalated as usual and told him, "I want to do some bombings."  The

24

1
2
3
4
5
6

person asked Mr. Alhaggagi to write a statement.  Mr. Alhaggagi complied and wrote that he wanted to burn the Berkeley Hills, leave bombs on the streets of Oakland, Berkeley, and San Francisco, and poison people's drinks with strychnine.  He got the idea of using strychnine as a poison from a YouTube video about the top ten poisons in history, and strychnine was the list.  He also read a book by a mafia hitman who had used strychnine for some of his hits. . . . The talk about strychnine was just to impress his interlocutor and he never made any attempt to procure it.  This letter did not satisfy the person, who asked Mr. Alhaggagi to make a video pledging bayat [allegiance, in Arabic] to the Islamic State.  Mr. Alhaggagi had no desire to do so, stopped talking to this individual, and never got the manual.

7     Sageman Report, 9.

8          After his arrest, Mr. Alhaggagi was interrogated by the FBI.  He admitted knowing ISIS

9     was a foreign terrorist organization and reading about ISIS through online messaging

10    applications, stating he did so to get the "real" news from Syria and Iraq.  When asked about the

11    UCE, he falsely stated they had only met once, and then ended the interview when pressed.

12    **IV.     The Probation Officer correctly calculated the guidelines**

13         The PSR's guideline calculations are correct.  At an adjusted offense level of 23, with

14    zero criminal history points, Mr. Alhaggagi's guideline range is 46-57 months.  In addition, his

15    conviction for aggravated identity theft carries a two-year mandatory sentence to be imposed

16    consecutive to any guidelines sentence.

17         The government may argue that the Court should impose § 3A1.4's terrorism

18    enhancement.  This would add 12 offense levels and move Mr. Alhaggagi to Criminal History

19    Category VI, increasing the guidelines range more than six fold to 292-365 months.  The

20    government cannot meet its burden of proving by clear and convincing evidence (*see United*

21    *States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001)) that the enhancement applies, because the

22    act of opening social media accounts was in no way calculated to influence the conduct of a

23    government by intimidation or coercion, or to retaliate against a government, as required under

24    18 U.S.C. § 2332b(g)(5).

25         Similarly, the Probation Officer is correct that Mr. Alhaggagi has accepted responsibility

26    and thus merits the three level decrease in his offense level.  The defense requests that the

27    government's last ditch effort to introduce jailhouse informant material as grounds to deny

28

acceptance points should be rejected and the material struck from the PSR and disregarded in its entirety.  The defense notes the following:

First, despite knowing this information for more than a year and a half, the government elected not to present it to the Probation Officer in its narrative of the offense, choosing instead to bury it in thousands of pages of discovery.

Second, the government chose to press the material only after release of a draft PSR that agreed with the defense guidelines calculations.  And, even then, the government raised the allegations to advance a legally unavailable theory – that the material required denial of acceptance of responsibility points.  Since even the government admits that the allegations are not part of the offense conduct, Mr. Alhaggagi had no duty to address the allegations in order to receive acceptance points.[7]

The government's raising of these allegations long past the deadline set forth in Local Rule 32-3(c) raises the question of why now and to what end?  What we already know is that the informant is has a lengthy criminal history (Category VI), is far older than Mr. Alhaggagi and, in the opinion of the informant's Probation Officer, is mentally unstable.  We also know that the informant was in a position to know all about Mr. Alhaggagi's case and the evidence outlined in the discovery.  And Mr. Alhaggagi is certainly one of the more infamous inmates of the jail – a tempting target of anyone wanting a benefit through cooperation.

The defense believes that the informant material should not be considered at this late stage and that reference to it in the PSR should be struck out.

**V.     The sentence recommended by Probation avoids unwarranted sentencing disparity**

The facts of this case are *sui generis*.  The defense has been unable to locate any other case where the offense conduct consists only of opening social media accounts, much less where the defendant was not radicalized, has no commitment to terrorism, and fled when offered the

---

[7] As the PSR Addendum correctly notes, even if these allegations could be deemed relevant conduct under the guidelines – which they cannot – Mr. Alhaggagi's silence about them in his interview with the Probation Office would not be a valid grounds to deny acceptance points. USSG § 3E1.1, Application Note 1 ("a defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection").

apparent opportunity to actually initiate an attack. This does not change the fact of Mr. Alhaggagi's guilt, but it does make comparison to other prosecutions difficult. The defense points to two recent cases as worthy of comparison.

First, there has been one other terrorism case prosecuted to sentencing in this district, *United States v. Islam Natsheh*, CR 16-0166 RS. According to the government's sentencing memorandum in that matter, Mr. Natsheh came to the attention of the authorities when he posted pro-ISIS messages, including an execution video, on Facebook and Twitter. He was interviewed and denied holding radical beliefs or planning to commit any act of violence. Later, however, agents learned Mr. Natsheh had purchased two tickets to Turkey, for himself and a minor male companion. He was arrested attempting to board his flight, initially denied any intent to travel beyond Turkey, and ultimately admitted his was planning to cross into Syria to fight alongside ISIS. Judge Seeborg sentenced Mr. Natsheh to five years in custody.

Second, undersigned counsel has located one recent case with facts that are in some respects comparable, in that a non-radicalized individual gave *de minimis* assistance to a terrorist organization for purely non-terrorist reasons. In *United States v. Jumaev*, 2018 WL 3490886, CR 12-00033 JLK (D. Colo. July 18, 2018), the defendant was convicted after trial of attempting to provide material support in the form of $300 to the Islamic Jihad Union (IJU), a small terrorist group in Uzbekistan. *Id.* at *2. Jumaev had been detained by ICE for overstaying his visa and borrowed $500 from codefendant Jamshid Muhtorov to post bond. Muhtorov was a supporter of the IJU and told Jumaev the organization was in financial straits. Eventually, Jumaev gave Muhtorov $300, which he understood would be sent on to the IJU.

Senior Judge John L. Kane found that there was "no reason to believe that Mr. Jumaev would have ever sent money to the IJU if he had not been arrested by ICE and been loaned money by Mr. Muhtorov." *Id.* at *6. After a thorough examination of the § 3553 factors and a review of sentences imposed in other material support cases, he imposed a sentence of time served, noting that "a term of less than the [76 months] he has spent in detention would be meaningless at this point." *Id.* at *16. The implication was that had Mr. Jumaev not already served 76 months, he would have received less time in custody.

Neither of these cases is a perfect match for Mr. Alhaggagi's. Like Jumaev, his attempted assistance was *de minimis*, and he was not motivated by support for terrorism. Mr. Natsheh's case, like all so-called "traveler" cases, includes an element of commitment to a terrorist cause that Mr. Alhaggagi's lacks. The defendants in traveler cases are sufficiently determined to participate in violent jihad that they take the affirmative step of leaving the country (or attempting to) in the hopes of joining a terrorist organization and helping in battle. Mr. Alhaggagi lacked that determination and made no such effort; he rejected the opportunity to engage in a violent act, and instead unthinkingly provided minimal, non-violent support through opening social media accounts.

The outcomes in these cases reveal the reasonableness of the 48-month sentence recommended by Probation. Mr. Alhaggagi should receive less time than defendants who travel, simply because in such cases the defendants demonstrate a commitment to terrorism and a willingness to undertake acts of violence that Mr. Alhaggagi does not have.

## VI. Conclusion

As the Court has seen in previous court appearances, Mr. Alhaggagi has the overwhelming support of his community, which well understands the scourge of terrorism and would dissociate itself immediately from anyone who they thought harbored radical leanings. Those who spend time getting to know him, from the neuropsychologist, to the radicalization expert, to the Probation Officer, come away with the same impression: He is an immature young man who found mocking, pranking, and trolling people irresistible. He fell into the game of outrageous claims and online provocation at a point where he was out of a job and living in the repressive atmosphere of his parents' home. He had no conception that opening social media accounts, even for ISIS sympathizers, was against the law. He does understand that now, and he is genuinely remorseful for all the fear he has caused and the government resources his disruptive behavior wasted. "I realize that I set a huge surveillance operation in motion and that people thought that I was going to bomb the Bay Area. I swear that nothing was farther from the truth, but I now know that that is what I made the FBI think..... I feel so embarrassed and humiliated by my actions, my stupidity and my thoughtlessness." Alhaggagi Statement, 6. He is

28

not, and never was a terrorist, nor was he radicalized, nor is he dangerous.  He has served two years in custody, more than one of which has been in difficult conditions in isolation.

Examining neuropsychologist Amanda Gregory notes that Mr. Alhaggagi's social development was damaged by conflict with and estrangement from his strict father.  Exh. D, 2. Compounding this, his age (21 at the time of the offense) is one "where the prefrontal cortex of the brain is still maturing, placing him at heightened risk for poor judgment, lack of adequate consideration of potential consequences, impulsive behavior and impetuous decision-making," all of which Mr. Alhaggagi demonstrated here.  *Id*., at 11.  Development continues into the mid-twenties in ways that are directly relevant to culpability and capacity to rehabilitate.  *Id*.  Mr. Alhaggagi is now 23 years old, and his ability to self-regulate is on the increase (until approximately age 26).  *Id*.  Keeping him in a prison environment during this important developmental phase, when he will receive no treatment due to the nature of his crime of conviction, has little to recommend it.  Enabling him to return to his community, with an intensive plan of treatment for drugs and a mental health regimen, with strict supervision by the Probation Officer provides a far better path for both Mr. Alhaggagi and society.

The Probation Officer's recommendation of 48 months in custody, to be followed by three years of supervision with restrictions, is reasonable and serves the purposes of 18 U.S.C. § 3553.

Dated: December 4, 2018                    Respectfully submitted,

                                             /s/
                                    Mary McNamara
                                    August Gugelmann
                                    SWANSON & McNAMARA LLP
                                    Attorneys for Amer Alhaggagi

29