1

Mary McNamara, SBN 147131
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

2

3

4

5

Attorneys for Defendant
AMER ALHAGGAGI

6

7

8

9

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

13

UNITED STATES OF AMERICA,

Case No.  CR 17-0387 CRB

Plaintiff,

14

**DEFENDANT'S REPLY TO
GOVERNMENT SENTENCING
MEMORANDUM**

vs.

15

AMER SINAN ALHAGGAGI,

16

Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   Introduction ................................................................................................ 1

II.   Mr. Alhaggagi is not a savvy terrorist who outfoxed the FBI ................................. 2

   a.   Mr. Alhaggagi spilled the beans before ever "testing" the UCE. ....................... 3

   b.   Mr. Alhaggagi took no steps to further the supposed plots for which he did not
      need the UCE's explosives expertise. ............................................................. 4

   c.   Mr. Alhaggagi's "tests" of the UCE were nothing of the sort ............................ 5

   d.    Mr. Alhaggagi reveals his suspicion to the CHS ......................................... 8

   e.   Mr. Alhaggagi's actions after supposedly outing the UCE ................................. 9

III.   Facts the government ignores ....................................................................... 11

IV.   The terrorism enhancement does not apply. ..................................................... 13

   a.   Legal standard ......................................................................................... 13

   b.   The government must prove the applicability of the terrorism enhancement
      by clear and convincing evidence. ................................................................ 15

   c.   The government's theory on the terrorism enhancement has no factual support. ........... 15

   d.   Mr. Alhaggagi's opening of social media accounts was not calculated to affect
      government by intimidation or coercion. ......................................................... 17

   e.   Even if the enhancement could apply, the Court should reject it. ....................... 21

V.   The government's recommended sentence is unreasonable ................................... 22

IV.   Conclusion ................................................................................................ 24

## FEDERAL CASES

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) ................ 19

*Spears v. United States*, 555 U.S. 261 (2009) ........................................................................ 23

*United States v. Abu Khatallah*, 314 F.Supp.3d 179 (D.D.C. 2018) ........................................ 19

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005) ........................................................ 14

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) ...................................................... 14, 18, 20, 21

*United States v. Banol-Ramos*, 566 Fed.Appx. 40 (2d Cir. 2014) .............................................. 19

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ........................................................ 22

*United States v. Dye*, 538 Fed. App'x 654 (6th Cir. 2013) ...................................................... 19

*United States v. Fidse*, 862 F.3d 516 (5th Cir. 2017) ............................................................ 14

*United States v. Graham*, 275 F.3d 490 (6th Cir. 2001) ........................................................ 14

*United States v. Haipe*, 769 F.3d 1189 (DC Cir. 2014) .......................................................... 21

*United States v. Hopper*, 177 F.3d 824 (9th Cir.1999) .......................................................... 15

*United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001) .......................................................... 15

*United States v. Jumaev*, 2018 WL 3490886, CR 12-00033 JLK (D. Colo. July 18, 2018) ........ 23

*United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004) ............................................ 21

*United States v. McDavid*, 396 Fed.Appx. 365 (9th Cir. 2010) ................................................ 21

*United States v. Ressam*, 679 F.3d 1069, 10 (9th Cir. 2012) ............................................ 24, 25

*United States v. Shehadeh*, CR 10-1020, 2013 WL 6049001 (E.D.N.Y. Nov. 14, 2013) ........... 22

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ............................................................ 18

*United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008) .................................................... 16

*United States v. Thomas*, 521 Fed. Appx. 741 (11th Cir. 2013) .............................................. 21

*United States v. Thurston*, CR 06-60069 AA, 2007 WL 1500176 (D.Or. May 21, 2007) .......... 16

*United States v. Tubbs*, 290 Fed.Appx. 66 (9th Cir. 2008) ...................................................... 19

*United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018) .................................................... 21

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014) .......................................................... 18

**DOCKETED CASES**

*United States v. Yassin*, Western District of Missourri,  CR 16-3024 MDH................................ 18

**STATUTES**

18 U.S.C. § 2332b.................................................................................................... 14

18 U.S.C. § 3553...................................................................................................... 22

U.S.S.G. § 1B1.3...................................................................................................... 14

**MISCELLANEOUS**

Brown, *Punishing Terrorists*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014) ............................ 21

McLoughlin, *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law & Ineq. 51, 115 (2010)............................................................................................. 22

Sageman, *Misunderstanding Terrorism* (University of Pennsylvania Press, 2017).................... 12

**Response to Government Sentencing Memorandum**
*United States v. Alhaggagi*, CR 17-0387 CRB

1

2 **I.       Introduction**

3          As the defense sentencing memorandum makes clear, Mr. Alhaggagi engaged in
4 appalling speech with the UCE and CHS.  His statements about bombing gay nightclubs, setting
5 fire to the Berkeley Hills, poisoning people with strychnine, executing and stabbing people are
6 despicable and appalling.  In deciding Mr. Alhaggagi's punishment, the defense fully agrees with
7 the government that the Court must take all of this into account.  What the government continues
8 to get wrong however, is the idea that Mr. Alhaggagi is a terrorist who was planning to do any of
  the things that he claimed.

9          The government spins an elaborate theory to explain why a supposed terrorist never took
10 a single step to carry out any of his plots.  The government posits that Mr. Alhaggagi, an
11 untrained 21 year old with the mentality of a teenager, is a criminal mastermind whose refusal to
12 act is even *bigger proof* that he is a terrorist.  In the government's telling, Mr. Alhaggagi in the
13 very first meeting tricked the undercover agent into a series of "red flag" blunders and "critical
14 missteps" that revealed his true status.  Then, despite exposed the undercover, he continued to
15 meet with him, repeatedly confessing all the things that the government now says warrant a
16 prison sentence of 33 years.  The government tries to persuade the Court that words mean actions
17 by quoting Mr. Alhaggagi's horrendous claims at great length.  Tellingly, except for distorting
18 one line in Mr. Alhaggagi's chat activity – noting that Mr. Alhaggagi called his flame war
19 enemies Shiites in Sunni ISIS chatrooms without disclosing that he also called the same people
20 Sunnis in Shiite chatrooms – the government fails to discuss at all Mr. Alhaggagi's
21 contemporaneous online pranking, his trolling, and his well-known twisted sense of humor.
22 Equally noteworthy is the government's distortion of a later group chat ostensibly about bomb-
23 making, but really a play on words filled with sexual innuendo, emojis, and an explicit statement
24 from Mr. Alhaggagi that he was not planning on bombing anyone.  Finally, in all of its 65 pages,
25 the government finds no space to address Dr. Sageman's report, which unlike the government's
26 memo, gives a full accounting of the entire record of Mr. Alhaggagi's behavior and motivations.
27 Dr. Sageman has interviewed hundreds of actual terrorists, read dozens of jihadi suicide notes,
28 and knows the difference between a radical bent on violence and a trash talking, immature

bloviator like Mr. Alhaggagi.  But one does not have to be a Marc Sageman to answer why Mr. Alhaggagi failed to take a single step towards bomb-making, when bomb-making was allegedly what he most craved.  As is the case in virtually all things in life, the simplest explanation is the correct one:  Mr. Alhaggagi was all talk – very disturbing talk – but he never intended to carry out any of the violent fictions he spewed forth.

The sentence recommended by the Probation Officer after due consideration of all of the government's evidence is reasonable and appropriate.  It communicates that Mr. Alhaggagi's behavior in opening social media accounts for ISIS was deplorable and that he must pay the price for giving even small assistance to a terrorist organization.  It also communicates that he is an immature young man who must be transitioned to independence from his parents' home and subjected to drug treatment, severe restrictions on computer access, and intensive mental health rehabilitation, including cognitive behavioral therapy to build better boundaries, reduce impulsivity and develop a healthier attitude toward the internet in the context of severe restriction of computer access.

## II.    Mr. Alhaggagi is not a savvy terrorist who outfoxed the FBI

The government's version of events is this: Mr. Alhaggagi is far from the immature troll that radicalization expert Dr. Marc Sageman, neuropsychologist Dr. Amanda Gregory, and the Probation Officer all found him to be.  He is instead extraordinarily savvy and "remarkably sophisticated" in his ability to employ "tests" and "ruses" to expose undercover agents.  In short, he is nothing less than a mastermind.

Remarkably, the government paints its own operation in just the opposite light.  In the government's telling, the FBI was faced with what it deemed a credible and imminent threat, but sent an agent to pose as an al Qaeda member who did not know the first thing about al Qaeda or ISIS – he could not name the leader of al Qaeda, could not pronounce the simple term "bayat" (the oath of allegiance to ISIS), he antagonized a  supposed Sunni radical by expressing admiration for Shiites, and he was undone when asked a rudimentary question about the Caliphate.  The reason Mr. Alhaggagi never took a single step towards executing any terrorist threat, in the government's telling, is because of the UCE's blunders.

2

This narrative is simply false.  Of course the FBI did not send an amateur to intercept Mr. Alhaggagi.  Its investigation was swift, thorough, and carried out with expertise.  The UCE was entirely up to his job and accomplished exactly what he was sent to do: he quickly engaged with Mr. Alhaggagi, got him to repeat in person the same claims he had been making online to the CHS, and set about testing the limits of his apparent commitment to terrorism.  It was not because of any misstep by the UCE that Mr. Alhaggagi never acted on the supposed plans.  It was because Mr. Alhaggagi never intended to commit any act of terror to begin with.

**a.      Mr. Alhaggagi spilled the beans before ever "testing" the UCE.**

The government's theory is that Mr. Alhaggagi was too savvy to trust the UCE and so embarked on a sophisticated campaign to test his bona fides, starting from their very first meeting.  But the government cannot explain why such a mastermind would spill the beans on his entire plot before this "vetting" even began.  One must wonder how savvy it is to begin testing whether someone is an FBI agent only *after* revealing your true name, *after* revealing your address, and *after* giving your true cell phone number, and *after* providing the alias under which it is registered.  And not only did Mr. Alhaggagi unhesitatingly reveal all his personal information, but he also gave the CHS and the UCE every conceivable detail of his supposed plans: that he could supply weapons, that he trafficked guns through Las Vegas, his methodology for intercepting packages, his supposed cartel connections, his plans to escape to Mexico, how he would cross into ISIS-controlled territory, how he had ordered strychnine under a false name and exactly where he had gotten it, his plan to mix the strychnine with cocaine, his history of credit card scams, his possession of a fake driver's license, how he was learning to make bombs, his plan to start fires in the Berkeley hills and place bombs in night clubs, exactly what parts of the city he planned to target, his source for AK-47s, his taking photographs for the "brothers," his idea of robbing an armored car, the plan to get false passports, his plan to conduct attacks in Dubai, his plans to attack Berkeley dorms, to put bombs in garbage cans.  *See* Govt. Memo, 2-21.  All of this is information Mr. Alhaggagi provided before he even *began* to "vet" the UCE.  In fact, there was not a single element of his supposed plans that he withheld.  These are hardly the actions of a sophisticated criminal, ever alert to the possibility of informants.

**b.    Mr. Alhaggagi took no steps to further the supposed plots for which he did not need the UCE's explosives expertise.**

The government says Mr. Alhaggagi stuck with the UCE despite the fact that his probing had revealed his true identity because the UCE "claimed to possess the one thing that ALHAGGAGI did not have, and had eagerly been trying to obtain from 'the brothers': bomb-making: know-how."  Govt. Memo, 28.  But if Mr. Alhaggagi was so desperate for information on how to build bombs, why at the very first meeting with the UCE ███████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████[1]  And, of course, Mr. Alhaggagi's reaction when he saw actual evidence of bomb-making – the UCE's buckets of chemicals – was to cut off contact, suggesting that he was not so eager to get the know-how after all.

Moreover, of Mr. Alhaggagi's many "plans" (distributing strychnine-laced cocaine, arson in the Berkeley Hills, executing his *kuffar* friends, setting up a modeling agency and then stabbing the models, and planting bombs), only one – bombing gay nightclubs - required any explosives expertise.  Taking Mr. Alhaggagi at his word, as the government argues we must, he could have carried out the remainder at any time.  Lacing cocaine with strychnine would have been simple for someone the government argues is a well-connected drug dealer[2] who had already ordered the poison.  But he never bought strychnine and had no cocaine.  Arson could have been accomplished simply by buying a can of gasoline and setting a match to it, but he never bought any gasoline.  Setting up a modeling agency and stabbing the models would have required planning, but no bombs.  Executing his *kuffar* friends would have been easiest of all.

---

[1] Throughout this brief, the defense has redacted references to material the government redacted in its sentencing memorandum.

[2] The government insinuates that Mr. Alhaggagi actually bought cocaine, pointing to a phone call where he talked about "the white" before going to Ukiah.  Govt. Memo, 27.  "The white" refers to a strain of particularly potent sativa marijuana, not to cocaine.  *See* www.wikileaf.com/strain/the-white/.  There is no evidence Mr. Alhaggagi ever bought, or sought to buy, cocaine.

Mr. Alhaggagi even had a borrowed gun for a time, but he never used it in any way other than to impress the UCE and the CHS.[3]  The stumbling block in each of these instances was not a lack of explosives expertise.  It was that Mr. Alhaggagi never intended to do any of it.

### c.  Mr. Alhaggagi's "tests" of the UCE were nothing of the sort

What the government describes as a series of canny tests that Mr. Alhaggagi supposedly put the UCE through were nothing of the sort.

**Test #1: Anwar al-Awlaki.**  The "testing" began with Mr. Alhaggagi "asking pointed questions of the FBI UCE about al-Qaeda," per the government.  Govt. Memo, 21.  Those "pointed" questions were in fact monosyllabic one-liners ("So, what's up with Al Qaeda nowadays, are they still on, or what?") in response to which the UCE provided paragraphs of detailed explication.  Exhibit J, 7814-15.  Mr. Alhaggagi then said Anwar al-Awlaki had a "right-hand man" who was working for the FBI.  The government adds emphasis to its brief where there was none in the conversation, and ascribes great significance to Mr. Alhaggagi "looking directly at the FBI UCE."  Govt. Memo, 21.  One would question the sophistication of a "test" that consists of staring at someone and all but accusing him of working for the FBI, but that is not actually what happened.  Mr. Alhaggagi and the UCE were simply having a conversation, during which Mr. Alhaggagi sometimes looked at the UCE and sometimes looked elsewhere.

**Test #2: "Disdain" for Shiites.**  Mr. Alhaggagi's "next challenge" was to ask the UCE what he thought of the Caliphate.  How exactly this was supposed to reveal the UCE's status is left unexplained, but the government says the UCE blundered in response by praising Iran for preserving its sovereignty against U.S. intrusion.  This was "a critical misstep that raised Mr. Alhaggagi's suspicions," the government submits, because Mr. Alhaggagi harbors a "particular disdain" for Shiite Muslims.  Govt. Memo, 22-23.  This is nonsense.  The government invented

---

[3] The government accuses Mr. Alhaggagi of failing to address his "ability to traffic in firearms" in the PSR.  Govt. Memo, 60.  Mr. Alhaggagi has no such ability.  However, in a meeting after his arrest, he did forthrightly explain to the government exactly where he got the gun that he showed the UCE, and he spoke about it again in his statement to the Probation Officer.

this "disdain" out of whole cloth.  In support, it cites only Mr. Alhaggagi's admission that he trolled ISIS supporters online by falsely claiming Telegram users he was feuding with were Shiites.  *Id.*  In so doing, the government conspicuously omits the fact that Mr. Alhaggagi said he was targeting *Sunnis* in exactly the same manner.  Exh. I, at 65 (Mr. Alhaggagi explaining in a contemporaneous chat with YMN that "I took their identifiers to the Dawa'ish [Sunni ISIS supporters] and told them these are Shiites, block them, and took it [the identifiers] to the Shiites and told them these are Dawa'ish, block them.")  Moreover, Mr. Alhaggagi was raised in Saana, which at the time was an integrated city of Shiite (Zaidi) and Sunni (Sha'afi) Muslims without sectarian tension.  Mr. Alhaggagi's close friends were Zaidi.  *See* Exhibit K (Declaration of Defendant's Sister) (describing that Mr. Alhaggagi was "very sad and mournful" when he recently learned one of his childhood Zaidi friends had died).  Mr. Alhaggagi has no anti-Shiite beliefs.  He is simply an equal opportunity troll.

**Test #3: Ayman al-Zawahiri.**  Mr. Alhaggagi's next "challenge to test the FBI UCE's bona fides" was to ask his opinion of Ayman al-Zawahiri, the leader of al Qaeda.  Govt. Memo, 23.  This is like asking someone posing as an American what she or he thinks of Donald Trump. The government would have the Court believe the FBI sent such a bungler into the field that, even though he was posing as an al Qaeda member, he "did not immediately recognize the name of al Qaeda's highest leader" and thus fell into Mr. Alhaggagi's trap.  *Id.*  This is "nonsense upon stilts."  J. Bentham, Anarchical Fallacies (1843).  The recording shows it was Mr. Alhaggagi's unusual pronunciation that threw the UCE off, not the UCE's ignorance as to his own purported leader.  Mr. Alhaggagi, who is a fast talker, rushed the pronunciation and uses the Arabic "th" sound instead of the normal "z" sound to pronounce Zawahiri.  The exchange was as follows, with Mr. Alhaggagi speaking very quickly:

| | |
|---|---|
| Alhaggagi: | What do you think of uh – Ayman al **Th**ahwahiri? |
| UCE: | Who? |
| Alhaggagi: | Ayman al **Th**ahwahiri?  Ayman al **Th**ahwahiri, he's the leader of Al Qaeda |
| UCE: | How do you say it? |

| | |
|---|---|
| Alhaggagi: | Ayman al **Th**ahwahiri |
| UCE: | You say it so differently from the Afghan |
| Alhaggagi: | How do you guys pronounce it, Ayman al **Z**awahiri? |
| UCE: | Yeah |
| UCE: | You're saying it with a **th**, I'm like – |
| Alhaggagi: | With a **th**, yeah |
| UCE: | **Th, th, th** |

Exh. L.  The UCE then demonstrates that he, of course, knows exactly who al-Zawahiri is, waxing lyrical about how inspiring he is to the "brothers."  Exh. J, 7821.[4]

**Test #4: Mr. Alhaggagi threatens to beat someone up.**  In a "remarkably sophisticated effort by Alhaggagi to test the FBI UCE's bona fides once and for all," Mr. Alhaggagi told the CHS he was going to "beat someone's ass later on today for talking crazy."  Govt. Memo, 28-29. With absolutely no evidence to back up this theory, the government explains that Mr. Alhaggagi was employing a method used by organized crime to "smoke out" law enforcement, citing entirely unrelated testimony from the "Shrimp Boy" case.  What Mr. Alhaggagi was doing was nothing like what happened in the Shrimp Boy case.  There, a criminal was trying to force *the undercover* to commit a crime and thereby reveal himself.  Govt. Memo, 29 n.30.  Here, Mr. Alhaggagi was bragging about *his own* intent to commit a crime.  That was of course exactly what he had been doing throughout his relationship with both the UCE and the CHS – bragging about his intent to commit crimes both real (identity theft) and imagined (terrorist attacks, weapons dealing, cocaine dealing).  There was nothing about this particular boast that would make it – in contrast to all the boasts that had gone before – the "remarkably sophisticated" ploy described by the government.  The real explanation is far simpler.  Mr. Alhaggagi was spouting off, yet again, about criminal plans he never intended to carry out.

[4] ████████████████████████████████████████████████████████████████

**Test #5: Checking for "vague answers."**  Despite claiming Mr. Alhaggagi had already tested the UCE "once and for all" with his plan to beat someone up, the government points to Mr. Alhaggagi's subsequent questions about their planned attack as yet another "test."  Govt. Memo, 34.  Here, Mr. Alhaggagi supposedly was checking to see if the UCE's answers about their getaway plans were "too vague and generalized."  *Id.*  Did the agent pass or fail?  The government does not explain and in fact, nobody can tell.  There is no recording of this meeting.

**Test #6: Mr. Alhaggagi's grandmother.**  The next, apparently (really) "final test" was on August 19, 2016.  Govt. Memo, 35.  At this point, Mr. Alhaggagi had already seen the bomb-making material and had cut off contact, and the UCE was attempting to draw him back in.  Mr. Alhaggagi supposedly "turned the tables on the UCE" by saying he had to visit his grandmother in another city and thus couldn't go to the storage locker with the UCE.  The government says Mr. Alhaggagi deliberately chose "the very same city that the FBI UCE had suggested was his residence" to see if the UCE was willing to meet on his "home turf."  *Id.*  Again, the government has no evidence to support this claim.  Mr. Alhaggagi was simply looking for an excuse not to meet the UCE.  And he chose that particular city because his grandmother, in fact, lives in the area and is, in fact, in poor health.  Exhibit K (Declaration of Mr. Alhaggagi's Sister).

### d.      Mr. Alhaggagi reveals his suspicion to the CHS

After his second meeting with the UCE, Mr. Alhaggagi told the CHS that, when he first met the UCE, he thought he might be an informant.  Exh. E, 7740-41.  According to the government, by this point (August 9), the UCE had already flubbed the "pointed questions" about al Qaeda, had triggered Mr. Alhaggagi's anti-Shiite bigotry, and had betrayed that he does not know the name of his own organization's leader.  Anyone as "savvy" as Mr. Alhaggagi, the "remarkably sophisticated" terrorist schooled in the ways of organized crime, would realize that if the UCE was an agent, then the CHS, who had introduced the UCE and who was in constant contact with him, likely was also suspect.  And yet Mr. Alhaggagi chose to reveal his initial suspicions to none other than the CHS.  Moreover, he told the CHS that what concerned him was the fact that the UCE had been with Al Qaeda – it was not his supposed mispronunciation of

*bayat*,[5] not his answers to the "pointed questions," not his failure to recognize al-Zawahiri, not his praise for Iran. This theory makes no sense, of course. By the time Mr. Alhaggagi told the CHS of his suspicions – if he ever really harbored any – he had long since concluded that the UCE was not a danger to him. The reality is that Mr. Alhaggagi thought that the UCE was an angry man who had lost his job for being a Muslim and was venting by talking about plots and plans with Mr. Alhaggagi. Mr. Alhaggagi, who was indeed fascinated by bombs, guns, devices of war of all kinds, was game to participate – as long as it was just talk.

       **e.**     **Mr. Alhaggagi's actions after supposedly outing the UCE**

       The government claims Mr. Alhaggagi "began to distance himself from the FBI UCE once he began to (correctly) believe that the FBI UCE was not a bombmaker, and was in fact law enforcement." Govt. Memo, 33. Not so. Mr. Alhaggagi continued to meet with the UCE – not just once, but three additional times – *after* the UCE had tipped his hand with "critical missteps" and "red flags." And during those meetings, he freely discussed every detail of his supposed plans, spouting endless abhorrent claims. He boasted about buying strychnine; he described using stolen credit cards, he said he would steal weapons from the police, he explained how he could sneak bombs into nightclubs, he suggested an attack on AT&T park, he made plans to steal a vehicle for a car bomb, he said he would set up a fake modeling agency and stab aspiring models, he asked how cell phone detonators work, he offered to buy all the supplies for a bomb, he planned to rob an armored car, he said he would shoot the officer if they got pulled over while driving, he went into details of his backpack bomb idea, he asked for more information about car bombs, and he suggested getting automatic weapons (Govt. Memo, 24-27) – all in conversations with someone he supposedly knew was a government agent.

       Finally, consider what Mr. Alhaggagi did after the UCE supposedly failed the final "test," when the agent demurred to the suggestion that he meet Mr. Alhaggagi in the city he claimed to be from (the area where Mr. Alhaggagi's elderly grandmother lived). At this point, the

---

[5] The recording reveals that the UCE and Mr. Alhaggagi in fact used the same pronunciation of *bayat*. <u>Exh. N</u>. Mr. Alhaggagi asked the UCE to repeat himself because he did not hear him, not because he said the wrong word.

government says, Mr. Alhaggagi was entirely certain that he had been the target of an extensive undercover operation.  And what did he do?  Flee to Tijuana where his second-hand computer (but not he) had ostensibly made a trip?[6]  Shoot into a crowd, go to downtown Oakland and spread panic, stab models, set fire to the hills, and then commit suicide with the supposed suicide note[7] as his last communication?  No, he went *home* – to the address he had given the FBI agent, where the FBI agent had picked him up in his car, which the FBI had under 24/7 surveillance – and went about his identity theft activities, fabricating fake credit cards, fake IDs and looking into fake passports, ordering himself fancy clothes with the fake and stolen credit cards and intercepting the clothes packages in broad daylight.  Hardly the work of a savvy criminal.

The other thing Mr. Alhaggagi did not do, after hiding at home from the UCE, was seek expertise on bomb-building from "VIP."  Govt. Memo, 46.  The exchange the government is referring to took place in Mr. Alhaggagi's "Samarat Al-Arrabiya" chat, the one he created as a way to gather usernames of girls to flirt with.  And indeed, the chat is full of this sort of behavior, along with Mr. Alhaggagi's usual online inanity.  Dr. Sageman discussed the purported bomb-making excerpt at length in his report, concluding that it was no indication of terrorist tendencies:

> Mr. Alhaggagi explained the alleged conversation about bomb making with VIP
> on this chat group.  This conversation, like so many others in this group, had
> sexual innuendos in Arabic.  It started out talking about sex with a young girl and
> the dangerousness of detonators (referring to their phallic symbolism).  The
> conversation built on this metaphor.  Mr. Alhaggagi challenged VIP to teach him
> to ignite his detonator, referring to masturbation.  In fact, the facetious nature of
> the conversation was punctuated with smiley face emojis and laughter.  YMN
> commented that they were talking about urine and shit.  He also joked that Khaled
> was scared shit by the conversation and had to go to a bathroom.  Then YMN
> teased his friends not to blow up an ice cream cart.  Mr. Alhaggagi reminded
> YMN that it was only a comical and theoretical discussion, and no one had any
> intention to blow up anything.  When they discussed miniature bombs small

---

[6] Mr. Alhaggagi has never been to Mexico, which the government must know.

[7] The note is not a suicide note, but rather a bargaining chip that Mr. Alhaggagi unsuccessfully used to get a bomb manual online, as explained by Dr. Sageman (Exh C., 9) and in the defense sentencing memorandum.  Even on its face, the note is not a suicide note.  It states that Mr. Alhaggagi will die if he is cornered, i.e., as a last resort.  It is not the suicide note of a Jihadi, which features an account of settled debts and an explicit intention to kill oneself for the glory of Allah.

enough to insert in one's rectum, Mr. Alhaggagi found this so hilarious that he
sent 20 smiley face emojis.

Sageman Report, 16.  Only by stripping the conversation of its full context of sexual innuendo
and emoji-laden goofing, and lopping off Mr. Alhaggagi's explicit reminder that he was not
planning on bombing anything, can the government read this as an effort to seek bomb-building
expertise.

Nor is there evidence of Mr. Alhaggagi's continued dangerousness in his other online
activity.  The government is alarmed that he searched for Halloween parties in mid-October
(Govt. Memo, 46-47), but October 31 came and went with Mr. Alhaggagi taking no step in the
direction of an attack.  Nor did he ever purchase sulfuric acid, igniters, electric matches, or
anything else that could have been used for bombmaking.  *See id.* at 46.

## III.    Facts the government ignores

The problem with the government's narrative is not just that it invents facts and is
internally inconsistent.  It also completely omits mention of the facts that the government cannot
reconcile with its narrative.

First, the government omits entirely the contemporaneous evidence demonstrating that
Mr. Alhaggagi's decision to help ISIS supporters by opening social media accounts was not part
of an ideological campaign to commit acts of terror but the outgrowth of a puerile flame war
with other Telegram users.  That does not fit the government's narrative of a canny terrorist who
only moved his activities online in order to escape the FBI sting he unveiled.  Stuck with no
answer, the government simply ignores it.

Second, the government never mentions Dr. Marc Sageman.  Dr. Sageman is a forensic
psychiatrist, a former case manager for the CIA based in Pakistan and India, has served as
terrorism consultant to the Secret Service's National Threat Assessment Center, and has acted as
a special advisor on terrorist threats to the U.S. Army.  He has acted as a consultant on terrorism
to numerous U.S. government agencies, including the National Security Council, the Department
of Homeland Security, the FBI, the Department of Justice, the Department of State, many
branches of Department of Defense and the intelligence community, and the Sandia National

Laboratories, as well as to over twenty foreign governments.  *See* resume attached to <u>Exh. C</u>

(Sageman Report).  As detailed in his many books, he has reviewed discovery in scores of cases

and interviewed hundreds of (actual) terrorists.  *E.g.* Sageman, *Misunderstanding Terrorism*

(University of Pennsylvania Press, 2017).  Dr. Sageman reviewed all the discovery in the case

(including the informant proffers the government now wants to have the Court consider),

conducted an extensive evaluation of Mr. Alhaggagi over many days, and found him to have no

signs of radicalization whatsoever and to be no more dangerous than the average American –

less, in fact, given that he has no history of violence and is "somewhat of a coward."  <u>Exh. C</u>, 46.

His "intellectual and moral development" appear to have been "frozen at an immature stage of

adolescence."  *Id.* at 42.  He demonstrates a "lack of ideological commitment to jihad."  *Id.* at

44-45.  Instead, he is an "immature young man who bragged online about being a dangerous

terrorist to impress gullible young men communicating with him."  *Id.* at 46.  Because Dr.

Sageman is not describing a cunning and savvy terrorist mastermind able to outwit highly trained

FBI agents, the government ignores him.

The government is also silent about the expert evaluation by forensic neuropsychologist

Amanda Gregory.  Dr. Gregory performed a battery of cognitive assessments and determined

Mr. Alhaggagi to be only of average intelligence, with a full-scale IQ of 101 (53rd percentile).

<u>Exh. D</u>, 6.  Notably, she found his insight and judgment are "limited to fair," and his "social

behavior tended to be immature; he liked to joke around and frequently giggled."  *Id.*  Dr.

Gregory also reports that Mr. Alhaggagi interacted with the CHS and UCE, and committed his

offense, at an age where the relative immaturity of his prefrontal cortex left him at "heightened

risk for poor judgment, lack of adequate consideration of potential consequences, impulsive

behavior, and impetuous decision-making."  *Id.* at 11.  All of this is entirely consistent with Mr.

Alhaggagi's being what Dr. Sageman also found him to be – immature, not especially intelligent,

and with poor judgment.  The government cannot square these facts its narrative, so it pretends

they don't exist.

Finally, the government ignores that the people who know Mr. Alhaggagi best – his

friends and members of the community – all describe him as exactly what he was here: an

immature troll whose "constant pranks, jokes and sarcasm . . . continuously made it a challenge for others to take him serious" (Ali Letter, <u>Exh. B</u> at 6), who "sometimes doesn't know when he's crossing the line" (Homza Letter, *id.* at 12-13), and who "simply enjoys the shock of someone thinking he is serious" (Hammad Letter, *id.* at 10).  These descriptions are entirely consistent with the horrific but completely implausible claims Mr. Alhaggagi made about matters large and small, from his ability to source RPGs, to his owning six backpacks, to his cartel connections, to his cocaine trafficking, to his plans to stab models, to his purchase of strychnine, to the $150,000 and a car he had obtained, to the safehouse he had in escrow, to his constant claims about having bought material on the UCE's bomb-making list, to "redefining terror" and causing hundreds of deaths and millions of dollars of damage.  Not a word of it was true, and the government knows it.  But because an over-the-top, trolling liar doesn't have a place in its preferred story, the government pretends none of this evidence even exists.

## IV.   The terrorism enhancement does not apply.

The PSR's guideline calculations are correct.  At an adjusted offense level of 23, with zero criminal history points, Mr. Alhaggagi's guideline range is 46-57 months.  In addition, his conviction for aggravated identity theft carries a two-year mandatory sentence.  The government argues that the Court should impose § 3A1.4's terrorism enhancement.  This would add 12 offense levels and move Mr. Alhaggagi to Criminal History Category VI, increasing the guidelines range more than sixfold, to 292-365 months.  The enhancement does not apply on these facts, and the Court should decline to impose it.

### a.   Legal standard

The terrorism enhancement applies in either of two scenarios: where the defendant's offense of conviction "involved" a federal crime of terrorism or "was intended to promote" one. It provides as follows:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

13

U.S.S.G. § 3A1.4.  The government does not argue that the "intended to promote" prong applies, and the defense agrees.[8]

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the court explained that an offense "involves" a federal crime of terrorism if the defendant "committed, attempted, or conspired to commit a federal crime of terrorism . . ., or his relevant conduct includes such a crime." *Awan*, 313-14.[9]  A "federal crime of terrorism" is a crime that is (a) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (b) one of a list of enumerated offenses, including material support for terrorism. 18 U.S.C. § 2332b(g)(5)(A) and (B).

Thus, the government must prove the defendant "had the specific intent" to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Awan*, 607 F.3d at 317.  The question here is not the defendant's motive, as the government notes. *See* Govt. Memo, 53 ("the defendant's actual motive is 'simply not relevant'") (citing *Awan*).  If a defendant specifically intends to commit an act that he knows will influence government – whether or not he himself is motivated by a desire to influence government – the enhancement can apply.  As *Awan* explained, the statute "does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object." *Awan*, 607 F.3d at

---

[8] Under the "intended to promote" prong, the government would have to prove "which enumerated federal crime of terrorism the defendant intended to promote[.]" *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005); *accord United States v. Fidse*, 862 F.3d 516, 523 (5th Cir. 2017); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001).  The government does not claim Mr. Alhaggagi aided another in committing a federal crime of terrorism, and there is no evidence that he did.

[9] The government argues that Mr. Alhaggagi's verbal "plots" with the UCE were "part and parcel" of his offense conduct of opening social media accounts.  Relevant conduct includes a defendant's acts "only if they occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A) and (B).  The offense of conviction is opening the social media accounts for ISIS supporters, a non-violent offense carried out online, which involved non-violent speech.  The earlier conversations with the UCE and CHS were not part of the opening of accounts, did not in any way constitute preparation for the opening of accounts, and were not done to avoid detection or responsibility for the opening of the accounts.

317. "Thus, a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id.*

### b. The government must prove the applicability of the terrorism enhancement by clear and convincing evidence.

Ordinarily, facts that increase a sentence need only be proven by a preponderance of the evidence. However, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." *United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001) (citing *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir.1999)). In *Jordan,* the Ninth Circuit found error where the district court applied the lower standard to a defendant facing an enhancement that would "more than doubl[e] the length of his sentence." *Jordan*, 256 F.3d at 929; *see also*, *e.g.*, *United States v. Lynch*, 437 F.3d 902, 916 (9th Cir. 2006) ("Since the use of the enhancement in this case increased the sentencing range by 105 to 203 months, the clear and convincing standard applied.").

Here, this single enhancement would increase Mr. Alhaggagi's guidelines sentence by over 20 years, from a low end of 46 months to a low end of 292 months. This 635% jump is "extremely disproportionate" under *Jordan*, and the clear and convincing standard applies. *See United States v. Tankersley*, 537 F.3d 1100, 1106 (9th Cir. 2008) (district court held government to higher standard of proof in seeking the terrorism enhancement); *United States v. Thurston*, CR 06-60069 AA, 2007 WL 1500176, at *19 (D.Or. May 21, 2007) (same).

### c. The government's theory on the terrorism enhancement has no factual support.

Despite noting that "the defendant's motive is 'simply not relevant,'" the government in arguing for the application of the enhancement has combed through the discovery to find precisely that – evidence it claims reveals Mr. Alhaggagi's motives. The government has lighted on a far-fetched theory hinging on two isolated posts in a chat forum. This theory is as follows.

Mr. Alhaggagi's Telegram account included a chat called "Allah is with those who endure," which was replete with pro-ISIS users expressing "hatred and violence towards the United States."  Govt. Memo, 53.  (The government does not suggest Mr. Alhaggagi ever expressed such a sentiment, nor did he.)  A user on this chat ("Migration Commando") posted a message exhorting readers to "kindle strife and chaos" through racist Tweets; another user ("Publisher") posted a similar message days later.  *Id.* at 53-54.  According to the government, Mr. Alhaggagi saw these posts and then opened the accounts, thereby demonstrating that his actions were politically motivated.  "The timing of these posts and the defendant's subsequent actions is inescapable," the government contends.  *Id.* at 54.

There is nothing inescapable about this theory.  Mr. Alhaggagi was not inspired to open social media accounts by Migration Commando or Publisher, for two reasons.  First, there is no evidence Mr. Alhaggagi ever saw these posts.  But even if he did, he had already opened accounts before the posts were even made.

First, the suggestion that Mr. Alhaggagi saw the messages is conjecture.  Mr. Alhaggagi never mentions them (or their authors) in any of his voluminous chats.  He was not active in the "Allah is with those who endure" chat at or around the time they were posted on November 11.  He participated in that forum on November 9, but then not again until November 14.[10]  Over 900 messages were posted in the interim.  To suggest that Mr. Alhaggagi read every message posted by every user on this forum – even leaving aside the thousands of messages posted on all the other forums preserved on his phone – is beyond speculative.  It is no more plausible than claiming a newspaper subscriber read every article in every edition of the paper over a five-day period.

But more fundamentally, the government's theory holds no water because Mr. Alhaggagi had *already opened accounts* by the time Migration Commando and Publisher posted their

---

[10] On November 14, when Mr. Alhaggagi returned to the "Allah is with those who endure" channel, he did so seeking aid in his endless feuds with other users.  His posts asks "People bombard me with stickers may Allah reward you so the ban on me is lifted."  His account has been blocked again, and he is asking for other users to send him private messages.  Doing so, he believes, will tell the Telegram system that his account is legitimate and should be reinstated.

messages.  The government attempts to obscure the timeline by first describing the November 14 Muharib chats (Govt. Memo, 38) and only then recounting Mr. Alhaggagi's interactions with Bank Al Ansar (*id.* at 43).  The fact is, however, that the chat with Al Ansar, during which Mr. Alhaggagi opened the first accounts, took place on October 31, 2016 – nearly two weeks *before* Migration Commando's post.  Mr. Alhaggagi clearly was not motivated by messages posted after he had already initiated the offense conduct.  Whatever the motivations of "Migration Commando" or "Publisher" may have been, those goals cannot be ascribed to Mr. Alhaggagi (nor, for that matter, to Al Ansar or Muharib, the users who asked Mr. Alhaggagi to open the accounts).

### d.   Mr. Alhaggagi's opening of social media accounts was not calculated to affect government by intimidation or coercion.

Even if its facts were right, the government's legal theory is wrong.  The enhancement applies only if the government can show Mr. Alhaggagi "had the specific intent . . . to commit an offense that was calculated to influence of affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Awan*, 607 F.3d at 317.  The government must therefore prove by clear and convincing evidence that (1) the act of opening social media accounts was calculated to have such an effect, and (2) Mr. Alhaggagi knew it.  *See id.* at 317-18 (noting that the enhancement could apply "if the evidence showed Mr. Awan engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India[.]"); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014) ("A defendant has the requisite intent if he or she acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind.").[11]

---

[11] It should go without saying – but, given the government's arguments based on sentiments expressed by unknown persons in the "Allah is with those who endure" forum (Govt. Memo, 53 n.36), it cannot – that the enhancement does not lie if someone unrelated to Mr. Alhaggagi sought to improperly influence the conduct of a government.  *See United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009) (noting that "the problem for the government remains: there is no evidence that Yousry himself sought to influence or affect the conduct of a government" and rejecting an argument that the enhancement should apply because the defendant's coconspirators had the requisite intent).

1    The government claims that we find ourselves in the heartland of § 3A1.4 cases, so much

2   so that failing to impose the sixfold increase "would render the enhancement meaningless."

3   Govt. Memo, 51.  But, tellingly, the government cannot point to a single case where any court

4   has applied the enhancement to facts remotely similar to those at bar.  It cites in passing only

5   *United States v. Yassin*, where, it says, the enhancement was applied to a defendant "charged

6   with making threats on social media on behalf of ISIL."  Memo, 52.  *Yassin* bears only the most

7   superficial similarity to Mr. Alhaggagi's case – in that social media were involved – which is

8   presumably why the government omits any further discussion of its facts.  The defendant in

9   *Yassin* did not merely issue threats on social media, she issued threats *specifically targeting*

10   *federal employees*, in which she included personal identifying information with instructions that

11   "I leave these details online to cause havoc in his life & for my brothers and Al-Qaeda in the

12   U.S. to eventually hunt him down & kill him."  *Yassin*, WDMO case CR 16-3024 MDH, Docket

13   125, 4-5 (government sentencing memo).  It is hardly surprising, then, that all parties in *Yassin*

14   agreed the targets were "official victims" (triggering an enhancement under § 3A1.2) and that the

15   defendant's actions were calculated to affect government conduct (meriting the terrorism

16   enhancement).  Indeed, courts frequently look to the choice of target in determining whether a

17   defendant had the specific intent to influence government conduct.  *E.g.*, *United States v. Dye*,

18   538 Fed. App'x 654, 666 (6th Cir. 2013) (defendant's firebombing a courthouse created a

19   "natural inference . . . that [he] sought to disrupt the functions of the court he was to appear

20   before or to retaliate against the institution for the charges pending against him"); *United States*

21   *v. Banol-Ramos*, 566 Fed.Appx. 40, 43 (2d Cir. 2014) (defendant FARC member was "aware of

22   FARC's goal of overthrowing the Colombian government" and participated in "hostage-taking

23   of Panamanian police"); *United States v. Abu Khatallah*, 314 F.Supp.3d 179, 198-99 (D.D.C.

24   2018) (attacks on U.S. Special Mission in Benghazi and a nearby intelligence facility); *In re*

25   *Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 153 (2d Cir. 2008) (attacks on

26   US embassies); *United States v. Tubbs*, 290 Fed.Appx. 66, 68 (9th Cir. 2008) (attack on federal

27   ranger station).

28

In this case, however, even assuming the "target" of a social media campaign is equivalent to the target of a bomb attack or a hostage-taking (which it is not), there was no target known to or contemplated by Mr. Alhaggagi from which one can infer the necessary intent to affect government conduct.  Mr. Alhaggagi opened accounts for ISIS sympathizers, and it can be safely presumed that he understood they would be used (if at all) to spread information sympathetic to ISIS.  But he did not know they would be used to influence government conduct by coercion or intimidation.  As *Awan* makes clear, the government must prove such knowledge for the enhancement to apply, but the facts show the opposite: Mr. Alhaggagi told Muharib he knew nothing about the social media campaign Muharib was planning (Govt. Memo, 42), and the accounts were in any event not used to improperly influence the conduct of government.  The messages they disseminated were not calls to violence or efforts to disrupt government operations, they were battlefield news[12] and generic exhortations in praise of ISIS.  (The government carefully selected only a single message to attach to its brief.  *See* Govt. Exh. 6.  The remaining messages are described in the defense memo at pages 23-24).

Moreover, for the enhancement to apply, the opening of accounts would have to be calculated not just to affect a government but to affect it through "intimidation or coercion." There is no element of either in anything Mr. Alhaggagi said about the accounts, or for that matter in anything Muharib posted with them.

Because it can point to no evidence that the opening of social media accounts was calculated to have the requisite effect, the prosecution turns to arguing that Mr. Alhaggagi was personally motivated to influence government.  Govt. Memo, 56.  It has picked through the discovery to support this theory, but all it could find was a solitary exchange with the CHS in which Mr. Alhaggagi suggested they threaten the Saudis in exchange for the release of "our

---

[12] The government accuses the Probation Office of a "factual mischaracterization" when it states that Muharib "disseminate[d] news," because, it says, it was ISIS propaganda and not news. Govt Memo, 55.  But even a propaganda machine can disseminate news, and that is what Muharib did here, by sending out information that included updates on the battle of Mosul.  In any event, what the government cannot quibble with is the fact that none of the messages was aimed at influencing government conduct.

scholars." *Id.* This comment was made months before Mr. Alhaggagi opened any accounts, and is unrelated to the offense conduct. Even assuming this exchange revealed that Mr. Alhaggagi had some personal desire to affect the conduct of the Saudi government (which he did not), it tells the Court nothing about whether *the opening of social media accounts* was "calculated, i.e., planned – for whatever reason or motive – to" influence government conduct. *See Awan*, 607 F.3d at 317 ("Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object."). There is nothing Mr. Alhaggagi said that can help the government meet its burden.[13]

The government's final argument – the "most important[]" one, it says – is that the enhancement has to apply because Mr. Alhaggagi attempted to support ISIS, an organization whose "raison d'etre" is to establish a caliphate. Govt. Memo, 56. This is no different than saying the enhancement automatically applies because this is a terrorism offense. It does not. The plain language of the statute makes clear that one must commit an enumerated offense *and* that the offense must be calculated to improperly influence a government. 18 U.S.C. §

---

[13] This is not to say that a defendant's words are always irrelevant. On the contrary, courts frequently look to a defendant's statements to ascertain whether an offense was calculated to have the requisite effect on government. But, because the focus of § 3A1.4 is the offense, not the defendant, the statements that matter are those that shed light *on the offense conduct. See, e.g.*, *United States v. McDavid*, 396 Fed.Appx. 365, 372 (9th Cir. 2010) ("[T]he district court noted that the group had discussed a number of different ways to disrupt the government and the economy, that the object of the conspiracy was federal facilities, and that McDavid had clearly expressed his goals and objectives in disrupting the government."); *United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004) (defendant "admitted he was planning to blow up electrical sites and then demand the release of Muslim prisoners and changes to the U.S. Middle East policy"); *United States v. Haipe*, 769 F.3d 1189, 1193 (DC Cir. 2014) (hostage-taker "inform[ed] a government official that [he would] release hostages on the condition that an official commit to specified policy changes"); *United States v. Thomas*, 521 Fed. Appx. 741, 743 (11th Cir. 2013) (defendant admitted "that he obtained explosives 'to assault federal agents' and 'for the purpose of attacking federal employees and buildings'"); *United States v. Van Haften*, 881 F.3d 543, 544 (7th Cir. 2018) (defendant's statements "persuaded the district court that [he] sought to join ISIS, at least in part, because he wanted to 'retaliate against the government for its treatment of Muslims in general and specifically for its treatment of [him] as a designated sex offender.'"). At no point did Mr. Alhaggagi say anything to indicate that in opening social media accounts his intent was to coerce or intimidate a government.

2332b(g)(5); *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) (rejecting the notion "that the enhancement automatically applies to a material support conviction"). The lengthy chain of causation the government draws in its effort to link Mr. Alhaggagi's actions to an effect on government only underscores the extent of its overreach here. Opening social media accounts is calculated to exert coercion and intimidation on a government, it claims, because opening accounts is necessary for using social media, social media is one way ISIS spreads propaganda, spreading propaganda helps ISIS attract followers, attracting followers is necessary for recruiting soldiers, and soldiers fight governments that oppose the establishment of a caliphate. Govt. Memo, 56. This reasoning is far too attenuated to demonstrate the specific intent required by law. *See United States v. Shehadeh*, CR 10-1020, 2013 WL 6049001, at *2 (E.D.N.Y. Nov. 14, 2013) ("This argument succeeds at inflaming passion but fails at law[.] . . . [W]hile Shehadeh's attempt to join the Army for malevolent purposes was real, his conduct in doing so was simply too remote from an attack on American soldiers abroad to qualify as conduct warranting the § 3A1.4 enhancement.").

    In short, there is no evidence that Mr. Alhaggagi's opening of Twitter accounts was calculated to influence a government. He acted without being told what the accounts would be used for, and they ultimately were not used in any effort to intimidate, coerce, or retaliate against a government entity. His acts were criminal, and they constituted attempted material support of ISIS. But they did not involve a federal crime of terror, and the enhancement does not apply.

    **e.      Even if the enhancement could apply, the Court should reject it.**

    Finally, even if the enhancement could somehow be read to apply, the Court should exercise its discretion and decline to impose the draconian sentence that would result. *Spears v. United States*, 555 U.S. 261, 264 (2009) (courts may vary from guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

    As courts have repeatedly recognized, "the terrorism enhancement takes a wrecking ball to [the] carefully constructed edifice" of the Sentencing Guidelines. Brown, *Punishing Terrorists*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014). The court in *United States v. Jumaev*,

2018 WL 3490886, CR 12-00033 JLK (D. Colo. July 18, 2018), in refusing to apply the

enhancement, concisely summarized the problems with this guideline.  First, like the crack-

powder disparity that was the subject of the *Kimbrough* decision, the terrorism enhancement "is

not backed by any empirical evidence."  *Jumaev*, 2018 WL 3490886 at *10; *see*, *e.g.*,

McLoughlin, *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law &

Ineq. 51, 115 (2010) ("[W]hen U.S.S.G. [§] 3A1.4 was adopted, the number of the anti-terrorism

cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon

which to build a reliable Guideline.").

Second, as Judge Kane wrote, "treating all 'terrorists' alike is impermissible under our

sentencing paradigm."  *Jumaev*, 2018 WL 3490886 at *10; *see also*, *e.g.*, *United States v.

Ressam*, 679 F.3d 1069, 1106 (9th Cir. 2012) (Schroeder, J., dissenting) ("The majority's

implicit assumption that terrorism is different, and must be treated differently, thus flies in the

face of the congressionally sanctioned structure of sentencing that applies to terrorism as well as

all other kinds of federal criminal offenses.").

In short, § 3A1.4 "represents bad anti-terrorism policy for several reasons":

> First, the Guideline increases a defendant's Criminal History Category to a level
> VI – the most culpable.  The shift to Criminal History Category VI ensures that a
> defendant will be sentenced as if he or she were a career criminal, with no
> empirical evidence that this is true or fair (under the considerations contemplated
> in 18 U.S.C. § 3553).  Second, the Guideline automatically and uniformly
> increases a defendant's offense level, ensuring a defendant will be sentenced as if
> his or her offenses are among the most serious offenses addressed by the
> Sentencing Guidelines, regardless of where the offense level fits on the spectrum
> of "material support."  For example, U.S.S.G. section 3A1.4 punishes the
> defendant who sends $500 to the social services arm of a DFTO, such as
> Hezbollah or Hamas, the same as the defendant who attempts to bomb the United
> Nations, or who provides weapons of mass destruction to al Qaeda.

McLoughlin, *supra*, 28 Law & Ineq. at 57-58.  The Court should sentence Mr. Alhaggagi

without respect to the enhancement.

## V.    The government's recommended sentence is unreasonable

The government seeks a sentence of 33 years.  As a "guidepost to avoid unnecessary

sentencing disparities," it points to Ahmed Ressam.  Govt. Memo, 57.  Because the only real

difference is that "Ressam was closer to completing an actual attack than the defendant here," the government says, Mr. Alhaggagi should receive comparable punishment. *Id.* at 58.

What Mr. Alhaggagi did is well known at this point. He spent weeks saying abominable things to the CHS and UCE, never took a step towards acting on any of them, ran away when the UCE showed him bomb-making material. Months later he opened Twitter accounts at the request of two ISIS supporters, thereby providing *de minimis* assistance in a social media/propaganda campaign. (ISIS had 7,000 social media accounts under its control at the time, *see* Govt. Exh. 8, of which Mr. Alhaggagi had opened fewer than ten.) This, the government says, merits 33 years in prison.

What did Mr. Ressam do to warrant the same punishment? Since the government decided not to tell the Court, here are the facts of his case. An Algerian national, he was jailed for arms trafficking to terrorists, traveled to France on a false passport, was deported to Morocco, and then arrived in Canada on another false passport. *United States v. Ressam*, 679 F.3d 1069, 1072 (9th Cir. 2012). By the time Canadian authorities issued a warrant for his arrest, he was in a terrorist training camp in Afghanistan. *Id.* Over the next several years, under the guidance of Abu Zubeida,[14] he attended numerous camps and received extensive training in "light weapons (handguns, machine guns, and rocket launchers), the making of explosive devices (including TNT, C4 plastic explosives, and black plastic explosives), sabotage, the selection of targets, urban warfare, tactics (including assassinations), security, and the use of poisons and poisonous gas." *Id.* He joined a terror cell "charged with carrying out an operation against a target in the United States – an airport or a consulate – before the end of 1999" and returned to Canada under a false name, bringing with him chemicals used for explosives and bomb-making instructions. *Id.* at 1073. When the other members of his cell were unable to join him due to immigration problems, he decided to go it alone and chose LAX as his target. *Id.* He and an accomplice plotted a bank robbery to obtain funds for the operation, obtaining a handgun and grenades for

---

[14] Zubeida (also spelled Zubayda) was a top lieutenant to Osama bin Laden said to have played an important role in the 1998 attacks on U.S. embassies in Tanzania and Kenya, which killed over 200 people.

the purpose. *Id.* He built a bomb in Vancouver, hid it in his car, and tried to enter the United States on yet another false passport. *Id.* He was stopped at the border, fled on foot, attempted a carjacking, and was finally apprehended. *Id.* The device he had built was "capable of producing a blast forty times greater than that of a devastating car bomb." *Id.* As the government notes, he then "cooperated, at least briefly, with the government, and his cooperation led to at least to some convictions; however, he later recanted many of his statements, undermining prosecutions of other individuals." Govt. Memo, 58.

Mr. Ressam was sentenced to 37 years. That is only four years more than the government thinks is reasonable for Mr. Alhaggagi – a man with no criminal history (much less a conviction for trafficking arms to terrorists), who has never illegally entered a country (much less several), who has never traveled or attempted to travel to join any terrorist organization, who has never attended a terrorist training camp, who did not work closely with bin Laden's second-in-command, who has never received instruction in machine guns, rocket launchers, explosives, urban warfare, assassination, or the use of poisons, who did not join a terror cell, who did not plot a bank robbery, who does not know the first thing about making explosives, who never possessed any bomb-making materials, who did not *build a huge bomb*, who did not even attempt a carjacking. All those differences, in the government's eyes, amount to *four years' worth* of prison time.

The government's recommendation is unreasonable. It is vastly out of proportion to the nature and circumstances of the offense, and it does not take Mr. Alhaggagi's personal history and characteristics into account at all. The government makes no serious effort to justify its recommendation by reference to any other sentence in any comparable case, and it would create vast and unwarranted disparity between Mr. Alhaggagi and others convicted of the same crime on exponentially more serious facts. The Court should impose the sentence recommended by Probation.

## IV.   Conclusion

The government's complex, contorted narrative is an artful pastiche of invention and omission, but as is so often the case, it is the simpler answer that actually fits the facts – all the

facts, including everything the government wishes to ignore.  Mr. Alhaggagi was a trash talker who got caught up in despicable roleplay.  He did not know the UCE was an agent, but neither did he believe him to be a real terrorist.  "I did not really think he was in Al Qaeda I thought he was a wannabe who liked to talk big and was maybe pissed off for losing his job."  Alhaggagi Statement, 3.  At no point did Mr. Alhaggagi take a single step to carry out the plans he had revealed to the UCE and CHS – he did not buy strychnine, he did not make "any purchases consistent with the [bombmaking] list" (Govt. Memo, 33), he did not try to buy RPGs, he did not procure a stolen car for car bombs, he did not find a safehouse (much less place one in escrow), he did not collect money, he did not get gasoline ▮▮▮▮▮ for arson, he did not set up a fake modeling agency, he did not contact his "boys" about weapons, nothing.  *See id.* at 35 ("Agents conducting round-the-clock surveillance on Alhaggagi knew that he had not made any purchase of any attack-related supplies.")  And he ran away not because he had successfully unmasked the UCE but because he saw the bomb-making material and was, finally, scared into his senses.  "It only hit me that moment that I've been talking to these people for too long and had no idea what I've gotten myself into and now I'm kinda freaked out."  *Id.*

Not only does this explanation fit all the facts of Mr. Alhaggagi's interactions with the CHS and the UCE, but it also fits the facts the government so pointedly ignores – the juvenile discussion of sex through bomb metaphors, the opinions of Dr. Sageman and Dr. Gregory, and the contemporaneous evidence of Mr. Alhaggagi's trolling of ISIS supporters.  It also ignores the statements to the Court about Mr. Alhaggagi from his many friends, family members and the people to whom he has given a helping hand.  Despite his notoriety and the broad publication of all the vile things that he has said, Mr. Alhaggagi retains the dedicated support of his family and the community that knows him best.  Perhaps this is the most remarkable indication of Mr. Alhaggagi's true nature.  He is a popular despite it all, a well-loved young man whose immature impulsiveness and need to brag about his "badass" ways got so far out of hand that he stands convicted of a terrorism offense and will deal with the consequences of that for the rest of his life.  A four year sentence, which has already featured some eighteen months of isolation, is a fitting punishment for what he has done.

The defense respectfully requests that the Court impose the sentence recommended by the Probation Officer.

Dated: December 10, 2018                    Respectfully submitted,

                                            _____/s/_____
                                            Mary McNamara
                                            August Gugelmann
                                            SWANSON & McNAMARA LLP
                                            Attorneys for Amer Alhaggagi