ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

S. WAQAR HASIB (CABN 234818)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      FAX: (415) 436-6982
      waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-17-0387-CRB-1 |
| Plaintiff, | UNITED STATES' REPLY TO DEFENDANT'S SENTENCING MEMORANDUM |
| v. | |
| AMER SINAN ALHAGGAGI, | |
| Defendant. | |

The government, having reviewed the defendant's sentencing memorandum, hereby files this reply.

The overarching theme of the defendant's plea for leniency is that all of his actions were a joke, a lark, and that he should never have been taken seriously. These explanations are patently false. Apparently, having engaged in fraud and deception as a means of survival for virtually his entire adult life, the defendant now seeks to do the same before this Court. He will say anything to hide from the Court what he truly is: a violent threat to the community, whose imagination and appetite for evil knows no bounds.

Particularly deceptive is the narrative pressed by the defendant that he is a peaceful person who,

1   as one of his acquaintances wrote, would not hurt a fly.  Def. Sentencing Memorandum Exhibit B at pg.

2   13.  This description is entirely incompatible with the materials recovered on the defendant's electronic

3   devices.  For example, as described in the government's sentencing memorandum, when the defendant's

4   residence was searched, agents seized a 64 GB microSD card from a camera that the defendant's brother

5   was apparently trying to remove from the scene of the search.  Gov. Sentencing Memorandum at pg. 36.

6   On the SD card was, among other things, a copy of issue number 8 of ISIS's Dabiq Magazine.  This

7   "magazine" is universally recognized as an official tool of ISIL's propaganda machine.  *See Fields v.*

8   *Twitter*, 881 F.3d 739, 741 (9th Cir. 2018)(noting that ISIL claimed responsibility for killing two

9   American nationals by publishing a statement in an issue of its magazine, Dabiq); *see also* "The

10  Apocalyptic Magazine the Islamic State Uses To Recruit And Radicalize Foreigners," by Terrence

11  McCoy, *Washington Post*, September 16, 2014, available at

12  https://www.washingtonpost.com/news/morning-mix/wp/2014/09/16/the-apocalyptic-magazine-the-

13  islamic-state-uses-to-recruit-and-radicalize-foreigners/?utm_term=.079c61ad48c3 (last accessed

14  December 10, 2018).

15       Issue Number 8, found on the defendant's SD card, is particularly vile, grotesque, and

16  reprehensible.  Among other things, it features a full-page photograph of an armed child soldier in

17  camouflage, holding a pistol in one hand.  At the child's feet is a dead man with a bloodied face who

18  appears to have been shot in the head, presumably executed by the child soldier.  The caption on the

19  photograph reads "The Lions of Tomorrow."[1]  The description to the photograph explains "as the

20  *mujahidin* of the Islamic State continue their march against the forces of *kufr* [non-believers of Islam]

21  there is a new generation waiting in the wings."  The description goes on to say that "it is these young

22  lions[2] to whom the Islamic State recently handed over two agents caught spying for Russian Intelligence

23  and an agent caught spying for the Israeli Mossad, to be executed and displayed as an example to

24  anyone else thinking of infiltrating the mujahidin."  A full copy of Issue 8 of Dabiq is attached as sealed

25  Exhibit 1 to this reply.  Perhaps not surprisingly, the defendant did not mention his possession of this

26

27       [1] It should be noted that one of the online handles that ALHAGGAGI used to identify himself on
    encrypted messaging applications was قَسْوَرَة, which loosely translates as "lion."

28       [2] See fn. 1, *supra* – one of ALHAGGAGI's online handles was an Arabic word for "lion".

"magazine" in his statement to the Court, in his statements to Probation, or in his statements to the defense experts who interviewed him.

Particularly telling is the fact that agents recovered the copy of this "magazine" not on the defendant's telephone, or computer, or any of the devices on which he admits using encrypted messaging applications, but on a removable SD card. That means that even if one were to believe ALHAGGAGI's nonsensical story that he unwittingly downloaded ISIS materials by mistake when he used encrypted messaging applications[3], a story that is incredulous on its face,[4] he cannot possibly have then accidentally saved a copy of Dabiq on the SD card. More alarming is what *else* was found on that SD card, along with Issue 8 of Dabiq: ALHAGGAGI's suicide note, in which he described in detail the multiple attacks he wanted to carry out in the Bay Area. See Gov. Sentencing Memo. At pg. 36-37.

This brings the government to the explanation the defendant provided to defense experts about that suicide note, an explanation that would be laughable, if not for the fact that the attacks ALHAGGAGI contemplated in his suicide note are so horrific. According to defense expert Dr. Marc, Sageman ALHAGGAGI told him that "one time, on a chat group sympathetic to the Islamic State, *out of curiosity*, [ALHAGGAGI] asked how to make bombs." Def. Exhibit C, Sageman Report at pg. 9 (emphasis added). That statement, in and of itself, could hardly be more ridiculous. Imagine a defendant coming before this Court and saying, "one time, on a chat group sympathetic to al-Qaeda, *out of curiosity*, I asked how to hijack an airplane," or "one time, on a chat group sympathetic to Timothy McVeigh and the Oklahoma City bombers, *out of curiosity*, I asked how to blow up a federal building." Nonetheless, ALHAGGAGI's deceit continued. ALHAGGAGI explained to Sageman that after being

---

[3] *See, e.g.*, Def. Exhibit C, Sageman Report, at pg. 9 (suggesting that ALHAGGAGI accessed a Telegram channel called "Science of Explosives," causing an ISIS bomb-making manual to be "automatically" downloaded to his computer. *See also* Def. Exhibit C, Sageman Report at Pg. 15, suggesting that ALHAGGAGI was "surprised" that due to a default feature on Telegram ALHAGGAGI had inadvertently downloaded thousands of *jihadi* propaganda materials.

[4] The defendant goes to great lengths in his statement to the Court and his statements to defense experts to explain how encrypted messaging applications work, describing how he used some of their most complex features and functions. He then turns around and suggests he had no idea that encrypted messaging applications were "automatically" downloading vast quantities of ISIS materials. The fact that he presents himself alternatively as both an expert on encrypted messaging applications and a complete novice is further proof that the defendant will say anything, truthful or not, to this Court to bolster his plea for leniency.

introduced through several different people, he encountered a "person" online who could give

ALHAGGAGI the bomb manual he sought, but only if ALHAGGAGI explained how he was going to

use it.  The "person" then asked ALHAGGAGI to write a statement, which ALHAGGAGI did.  Def.

Exhibit C, Sageman Report at pg. 9.  Missing in the defendant's explanation is the obvious, critical, and

deeply troubling inference: the "person" to whom ALHAGGAGI was not someone working for the

government; instead, it was *an actual member of ISIS, from whom ALHAGGAGI had just knowingly and*

*willingly requested instructions on how to make a bomb*.[5]

ALHAGGAGI's lies to his defense experts continued.  Dr. Sageman writes that

"[ALHAGGAGI] knew that strychnine was a rodent poison… [but] the talk about strychnine was just to

impress his interlocutor and he never made any attempt to procure it."  *Id*.  This was a bald-faced lie.

Included in the government's sentencing memorandum is a screenshot of a conversation that

ALHAGGAGI had with someone on the website Alibaba.com, in which ALHAGGAGI was attempting

to procure strychnine.  *See* Gov. Sentencing Memo, Exhibit 1 at pg. 82, Bates US-007632

Still, ALHAGGAGI's lies to his defense experts continued.  Dr. Sageman writes that the suicide

note "did not satisfy the person [i.e., the ISIS operative ALHAGGAGI was talking to]," who "asked Mr.

Alhaggagi to make a video pledging baya [allegiance, in Arabic] to the Islamic State.  Mr. Alhaggagi

had no desire to do so, stopped talking to this individual, and never got the manual."  This was a lie.

The manual was recovered from ALHAGGAGI's electronic devices.  It was attached as sealed Exhibit 3

to the Government's Sentencing Memorandum.

The suicide note, and ALHAGGAGI's incredulous explanation for it, highlights the absurdity of

his narrative that this was all just a misinterpreted bad joke.  If ALHAGGAGI was truly joking about

causing mass murder and destruction in San Francisco, why write a suicide note?  What possible

---

[5] This leads to yet another distortion of the truth that ALHAGGAGI wants this Court to adopt – that this was some sort of FBI "sting" operation, led by a wily undercover agent seeking to ensnare an unsuspecting youth.  Def. Sentencing Memorandum at pg. 2.  This is false.  The FBI began its investigation into ALHAGGAGI only after learning that ALHAGGAGI had made threats to attack the Bay Area, and boasted of having obtained a bomb manual from the "brothers" in ISIS, which, in fact, he had.  That the FBI was able not only to identify ALHAGGAGI so quickly after his first nightclub bombing threats, but to successfully insert an undercover agent to thwart his plans was not an "elaborate sting operation" – it was outstanding police work.

1   purpose could the note serve if he were truly just an online prankster?  And why preserve it, on an SD

2   card no less, separate and apart from the rest of his electronic devices?  There is no credible explanation,

3   other than that ALHAGGAGI was seriously contemplating carrying out the attacks he wrote about.

4          Then there is the matter of firearms.  If ALHAGGAGI was just a playful online troll, as he

5   would have this Court believe, why carry a gun, and why take it to meet the FBI UCE?  Interestingly,

6   lost in ALHAGGAGI's tortured explanation for how he temporarily borrowed the gun from a friend is

7   the fact that agents were able to identify the gun's serial number and trace it.  (Recall that

8   ALHAGGAGI sent a picture of the same gun to the FBI Source and then exclaimed to the FBI Source,

9   "this is gonna be for the mini missions.  Ima put a silencer on it…. Man I'mn gonna kill half of the ppl

10  on my neighborhood just because."  Exhibit 1 to Gov. Sentencing Memorandum at pg. 181, Bates US-

11  007731.  Unbeknownst to ALHAGGAGI, agents were able to identify a serial number from that

12  photograph).   Agents determined that the gun is registered neither to ALHAGGAGI, nor to anyone he

13  has identified as a friend.  Rather, the gun was purchased by an unrelated individual in Indiana who

14  appears to have no connection whatsoever to ALHAGGAGI.  ALHAGGAGI's ability to obtain this gun

15  was, and remains, deeply troubling to investigating agents – if he could, as he bragged, obtain firearms

16  at will, then there is no telling what other, *more* dangerous weapons he may be able obtain, particularly

17  given his ability to steal identities.

18         While on the topic of stolen identities, if ALHAGGAGI's story is to be believed, why did he

19  have a telephone subscribed in a false name?  Why did he have a California driver's license bearing his

20  photograph but the name of another?  If he were just an online troll, he would have no use for either.

21  Moreover, his explanation for how he came to engage in identity theft is entirely unbelievable.  He

22  claims to the Court that he simply took credit card information from customers at a Boost Mobile store

23  where he worked.  Def. Sentencing Memorandum Exhibit A at pg. 1.  With this explanation, he is

24  concealing from this Court the true depth of his identity theft conduct.  In fact, as the government

25  described in its sentencing memorandum, ALHAGGAGI's electronic devices revealed, among other

26  things, that he was perusing webpages where credit card information was being traded, and blank

27  passports and driver's licenses were on offer.  Gov. Sentencing Memorandum at pg. 47-48.

28

1    ALHAGGAGI also offers no explanation whatsoever for how he ended up with not just a fake credit

2    card but what appeared to be a legitimate California identification for Victim #1.  Notably, Victim #1's

3    credit card statements show no activity at any Boost Mobile stores prior to Victim #1 reporting

4    fraudulent activity on his/her card.  In other words, ALHAGGAGI is lying about to the Court about how

5    he obtained false credit cards, and has provided no explanation whatsoever as to how he obtained false

6    identifications.

7         Perhaps most troubling, ALHAGGAGI minimizes his description of his conduct on encrypted

8    messaging applications.  If he is to believed, his activity was limited to simply reporting some encrypted

9    messaging application users for abuse, and responding to reports of abuse by other users, and then

10   opening a few social media and email accounts for people who were by chance members of ISIS.  He

11   makes no mention of the fact that, among other things, he posted instructions on encrypted messaging

12   applications on how to make napalm and chloroform.  Alarmingly, he posted these instructions shortly

13   after posting the text of a letter apparently from the Oakland Police Department, apparently bragging to

14   his online community, many of whom were ISIS members, that he had been selected to interview for a

15   position as a "cyber security specialist."  Sealed Exhibit 2.  (Recall that one of the ways agents were able

16   to identify ALHAGGAGI in the first place was that he boasted to the FBI Source that he had recently

17   applied for a job with a local police department, so that he would have greater access to weapons.  Gov.

18   Sentencing Memorandum at pg. 11-12.)  The instruction ALHAGGAGI posted on making chloroform

19   specifically noted the size of doses that would be necessary to kill humans.  Moreover, among the many,

20   many videos in ALHAGGAGI's feeds on encrypted messaging applications, agents followed links for

21   two in particular – one led to what appeared to be a training video for online ISIL supporters to assist in

22   practice for cyber operations, online anonymization, use of Proxy servers, and tips and tricks for using

23   TOR, Orbot, Twitter, and VPNs to disguise one's online persona.  Exhibit 3.  The other led to a video of

24   a man whose face was hidden by a black hood, giving a lesson in Arabic in front of a whiteboard on

25   what appeared to be the explosive qualities of nitric acid, among other things.  Sealed Exhibit 4, Exhibit

26   5. In short, ALHAGGAGI's online activities were not those of a peaceful man who would never hurt a

27   fly.  They were the activities of a man obsessed with finding ways to cause mass death and destruction.

28

U.S. REPLY TO DEF. SENTENCING MEMORANDUM
CR-17-0387-1 CRB

Finally, the government reiterates that the Probation Office and the defense have plainly miscalculated the applicable guidelines.  There can be no doubt whatsoever that the terrorism enhancement in U.S.S.G. § 3A1.4 applies in this case, given the nature not only of the charged conduct, i.e. opening social media and communications accounts online on behalf of ISIL, but also the relevant conduct, i.e., the multiple attacks ALHAGGAGI contemplated committing around the Bay Area in the name of ISIL, before suspecting that the FBI UCE was a law enforcement officer.  The defendant does not cite to, and the government has not been able to identify, a single case with even somewhat similar facts where the enhancement was *not* applied.  To the contrary, it appears that in virtually every case in which a defendant has been convicted of 18 U.S.C. § 2339b, courts have applied the terrorism enhancement.  If the Court were to fail to do so here, it would be sailing deep into unchartered territory.  Notably, even the case cited by the defendant, *United States v. Natsheh*, applied the terrorism enhancement, arriving at an offense level 37 and a Criminal History Category of VI.  Sentencing Transcript, pg. 3, Docket No. 26, July 24, 2017, in *United States v. Natsheh*, Cr-16-0166-RS.

Speaking of *Natsheh*, the defendant's sentencing memorandum points out precisely why *Natsheh* is entirely inapposite.  The defendant boldly claims that he "rejected the opportunity to engage in a violent act."  But that is plainly not true.  It is precisely *because* he wanted the opportunity to engage in a violent act that this whole case started.  But for ALHAGGAGI describing to the FBI Source online his vile plans to bomb gay nightclubs, light fires in residential areas of the Berkeley Hills, and lay backpack bombs around crowded areas of San Francisco and Oakland, he may never have shown up on the FBI's radar.  Moreover, the defendant in his sentencing memorandum makes the bizarre argument that a "traveler" who is leaving the United States to join a terrorist organization is less dangerous and deserves less of a sentence than someone seeking to engage in terrorism inside the United States.  This makes no sense whatsoever.  Comparing ALHAGGAGI to the so-called "traveler" cases is comparing apples to oranges.  ALHAGGAGI's scenario is far more dangerous.

A more compelling starting point is a recent case in the Eastern District of California, *United States v. Jameson*, 18-CR-00001-LJO.  There, the defendant was approached by undercover agents to carry out an attack on San Francisco's Pier 39 over the holiday season.  The defendant pled guilty and

was sentenced to 15 years.  The facts against ALHAGGAGI are far more damning, though.  For starters, in the *Jameson* case, there is no evidence that the defendant ever had any actual contact with members of ISIS.  Rather, he was simply approached by undercover agents after having "liked" some pro-ISIS Facebook pages.  Plea Agreement, Docket No. 22, June 4, 2018, in *United States v. Jameson*, CR-18-00001-LJO.  In other words, the *Jameson* case involved precisely the type of "sting" operation criticized by the defendant, yet he still got 15 years.  In comparison, in this case, ALHAGGAGI had apparently significant online contact with *actual* ISIL members, obtaining a bomb manual from them.  Add onto that the fact that the attacks he plotted were particularly heinous, such as planting bomb at a gay nightclub in San Francisco, and then identifying routes that first responders would take to respond to victims, to kill them too.  After suspecting (correctly) that his overly cautious, paranoid bombmaker was in fact an undercover agent, ALHAGGAGI went *back* online to reconnect with people from ISIL, this time successfully helping them to open social media and communications accounts.  ALHAGGAGI even contemplated leaving the United States after any attacks he committed, to join ISIL in Syria, perhaps stopping in Dubai on the way to conduct another attack.  On top of all of this, ALHAGGAGI engaged in constant identity theft.  In other words, ALHAGGAGI's conduct far, far exceeded that of the defendant in *Jameson*.

Then, there is the post-arrest conduct.  The defendant in his sentencing memorandum seems offended that the government bothered to notify Probation of the existence of its jailhouse informants (there were two, not one, as the defendant suggests) and the substance of the information they provided about ALHAGGAGI's statements while in custody.  Indeed, the defense asks the Court to strike the information entirely from its consideration, implying that it was wrong for the government to alert Probation and the Court of it.  With respect, had the government failed to bring this information to light, it would likely have been guilty of gross incompetence in representing its client, not to mention a failure of duty of candor to the Court.  The Court would be well within its discretion to deny the defendant any acceptance of responsibility based on the informants' information.  See Application Note 3 to U.S.S.G. 3E1.1 (noting that evidence of acceptance of responsibility may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.")  Having now read and digested

the defendant's explanations for his conduct, and having outlined the multiple lies that he told to Probation, his defense experts, and now this Court, the government remains firmly convinced that the defendant's acceptance of responsibility is anything but genuine.

       For all of the reasons discussed above, and for the reasons set forth in the government sentencing memorandum, the government calculates the guideline range at 360-564 months, and recommends a mid-range guideline sentence of 396 months, followed by life on supervised release, a low-end fine of $50,000, restitution in the amount of $5,273.10, forfeiture, and a special assessment of $400.

DATED: December 10, 2018               Respectfully submitted,

                                       ALEX G. TSE
                                       Acting United States Attorney

                                       _____/s/_____
                                       S. WAQAR HASIB
                                       Assistant United States Attorney

**<u>EXHIBIT 1</u>**

**<u>FILED UNDER SEAL</u>**

**<u>EXHIBIT 2</u>**

**<u>FILED UNDER SEAL</u>**

**EXHIBIT 3**

DECLASSIFIED BY: NSICG F85M26K45
ON 11-17-2017

FD-302 (Rev. 5-8-10)

This redacted version only

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    01/05/2017

On 01/05/2017, Special Agent (SA) Matt Kotowski asked SA Greg Wuthrich to assist in reviewing and capturing a video posted online in regards to the ALHAGGAGI investigation. SA Kotowski, while reviewing ALHAGGAGI's phone, and in particular, in his encrypted ███████ chats inside the phone found the following URL link:

https://█████████████████████

SA Kotowski also provided the following links, which when viewed all still were active links and all reflected back to the same video which was already collected from the first provided link:

https:/█████████████
https:/█████████████
https:/█████████████

**ONLINE ACTIVITY**

On 01/05/2017, SA Greg Wuthrich logged onto a unattributable computer and reviewed the aforementioned link(s). As of 2:55pm EST, the links were still active, and SA Wuthrich saved the video for evidentiary value.

The video appears to be a training video for online ISIL supporters to assist in practice for cyber Operational Security (OPSEC), online anonymization, Proxy server information, and online safety practices. It appears to show tips and tricks for TOR, Orbot, Twitter, and VPN usage.

The video shows clips of US military, President Obama, FBI Evidence Recovery working in Atlanta, and ISIL propaganda videos towards the last few minutes.

| | | |
|---|---|---|
| Investigation on | 01/05/2017 | at | Oakland, California, United States (, Other (To document the online activities for 01/05/2017)) |

File # ██████████████████                        Date drafted 01/05/2017

by   Gregory P. Wuthrich

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

General Discovery Materials
Subject to Protective Order

**<u>EXHIBIT 4</u>**


**<u>FILED UNDER SEAL</u>**

**<u>EXHIBIT 5</u>**

