Mary McNamara, SBN 147131
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant
AMER ALHAGGAGI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  CR 17-0387 CRB |
| Plaintiff, | **SUR-REPLY TO GOVERNMENT SENTENCING MEMORANDUM** |
| vs. | |
| AMER SINAN ALHAGGAGI, | |
| Defendant. | |

As is abundantly clear, the government has a fundamentally different view of Mr. Alhaggagi's character and intentions than either the defense or Probation, contending that he is a sophisticated and committed terrorist who was determined to actually carry out an attack.  In the main, the parties have agreed on what the facts are, even though they offer dramatically different interpretations of what those facts signify.  However, the government's reply sentencing memorandum contains several claims that are incorrect.  This sur-reply corrects those points.

Second, the government's reply memorandum discusses, for the first time, the case of *United States v. Jameson*, which it now claims demonstrates the reasonableness of its sentencing recommendation. The *Jameson* case is readily distinguishable.

Finally, this sur-reply discusses the informant discovery upon which the government is relying.

### I.    Factual inaccuracies in the government reply memorandum

####    1. Bomb manual

The government claims that Mr. Alhaggagi lied about getting bomb-making manuals. In fact, Mr. Ahaggagi openly admitted his curiosity about bomb-making and that he sought out manuals. This was the reason he created the "Abu Harb Al-Yamany" document, (which the government incorrectly labels a "suicide note"): As Mr. Alhaggagi explained to Dr. Sageman (and Dr. Sageman recounted in his report), he was curious about bomb-making and asked for information about how to make bombs; he was told by someone online that he would have to first provide a report on his plans; and he wrote the "Abu Harb" document for that reason. The document clearly states that it is a "report," which is an odd thing to call it if it is meant as a suicide note. His online contact wanted him to swear bayat, however, which Mr. Alhaggagi did not do and thus did not "earn" any bomb-making instructions at that time. He did later receive a bomb-making manual from an ISIS site. Mr. Alhaggagi's curiosity about bomb-making, chloroform, napalm, and ISIS is evident throughout his online output and were fully considered by Dr. Sageman. None of it is criminal. Nor, in the context of someone who never takes a step to acquire these materials, does it signify much other than curiosity.

The government accuses Mr. Alhaggagi of hiding the fact that the person to whom he made the bomb manual request "was not someone working for the government; instead, it was *an actual member of ISIS*." Govt. Reply, 4 (emphasis in the original). Mr. Alhaggagi forthrightly told Dr. Sageman that he made the request "on a chat group sympathetic to the Islamic State," and a person responded. Sageman Report, 9.

2. <u>Identity theft</u>

Next, the government accuses Mr. Alhaggagi of "concealing from this Court the true depth of his identity theft conduct." Govt. Reply, 5. This is not true either. He has explained in detail the types of fraud he committed, including revealing facts that the government did not know, i.e., that he caused losses far in excess of the $5,273 the government is seeking in restitution.

> Mr. Alhaggagi started engaging in identity theft and credit card duplication after graduation. A person taught him how to do it. He bought a reader and writer to copy credit cards' magnetic stripes. He also got a skimmer which he plugged into a computer and connected to the reader and writer. With this equipment, he was able to manufacture new credit cards from blanks. With them, he bought food, clothing, jewelry, and gas. He did not have a car himself but had access to a friend's car. His fraudulent career was intermittent: he would do it for two to three months and then stop. He estimated that he did this for about a year and stole about $5,000 to $10,000 in merchandise. He then progressed to online credit card fraud. He took pictures of the front and back of credit cards and use them for online purchases. He used this method exclusively to buy clothes, and he estimated that he totaled about $20,000 in clothes at the very most.

Sageman Report, 7. Mr. Alhaggagi also expressed remorse for his identity theft in his statement to the Court. Alhaggagi Statement at 1.

3. <u>Spreading information on napalm and chloroform to ISIS</u>

The government's reply memorandum accuses Mr. Alhaggagi of spreading information on napalm and chloroform to ISIS members. Govt. Reply, 6. This is a misunderstanding of the Telegram discovery. Although Mr. Alhaggagi's Telegram activity did include posts about napalm and chloroform, just as it did bomb-making, those were private messages that he sent to himself, i.e. chats between his "Barud" handle on the ZTE phone and his "Zain" handle on the Samsung phone. Mr. Alhaggagi never posted on these subjects in any forum accessible to anyone else. Nor did he "brag[] to his online community" about his application to work at the Oakland Police department. *Id.* That post to which the government is referring was also a private chat between "Barud" and "Zain," not a communication with anyone else.

**II.     The government's sentencing recommendation**

In support of its request for a 33-year sentence, the government previously pointed as a "guidepost" to the case of Ahmed Ressam, the Millennium LAX Bomber, arguing that Mr.

Alhaggagi should receive comparable punishment for comparable conduct.  Govt. Memo, 57. For the first time on reply – perhaps now recognizing that Ressam's history and offense conduct were exponentially more serious than Mr. Alhaggagi's – the government points to a different case, *United States v. Jameson.*  Govt. Reply, 7.  But this comparison does not fare much better.

The *Jameson* case involved an 11(c)(1)(C) plea to a 15-year sentence agreed to by the defense.  The defense filed no sentencing memorandum, indicating a lack of mitigating information to present to the court.  Here, there is a wealth of mitigating evidence, including contemporaneous documentation that Mr. Alhaggagi was trolling ISIS members online, compelling testimonials from Mr. Alhaggagi's friends and family that his words in this case match his juvenile and misguided sense of humor, and the opinion of the foremost radicalization expert in the country that Mr. Alhaggagi is not radicalized or dangerous.

Moreover, the facts in *Jameson* are readily distinguishable.  Jameson was a trained Marine sharpshooter, experienced with both the M-16 and AK-47 rifle; Mr. Alhaggagi has no military training or experience.  It was Jameson who apparently secured a facility to store bomb-making material, who gave the undercover instructions on bomb-making, and who told the undercover what components were needed; Mr. Alhaggagi did none of those things and did not follow the UCE's orders when told what supplies to purchase.  Jameson distributed material relating to destructive devices; Mr. Alhaggagi did not.  Jameson executed a last will and testament shortly before the date of his planned attack; Mr. Alhaggagi did not (and what the government describes as a "suicide note" was not).  The undercover in *Jameson* tried to dissuade him from his plans on three separate occasions, but Mr. Jameson persevered; the UCE in this case actively encouraged Mr. Alhaggagi's plans.  Most importantly, Jameson was a self-proclaimed radical who openly told law enforcement after his arrest that he supported ISIS and would be happy if an attack was carried out.  Agents searching his house found no evidence of credit card scams and identity theft but two rifles, one handgun, a receipt for the recent purchase of a firearm, several magazines of ammunition as well as empty magazines, and cylindrical fireworks.  In short, Jameson was a committed radical who had taken concrete steps to put an attack plan into action.  Mr. Alhaggagi is not and did not.  And even so, the government thinks

Mr. Alhaggagi deserves more than twice the punishment it agreed was appropriate for Jameson. The government's recommendation is unreasonable.

### III. Informant information

The defense is not "offended" that the government has brought the informant material before the Court (Govt. Reply Memo, 8); it is, however, concerned about the manner in which the government has done so.  In breach of the local rules, the government presented this material only after issuance of the Probation Officer's draft report, thus depriving both the Probation Office and the defense of an opportunity to address it.  Having elected not to make it part of its presentation to the Probation Officer, the government then complained (without any legal basis) that Mr. Alhaggagi should be denied acceptance points for not discussing it himself.

In addition, and of more concern, the government has notified the defense that it will not call these witnesses, although the law provides that informant information may not be presented at sentencing without live testimony.  The Ninth Circuit has repeatedly held that informants must be subject to cross-examination in order for their allegations to be considered at sentencing.  *See*, *e.g. United States v. McGowan*, 668 F.3d 601, 608 (9th Cir. 2012); *United States v. Corral*, 172 F.3d 714, 715 (9th Cir.1999); *United States v. Hanna*, 49 F.3d 572 (9th Cir. 1995); *United States v. Kerr*, 876 F.2d 1440, 1446 (9th Cir.1989).  The informants in this case both have extensive criminal histories.  The one who makes the most serious claims against Mr. Alhaggagi committed crimes of dishonesty shortly after being released from supervised release (on the same day as his last interview with the government against Mr. Alhaggagi).  He is also a long time drug abuser who suffers from mental instability.  The government's refusal to expose him and the other informant to cross examination requires striking of the material from the PSR and the Court's declining to consider it at sentencing.

Dated: December 12, 2018                         Respectfully submitted,

                                                                              /s/
                                                    Mary McNamara
                                                    August Gugelmann
                                                    SWANSON & McNAMARA LLP
                                                    Attorneys for Amer Alhaggagi