Volume 1

Pages 1 - 209

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )    NO. CR 17-00387 CRB
                                  )
AMER SINAN ALHAGGAGI,             )
                                  )
          Defendant.              )
_____ )

San Francisco, California
Monday, December 17, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

        ALEX G. TSE
        United States Attorney
        450 Golden Gate Avenue
        San Francisco, California  94102
    BY: **S. WAQAR HASIB**
        **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:

        SWANSON & MCNAMARA LLP
        300 Montgomery Street - Suite 1100
        San Francisco, California  94104
    BY: **MARY MCNAMARA**
        **AUGUST GUGELMANN**
        **ATTORNEYS AT LAW**

Also Present:      **Special Agent David Peacock, FBI**
              **Catheryn Grier, U.S. Probation**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

## <u>I N D E X</u>

Monday, December 17, 2018 - Volume 1

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **SAGEMAN, MARC** | | |
| (SWORN) | 25 | 1 |
| Direct Examination by Mr. Gugelmann | 26 | 1 |
| Cross-Examination by Mr. Hasib | 121 | 1 |
| Redirect Examination by Mr. Gugelmann | 193 | 1 |
| Recross-Examination by Mr. Hasib | 197 | 1 |

## <u>E X H I B I T S</u>

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1 | 137 | | 1 |
| 2 | | 139 | 1 |
| 3 | 178 | 196 | 1 |

## <u>E X H I B I T S</u>

| **HEARING EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1 | 45 | 46 | 1 |
| 2 | 65 | | 1 |

PROCEEDINGS

| | |
|---|---|
| 1 | <u>Monday - December 17, 2018</u>                              <u>9:34 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Calling Criminal Action CR 17-0387, U.S.A. |
| 5 | versus Amer Sinan Alhaggagi. |
| 6 | **MR. HASIB:**  Good morning, Your Honor.  Waqar Hasib for |
| 7 | the United States; and just for the Court's information, seated |
| 8 | with me at counsel's table is Special Agent David Peacock of |
| 9 | the FBI. |
| 10 | **THE COURT:**  All right.  Good morning. |
| 11 | **MS. McNAMARA:**  Good morning, Your Honor.  Mary |
| 12 | McNamara for Mr. Alhaggagi, who is before you in custody. |
| 13 | **MR. GUGELMANN:**  Good morning, Your Honor.  Alex |
| 14 | Gugelmann also for Mr. Alhaggagi. |
| 15 | **THE COURT:**  So this is the time set for sentencing |
| 16 | and, of course, the Court has received about a foot of filings |
| 17 | in connection with sentencing; and the way I'd like to proceed |
| 18 | is I understand there's going to be testimony, and so I'd like |
| 19 | to hear the testimony first and then address the guideline |
| 20 | issues, and then after that address nonguideline issues.  We'll |
| 21 | just see where we go from there. |
| 22 | Obviously the guideline issues turn, I think almost |
| 23 | exclusively, on the question of whether the 12-level |
| 24 | enhancement is appropriate in connection with an act of |
| 25 | terrorism, and I'd like -- the Government has filed an |

**PROCEEDINGS**

1    objection to the Presentence Report on that issue and thinks it

2    should be included -- or should be applied in this case.

3        There are two aspects of the terrorism.  One dealing

4    with -- and actually the parties have sort of dealt with the

5    first part.  Let me get it.

6                     (Pause in proceedings.)

7        THE COURT:  It's 3A1.4 is the guideline issue, and the

8    question is whether the offense was calculated to influence or

9    affect the conduct of government by intimidation or coercion;

10   and that's been addressed, I think, by the parties.

11       But there's a second part, "or to retaliate against

12   government conduct."  And why that's interesting to the Court

13   is that given the offense of conviction, given the defendant's

14   plea in which he stated that he put people in touch with the

15   ISIS websites -- I'm talking generally; I'm sure there was some

16   imprecision -- whether that would or would not be an act of

17   terrorism in that ISIS is committed to attacking -- I don't

18   know what the right word here is -- or defeating or impairing

19   the United States in connection with its purposes in ensuring

20   peace in connection with global activities.

21       That's not precise, but I'm trying to see whether does it

22   fit within Category I, does it fit within Category II, because

23   it must fit in one or the other in order for the 12-level

24   enhancement to be applied.

25       And obviously the 12-level enhancement, in terms of

**PROCEEDINGS**

1    sentencing, makes a big difference, not only in terms of the

2    offense level but in terms of criminal history.

3         And so I would also like some discussion about whether,

4    notwithstanding the guideline, which would put him in Criminal

5    History Category VI, he should be considered for a departure

6    because his criminal history is overstated by putting him in

7    Category VI when, in fact, absent that, he would be in Criminal

8    History Category I.

9         So it's sort of a double punishment.  And does it address

10   the real issues of criminal history?  You know, is there

11   evidence of -- putting it another way, let me just say this.

12        Criminal history is a very good, not perfect, indicator of

13   a likelihood of recidivism; that is, committing another crime.

14   It's perhaps the most reliable indicator that the Sentencing

15   Commission has found over time to predict behavior in the

16   future; and we have found with some exceptions, but very few

17   exceptions, that the higher the criminal history, the greater

18   the likelihood is of future dangerousness or recidivism.

19        So then you have a guideline that comes along and says,

20   "Look, if he commits this type of act, we're just going to put

21   him in Criminal History Category VI."  And the question is:  Is

22   there any evidence to support that other than the guideline

23   itself which requires it?

24        Because logically if a person commits a terrible offense,

25   you then give an offense level which reflects that awful

**PROCEEDINGS**

1  offense, and that's exactly what's done with every other

2  offense.  That's why terrorism is very high and why shoplifting

3  or some smaller offense is low, is because of the dangerousness

4  of the offense.

5       But then to come along and say it's dangerous and so we

6  give it a very high offense level and, by the way, we give a

7  Criminal History Category up to VI, the question is, of course:

8  What evidence is there to suggest that the criminal history of

9  somebody who commits this offense should be put at the highest

10  level?  There may be evidence, there may not.  I don't know.

11  That's something that we need to discuss.

12       Okay.  So this is going to be a little bit lengthy, I

13  apologize for that, but it's a serious matter.  And it's not

14  just serious for -- obviously it's serious for the defendant.

15  Every criminal sentencing is serious for the defendant.  But

16  it's also serious because a sentence of this type for these

17  offenses is particularly significant as both a general

18  deterrence and a specific deterrence, which under 3553(a) of

19  factors that the Court must consider, that is one of the

20  factors.

21       So the question is:  Somebody who does something of the

22  type of which the defendant has pled guilty, what message does

23  one send?  This Court is always concerned about, quote,

24  "sending messages" because that's not necessarily the role of a

25  Court.  The Court is to give an individualized sentence.

**PROCEEDINGS**

1      But, on the other hand, it's naive to believe that a case

2  that has a certain degree of notoriety, which this one does,

3  would not inform the judgment of other people who are subjected

4  to the criminal justice system or who live in this country what

5  penalties are associated with this type of behavior.  So I'm

6  mindful of that.  I think it's a serious job.

7      It does fall to every district judge to participate in

8  this system.  While it's difficult, it is important and is

9  significant, and I don't mean to elevate the role of the

10  judiciary, but it does fall to judges to try to make these very

11  human and difficult decisions.  So I want to take some time and

12  I want to give both sides the opportunity to present anything

13  they want in connection with these particular issues.  So if it

14  takes longer than today, it takes longer than today, and I

15  don't feel anybody should feel the press of time to try to go

16  forward on this.  Okay?

17      All right.  So with that, how do you want to proceed?  Do

18  you have some agreement, or what will be the easiest way to

19  proceed?

20      **MR. HASIB:**  Your Honor, may I have a moment just to

21  talk with counsel for a second?

22      **THE COURT:**  Of course.  Okay.

23      And, Mr. Alhaggagi, if you'd like to be seated, you may.

24  You don't have to stand through this.

25      **THE DEFENDANT:**  Thank you, Your Honor.

PROCEEDINGS

1          **MR. HASIB:**  Your Honor, I think the outline that the

2    Court has presented makes ample sense given the significance of

3    this case.  I think it makes sense to hear from -- the one

4    witness who's going to be presented today I think is a Defense

5    expert, Dr. Marc Sageman.

6          Before that happens, though, I think there's one issue

7    that the parties would like to take up because it may impact --

8    certainly it will impact my cross-examination of Dr. Sageman,

9    and that is the issue of some information provided by jailhouse

10   informants.

11         This was described with some generalization.  I did not go

12   into any substance of the nature of the allegations from the

13   informants in the Government's sentencing memorandum, and that

14   was largely by design.

15         Counsel and I had spoken beforehand about the information

16   that these informants had provided about Mr. Alhaggagi's

17   conduct post-arrest.  Counsel who's -- frankly, her judgment I

18   appreciate it greatly and when she said she was very worried

19   that I would put these allegations out in public proceedings in

20   a sentencing memorandum, I took that to heart.  So that's why

21   in our sentencing memorandum I didn't describe them in any

22   detail.  I simply said "We have stuff that happened

23   post-arrest."  And the Court has seen the allegations because

24   they were filed under seal.

25         So I think before we go forward with Dr. Sageman's

**PROCEEDINGS**

1    testimony, I know Ms. McNamara would certainly like to be heard

2    about whether that information post-arrest from the jailhouse

3    ought to be something that's heard.

4         **THE COURT:**  Okay.  Well, let me -- I can give you some

5    tentative thoughts or --

6         **MS. McNAMARA:**  Thank you.

7         **THE COURT:**  -- I can listen to what you have to say.

8         **MS. McNAMARA:**  Please.

9         **THE COURT:**  Okay.  First of all, I think that it's

10   relevant for two reasons.  Number one, it supports the

11   Government's position that the defendant is not entitled to a

12   third point for acceptance of responsibility; that is to say,

13   whether in the normal course a third point is given when a

14   defendant pleads guilty.  It's not in this case.  And I think

15   in part, as I understood it, the justification -- not that the

16   Government needs a particular justification.  I don't know what

17   it is because it's a motion that has to be made by the

18   Government in any event.  The Court can't do it.  Defense

19   counsel can't do it.  But I don't think the Government can act

20   arbitrarily in that manner.  Nevertheless, it does support the

21   Government's position that a third point is not warranted.

22        I don't know, Ms. McNamara, whether you want to take the

23   position that it is warranted; that is, the Government should

24   have made the motion, that it's arbitrary, and we would have to

25   adjudicate that.  But I took that as some significance -- some

**PROCEEDINGS**

1    justification for not doing it.

2        Secondly, I think it does go to the issue of future

3    dangerousness.  That is to say, it is the Government's position

4    that the defendant is dangerous as demonstrated by his

5    activities post-arrest.

6        I guess was it post-plea or post-arrest?

7        **MS. McNAMARA:**  Post-arrest.

8        **MR. HASIB:**  It was post-arrest, pre-plea.

9        **THE COURT:**  Pre-plea.  Okay.  So to that extent I

10   think it's relevant.

11       Now, I understand that the argument is that that

12   information about the post-arrest conduct is of questionable

13   reliability.  So I don't know at this point, and I have to hear

14   from counsel, to what end -- what would we accomplish by having

15   a hearing on that, an airing of that?

16       I understand the Government's position is that there are

17   some sensitive matters; is that correct?  Maybe it's the

18   Defense position as well.  I don't know whether that's true,

19   but I haven't thought it all through so I have to see how

20   significant it appears.

21       I don't -- at this point I think I have to know more about

22   what the other justifications are for the Government's position

23   that the defendant is dangerous to make that judgment because

24   it's a piece.  Is it a small piece?  Is it they say, "Well,

25   look, we normally wouldn't think he's so dangerous except for

1    this"?

2        And only Government counsel can make that determination

3    based upon how you view the entirety of the case so I leave

4    that to you.  But it is something that the Court would consider

5    if the Government thinks it's of such significance that I ought

6    to take it into account.

7        Ms. McNamara?

8        **MS. McNAMARA:**  Thank you, Your Honor.  I appreciate

9    the Court's thoughts.

10       Let me turn to the issue of future dangerousness.  If the

11   Court puts any weight on these allegations at all -- and we

12   have moved to strike them in their entirety from the PSR and

13   from the Court's consideration -- the Government simply has to

14   call these people.  This is the time for sentencing.  The case

15   law is very clear that if you've got informant testimony, it's

16   got to be presented.  The indicia of reliability have to be

17   there unless the actual informant comes in and testifies.

18       And the Government's view is the indicia of reliability

19   are present because -- and we're really talking about mainly

20   one informant who I believe is known to the Court.  We'll call

21   him Informant Number 1.

22       Informant Number 1 knew that our client had a Gmail

23   address and knew what it was, and he also knew that our client

24   was proficient or skilled in using the online application

25   Telegram, which is at the heart of the case.

**PROCEEDINGS**

1       Those two things don't go to the rather sensational

2   allegations Informant Number 1 makes about a subsequent action.

3   They simply verify that he knew something about our client's

4   case.  And, indeed, we have no dispute about that.  He did it.

5       Our client consulted him as a jailhouse lawyer.  Informant

6   Number 1 is in his 50s.  Our client at the time was 21.  Our

7   client was new to the jail.  He had just been arrested.  He had

8   been presented with a Plea Agreement that asked him to adopt

9   certain enhancements that are before the court today -- namely,

10  the terrorism enhancement -- and in that context our client

11  reaches out to this jailhouse informant.

12      Our client did write a letter as is described by Informant

13  Number 1.  The contents of the letter are misrepresented in our

14  view, but certainly our client gave Informant Number 1 through

15  that letter the e-mail address, and he knew -- Informant

16  Number 1 knew all about the allegations against our client.

17      So to suggest that the mere possession of the e-mail

18  address and Informant Number 1's knowledge that our client was

19  proficient in Telegram says nothing other than that our client

20  told him about what he was in for.

21      And, by the way, our client was notorious in the jail.  He

22  went by the moniker, according to the other inmates, "The

23  Terrorist," although he never called himself that.

24      So that is why this is of such concern.  We have said to

25  the Government in advance, weeks in advance, "Please call these

 1    informants.  We want to cross-examine them and so that the

 2    Court can have a full airing of how reliable these informants

 3    are."

 4         Informant Number 1, in reference to the Court's earlier

 5    remarks about criminal history, has a Criminal History

 6    Category VI, the highest criminal history category under the

 7    guidelines.  He's a repeat recidivist.  He got a benefit as a

 8    result of his cooperation here against our client; and the

 9    benefit, while it may not appear to be a large one, was to him

10    a large one because it excused him from further supervision by

11    the court, which was very inconvenient to Informant Number 1

12    because he couldn't keep a straight record on supervision.  He

13    was repeatedly not giving his probation officer his address.

14    He flunked out of drug treatment.  He didn't even report to

15    drug treatment.  He went AWOL on numerous occasions.  Those are

16    important benefits to Informant Number 1.

17         Informant Number 2, also criminal history got a 5K

18    departure of two levels, which was significant for him in

19    sentencing.

20         Both of these men got benefits, and there were no indicia

21    of reliability other than their intrinsic statements that the

22    Court can rely on here.

23         The law in that circumstance is clear.  The *McGowan* case,

24    which we have cited to the Court, says in a case that had far

25    more indicia of reliability than either one of these gentlemen,

**PROCEEDINGS**

1   where an informant was subjected to cross-examination under

2   oath in a separate proceeding that was connected to

3   Mr. McGowan's case, the Court rejected reliance on that at

4   sentencing because Mr. Seevers, the informant, had a motivation

5   to lie, although there's nothing in the record about what

6   benefit he received; he was not subjected to cross-examination

7   in the proceeding; and his indicia of reliability went far

8   further than either of these two gentlemen.  Mr. Seevers knew

9   where Mr. McGowan lived, he knew his address, and he could

10  describe his home and, yet, the Court said that proves nothing

11  other than he knows where he lives.

12      So in that case the *McGowan* court refused to rely on

13  Seevers, the informant, to say that Mr. McGowan had done

14  methamphetamines with him and imported them into the jail.

15      I can't think of how that can be squared here in a case

16  where we've set aside a full day for argument where the

17  Government has refused to call either of these gentlemen and

18  where I can tell the Court both of them are incarcerated at

19  institutions that are readily available and accessible to the

20  Government.

21      In terms of the third point, of course the Court's

22  correct.  I can't move the Court nor can the Court sort of

23  *sua sponte* award the third point to our client here, but that's

24  different from the Government's relying on this very

25  late-submitted informant testimony to deny it.

**PROCEEDINGS**

1       And I just want to underline to the Court the

2  circumstances for how this all came up.  These informants gave

3  their stories to the Government a year and a half ago.  The

4  Government produced the discovery that it has submitted to the

5  Court almost at the same time.

6       When it came time for sentencing and submission to the

7  Probation Department, the Government gave a very detailed, very

8  well-written narrative of the offense, and it included not

9  just, of course, the ISIS Telegram behavior, it also included

10  all of the terrible things our client said to the undercover

11  agent and the confidential informant, everything about his

12  lifestyle, everything about the identity theft.  It went on for

13  pages and pages and, yet, not a single clause in that multipage

14  statement reflected this information about either one of the

15  informants.

16       And the Government produced 4,000 pages of discovery to

17  the Probation Office.  Embedded in that was this material.  It

18  was not called out to the probation officer.  We did not call

19  it out to the probation officer in response because we assumed

20  the Government simply thought these guys were unreliable.

21       Our client didn't speak about it at his interview.  The

22  probation officer had no chance to do any due diligence on it,

23  neither did we.  And after the draft Presentence Report comes

24  out, now the Government says this is extraordinarily important

25  and the Court must certainly rely on it to deny it, just not

**PROCEEDINGS**

1  the third point, but the entirety of the acceptance of

2  responsibility, and argues that our client is dangerous on the

3  basis of it.

4       That's just not how the game is played, and here the Court

5  has to hear from these individuals if they're going to be

6  relied on.

7       So the Government is late.  They didn't follow proper

8  procedure.  The Court should strike it.

9            **THE COURT:**  Well, here we go.  The real issue -- I

10  think that -- I think Ms. McNamara is correct as to the

11  procedure.  That is to say, under 6A1.3, if it is a factor that

12  is important to the Court's sentencing, it has to have

13  sufficient indicia of reliability to support its probable

14  accuracy.  That's what 6A1.3 provides.  So that's a correct

15  statement of the law, and I would -- I don't want to be

16  reversed on not following the law.  I have to follow the law

17  obviously.

18       So I think -- but I think the judgments remain with the

19  Government; that is, you either want me to consider it or you

20  don't.  And if you do, for what purpose?  And once the

21  Government makes those elections, then we know how to proceed.

22       You know, I don't think you -- you can wait on that a bit

23  because I want to hear from the -- well, I want to hear from

24  the witness who came out here this morning, but I think that's

25  one of the points to address and I'll leave it up to you how

**PROCEEDINGS**

1    you want to address it.

2        In other words, I don't -- I'm not asking you now to say,

3    "Look, we want you to consider it" or "We don't want you to

4    consider it."  "We believe it to be reliable."  "We don't need

5    a hearing."  "We do need a hearing."  I think we do need a

6    hearing if I'm to consider it.  That's the Defense point.

7              **MR. HASIB:**  That is the Defense point.  That is not

8    the Government's point obviously.  I think 18 U.S.C. 3661 is

9    crystal clear.  The Court can --

10             **THE COURT:**  Wait a minute.

11             **MR. HASIB:**  Sure.

12                       (Pause in proceedings.)

13             **THE COURT:**  I always like to hear that something's

14   crystal clear.  It hasn't been my experience --

15             **MR. HASIB:**  It's not always the case in Title 18,

16   Your Honor, but this one is pretty clear.

17             **THE COURT:**  Okay.  This one's clear.

18             **MR. HASIB:**  3661, Use of Information for Sentencing.

19             **THE COURT:**  No limitation, right.

20       Okay.  So -- oh, well, this just says I can consider -- I

21   consider any evidence, any information.  It doesn't even say

22   "evidence."  It says "information concerning background,

23   character, and conduct of a person convicted of an offense may

24   receive and consider for the purpose of imposing an appropriate

25   sentence."

**PROCEEDINGS**

1      The issue here, though, as I -- so that may suggest,

2   because it's nice and clear, that I consider everything.  On

3   the other hand, we have 6A1.3 which says if there is a factor

4   important to the sentencing determination, then if it's in

5   dispute, the Court can hold a hearing in order to determine

6   whether it's reliable.

7      So I think that that's the balance I would suggest,

8   otherwise you would never have -- there would be no 6A1.3.

9   You'd just say, "Well, look, Judge, isn't it information?"

10  "Oh, yeah, it's information."  "Well, that's it.  Submitted."

11     So I don't think it's of the type that I wouldn't consider

12  it; that is, I think it does relate to the issues that I've

13  identified, whether one is doing it for the third point or one

14  is just doing it on the more important point of future

15  dangerousness, but I leave that up to you.

16     **MR. HASIB:**  I agree wholeheartedly with 6A1.3 and

17  really the only limitation on what this Court can hear at

18  sentencing is:  Is there some degree of reliability to it?

19     And with respect to Ms. McNamara's characterization of the

20  *McGowan* case, I think it's clear that there's no rule that a

21  Court has to hear from informants at sentencing.  Rather, even

22  in the *McGowan* case, the touchstone is:  Is the information

23  before the Court credible?  Is there any reliability to it?

24     Now, I can go and outline for the Court why exactly the

25  Government thinks that there is at least some modicum of

1    credibility to these two informants.  Ms. McNamara is correct,

2    there's one main informant.  Then there's a second informant

3    that sort of corroborates some of the information provided by

4    the first one.

5        But there is no need for a hearing.  This Court is well

6    versed in the dangers of relying on jailhouse informants.  They

7    are notoriously difficult to determine whether their

8    information is accurate or not.

9        That said, there are factors here that suggest that these

10   informants were, in fact, credible.  Number one --

11       **THE COURT:**  Don't you think -- before we get into it,

12   don't you think informants are of a particular type that

13   cross-examination is a key mechanism for trying to ferret out

14   the truth of the matter?

15       I mean, remember, a person who's an informant, at least in

16   this context, is a person who himself or herself -- himself in

17   this case -- is undergoing the criminal justice system, is not

18   found to be -- wasn't sort of a citizen informant, just

19   somebody coming forward who saw something and then reported on

20   it as a public citizen.  This is a person who is in jail either

21   awaiting sentencing or part of the criminal justice system who

22   is already found to be engaged in criminal activity, and I

23   think not to permit the Defense to cross-examine this person is

24   suspect.

25       So I would -- there may be some indicia of reliability,

**PROCEEDINGS**

1    but I think that the Court has long relied on the airing the

2    public disclosure of the reasons for the sentencing, you know,

3    occurring on the record in front of the public and the Court

4    making the determination as to whether or not something's

5    reliable or not.

6        I'm not saying that I'm particularly an expert in this

7    area, but I think that we have guaranteed to defendants the

8    right of cross-examination.  It seems particularly critical

9    here where the determination is how long does a person serve.

10        If the Government were saying to me, "Well, look, it's not

11    a lengthy -- they weren't asking for a lengthy sentence," but

12    you're asking for a 33-year sentence for a 23-year-old person,

13    and so I can't imagine a more dramatic impact on sentencing

14    than future dangerousness has and, indeed, the Government

15    believes that the defendant is highly dangerous and, therefore,

16    I would allow cross-examination.

17        Now, you know, I cut you off, but I thought maybe you

18    should make these elections a bit later in this process.  Maybe

19    you've made them already, you know.  I'm cutting you off and I

20    don't want to do that, but I think we'll see things as they go

21    along and then we'll try to figure out where we go.

22        **MR. HASIB:**  I think I hear the Court loud and clear.

23    It looks like this is going to be at least a two-day sentencing

24    hearing if not more than that, and we'll prepare to have the

25    informants brought here so that the Court can gauge their

PROCEEDINGS

1    credibility for itself.

2        I would remind the Court that the Court already has

3    experience with the main informant.  He was before Your Honor.

4    Your Honor sentenced him the first time.  Your Honor put him

5    back in jail on supervised release, which is how -- at least

6    the Government alleges that's how he ended up in custody with

7    Mr. Alhaggagi.

8        So Your Honor has already gauged Informant Number 1, but

9    I'm not going to beat a dead horse.  I hear the Court wants to

10   hear them again in person given, again, the nature of the case

11   and the substance of the allegations.

12       **THE COURT:**  Well, I didn't cross-examine the

13   informant.  I mean, the informant was a defendant in front of

14   me.  My interaction with the defendant was through his counsel

15   so I don't have -- as I sit here now, I have no judgment in my

16   mind as to whether or not this person's reliable.  I must tell

17   you that.  There is no experience that I had that sort of

18   endorsed or detracted from his credibility.  I actually don't

19   remember him, but -- I don't want to offend anyone -- but the

20   fact is I would judge his -- if the Government believes it's

21   significant, then I would judge his credibility as I would any

22   other witness who comes before me; but I think in this case

23   that person ought to be subject to cross-examination.

24       **MR. HASIB:**  Well, in that case, Your Honor, Your Honor

25   questioned whether the Government was going to rely on this

**PROCEEDINGS**

1  information and whether we wanted to elect now or later, we are

2  going to rely on it and we are going to put it in front of

3  Your Honor; and if Your Honor wants to have it in front of you

4  in the form of an evidentiary hearing, then we'll prepare for

5  that.  But the answer to Your Honor's question is, yes, we are

6  going to rely on it.

7          THE COURT:  Fair enough.  That's fine.

8          MR. HASIB:  Now, that said, I think we can move on to

9  the testimony from the one witness the Defense is going to

10  offer today with one -- I have one clarification for the Court.

11  I intend to ask that witness about some of the allegations, but

12  I would do so in a -- much as I did in the sentencing

13  memorandum.

14          THE COURT:  You can do it in any way you want to do

15  it.

16          MR. HASIB:  Okay.

17          MS. McNAMARA:  Your Honor, thank you.

18      I would just note for the record we object to giving the

19  Government more time here to call these men.  We made it

20  abundantly clear they should be here today, and I think the

21  Government tried to allied what is clearly the rule and decided

22  not to call them.  I think they're stuck with that, and so I

23  would object to extending this any more than it has to be

24  already.

25          THE COURT:  Well, your objection is overruled and

**PROCEEDINGS**

1  noted for the record.

2          **MS. McNAMARA:**  I had the feeling the Court would say

3  that.

4          **THE COURT:**  Well, I just -- I really want to try to

5  get this right and it is so serious.  I don't think -- I was

6  remarking earlier, musing about it -- that I've had a

7  sentencing as dramatic in the sense of what was done, what was

8  said, and what a potential sentence should be, and I've done

9  this now 21 years.

10          So I just want to give the parties -- and believe me, I

11  mean both the Defense and the Government -- really a full

12  opportunity.  So when all is said and done, the parties aren't

13  going to look back and say, "You know, if only I could have

14  presented this or if only I could have shown that."  It's not

15  going to be counsel or the Court's lack of attention to the

16  details.  It could be something else.

17          **MS. McNAMARA:**  I fully appreciate that, Your Honor.

18          Very good.  So given that, we will -- my colleague,

19  Mr. Gugelmann, will raise with our Defense expert the substance

20  of these allegations in the same spirit that the Government has

21  addressed them in open court, which is somewhat generally.

22          In addition, there is one other correction to the PSR we'd

23  like to have the Court hear now, and Mr. Gugelmann will address

24  it, but it goes directly to the offense conduct so I think we

25  should get that on the record.  And I believe the Government

**PROCEEDINGS**

1    does not have an objection to our motion to correct.

2         **MR. HASIB:**  That is absolutely right and, in fact,

3    this is something that we raised in our objection letter to the

4    draft PSR and it's still in the final version.

5         **THE COURT:**  What paragraph should I be looking at?

6         **MR. GUGELMANN:**  This is paragraph 24, Your Honor.

7         **THE COURT:**  All right.  Let me take a look at it first

8    if I may.

9                    (Pause in proceedings.)

10        **MR. GUGELMANN:**  And on the third line the sentence

11   that starts "In this conversation."

12        **THE COURT:**  Yes.

13        **MR. GUGELMANN:**  That refers to something that just --

14   that was just a factual confusion there.  That just didn't

15   happen in that conversation.  So we have -- the parties have

16   agreed, and we've discussed with the probation officer, that to

17   fix this we would strike on line 3 beginning at "Bank al Ansar"

18   all the way through the end of line 6 so that the sentence

19   would then read (reading):

20        "In this conversation, Alhaggagi opened a Twitter,

21     Facebook, and Gmail account."

22        **THE COURT:**  Okay.  And that's by agreement?

23        **MR. HASIB:**  Yes.  Absolutely.

24        **THE COURT:**  Okay.  So the sentencing report will be

25   amended.

**PROCEEDINGS**

1          **MR. GUGELMANN:**  And one other amendment that goes with

2    that.  The note that is below between paragraph 24 and 25 will

3    be stricken as well.

4          **THE COURT:**  Okay.  And that's by agreement?

5          **MR. HASIB:**  Yes, Your Honor.

6          **MR. GUGELMANN:**  Yes.

7          **THE COURT:**  Okay.  So that's omitted.  Thank you.

8          **MS. McNAMARA:**  Thank you, Your Honor.

9          **THE COURT:**  Okay.  So, Ms. McNamara, do you want to

10   proceed?

11         **MS. McNAMARA:**  Mr. Gugelmann will address the Court

12   through our expert Dr. Marc Sageman.

13         **THE COURT:**  Okay.  Thank you.

14      Thank you, Mr. Gugelmann.

15         **MR. GUGELMANN:**  Thank you, Your Honor.  And the

16   Defense would call Dr. Sageman.

17         **THE COURT:**  Okay.

18         **THE CLERK:**  Please raise your right hand.

19                          <u>**MARC SAGEMAN**</u>,

20   called as a witness for the Defendant, having been duly sworn,

21   testified as follows:

22         **THE WITNESS:**  Yes, I do swear.

23         **THE CLERK:**  Thank you.  Please be seated.

24      Please state your full name for the record and spell your

25   last name.

**SAGEMAN - DIRECT / GUGELMANN**

1          THE WITNESS:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          THE WITNESS:  My name is Marc, M-A-R-C, S. middle

4    initial, Sageman, S-A-G-E-M-A-N.

5                         **DIRECT EXAMINATION**

6    BY MR. GUGELMANN:

7    Q.   Good morning, Dr. Sageman.

8    A.   Good morning.

9    Q.   Could you start by please outlining your educational

10   background?

11   A.   Yes.  I went to Harvard University.  I graduated from the

12   college with an A.B. in 1973.

13        I then went on to be an M.D.-Ph.D. fellow and got both my

14   degrees at New York University.

15        After that, I went to flight school.  I went to CIA case

16   officer school.  I went to many professional schools.

17   Q.   Well, so, let's, then, start with after you got your

18   M.D.-Ph.D. what your career trajectory was from there.

19   A.   I first did a residency in surgical pathology.  I joined

20   the Navy as a flight surgeon.  I retired as a commander after

21   three years.

22        I joined the CIA, the Central Intelligence Agency, in

23   1984.  Went to, I guess, CIA case officer school for a year.  I

24   was assigned to Washington, D. C., and headquarters in

25   Islamabad, then New Delhi.

**SAGEMAN - DIRECT / GUGELMANN**

1       In 1991 I resigned from the CIA.  Went back to civilian

2   life.  Did an internship in medicine for a year, then a

3   residency in psychiatry with a subspecialty in forensic

4   psychiatry.

5   **Q.**   Can I just interrupt you for a moment, Dr. Sageman?  Can

6   you explain briefly what a -- so you served as a CIA case

7   officer?

8   **A.**   That's correct.

9   **Q.**   Can you just explain what that means?

10  **A.**   The CIA case officer is the manager of spies.  He tries to

11  recruit other countries' people to spy on their country for the

12  U.S. Government and he handles them, he writes reports.

13      In my case, it was a little unusual because in my

14  activities I also ran a war, I ran a war against the Soviets in

15  Afghanistan from 1986 to 1989 for about three years from

16  Islamabad.

17  **Q.**   Thank you.

18      So you then got a -- you finished your residency in

19  psychiatry, and what did you do then?

20  **A.**   Most of my practice was forensic psychiatry.  I basically

21  specialized in death penalty cases.  So I had the opportunity

22  to interview about 400 convicted murderers.  And at the same

23  time I was teaching at the University of Pennsylvania, I was

24  teaching psychiatry and law.  I was also teaching -- because I

25  was very interested and I've always been interested in

1    political violence, I was part of this group, Solomon Aschh

2    Center for the Study of Ethnopolitical Conflict from 1996

3    onwards.  Those were just faculty members of the University of

4    Pennsylvania that met and discussed political violence around

5    the world.

6         And so as part of that, I was teaching seminars at the

7    University of Pennsylvania.  I taught seminars on terrorism, on

8    the moral psychology of holocaust perpetrators on trauma, to

9    basically senior honor students at the undergraduate level and

10   also at the graduate school in arts and sciences in psychology.

11   At the same time I was teaching, as I said, low-end psychiatry

12   to most of the residents of the city of Philadelphia for about

13   eight years.

14   Q.  At some point you moved from academia essentially into a

15   consulting role with respect to terrorism and terrorist

16   threats; is that correct?

17   A.  That's correct.  9/11 happened and I was fascinated by

18   that like anybody else was, but the first question was:  Did I

19   train those people?  And there were no Afghans in Al-Qaeda at

20   that point, and so they weren't the people I trained.  So who

21   were they?  And that's when I started applying the methodology

22   of social sciences, specially evidence-based social science, to

23   the study of political violence.

24   Q.  And can you explain what that means, to apply the

25   methodology of social sciences to the study of political

 1  violence?

 2  **A.**   Well, for instance, at the time there were a lot of

 3  misconceptions of what terrorists were, and so I tested most of

 4  those theories, most of those hypotheses, by just using

 5  statistics and apparently I was one of the first ones to do so.

 6  My first book *Understanding Terror Networks* became, I guess,

 7  one of the best-selling works in the field and is probably the

 8  most quoted work, and that I did in 2004.  So it's basically

 9  applying statistics, epidemiology, control group, Bayesian

10  probability -- Bayesian, B-A-Y-E-S-I-A-N, from reference-based

11  mathematician in the 18th -- so applying Bayesian probability

12  to the study of political violence, people who become

13  perpetrators.

14  **Q.**   And part of that study, then, became --

15       **THE COURT:**  Let me ask you a question.  Because you've

16  used this term a few times, I want to make sure I understand

17  your meaning of it.  You say "political violence," and what

18  exactly do you mean by that?

19       **THE WITNESS:**  Political violence includes noncriminal

20  violence, and by that I mean criminals usually do things for

21  their own benefit.  Most people who do political violence do it

22  on behalf of a group, either their nation, their community.

23  That's why it's political.  And often they sacrifice so it's at

24  a great cost to themselves, and so the motivation between

25  political violence and criminal violence are almost on the

**SAGEMAN - DIRECT / GUGELMANN**

1  opposite side of the spectrum of violence.  It still is

2  violence and maybe the law may consider both of them criminal.

3  Analytically they're quite different to try to understand them.

4         THE COURT:  So because violence, whatever its

5  motivation, can be criminal.  I mean, it is criminalized.

6         THE WITNESS:  That's correct.

7         THE COURT:  Okay.  I mean, there are defenses and so

8  forth, but putting those aside for the moment, I do something,

9  I commit an act of violence, usually it's criminalized.

10     So what you mean -- what I understand your term

11  "political" to mean is that the motivation for the act of

12  violence is not -- is not -- well, what?  Not greed?  Not

13  self-promotion?  Because, I mean, people sometimes act in a

14  criminal way without a monetary gain in mind but, rather, they

15  are promoting maybe themselves.  But in this case you're

16  talking about promoting a cause; is that the line?

17         THE WITNESS:  A community.  A community more than a

18  cause.

19         THE COURT:  A community more than the cause.  And so

20  what do you mean by "a community"?

21     I know I'm interfering with your examination --

22         MR. GUGELMANN:  Please, Your Honor.

23         THE COURT:  -- but I'm sort of the audience here --

24         THE WITNESS:  Right.

25         THE COURT:  -- and the nice thing about being the

1   audience is that I get to ask.

2       THE WITNESS:  And it's a fair question.  It really

3   goes to the heart of my argument.

4       First of all, soldiers commit violence and they're not

5   considered criminals.  They are under a different role, the

6   Geneva Convention, for instance.  Same thing for political

7   violence.  Throughout history, political violence was

8   considered very differently from criminal violence and the code

9   of law evolved differently.  I'm not going to try to teach you

10  the law, sir, but it really evolved from two different aspects

11  of the law.

12      So most people I found who commit violence, political

13  violence, like soldiers, they think of themselves soldiers

14  defending the community that has been attacked.  So soldiers

15  are a perfect example of people who commit political violence.

16  They volunteer very often to fight for their country, their

17  community.  They kill other people.  And after the war, they

18  get immobilized.  They come back.  They become citizens.  They

19  are not considered criminals and they are not pursued as

20  criminals.

21      It turns out that terrorists are very similar.  They

22  commit violence for the community that they feel -- they

23  imagine themselves to be part of this community.  They feel

24  that community is attacked and, therefore, they retaliate.

25      As outsiders, we think that this comes out of nowhere but,

**SAGEMAN - DIRECT / GUGELMANN**

1    in fact, in their mind they're just retaliating to what other

2    people are doing to their community.  And so this is explained

3    in great details in my last book *Turning to Political Violence*

4    and the book previous to that.

5         Is that clear enough?  So terrorism is part of political

6    violence, and I use "political violence" as a larger term to

7    include wars, guerrilla wars, insurgencies, civil wars,

8    terrorism.

9              THE COURT:  The only reason I started asking questions

10   was your use of the word "criminal" because a lot of what

11   political violence is has been, quote, "criminalized"; that is

12   to say --

13             THE WITNESS:  That's correct.

14             THE COURT:  -- governments have enacted laws saying

15   "Thou shalt not do this," you know, a criminal statute.

16             THE WITNESS:  And this is very --

17             THE COURT:  And you're really describing a

18   different -- you're describing a set of -- you're describing

19   conduct which, while it may be criminalized, is distinguishable

20   in your mind from what one might call the run-of-the-mill

21   criminal behavior.

22             THE WITNESS:  That's correct, and it was called crimes

23   of Lèse-majesté.

24             THE COURT:  Right.

25             THE WITNESS:  And only very recently in the last three

**SAGEMAN - DIRECT / GUGELMANN**

1   or four decades in Western country has this conduct become

2   criminalized as common criminal, that's correct.

3        But if you want to understand them analytically why people

4   commit such action, you really have to just start thinking

5   outside -- I'm not a lawyer.  I'm not a judge.  I'm an academic

6   trying to understand why people and how people do such things,

7   and so that's why I'm -- that's my work.

8        **THE COURT:**  Thank you.

9   **BY MR. GUGELMANN:**

10  **Q.**   So when you say you try to understand why people do such

11  things, part of your work is trying to help governments or in

12  the past has been trying to help governments and government

13  agencies decide whether a given individual or maybe a group of

14  individuals poses a risk of political violence; is that

15  accurate?

16  **A.**   Yes.  So on the basis of my whole project, which is really

17  to understand how people turn to political violence, a subsite

18  of it is actually evaluating people since now I have a larger

19  theory:  Is this person dangerous?

20       And so, yes, for the Secret Service, for the NYPD, and for

21  the U.S. Army I did evaluate individuals to try to determine

22  the potential or the probability -- again it's a probabilistic

23  statement -- that they might turn to political violence and,

24  therefore, be a danger.

25       **THE COURT:**  Okay.  And when you say "dangerous," what

1    do you actually mean by that?  Do you mean that the person will

2    commit an act of violence and, therefore, would be dangerous

3    from that point of view?

4         Because the case we have here, putting aside the issues of

5    talk for a moment, speech, just putting those aside, we do have

6    a defendant who put individuals in touch with or aided these

7    ISIS websites.  And do you consider that to be an act of

8    violence?

9              **THE WITNESS:**  No, I don't.  To me, violence is actual

10   violence.  You break people's bones, you kill them, it's actual

11   violence.  But, however, in order to achieve that state, most

12   people go through other states.  They're part of a political

13   protest community in which they share some ideas, and the

14   people who become violent emerge out of this political protest

15   community.

16        So in a sense, it's included.  The violence itself is

17   really the end product of a much larger process where you start

18   with a lot of people and it really dwindles down to just a few

19   individuals committing violence.

20             **THE COURT:**  Okay.  Thank you.

21   **BY MR. GUGELMANN:**

22   **Q.**   In your role as a consultant acting to try to identify

23   whether individuals or groups pose a risk of committing

24   political violence, what's your process?  How do you go about

25   figuring out for a given individual if that person is

1  dangerous?

2  **A.**   Well, I accumulate as much data, as much information about

3  them as possible.  I try to prepare.  Eventually it's going to

4  lead to an interview, but I'm trying to prepare myself to know

5  as much about them as possible, and that includes all the NSA

6  traffic.  I had all my clearances at the time so everything

7  that they had on the Internet, everything that's been known in

8  terms of other interviews of other individuals.

9       In this country, when I conducted those evaluations

10  because terrorism is under the jurisdiction of the FBI and even

11  though I conducted them for the Army, I did it in conjunction

12  with the FBI, but it was me asking the questions since I knew

13  the individual much more.

14       So I usually interviewed them, and the interview is in a

15  sense unlike a lot of the other forensic interviews.  People

16  present a certain persona to you in prison, and they're usually

17  in prison many of them, and so I let them talk.  I let them

18  talk to present to me their story however they want to present

19  it; and to me that's when the interview starts, after they

20  finish, because then I start confronting them with the evidence

21  to try to understand the evidence to put it in the context so

22  that I can understand them and see where they are in the

23  spectrum.  And that's basically how I proceed.

24  **Q.**   How many interviews of terrorists have you conducted?  And

25  I hesitate because I don't want to oversimplify the political

**SAGEMAN - DIRECT / GUGELMANN**

1    violence analysis that you're doing by saying "terrorists;" but

2    if that's a fair term, how many of those interviews have you

3    conducted?

4    **A.**    Personally about 50, I guess.

5    **Q.**    And how many interviews of terrorists have you reviewed or

6    otherwise been made aware of the contents of even if you didn't

7    conduct them?

8    **A.**    Oh, hundreds.  I interviewed most of the people in

9    Guantanamo.  I interviewed other cases, other legal cases where

10   I got access to the trial transcripts, some of the evidence

11   admitted at trial.  I could not get access to sometimes the

12   discovery material, but in some cases where I was actually

13   investigating for the Army, I did get access to the discovery

14   material as well.  So hundreds more.

15   **Q.**    And have there been cases where you concluded that the

16   person you were evaluating in fact did pose that danger?

17   **A.**    Yeah.  The majority of them.

18              **THE COURT:**  I'm sorry?

19              **THE WITNESS:**  The majority of them, yes.

20   **BY MR. GUGELMANN:**

21   **Q.**    You identified sort of a two-part inquiry, whether there's

22   a community, an imagined community, that the subject sees

23   themselves a part of; and, secondly and maybe separately,

24   whether they pose a risk of violence.

25        Are there instances, in your experience, where the

**SAGEMAN - DIRECT / GUGELMANN**

1  community aspect is there but not the violence aspect?

2  **A.**   Yes.   I mean, if you want to give an arbitrary number, if

3  you have a community of a thousand militants, maybe 10 will

4  become violent of the thousand.   So you can see this dramatic,

5  dramatic decrease when we see the violence.

6       But under certain conditions, that number may increase,

7  and the conditions are an escalation of the conflict between

8  the state and this endangered community that they feel being

9  part of; disillusionment with nonviolent ways to address

10  grievances; and the third and most important, moral outrage at

11  state aggression against a community, and that leads a few

12  people, very few, to volunteer to become soldiers to defend

13  their communities and attack first the state selectively but

14  then often society because the state stands for society.

15       So you have a degradation in a sense over time for those

16  people to commit violence.

17          **THE COURT:**   I want to make sure I understand your

18  statistics.   When you say -- let's start with the 1,000

19  people --

20          **THE WITNESS:**   Right.

21          **THE COURT:**   -- in the community.   Now, is this a

22  community which identifies as a -- how are they identified?

23       See, I think part of the problem when I start to look at

24  this is when you talk about ISIS, are you talking about those

25  people as an example as a community, if that's a community?

SAGEMAN - DIRECT / GUGELMANN

1    Are you talking about that would be the thousand people?  Or

2    are you talking about a larger community of, you know, people

3    who adhere to a particular religious sect or set of beliefs and

4    they're the community?

5        Because the statistic you give is a rather -- is an

6    interesting statistic.  It's 1 out of -- I guess you'd say 1

7    out of 1,000 or 1 out of 100, so it's 1 percent.  So you would

8    say, "Well, 99 percent, roughly, 99 percent don't present

9    themselves as dangerous in terms of violence."  I think if I

10   understand your statistics.

11       THE WITNESS:  That's correct.

12       THE COURT:  But I have to actually understand the

13   denominator to put it in context.

14       THE WITNESS:  Okay.  So let's talk about ISIS.  For me

15   all of the ISIS people are violent and so those would be the

16   1 percent.  But the community, the much larger community, of

17   people who sympathize or identify with victims of the Syrian

18   state, the little babies that are being killed by barrel bombs,

19   so you have a much larger community that sympathizes but of

20   that large community, only about 1 percent decide to go to

21   Syria and fight.  They're very, very few.

22       So the community is much, much larger than just ISIS; and

23   even though ISIS at its height was maybe 50-, 60,000 people,

24   you think it's a large community but the community worldwide

25   sympathizing with them was much larger than that.

SAGEMAN - DIRECT / GUGELMANN

1   BY MR. GUGELMANN:

2   Q.    And you used the word "soldiers."  You've used that term

3   several times.  Is it fair to say what you're trying to

4   identify is whether the person you're evaluating sees

5   themselves as a soldier?

6   A.    Yes.  I'm looking at a person's social identity, and so I

7   try to -- sometimes I ask them and they would tell me "I'm a

8   Mujahed," which in Arabic it's "I'm a person who does jihad."

9   Mujahed is a person who does jihad, and that means a soldier of

10  Allah.  And that's what Major Hasan, for instance, called

11  himself, SOA, Soldier of Allah.

12      So those people who think of themselves as soldiers are

13  extremely dangerous because that's what a soldier does, a

14  soldier kills for his community.  So I'm trying to really kind

15  of gauge where they are in that spectrum from just sympathizer

16  to "I'm a soldier and I'm going to do something."

17  Q.    In this case you did an evaluation of Mr. Alhaggagi?

18  A.    Yes, I did.

19  Q.    And I just want to be clear how that evaluation fits into

20  the framework of what you're looking for.

21      If Mr. Alhaggagi had committed or intended to commit the

22  offenses that were discussed, would he then fall in the

23  category of political violence and a soldier as you define

24  those categories?

25  A.    Definitely, yes.

**SAGEMAN - DIRECT / GUGELMANN**

1  Q.   So your evaluation of Mr. Alhaggagi, I want to skip to the

2  end and then sort of work our way through it.  Can you tell us

3  what your conclusions were to start?

4  A.   Well, my conclusion is that Mr. Alhaggagi did not think of

5  himself as a soldier for the Islamic State.  In that sense, he

6  was not a terrorist as people call it.  I use -- I avoid the

7  term because "terrorist" is very loaded and people use it very

8  differently, and so I'm much more specific.

9       He did not consider himself a soldier of the state;

10  therefore, he was a very low probability of becoming

11  politically violent.  But I also looked at him as potential for

12  just criminal violence; and, here, again, I found him at low

13  probability of even criminal violence.

14  Q.   So you explained your methodology here is to start -- your

15  methodology generally is to start with what in this case would

16  be the discovery, what the defendant has said, what he's been

17  seen doing, and then interview the subject.  Is that what you

18  did here?

19  A.   Yes.  Unfortunately, I did not have the whole of

20  discovery, I had portions of the discovery material, in June of

21  this year when I interviewed Mr, Alhaggagi.

22  Q.   And then meaning you had the discovery that had been

23  produced to that point and then you received more discovery

24  later on?

25  A.   That's correct, yes.

1  **Q.**  Dr. Sageman, I want to show you one document that sort of

2  amazingly is not part of what has been filed so far.

3          **THE COURT:**  I think I have it, don't I?  Was this just

4  handed to me?

5          **MR. GUGELMANN:**  No.  This is a different one.

6          **THE COURT:**  Oh, no, this is something else.  So can we

7  mark this?

8          **MR. GUGELMANN:**  Yes.  And I don't know if we want to

9  continue with the order of the Defense exhibits.

10          **THE COURT:**  Well, no.  Let's have a hearing exhibit

11  number so then I can keep track.

12      By the way, this document is marked "Secret."  So what am

13  I supposed to take from that?

14          **MR. GUGELMANN:**  So I think this would be submitted

15  under seal, I think.

16          **THE COURT:**  Well, it's now being -- is it being shown

17  to --

18          **THE CLERK:**  Uh-huh.

19          **THE COURT:**  It's okay by me.  It's being shown to the

20  audience or is it not?  I mean, we're not going to swear

21  everybody in this room to secrecy.  So the question is:  Is it

22  being disseminated in this public setting?  So, of course,

23  the --

24          **THE WITNESS:**  Your Honor, it has the name of the

25  translator, which has been blacked out in previous -- in

SAGEMAN - DIRECT / GUGELMANN

1   another setting.

2        MR. GUGELMANN:  So I think we would not display this,

3   certainly not the page that has the name of the translator.  We

4   would be displaying only -- let me just show the Government

5   real quick.

6        THE COURT:  Well, this should all be worked out

7   between the Government and the --

8        MR. HASIB:  It will, Your Honor.  For today's

9   purposes, I think let's not show it to the public.  I can

10  represent to the Court that I believe these materials -- the

11  Court will recall there was a CEPA motion that was filed in

12  this case.

13       THE COURT:  Yes.

14       MR. HASIB:  Along with that, the Government --

15       THE COURT:  I think I granted it.

16       MR. HASIB:  I think you did.  I'm quite sure you did.

17     Along with that CEPA motion, the Government also

18  declassified lots of documents.  I believe this was something

19  that was declassified.

20       THE COURT:  It has been declassified.

21       MR. HASIB:  What we're looking at is the version that

22  was originally classified but has since been declassified.  For

23  today's purposes, I suggest we review this not publicly; but if

24  I can confirm --

25       THE COURT:  If he's going to be asked questions about

**SAGEMAN - DIRECT / GUGELMANN**

1  them, how can people not -- I mean, people have to understand

2  what these -- I mean, I don't want one of these hearings where:

3  "Okay.  Do you see that on line 3?

4  "Yes.

5  "What do you think about that?"

6  I mean, what's "that"?  That's not -- we're not going to

7  have a hearing like that.

8  This is not a hearing on secret testimony.  This is a

9  public hearing.

10  **MR. HASIB:**  May I have a moment, Your Honor?

11  **THE COURT:**  Yes.  Do you want to take a little recess

12  now and maybe go through what these documents are, and then --

13  **MR. HASIB:**  Yes.

14  **THE COURT:**  Okay.  We'll be in recess until 11:00.

15  **MR. HASIB:**  Okay.  Thank you, Your Honor.

16  **MR. GUGELMANN:**  Thank you.

17  (Recess taken at 10:42 a.m.)

18  (Proceedings resumed at 11:02 a.m.)

19  **MR. HASIB:**  Your Honor, before Mr. --

20  **THE COURT:**  Wait.  We have to wait for the defendant.

21  **MR. HASIB:**  Yes.  Sorry.

22  (Defendant present.)

23  **THE COURT:**  Okay.  Let the record reflect the

24  defendant is present, the parties are present.

25  Yes, sir?

1          **MR. HASIB:**  Your Honor, before Mr. Gugelmann

2    continues, I've consulted with my colleagues at FBI.  The

3    document in question was declassified.  It appears that the

4    version that is here with Mr. Gugelmann's material erroneously

5    still contained the classification marking.  It erroneously

6    still contained a classification marking.  We are working to

7    get a version that does not have that classification marking.

8        In the meantime, I've reviewed the materials Mr. Gugelmann

9    is going to move from this point forward and they appear no

10   classification.  So the Government's --

11         **THE COURT:**  So while the term "Secret" appears on the

12   document, it has been declassified and so the substance of it,

13   that's fine, and that the accurate version of that document

14   that exists today should not have the term "Secret" on it?

15         **MR. HASIB:**  That's correct.

16         **THE COURT:**  Because I understand "Secret" is a

17   classification.  "Secret" is a secret.

18         **MR. HASIB:**  Not anymore apparently.

19         **THE COURT:**  Well, it's not a secret.  Okay.

20         **MR. GUGELMANN:**  So we won't display anything that

21   bears the word "Secret" on there.

22         **THE COURT:**  Okay.  But I would say it's probably not a

23   well-kept secret.

24         **MR. GUGELMANN:**  No longer.

25         **THE COURT:**  Right.

1    **MR. HASIB:**  It seems fairly safe to say.

2    **THE COURT:**  Okay.  So let's --

3    **MR. HASIB:**  In any event, the content --

4    **THE COURT:**  The content is not secret?

5    **MR. HASIB:**  Plainly declassified, yeah.

6    **THE COURT:**  All right.  You may proceed.

7        And let's have it marked as -- well, just list the

8    exhibit, Exhibit Number 1, Hearing Exhibit 1.

9    **MR. GUGELMANN:**  Hearing Exhibit 1.  Thank you,

10   Your Honor.

11       (Hearing Exhibit 1 marked for identification)

12   **BY MR. GUGELMANN:**

13   **Q.**  All right.  Dr. Sageman, we had been discussing your

14   conclusions about Mr. Alhaggagi.  And specifically did you find

15   that Mr. Alhaggagi had any sort of a grievance against the

16   United States or against any government in particular?

17   **A.**  No, not really.

18   **Q.**  So you should have before you now Hearing Exhibit 1, which

19   is the document with the Bates Number 4939.  Do you recognize

20   that document?

21   **A.**  Yes, I do.

22   **Q.**  And what is that?

23   **A.**  It's a translation of, I guess, the Chat Group 90, as it's

24   referred to, but in another version it's Chat Group 3078.

25   **Q.**  And is that one of the documents that you reviewed in

**SAGEMAN - DIRECT / GUGELMANN**

1    connection with your review of the discovery here?

2            **MR. HASIB:**  No objection to authenticity, Your Honor.

3            **MR. GUGELMANN:**  We'd ask that it be admitted,

4    Your Honor.

5            **THE COURT:**  Okay.  Admitted.

6        (Hearing Exhibit 1 received in evidence)

7    **BY MR. GUGELMANN:**

8    **Q.**   I'd like to draw your attention to a statement on the

9    second page of the document --

10           **THE CLERK:**  Publish it?

11           **MR. GUGELMANN:**  Yes.

12           **THE COURT:**  Just give the Bates number.

13           **MR. GUGELMANN:**  It's on Bates 4940.

14   **Q.**   And the statement there says -- I'm not sure if it's

15   appearing on the screen yet or not -- (reading)

16           "TN," translator note, "Case agent requested a

17       verbatim translation only of the part of the conversation

18       where the subject is discussing nefarious actions; i.e.,

19       selling guns, buying phones, manipulating Twitter feed,

20       et cetera."

21       Did you notice that statement in your review of this

22   material?

23   **A.**   Yes, I did.

24   **Q.**   And can you tell us how that indication compares with your

25   methodology in making the assessments of political

SAGEMAN - DIRECT / GUGELMANN

1    dangerousness?

2    **A.**   Well, as I said before, I reviewed the whole of discovery

3    material.  I'm interested in both the most incriminating and

4    the most exonerating elements of a person's life, of a person's

5    behavior, because you have to look at the totality of things.

6        I was a little bit disturbed that instead of translating

7    the whole of the discussion group, which runs to about 200

8    pages and gives you the flavor of what the discussion group is

9    about, they only translated 10 pages.

10   **Q.**   In your initial review, you reviewed a version of this --

11   a translation of this particular chat; is that right?

12   **A.**   Yes, but not this one.

13           **MR. GUGELMANN:**  And, Your Honor, if I could approach.

14   **Q.**   If you could turn in the binder in front of you --

15       Your Honor, these were filed in connection with the

16   sentencing by both parties.

17       About halfway through the binder you'll see the

18   Government's sentencing memo and then Tab 8 for Exhibit 8 to

19   that memo.

20   **A.**   Yes.

21   **Q.**   Is that the version of this particular chat that you

22   reviewed before you interviewed Mr. Alhaggagi?

23   **A.**   No, it was not.

24   **Q.**   Which version did you review?

25   **A.**   I reviewed, as I said, Bates Number 00496 to '504.

**SAGEMAN - DIRECT / GUGELMANN**

1   **Q.**   And was it the same -- was it substantively the same

2   although it's produced with a different Bates number?

3   **A.**   Yes, with the exception of the back page --

4   **Q.**   Okay.

5   **A.**   -- and the front page and the cover sheet.

6   **Q.**   But the substance of the communications there between

7   Mr. Alhaggagi and others --

8   **A.**   It's identical.

9   **Q.**   And what were your impressions upon reviewing this before

10   you met with Mr. Alhaggagi?

11   **A.**   I was very alarmed by it.

12   **Q.**   Can you tell us why?

13   **A.**   Well, it seems, according to this version, that it may be

14   a discussion of bomb making with some irrelevant information,

15   jokes in it, but still it seems to be a fairly serious

16   discussion about how to, first of all, perhaps make a bomb and

17   then how to connect that bomb to a telephone, to a mobile

18   phone.

19   **Q.**   And on your screen are excerpts from this document, or

20   should be momentarily.  There's a line at the beginning from

21   Qurrat al-'Ayn, which is Mr. Alhaggagi's handle in this chat --

22   **A.**   That's correct.

23   **Q.**   -- saying (reading):

24          "I know how to make a bomb with shrapnel and I know

25          how to make a detonator, but I cannot install it on a

SAGEMAN - DIRECT / GUGELMANN

1      mobile phone."

2            **THE COURT:**  This is 4949?

3            **MR. GUGELMANN:**  494 -- no, Your Honor.   In

4   Government --

5            **THE WITNESS:**  It's 7462.

6            **MR. GUGELMANN:**  It's 7462.

7   **Q.**   There's a statement there from Mr. Alhaggagi (reading):

8            "I have made explosives and hand grenades before."

9         There's a statement (reading):

10           "It needs hydrogen and it needs acetone."

11        There's a statement that says (reading):

12           "You mix them all in a glass flask in the middle of a

13        container with ice."

14        Is it fair to say this is the type of statement you found

15   alarming in reviewing this?

16  **A.**   Yes.

17  **Q.**   And further statements in the same vein in this chat?

18  **A.**   Well, fragments of statements because it's sprinkled with

19  jokes.

20  **Q.**   So you described that your process was that you'd review

21  the discovery, conduct an interview, confront the subject with

22  things that you had seen in the discovery.  Can you explain how

23  your confrontation of Mr. Alhaggagi with this material went?

24  **A.**   Yes.  I told him about the discussion because when I go to

25  prison, I only have my pen and just a notebook.  I don't really

**SAGEMAN - DIRECT / GUGELMANN**

1    bring documents.  And I told him about the discussion and he

2    basically said, "But we were joking.  It was a joke."  I mean,

3    this whole group session is a bunch of friends trolling girls

4    and joking about things.  And he said, "This was not really

5    serious."

6    **Q.**   And what was your impression of that and what did you do

7    next?

8    **A.**   Well, I was puzzled.  I heard him, but I needed evidence

9    that he was right, and I let the matter lay there for about

10   three months until you produced for me a complete set of the

11   discovery material.

12   **Q.**   What did you find then?

13   **A.**   Well, I went through every item and that's when I found

14   this (indicating); namely, what's been introduced here as

15   Exhibit 1 or A, I'm not sure, what's under Bates 4939.  So I

16   found a second version of this discussion.

17   **Q.**   And what was the significance of that to you?

18   **A.**   First of all, the translation was not the same and

19   significantly not the same, and then there were emojis in this

20   second translation and this puzzled me because in the original

21   discussion, there was no emoji.

22        So I went to the 18,000-page mobile telephone -- ZTE

23   telephone extraction report, tracked down the page number in

24   Arabic.

25        And, Your Honor, you have to understand that I don't speak

1    Arabic and I don't read it --

2              **THE COURT:**  I understand.

3              **THE WITNESS:**  -- and so I'm just looking at what it

4    looks like.

5         And at the relevant pages, and I knew it was a relevant

6    page because they have the time of the communication, so they

7    have the exact time of the communication, Greenwich Mean Time,

8    UTC basically, and so I was able to see which communications

9    were which in Arabic and there were no emoji in that -- in the

10   ZTE extraction report, 18,000 pages, which constituted

11   obviously the document that the first translation that I had

12   read came from because they have no emoji.

13        And when the ZTE extraction report said the name, for

14   instance, Qurrat al-'Ayn and then there was a blank and then

15   another person chimed in, the first translation that I had

16   previously read -- namely, before going to prison -- just said

17   "blank."

18             **MR. GUGELMANN:**  So if you could put up the next slide.

19   **Q.**   So the slide in front of you on the screen at the top is

20   an excerpt from Government Exhibit 8 and below is an excerpt

21   from Hearing Exhibit 1.

22   **A.**   That is correct.  And you can see that it's very, very

23   different, the two translations.

24   **Q.**   Can you tell us what the significance of the difference in

25   those translations told you?

1   A.   Well, I think this was in reference to a very famous

2   attack that happened in Saudi Arabia in I believe it was

3   October 2009.  Two Al-Qaeda members, brothers, Abdullah

4   al-Asiri and his brother the bomb maker Ibrahim al-Asiri, tried

5   to assassinate the person who later became the Crown Prince of

6   Saudi Arabia, namely, Mohammad bin Nayef, Prince Mohammad

7   bin Nayef.

8        And so Ibrahim sent his brother Abdullah to recant and to

9   ask forgiveness of the prince, and usually this is a personal

10  meeting where the prince meets with the person and pardons that

11  person and allows the person, the subject, almost to come back

12  to the kingdom.

13       But the plot was that they inserted a bomb in -- Ibrahim

14  inserted a bomb in his brother Abdullah's rectum which he

15  exploded remotely when Abdullah was with Prince Mohammad

16  bin Nayef.  I kid you not.  This really happened.

17       The reason Mohammad bin Nayef is still alive is that this

18  happened in a tent.  So when the bomb blew off, the person who

19  had the bomb, Abdullah, just flew up in the air through the

20  tent.  Had it happened in, like, this courtroom with very rigid

21  walls, the reverberation would have killed the prince.

22       And so this actually refers to when they say "The bomb can

23  be miniaturized."  And as you can see in the first section, it

24  says "At the end they will enter it in their den."  What they

25  really said in Arabic, in Yemeni Arabic, they said, "They

**SAGEMAN - DIRECT / GUGELMANN**

1   inserted the bomb in the rectum."  And this drew a laugh from

2   Mr. Alhaggagi, and you see he has 20 smiley emoji in what

3   really is the real version.

4        And I found this real version again in the discovery

5   material in a very large file called "ZTE Word," where I

6   checked all the chats, all the Telegram chats; and within that

7   chat, this is the chat that's labeled 3078, and it really

8   had -- it was very similar to the second version of the

9   translation.

10       So here I can see that they very much were joking about

11   all those bombs, and at some point one of the persons talking

12   said, "Gee, you guys look like scientists but you can't even

13   make up your bed."

14       And the other person was saying, "Do you realize that when

15   they talk about fertilizer and an acid" -- and they could use

16   urine for an acid, although it's a very weak acid, nobody uses

17   that -- the other person, "do you realize that they're talking

18   about shit and urine here?"

19       And so you can see very much it was a joke.  It was -- the

20   whole thing was a joke.  And so I had to really kind of say,

21   "Well, why would they joke about that?"  And I realized that

22   they were trolling a girl, a 16-year-old girl.

23       Now, that I could -- that I could understand because the

24   troll was in English.  So it was in English in the original.

25   And, you know, they were asking her, "Well, do you have sex?"

1          And she says, "No, no.  It's *haram*."

2          And another person said, "Well, can you show us a picture

3    of your pussy?"

4          And she said, "No."  You know, she was very offended and

5    turned off.

6          But within that, they say, "Well, you know, when you have

7    a girl on this -- in this chat group, boys are boys and they

8    become horny."  And VIP, the person who actually is trying to

9    teach how to make a bomb, apparently in this context was

10   saying, "Yes, I'm horny."

11         And Mr. Alhaggagi under his handle Qurrat al-'Ayn said,

12   "You're a dangerous person."

13         So VIP asked --

14   **Q.**   Let me interrupt you briefly.

15            **MR. GUGELMANN:**  If you could put up...

16                     (Pause in proceedings.)

17   **BY MR. GUGELMANN:**

18   **Q.**   Is that the exchange you were just about to discuss?

19   **A.**   Yes, very much.

20   **Q.**   And VIP, who's the handle of the person that Mr. Alhaggagi

21   is in this chat room with, asked, "Where is the danger?"

22         Mr. Alhaggagi says, "In the detonator."

23         VIP says, "Bombs are much more dangerous."

24         And then we see the three smiley face emojis, which did

25   not appear in the first version of the chat that you reviewed.

1  **A.**    That's correct.  So basically by "detonator" I think he

2  probably means his phallus in here.  And so they go about using

3  this metaphor and they go about discussing the dangerousness of

4  the main charge, which I think the VIP calls the "bomb" or it's

5  translated into the "bomb" versus the "detonator," which is

6  actually the more dangerous.

7  **Q.**    And if you could go to the next slide.

8          **THE COURT:**  So I understand it, what I'm now looking

9  at, the slides with the emojis, is it understood that these

10  were in the original documents?

11          **MR. GUGELMANN:**  These were in the original documents

12  through -- in the original documents, yes.  Through the

13  process --

14          **THE COURT:**  The original documents being the evidence

15  of the chat room?  This is the way the chats occurred; is that

16  right?

17          **THE WITNESS:**  Correct.

18          **MR. GUGELMANN:**  Correct.

19          **THE COURT:**  The one with the emojis.

20          **MR. GUGELMANN:**  Correct.

21          **THE COURT:**  And I think that's your point.

22          **MR. GUGELMANN:**  That's my point.

23          **THE COURT:**  Okay.  So what I look at when I look at

24  the screen now, I'm now looking at a translation of the

25  original chat.

1      **MR. GUGELMANN:**  Correct.

2   **Q.**   So if you could look at what's before you right now.  This

3   is the end of the conversation with VIP about bomb making.  And

4   I'll just ask whether this supports your conclusion that all of

5   this really started with jokes about -- fairly crass jokes

6   about sex?

7   **A.**   Yes, because here they say, "Well, maybe we should insert

8   the bombs in women's vagina," and trying to recruit them doing

9   that.  And they're all laughing and, you know, one guy says,

10  "Well, what are we talking about?"

11       And VIP is laughing and says, "About terrorism."

12       And the other person says, "About dicks and penises."

13       So you can see very much what that conversation is all

14  about.

15  **Q.**   So having gotten a fuller picture of the discussion about

16  bomb making than you had in the first version that you viewed,

17  you testified that when you first saw it, you found it very

18  alarming, you were puzzled by Mr. Alhaggagi's explanation that

19  it was all a joke.  How does that explanation square with the

20  chat as you saw it ultimately in its completion?

21  **A.**   Well, I think that supports what Mr. Alhaggagi told me.

22  You know, I don't really take at face value what defendants

23  tell me.  I try to look further in the evidence, and I think

24  here he probably was right.

25  **Q.**   I want to spend some time talking about the specifics of

1   the evidence in this case and how those pieces of evidence

2   relate to your conclusions about Mr. Alhaggagi.  Before I do

3   that, can you tell us a little bit about his personal

4   background as it related to your -- relates to your conclusion

5   he was not dangerous?

6   **A.**   Well, as I said, I try to look at the totality of a

7   person.  So basically he came from a Yemeni family who

8   emigrated to the United States in the early '90s.  He was born

9   1995 in Lodi, California.  Spent the first six, seven years in

10  this country.

11       And then the whole family, except for the father, who

12  stayed behind in California to work, the family went back to

13  Yemen.  The reason is a little bit obscure.  It seems that

14  there may have been -- it may have been a consequence of the

15  hostility they faced after 9/11 from their neighbors; but the

16  mother explained to the defendant, Mr. Alhaggagi, that they

17  wanted him to learn about Yemeni culture and so they went back.

18       He stayed in Yemen until 2005.  Came back for the school

19  year of fifth grade in 2005-2006 because his mother felt he was

20  a little bit of a handful and needed a man.

21       And during that time, because the father was working all

22  day long till 9:00 p.m., he forced his son -- and the father

23  was sharing an apartment with two men that he did not think

24  were good for his son, and so he told his son -- he forced his

25  son to go to the synagogue -- I'm sorry, the wrong religion.  I

1   cannot project my own here -- to go to the mosque from the end

2   of school to 9:00 o'clock when the father would pick him up.

3        And Mr. Alhaggagi, the son, was totally bored out of his

4   mind during that time, basically tuned out.  Still is angry at

5   dad.

6        He returned to Yemen in 2006 to 2009.  And while in Yemen,

7   he got into lots of fights because that seems to be a national

8   pastime in Yemen.  Little boys fight, but especially

9   Mr. Alhaggagi, because he defiantly had a T-shirt with an

10  American flag on it and people called him *al-Amriki*, meaning

11  "the American."  And he was proud of his American background.

12       And at the same time he's a little bit pale and it seems

13  that in Yemeni culture paleness is also a sign of weakness, and

14  so he was picked on quite a bit so he defended himself.

15       And, again, he became a handful for his mother.  His

16  mother told the father he has to come back to the

17  United States.  He came back with his father in 2009 in ninth

18  grade.  So he did all of high school here.

19       But the first year that he came back, a few months after

20  he came back, the father went back to Yemen for four months and

21  left his son by himself at the age of 14 to fend for himself

22  because in Yemen you're a man at the age of 13.  So he's a man.

23  He can have the responsibility.

24       Of course, Mr. Alhaggagi was a little bit immature.

25  Basically he cut classes, had friends, and started smoking

1    marijuana.  He was going to Berkeley High School so he was

2    mostly on campus at Berkeley University, because the high

3    school is two blocks away, with some friends and they're

4    starting basically talking nonsense, trolling other people.

5         And that's how he developed his trolling character,

6    started a Facebook page with all kinds of strange clothing on

7    it.  Somebody sent it to his father who was really upset so

8    when the father came in, he made him throw all his clothes

9    away, except for three pair of pants and three shirts, because

10   he did not approve of it.

11        But the sophomore year, the same thing happened.  The

12   father went back to Yemen for about four months and again

13   Mr. Alhaggagi basically dropped out of school almost, flunked

14   all his classes in ninth grade, tenth grade.

15        When the father came back, pulled him out of Berkeley High

16   School, put him in another school where he became popular and

17   was even elected class president on a platform of distributing

18   marijuana to all the students.  So that's the basis of his

19   popularity.  And then went to remedial high school where he

20   actually caught up and finally returned to Berkeley High School

21   where he graduated I believe in 2013, in June 2013.

22   Q.   You started to talk about his online activity and

23   trolling.  At some point the evidence shows that Mr. Alhaggagi

24   in his online activity developed an interest in events in the

25   Middle East and in ISIS.  Can you explain how Mr. Alhaggagi

 1  came to be interested in ISIS and then ultimately to interact

 2  with ISIS supporters online?

 3  **A.**    Yes.   That came quite a bit later, about three years

 4  later.   He had gone first to Saudi Arabia for the whole month

 5  of April for his sister's wedding.   He was a male escort for

 6  his sister because his father could not really come.   And he

 7  had plans to get into business with a cousin, and that fell

 8  through.

 9        So when he came back from Saudi Arabia in May of 2016, he

10  had nothing to do so he had been very busy online on a lot of

11  social apps, trolling girls at the time.   And the big thing in

12  the Middle East was the war, was the war in Syria and Iraq.

13  And so on Twitter he saw something that said "If you're

14  interested in what's happening to the Middle East, click this,"

15  and it was the Telegram.   I don't know if it was a chat group

16  or if it was a channel, but he clicked on it and he had to be

17  part of Telegram so he downloaded the Telegram app and started

18  reading the news.

19  **Q.**   Is it common, in your experience, for people to gain an

20  interest in ISIS and review material related to ISIS online?

21  **A.**    Well, when you're from the Middle East, yes, it's very

22  common because this is not really well reported in the West,

23  especially not in the United States.   The report is a little

24  bit better in Europe.   And so for you -- for a person to find

25  out what's going on in the war, not just ISIS but in the war,

**SAGEMAN - DIRECT / GUGELMANN**

1   you basically have to look online at either Twitter or Telegram

2   or Facebook, all kinds of social media.

3   **Q.**   Is it an indication in your opinion that someone has

4   adopted extremist beliefs or a radical ideology that they look

5   up information about ISIS on Twitter or online in general?

6   **A.**   No.  This is just simply curiosity.  Especially if you

7   come from the Middle East, it's actually quite common.

8   **Q.**   Is it an indication of tendency towards or risk towards

9   political violence?

10  **A.**   No, not yet.

11  **Q.**   When you say "not yet," what do you mean by that?

12  **A.**   Well, I mean you have to become a militant and activist.

13  You have to be part of a political protest community, and he

14  was -- he was just watching -- he was just looking at the news.

15  **Q.**   At some point the evidence shows Mr. Alhaggagi also

16  developed an interest in bombs and in bomb making.  Does the

17  evidence that you reviewed show that?

18  **A.**   Yes.

19  **Q.**   And what did you learn about how that interest developed

20  and what steps, what actions Mr. Alhaggagi took arising out of

21  that?

22  **A.**   Well, this -- I must say the fascination with bombs is a

23  little bit more unusual than an interest in Middle Eastern

24  politics, but I myself am fascinated by bombs.  I was trained

25  in bomb making for three times, I think.  There's something

1    fascinating about something that can destroy you.  Some people

2    are interested in weapons in this country.  I'm not but bomb

3    making was different for me.

4        So a lot of people are interested in bombs because bombs

5    can destroy you.  It can blow you up.  It's almost like an

6    existential threat so people are kind of fascinated by that.

7        Mr. Alhaggagi tried to get on, I think, maybe an ISIS

8    channel, an ISIS chat group, I'm not really sure what, and he

9    met a person online who seemed to have introduced him to some

10   kind of bomb trainer.  And so the bomb trainer said, "Well,

11   what are you going to use it for?"

12       And this is actually very common.  In most terrorist

13   organizations, such as Al-Qaeda, all kinds of -- not just

14   Al-Qaeda but any kind of even non-Muslim terrorist

15   organizations, the bomb makers, the trainers, feel responsible

16   for what the students would do, and so they ask the students

17   what are they going to do with that knowledge; and in order to

18   have some control over the students, they ask the students to

19   pledge allegiance to them.

20       And this seems to be what the trainer online asked

21   Mr. Alhaggagi to do, to kind of send him a report on what he

22   was going to use his knowledge for, and Mr. Alhaggagi did that.

23   **Q.**   Could you turn in your binder there to Government

24   Exhibit 5?

25   **A.**   (Witness examines document.)  Yes.

**SAGEMAN - DIRECT / GUGELMANN**

1   **Q.**   Is that the report you were just referring to?

2   **A.**   Yes, that's correct.  That's a report he told me he sent

3   to get the bomb training manual.

4   **Q.**   Is this -- you've reviewed this report; correct?

5   **A.**   Yes.

6   **Q.**   Is this document a suicide note?

7   **A.**   Absolutely not.

8   **Q.**   And why do you say that?

9   **A.**   Well, first of all, in Islam there's really no suicide

10  note.  There's no suicide in Islam.  It's strictly, strictly

11  prohibited and so people don't really use suicide notes that

12  way.

13       However, some people who are going to become a suicide

14  bomber -- and they think of it as martyrdom so they don't think

15  of suicide, they think it's the ultimate sacrifice for your

16  community, martyrdom -- they leave behind the document

17  explaining the justification and their rationale for doing what

18  they're doing.

19       And so you can have two types of notes.  You can have a

20  personal note to your spouse and in order to kind of contrast

21  this with what people call suicide notes or *wassiya*, some will

22  that's videotaped.  I just count from my next book, I took 10

23  suicide notes which I discuss in my next book called *The London*

24  *Bombings*, and you can see that there is nothing operational in

25  any of the 10.  And I've seen maybe two or three dozen suicide

1    notes.  These are just downloaded from my book.

2    **Q.**  And when you say there's nothing operational, does that

3    mean there's nothing describing the actions that the person

4    would be planning?

5    **A.**  That's correct.  Because a note is, of course, written

6    before the operation and it would be terrible security to say

7    what you're going to do.  They just explain the rationale.

8          So if it's a personal note like this one, the person said

9    (reading):

10              "I want that my whole family and all my friends know

11          that I want to do jihad in the name of Allah and I hope to

12          find a place in paradise.  To my wife," and I'm not going

13          to say her name, "you were a good woman to me for more

14          than 20 years.  As God is my witness, I have loved and

15          been faithful to you, and so on, but, nevertheless, my

16          love for God and jihad was greater, therefore, I did

17          this."

18          And if you look at all the suicide notes from the London

19    bombers, and I have two of them, and the suicide notes that

20    were recorded in the Overt case, which was liquid bomb case in

21    London in 2006, we have all of those and you can see that all

22    of them is about the rationale of what they're doing to the

23    public, trying to explain to them what they're doing.  It's

24    really more of a propaganda piece to try to influence other

25    young Muslims to join them to do this.

SAGEMAN - DIRECT / GUGELMANN

1   Q.   I want to --

2          MR. HASIB:  Your Honor, if I may ask, the Government

3   has not seen these additional notes.  If they could be marked

4   as, I think, sealed exhibits, I don't know, as a precaution.

5   If the Government can be provided a copy.

6          MR. GUGELMANN:  Yes.  We have additional copies of

7   those.

8          THE COURT:  Okay.  Will you give them to the

9   Government?  Thank you.

10          MR. GUGELMANN:  And I'll also mark a copy here as

11   Hearing Exhibit 2.

12      (Hearing Exhibit 2 marked for identification)

13          THE COURT:  Why should they be sealed?

14          MR. GUGELMANN:  I would defer to Dr. Sageman on

15   whether they would need to be sealed.

16          THE WITNESS:  Yeah, I mean, those are my notes and

17   there's nothing -- maybe the last one, but the last one was

18   part of a document that was entered in the Amor Ftoui case.

19   That's still in litigation.  I don't think that --

20          MR. GUGELMANN:  I don't know that these need to be

21   entered into evidence, Your Honor.  I think he's referred to

22   them.  The Government has seen them.  The Court can --

23          THE COURT:  All right.  So they'll be marked for

24   identification, remain sealed unless a party wishes -- as I

25   understand, these are examples --

1        **THE WITNESS:**  That's correct.

2        **THE COURT:**  -- of suicide notes --

3        **THE WITNESS:**  That's correct.

4        **THE COURT:**  -- in operations in which it was clear

5   that a suicide -- I mean, a bombing occurred and this was what

6   was found by the authorities one way or the other or

7   disseminated by the bomber --

8        **THE WITNESS:**  Disseminated by the bomber.

9        **THE COURT:**  -- disseminated by the bomber as his or

10  her last note on the subject?

11       **THE WITNESS:**  That is correct, and all of those were

12  suicide bombings.  By that I mean the whole purpose was to blow

13  yourself up and kill as many people as possible.  So suicide

14  was an integral part of the operation.

15       **THE COURT:**  And your point here is when you compare

16  and contrast these notes with what is Exhibit Number -- well,

17  it's listed as 5053 Bates stamp --

18       **THE WITNESS:**  That's right.

19       **THE COURT:**  -- they're not similar, they're

20  dissimilar, and they're dissimilar in some ways, one of which

21  is this describes operational methods and the actual suicide

22  notes do not contain operational information?

23       **THE WITNESS:**  That's one difference.  And the other --

24       **THE COURT:**  Yeah.

25       **THE WITNESS:**  -- Bates 5053 does not -- explains a

1  rationale.  Those explain the rationale and justification for

2  doing things.  So they're radically different.

3          **THE COURT:**  Okay.

4  **BY MR. GUGELMANN:**

5  **Q.**   Did Mr. Alhaggagi -- so Mr. Alhaggagi submitted this

6  report to someone he told you; is that right?

7  **A.**   Yes.

8  **Q.**   Did he actually get any bomb-making instructions as a

9  result of providing this to someone?

10  **A.**   Not according to him.

11  **Q.**   And why was that?

12  **A.**   Because he did not submit a *baya* to -- he did not swear

13  allegiance -- *baya* is B-A-Y-A -- he did not submit allegiance

14  to the trainer and to ISIS, and so the bomb maker did not give

15  him the manual.

16          But I think that he logged on to another site, which is, I

17  don't know, the science of bomb making or something like that,

18  it was a channel; and as he accessed that, he saw a link from

19  some guy named Abu -- A-B-U -- something linking to some kind

20  of manual.  He clicked on the manual and he got -- he clicked

21  on the link and got the manual from the other person.

22  **Q.**   So he did ultimately --

23          **THE COURT:**  So as I understand the scenario is that he

24  did not swear allegiance to the -- we'll call him Individual

25  Number 1 --

1      THE WITNESS:  Right.

2      THE COURT:  -- the first individual.

3      THE WITNESS:  Correct.

4      THE COURT:  Okay.  And, therefore, he wasn't given the

5  information about how to make the bomb.

6      THE WITNESS:  That's correct.

7      THE COURT:  But he was interested enough in how to

8  make a bomb that he pursued that with someone else.

9      THE WITNESS:  With another site, and on this site

10 there was a link to a manual, he clicked it, and that's how he

11 got the manual.

12     THE COURT:  Then I'm trying to figure out if all of

13 this is sort of a joke, why wouldn't he carry the joke to the

14 next step and promise allegiance to somebody who he has no

15 allegiance to?

16     In other words --

17     THE WITNESS:  I see.

18     THE COURT:  -- what's the diff?  Since he's obviously

19 interested in the bomb or he seems to be, whatever his

20 motivation is, he does take the next step, what's the big deal

21 about, "Okay.  Here's my allegiance.  I'm for you, support you.

22 Now give it to me"?

23     THE WITNESS:  That's a fair question.  I don't think

24 that he wanted to have allegiance to ISIS.  He really wanted

25 the bomb making.  I don't think it was a joke to him to get the

1    manual.  He was actually interested in bomb making, simply

2    morbid curiosity, but he was not interested in pledging

3    allegiance to a terrorist organization.  I think he probably

4    knew that was wrong and that was -- that may have been against

5    the law.  So he drew the line there.

6            **THE COURT:**  Okay.

7            **THE WITNESS:**  But he also knew that the bomb manual

8    came from ISIS because, as I said, the individual who put the

9    link was named Abu something, which is often a jihadi name, and

10   so he was pretty sure it came from ISIS.

11   **BY MR. GUGELMANN:**

12   **Q.**   So Mr. Alhaggagi disclosed to you that he had not gotten

13   the bomb manual from the report -- from the person connected to

14   the report, had gotten some material through another means.

15   What did he do with that?

16   **A.**   Well, I think he read it and he was confused by it, as I

17   was, when I read it myself.

18   **Q.**   Confused in what way?

19   **A.**   It's not as clear.  There are a lot of bomb-making

20   articles in the jihadi literature.  The most famous and the one

21   that's used most often is from the first issue of *Inspire*

22   magazine, a magazine put out by Al-Qaeda in the Arabic

23   Peninsula, and the article there is "How to make a bomb in your

24   mom's kitchen."  And this is very simple bomb making that

25   people have downloaded multiple times.

**SAGEMAN - DIRECT / GUGELMANN**

1    And most of the bombings that we see that are self-taught,

2  because some people are trained and they make different bombs,

3  but most of the self-taught bombers use that recipe as opposed

4  to this ISIS recipe, which is for what we call a shape charge

5  or what they call in the manual a directional bomb.

6  **Q.**   You said this common or simpler bomb recipe was from

7  *Inspire* magazine.  Had Mr. Alhaggagi ever heard of *Inspire*

8  magazine?

9  **A.**   No, he had not.

10 **Q.**   And where did you -- how do you know that?

11 **A.**   Because he had a discussion with the FBI confidential

12 informant and the confidential informant said, "Well, it's like

13 *Inspire* magazine."

14    And he said, "What is that?"

15    And the informant said, "It's a magazine put out by Anwar

16 al Awlaki -- A-N-W-A-R, al, and then Awlaki is A-W-L-A-K-I.

17 And he's a Yemeni person.

18    And so Mr. Alhaggagi said, "Oh, I'll look for it."

19 Because he knew about Anwar al Awlaki.

20 **BY MR. GUGELMANN:**

21 **Q.**   What's the significance of Mr. Alhaggagi not knowing what

22 *Inspire* magazine is?

23 **A.**   Well, in my almost four dozen interviews with

24 English-speaking terrorists or terrorist suspects, he was the

25 only one who did not know what *Inspire* magazine is.  It's

**SAGEMAN - DIRECT / GUGELMANN**

1  extremely -- it's extremely famous and a lot of people who are

2  not even terrorists or don't inspire to become terrorists have

3  downloaded that magazine.

4  **Q.**   The second or the next phase in the chronology here is

5  that Mr. Alhaggagi came in contact online with the person we've

6  referred to as the CHS, the confidential human source.  And

7  we'll continue to just refer to that person as the CHS here.

8      Did you come to learn how that came about?

9  **A.**   Yes.  Mr. Alhaggagi was on I think it may have been an

10  Islamic State website talking to a person named Abu 'Ali who

11  was claiming to be able to sell weapons.  And so Mr. Alhaggagi

12  was testing him and says, "Well, you know, can I buy some

13  grenades with timers?  And how much are they?"

14      And Abu 'Ali was trying to kind of continue the

15  conversation, but somebody took a snapshot of the conversation,

16  and Abu 'Ali saw that because a person is notified immediately

17  when a snapshot of the conversation is taken, and he said,

18  "Nice try," and disappeared completely.

19  **Q.**   And how did that lead to the contact with the CHS?

20  **A.**   About a day or so afterwards, because with the

21  conversation with Abu 'Ali, I think Mr. Alhaggagi said he was

22  in the United States, and somebody else was in the same chat

23  room while this was taking on, supposedly CHS notified his FBI

24  handler who probably gave him the green light to contact

25  Mr. Alhaggagi.

1    So the next day the CHS contacted Mr. Alhaggagi and said,

2    "I come from Abu 'Ali, and do you have any weapons to sell?"

3    And that's how the contact was made.

4    **Q.**    And there are then extensive communications between

5    Mr. Alhaggagi and the CHS online or through various messaging

6    apps; correct?

7    **A.**    That's correct.  About 200 pages worth.

8    **Q.**    In the course of those conversations -- and we're going to

9    go through some of them -- Mr. Alhaggagi said a lot of quite

10    disturbing things about plans that he had for attacks, plans

11    that he supposedly was working on.

12    So I want to ask sort of a general question before we look

13    at some of the specifics, how his willingness to make those

14    claims factors into your evaluation of him in terms of his

15    dangerousness.

16    **A.**    Well, from the discussion that he had with CHS, I was very

17    alarmed.  Again, it looks very damning.  He said, "I'm going to

18    do this.  I'm going to do that."  And so if I were the FBI, I'd

19    look further into it.

20    **Q.**    Ultimately what did you conclude about his intentions with

21    respect to these various claims that he made?

22    **A.**    Well, after all the events happen and you can see that all

23    of this was just online talk and there was nothing that was

24    done offline except meeting with CHS' cousin, which I'm sure

25    we'll get to very soon, nothing was done.  There was no act in

**SAGEMAN - DIRECT / GUGELMANN**

1   furtherance and, therefore, the conclusion is that he's just

2   all talk and nothing else.

3              **MR. GUGELMANN:**  Can you put up slide -- I think we're

4   on 7.

5        So these next slides are going to be excerpts, Your Honor,

6   of Exhibit E to the Defense sentencing memorandum, which is a

7   document that starts at Bates 07551.

8   **Q.**   So on the screen in front of you, these are statements by

9   Mr. Alhaggagi.  He says (reading):

10            "I got some mad crazy plans."

11       He says (reading):

12            "I think the best thing to do is to plan everything

13       out, carry out many attacks and tactics at once, which

14       would show the enemies it's more than just guerilla

15       warfare and this is properly organized.  LMAO."

16       Which means what?

17  **A.**   Laugh my ass off.

18  **Q.**   (reading)

19            "That sounds so funny when you say it (escape plan)

20       hahaha."

21       I just want to ask about the "LMAO" at the end of that.

22   And if you turn to the next slide --

23  **A.**   I don't have a copy of your slides.

24  **Q.**   Oh.  I'm sorry.

25             **THE COURT:**  On the screen.

1    BY MR. GUGELMANN:

2    **Q.**   On the screen.

3    **A.**   Oh, on the screen.  I'm sorry.

4    **Q.**   (reading)

5          "LMAO.  I was thinking about that, just staying here

6          and establishing something; but you know what they say,

7          everyone is gangster until it's time to do gangster shit."

8          Three laughing emojis.

9          I just want to ask, in a lot of these chats we see "LMAO,"

10   we see emojis.  What does that indicate to you, if anything?

11   **A.**   Well, it's a certain informality of talk.  People are

12   becoming friends.

13         But before you do that, you have to set the context up

14   because context is always very important.

15         When CHS wanted weapons, Mr. Alhaggagi said, "Oh, I have a

16   lot of suppliers.  I can send you weapons and, you know, I've

17   been buying and selling weapons from the beginning."

18         And then the CHS dropped a hint, which is "I want to use

19   them to defend the *ummah*," meaning the Muslim community.  And

20   then he went on further, the CHS, even before I think

21   Mr. Alhaggagi said any of this, he said, "Wasn't Orlando

22   great?"  And by "Orlando great," he meant Omar Mateen's murder

23   of dozens of people at the Pulse discotheque I guess in

24   Orlando, Florida, that happened before.

25         And so with --

**SAGEMAN - DIRECT / GUGELMANN**

1   Q.   Doctor, I'm sorry to interrupt, but I think the exchange

2   you're talking about is on the monitor in front of you now; is

3   that correct?

4   A.   No.  That's before that.

5   Q.   There was an earlier reference?

6   A.   It was an earlier reference because that framed the whole

7   discussion.  And so when Mr. Alhaggagi is talking about "fag,"

8   if you remember the Pulse was actually a gay discotheque.  So

9   there was rumors that maybe Mr. Mateen was gay or something

10  like that, was an antigay type of attack, which turns out not

11  to be the case.

12       But I think that was really kind of the background of all

13  those denigration of gay.  Yes, "I was so happy about Orlando

14  brothers.  I live close to San Francisco," and so on.  That's

15  correct, that is the background of this.

16  Q.   One of the things Mr. Alhaggagi says here is (reading):

17            "I'm going to handle them right.  LOOOOL."

18       What does that mean?

19  A.   LOL is laugh out loud, and so this is laugh out out out

20  out loud.  It's an emphasis.

21  Q.   If you could go on to the next slide, he says (reading):

22            "I'm going to tear the city up.  The whole Bay Area is

23       going to be in flames."

24       Followed by four laughing emojis.

25       These are pretty grandiose claims that are being made,

1    especially if you go to the next slide (reading):

2             "My ideas are genius."  Laughing my ass off with a lot

3        of Os.  "I'll probably get near 500 but my goal is

4        10,000."

5        What does the large-scale grandiosity of these claims tell

6    you, if anything?

7    **A.**    Well, this is very typical of Mr. Alhaggagi; namely, he

8    escalates, he escalates, he escalates to see where the other

9    person is going to say, "Hey, timeout.  Let's be real here.

10   This is nonsense."

11       But instead what he gets is "This is great.  This is

12   fantastic."  He could not believe that the more ridiculous and

13   the more grandiose he was sounding, the other person was still

14   saying, "Oh, this is fantastic.  Let's do that, brother."

15   **Q.**    On the next slide (reading):

16            "My aim is to get 10,000 people."

17       On the next slide (reading):

18            "I'm going to redefine 'terror.'"

19       To which the CHS responds (reading):

20            "Even the best operations lately haven't come close to

21       500."

22       Is this what you're referring to when you say that he is

23   getting positive feedback?

24   **A.**    Yes.

25   **Q.**    And then finally I want to ask you specifically about the

**SAGEMAN - DIRECT / GUGELMANN**

1   exchange on the next page, which has to do with strychnine.

2   One of the things that Mr. Alhaggagi claimed he was planning to

3   do is obtain strychnine online.  Did you discuss that with him?

4   **A.**    Yes.

5   **Q.**    And did he follow through on that?

6   **A.**    No, he did not.

7   **Q.**    There is evidence in the record that you reviewed that he

8   went online and looked at a website where apparently you could

9   purchase strychnine.  Have you seen that?

10  **A.**    Yes.  He went to the Alibaba website to find out what

11  strychnine looked like because before he went online, he said

12  he was going to use the strychnine in drinks.  And as you can

13  see in the report that he sent to get the bomb manual, that's

14  exactly what he said.  He said, "I'm going to use the

15  strychnine in drinks to poison people."

16       But while he was on-site, he was asking the Alibaba

17  salesperson, he said, "What does it look like?"

18       And the Alibaba salesman said, "Just a white powder" --

19  "Just a powder."

20       And he said, "What color is it?"

21       And the salesman said, "It's white."

22       And so then he said, "Oh.  Maybe I'll mix it with

23  cocaine."

24       So about two hours after he was on the Alibaba website, he

25  said, "It looks like cocaine.  I could mix it with cocaine."

1    And so you can see that this is typical Mr. Alhaggagi.  He

2    actually does his homework.  When he trolls people, in order to

3    make himself more credible, he actually goes to the site, finds

4    out about the products.  Whether it's bomb making, whether it's

5    strychnine, whether it's satanic cults, he goes on the site,

6    finds out about it so it makes him sound a little bit more

7    credible.

8        And that's basically what happened here, he found out it

9    was white powder so that gave him the idea of cocaine.

10   Q.    Did he actually follow through on any -- did he have

11   access to cocaine, for example?

12   A.    Not that I know of, no.

13   Q.    Did he buy strychnine?

14   A.    No, he never did.

15   Q.    Did he take any steps that you're aware of to carry out

16   any of the plans that he described in the slides we've been

17   through and in other exchanges with the CHS?

18   A.    No.  Just all talk and to see what's the reaction of the

19   other person.  He told me he wanted to look like a bad ass to

20   the CHS so that the CHS would both admire and be scared by him.

21   Q.    Your task here was to evaluate two things, whether he has

22   an ideological commitment to an extremist mentality and whether

23   he poses a risk of danger.

24        How do these statements that he's made factor into your

25   opinion on the first part of that, that he does not espouse

1   radical beliefs?  Do they affect your view there?

2   **A.**   Well, there are two hypotheses here.  He's either trolling

3   people or he's a real jihadi, and so you have to decide.  And

4   so you try to accumulate as much evidence confirming or

5   refuting either hypothesis.  That's how it's done.

6        And here talk is cheap and people -- there are so many

7   people on the Internet claiming all kind of things.  I'm old

8   enough to remember the *New Yorker* cartoon of a dog in front of

9   a computer saying, "On the Internet nobody knows you're a dog."

10  And that's very much my relationship to the Internet.

11       And so I want to see a little bit more offline activity

12  carrying through some of the things that he says online.  But

13  as you can see, there's very little.  I mean, there's just

14  about potential attacks.  There's not that much justification

15  or signs of knowledge of the ideology of a jihadi group.  There

16  is no cursing of the United States that I see of a lot of other

17  jihadis that, you know, I've interviewed or seen.  People are

18  very negative about the United States.  It's the enemy and they

19  explain why they want to go after the United States.

20       Here there's none of that in those exchanges, and that

21  surprised me.  But, you know, I wanted to see more activity

22  offline to see whether he carries through some of the threats.

23  **Q.**   Is he a jihadi?  Does he have a jihadi mentality?

24  **A.**   He does not seem to have any action.  He just talks on the

25  Internet and says all kinds of very nasty things.  Not just

1    attacks but to people that he trolls, mostly women, and very

2    disgusting, obscene things.  He's not a nice guy.

3    Q.   So you said that what you were looking at in order to try

4    to answer this question, is he a jihadi or is he a troll, was

5    his action in the real world, actual steps taken.  And the next

6    thing that happens in the chronology here is that the CHS puts

7    Mr. Alhaggagi in contact with someone who is supposedly his

8    uncle who is, in fact, an undercover agent who we've been

9    referring to as the UCE, and let's continue to call him the

10   UCE.

11       Mr. Alhaggagi meets with the UCE.  So now he has taken a

12   step in the real world.  He has moved from purely online

13   activity.  How does -- his willingness to take that step, why

14   doesn't that mean to you that he is espousing an ideology or is

15   willing to commit political violence?

16   A.   He has developed this relationship over a week with CHS

17   who sends him out of the blue his cousin or uncle -- sometimes

18   referred to cousin, sometimes referred to uncle I think -- and

19   he said that his relative, the UCE, is on his way to meet him,

20   as he's texting Mr. Alhaggagi, and he had burned all his

21   bridges in Utah where he allegedly was from.  It's a 10-hour

22   drive.  And could he meet in a few hours at the mosque in

23   downtown Oakland.

24       Mr. Alhaggagi felt a little bit guilty that he was the

25   cause of this person leaving Utah and coming to see him, and he

**SAGEMAN - DIRECT / GUGELMANN**

1  kind of felt stuck and obligated to at least see him.  And I

2  think he was curious at the same time.  He didn't know what to

3  expect, and so he saw him.  I mean, there was no commitment

4  either way.

5  **Q.**  And I think you rightly corrected me.  I think I said

6  "uncle."  It was cousin.

7      With the UCE, he then has had in-person conversations

8  about, I think, all of the various things he had discussed

9  doing with the CHS and additional ones as well.  Why is -- his

10  willingness to have these conversations in the real world with

11  someone who is posing as an Al-Qaeda member, why does that not

12  indicate to you that he is dangerous?

13  **A.**  Well, at that time he's not an Al-Qaeda member.  I mean,

14  he thinks he's just a wannabe who's a Muslim and he's upset

15  that he lost his job in Utah.  And the fact that the UCE, the

16  cousin, is Al-Qaeda comes a little bit later in the

17  conversation.  So he basically thinks that this guy is putting

18  him on; and, as he told me, "You know, I lied to him, he lied

19  back to me," and that was kind of their relationship.

20      But he told him about the three sets of attacks that he

21  outlined in his report to the bomb maker, the same attacks.

22  You know, set fire to Berkeley hills, poison with strychnine a

23  large number of people, and then set off multiple explosions

24  through backpacks, especially the Berkeley dormitories and

25  perhaps some gay bars or discotheques.

1   Q.   You said that Mr. Alhaggagi said to you, "I lied to him,

2   he lied to me."  What did Mr. Alhaggagi think the UCE was lying

3   to him about at the time?

4   A.   I think he was lying to him being Al-Qaeda.

5   Q.   Mr. Alhaggagi did not think the UCE was Al-Qaeda?

6   A.   I think he was a wannabe who wanted to be -- just like

7   Mr. Alhaggagi wanted to look fierce so I think he felt he

8   embellished his background.  There was no doubt that in

9   Mr. Alhaggagi's mind that this guy was at least a sympathizer

10  or, you know, very close to Al-Qaeda.

11       He did not look like an Al-Qaeda guy, and by that I mean I

12  think that in Mr. Alhaggagi's mind, you know, people think

13  terrorists are 10 feet tall and, you know, they're strong and

14  so on; and this guy, who is in his late 40s, was very skinny,

15  did not really fit that profile of a strong person.  So he

16  didn't really feel very much intimidated by this guy, and at

17  the same time he really thought that this guy was bullshitting

18  him just as he was bullshitting the guy.

19  Q.   Did there come a point where Mr. Alhaggagi's views changed

20  on that, about whether the UCE was who he was pretending to be?

21  A.   Yes.  Two and a half weeks later.

22  Q.   What happened then?

23  A.   I think that the UCE took him to a storage place where he

24  showed him I think it was 4- or 5-gallon buckets filled with

25  ammonium nitrate, which are the main ingredient of the main

1   charge of some bombs, including what looked like maybe

2   detonator thus far.  And he said, "Oh, my God, what did I get

3   into?  This guy actually may be the real thing."  And at that

4   point things got, as he told me, real very quickly.

5           THE COURT:  Were there actual containers?

6           THE WITNESS:  Yes.

7           MR. GUGELMANN:  There were actual containers of

8   supposed -- of supposed material.

9           MR. HASIB:  What appeared to be explosives,

10  Your Honor, mock explosives.

11          THE COURT:  So somebody looking at it but not

12  sophisticated in chemistry --

13          THE WITNESS:  Would be scared.

14          THE COURT:  -- would reasonably believe that they were

15  vats of --

16          THE WITNESS:  Ammonium nitrate.

17          THE COURT:  Okay.  Thank you.

18          MR. GUGELMANN:  It was material that was mocked up to

19  appear as if it was actual explosive material.

20          THE COURT:  All right.

21  BY MR. GUGELMANN:

22  Q.   What did Mr. Alhaggagi do after being shown the barrels or

23  the buckets of explosive material?

24  A.   Well, he tried to delay the action by saying that he was

25  going to get all the supply -- the rest of the supply for the

1    bomb making -- and those were going to be car bombs I think or

2    truck bombs because they're large containers and on car bombs

3    those are not backpack bombs in a sense -- and started avoiding

4    meeting the UCE.

5        Now, UCE had told him that he was going to leave the

6    country the first week of December to go to Hajj because that's

7    when Hajj takes place.  So he calculated very quickly that if

8    he could delay him for two weeks, three weeks, the UCE would

9    leave and nothing would happen.

10   Q.    You said he told the UCE that he would get all the

11   supplies.  Did he know what supplies to get?

12   A.    No.  The UCE texted him the list of supplies to get.

13   Q.    Did Mr. Alhaggagi get those supplies?

14   A.    No.  Nothing.

15   Q.    Did he tell the UCE he had gotten them?

16   A.    He said he had half of it and he asked a friend to get

17   some more; and after two days, he stopped communication with

18   both the UCE and the CHS.

19   Q.    Did Mr. Alhaggagi in your opinion figure out that the UCE

20   was actually an undercover agent?

21   A.    No.  I think that was the last thing on his mind.

22   Q.    As you're aware, the Government has proposed a theory that

23   Mr. Alhaggagi was testing the UCE throughout the course of

24   their relationship, their interactions, and ultimately figured

25   out he was an agent and that's why he disappeared.

1       Do you see any evidence to support that theory in your

2  view?

3  **A.**    No, I don't.

4  **Q.**    Do you see any evidence that Mr. Alhaggagi was testing the

5  UCE?

6  **A.**    No.

7  **Q.**    Were Mr. Alhaggagi's interactions with the UCE, in your

8  view, consistent with those of someone who suspects that they

9  might be dealing with an agent or an informant?

10 **A.**    No, because -- kind of the opposite because basically what

11 Mr. Alhaggagi did, he kind of basically fled home and hid at

12 home.  And this may be effective against a stranger who does

13 not know whether you're armed at home and you're protected at

14 home so you assume that that stranger is not going to go and

15 find you at home.

16      Now, if that were the FBI, home is the last place you want

17 to be because the FBI knows exactly where you live.  I mean,

18 indeed, I think that the UCE picked him up from home at one

19 time.  And the FBI can come with SWAT teams.  I mean, even bad

20 B movies don't really have people hiding from the Feds. at

21 home.  They go and hide in a random place or they try to leave

22 the country.  That doesn't make sense.

23 **Q.**    One thing we have not discussed so far in terms of

24 Mr. Alhaggagi's actions is that in the course of these

25 interactions where he is having the conversations with the CHS

**SAGEMAN - DIRECT / GUGELMANN**

1  and then the UCE, he is also committing crimes in the real

2  world.  He is also committing identity theft crimes.

3  **A.**   That's correct.

4  **Q.**   Did you discuss those with him?

5  **A.**   Yes.

6  **Q.**   Did he stop committing those crimes when he withdrew from

7  his interactions with the UCE?

8  **A.**   No.  The FBI witnessed him picking up a package of goods

9  that he ordered on the false identity.  I think one was on

10 August 1st and the second was several weeks later.  So he

11 continued.

12 **Q.**   And is it consistent, in your experience, for someone who

13 believes they're the subject of an undercover operation to

14 commit crimes like that?

15 **A.**   No.  You would lay low and you wouldn't do anything

16 anymore.

17 **Q.**   Mr. Alhaggagi also discussed the slides that we went

18 through and other things that he said.  He discussed those

19 plans with the CHS before meeting the UCE.  Is that behavior

20 consistent with someone who is suspicious about the possibility

21 of being under surveillance or the subject of an undercover

22 operation?

23 **A.**   No.  If you want to vet somebody to see whether you can

24 trust a person, you vet that person before you tell them all

25 your secrets.  I mean, that's the whole point of vetting.  You

**SAGEMAN - DIRECT / GUGELMANN** 87

1  don't tell them all your secrets and then say, "Oh, by the way,

2  are you the real thing?"

3       Now, if you look at the conversation, from the very start

4  that he got into the UCE's car, the first time that they met on

5  July 29th, he told him everything.  He was going to do

6  strychnine.  He was going to set fire to the Berkeley hills,

7  and actually the UCE told him a better way of doing it.

8  **Q.**  And I'm going to stop you there.

9  **A.**  Right.

10  **Q.**  That's a portion of the Government's brief that was sealed

11  so we won't discuss that.

12  **A.**  No, but I'm not going to say any more on that, just a

13  better way.  And the bombings, the various bombings.

14       And the conversation about Al-Qaeda really came as the UCE

15  told him, "Well, some brothers are supporting me."

16       And so he said, "Who's that?  Al-Qaeda?"

17       And the UCE said, "Yes."

18       And then I think there was a gap and Mr. Alhaggagi was not

19  trying to vet him for Al-Qaeda; but at that time Al-Qaeda and

20  the Islamic States were fighting in Syria so he's asking him,

21  "What's with Al-Qaeda now?"  I mean, it's just kind of

22  information.

23       And, indeed, later that evening he asks the same question

24  to the CHS.  He said, "Do you follow what's been happening

25  between the Islamic State and Al-Qaeda?  You know, I'm lost.

**SAGEMAN - DIRECT / GUGELMANN**

1   Why do they fight together?"

2       And the CHS said the same thing, he says, "I can't make it

3   out.  So let's just fight the West, the *kufr*."

4   **Q.**   Another part of the theory that the Government has

5   advanced is that the UCE made some mistakes in their

6   interactions which alerted Mr. Alhaggagi to the possibility or

7   the likelihood that he was an undercover agent.  One of those

8   is that in the conversation I think you were just discussing he

9   mentioned Iran and expressed some support in a general sense

10  for Iran.

11      Would that have alerted someone in Mr. Alhaggagi's

12  position that the person he's dealing with is not a potential

13  Al-Qaeda member?

14  **A.**   No.  Al-Qaeda actually has a fairly good relationship with

15  Iran; and, as a matter of fact, I think the only -- except for

16  al-Zawahiri, who is the head of Al-Qaeda, most of the other

17  senior members of Al-Qaeda are in Iran.  They found sanctuary

18  in Iran; namely, the head of military operation, a guy named

19  Saif al-Adel -- A-D-E-L, Adel; Saif is S-A-I-F; al then Adel.

20      And in 2006, there was a very famous letter that Ayman

21  al-Zawahiri -- I'm sorry, Zawahiri is Z-A-W-A-H-I-R-I -- had

22  written to at that point the forerunner of the Islamic State

23  and the head of the forerunner was a guy named Zarqawi --

24  Z-A-R-Q-A-W-I -- telling him not to kill Shi'a, that they

25  should instead focus on the West fighting Americans in Iraq.

1    And so Al-Qaeda, the Al-Qaeda that's in Afghanistan, had good

2    relationship with both Shi'a and Iran.

3    **Q.**    Part of the Government's theory here is that in discussing

4    Iran, the UCE inadvertently aggravated Mr. Alhaggagi because

5    Mr. Alhaggagi has a particular antipathy towards the Shi'a.  Is

6    that the case in your view of the evidence?

7    **A.**    I haven't seen any evidence that really he disliked Shi'a.

8    On the contrary.  I think that he had Shi'a friends when he was

9    in Yemen and he treated Shi'a and jihadi the very same way when

10   he was trolling them on the Internet.  So, no, I did not find

11   that he had an antagonism towards Shi'a.

12   **Q.**    You mentioned Ayman al-Zawahiri.  Did the UCE make a

13   mistake by revealing to Mr. Alhaggagi that he didn't know who

14   Ayman al-Zawahiri is?  And just you said this but Ayman

15   al-Zawahiri, the leader of Al-Qaeda.

16   **A.**    Yes, I heard that.  I saw the video and I heard that, and

17   I could not make out the name of what I call Zawahiri.  He

18   pronounces very differently.  He doesn't put the emphasis on

19   the first syllable like I do, like most Westerners do.  He

20   pronounces it in an Arabic way, and I'm pretty sure that a

21   person speaking Dari, which is -- Dari, D-A-R-I -- which is a

22   form of Iranian Farsi -- F-A-R-S-I -- would probably pronounce

23   it in the Western way as opposed to the Arabic way.

24       So he repeated Zawahiri three times.  I could not

25   understand, and finally I figured out that it was Zawahiri.

**SAGEMAN - DIRECT / GUGELMANN**

1   But as soon as the UCE realized it was Zawahiri, he knew

2   exactly who Zawahiri was and even compared him in terms of how

3   he speaks to Bin Laden who speaks very softly, where Zawahiri

4   speaks very forcefully and he liked that.  He said he liked the

5   forcefulness of Zawahiri.

6   **Q.**   So I just want to be sure the record's clear because there

7   were several "hes" in there.  You're saying that Mr. Alhaggagi

8   has a different -- used a different pronunciation of Zawahiri's

9   name that you did not understand at first in listening to the

10  video, that it appears the UCE did not understand in listening

11  to Mr. Alhaggagi, but then once the UCE understood the name he

12  was saying, it was evident he knew who Ayman al-Zawahiri is?

13  **A.**   Yeah.  I think you summarized what I tried to say.  Thank

14  you.

15  **Q.**   Didn't Mr. Alhaggagi tell the CHS that he suspected that

16  the UCE was an agent?

17  **A.**   Yes, he did.  He did I think after the second meeting.

18  **Q.**   And why is that not an indication to you that

19  Mr. Alhaggagi was working on and ultimately did figure out that

20  the UCE was an agent?

21  **A.**   That's because speaking to the CHS is the same as speaking

22  to the UCE.  It's the CHS who introduced the UCE.  They're in

23  close contact with each other.  And, as a matter of fact, a day

24  or two later when he discussed something to the CHS, the UCE

25  calls him immediately and wanted to talk about that.

1      So you can see that if you cannot say to the -- to me it's

2   almost like one and the same person but if you tell the CHS,

3   "Oh, at first I thought that he may be an undercover or he may

4   be a Fed.," then you basically don't really believe it anymore

5   because you're not going to say, "You know, I don't trust your

6   cousin.  He's a Fed. and I'm not going to see him."

7      But instead he said, "You know, I didn't really think -- I

8   thought at first he was a Fed. and, hahaha, let's laugh about

9   it."

10     And the cousin said, "Well, we thought you were also a

11  Fed., hahaha."  You know, shake my head I think was how they

12  said -- SMH, shake my head, was how they had it in the text.

13  **Q.**   Last question on this issue.  One of the things that

14  Mr. Alhaggagi supposedly did to test the UCE was threaten to

15  beat someone up knowing, in the Government's theory, that this

16  would require the UCE as a law enforcement agent to intervene

17  and stop a violent crime from happening.  Is that consistent

18  with what you see in the evidence?

19  **A.**   No.  He did not tell the UCE that.  I think he tweeted

20  that -- he texted that in the middle of the afternoon to the

21  CHS, that he was going to beat up somebody and take $5,000 from

22  that person and was kind of avoiding the CHS at the time -- no,

23  not CHS -- I mean, he was avoiding the UCE at the time.

24     And I think that the UCE triggered an emergency meeting

25  four hours later to see him, and he said, "I'm half a block

SAGEMAN - DIRECT / GUGELMANN

1    away.  I need to see you now."

2       And he -- he actually did not want to answer the phone but

3    one of his friends did answer and said, "Oh, you have a guy

4    who's like half a block away.  He wants to see you."  So I

5    think he saw him.  That was on August 10th.  So it was the

6    third meeting between them.

7    **Q.**   And do you see any indication, either in the evidence in

8    the communications or from your interactions with

9    Mr. Alhaggagi, that he knew that this sort of threat would

10   require the UCE to respond in a certain way if the UCE was, in

11   fact, an agent?

12   **A.**   No.  I don't -- I don't know if Mr. Alhaggagi knew this

13   was the case.  I don't even know whether this is actually the

14   case, but I can -- I can very much identify with the FBI agent

15   listening to that and said, "Oh, my God.  We may be complicit.

16   We have to stop it."  And so I can see it from their point of

17   view, but I don't think that from Mr. Alhaggagi's point of view

18   he was that sophisticated that he might have expected that

19   reaction.

20   **Q.**   If Mr. Alhaggagi didn't figure out that the UCE was an

21   agent, why in your view did he retreat from his interactions

22   and then ultimately actually run away from the UCE and their

23   last meeting?

24   **A.**   It was the sight of those four buckets full of ammonium

25   nitrate that said, "My God, this is real.  This is not a joke."

 1   He treated it as a joke before that.

 2          THE COURT:  About how much longer do you have?  I'm

 3   not trying to hurry you.  I'm just trying to deal with

 4   recesses.

 5          MR. GUGELMANN:  I think this would be a good time for

 6   a recess.

 7          THE COURT:  Okay.  Ladies and gentlemen -- well,

 8   Counsel, we're going to take a recess.  We'll resume at

 9   1:00 o'clock.  Half an hour recess.

10              (Luncheon recess taken at 12:28 p.m.)

11   **Afternoon Session**                              **1:04 p.m.**

12          THE COURT:  Let the record show the defendant is

13   present, the parties are present.

14      You may continue, Mr. Gugelmann.

15          MR. GUGELMANN:  Thank you, Your Honor.

16   **Q.**   Dr. Sageman, before the break, we were talking about

17   whether Mr. Alhaggagi figured out that the UCE was, in fact, an

18   agent.  Prior to your life in academia, you had operational

19   experience in intelligence and counterintelligence; is that

20   correct?

21   **A.**   Yes.

22   **Q.**   Can you describe a little bit of that part of your

23   history?

24   **A.**   Well, I was a case officer at the CIA.  I ran spies.  I

25   also controlled most of the major Mujahideen commanders --

1  which Mujahideen is pleural -- against the Soviets during the

2  Afghan-Soviet war.  I ran very highly secret sources within the

3  Indian government and Pakistani government when I was over

4  there.

5       Then I did the opposite 20 years later; namely, when I was

6  both at the NYPD and the Army, I was the special adviser to the

7  deputy chief of staff and he trusted me so he wanted me to

8  actually evaluate people, and so I both evaluated potential

9  terrorists and potential traitors.

10      And so I got all the information that the FBI had, and

11  much of it was the FBI giving us the information.  And on the

12  basis of that, I would go and interview them to determine

13  their -- the probability that they may turn violent or may be a

14  threat to the United States; i.e., providing secrets to the

15  enemy.

16  Q.  And as part of your operational experience, did you have

17  to worry at that time about the concern of counterintelligence

18  or agents from other governments who were trying to figure out

19  what your agents were doing?

20  A.  Yeah, very much.  I also looked over the double-agent

21  program within the Army.

22  Q.  And so are you familiar with the way someone who's

23  experienced in intelligence work would go about vetting a

24  counterpart for potential -- to see if they were potentially an

25  undercover agent?

**SAGEMAN - DIRECT / GUGELMANN**

1    **A.**    Oh, I see what you're getting at.  Yes.

2    **Q.**    And in your opinion, is what Mr. Alhaggagi did in this

3    case consistent with the way someone who understands

4    intelligence work would have vetted potentially someone who

5    they suspect of being an agent for the other side?

6    **A.**    No.  He went about it completely the opposite of what we

7    would do.  The vetting is upfront to make sure that you trust

8    the person and you can share secrets with that person.  You

9    don't share secrets with that person and then, as an

10   afterthought, try to, quote, "vet them."

11   **Q.**    Mr. Alhaggagi, as we discussed, started with online

12   contact with the CHS.  He moved into real-world contact with

13   the UCE.  In your experience of interviewing and studying

14   terrorists, is that a pattern that you see in people who are

15   actually serious about making an attack?

16   **A.**    Well, there are two types of attacks.  There are attacks

17   coming from the outside and so people are trained outside and

18   they come back to the country and carry out the attacks, like

19   the 7/7/2005 bombings in London; or they are homegrown attacks,

20   people who decide on their own to go and carry out attacks.

21        There is no evidence that here we have a case of the

22   former; namely, people trained outside to come back to their

23   home country and carry out attacks.

24        So the question is:  Is this consistent with people

25   carrying out attacks here who are homegrown?  And not really.

**SAGEMAN - DIRECT / GUGELMANN**

1   Most people are a little bit more discreet and secret about

2   what they want to do.  They don't want to get caught.  They try

3   to develop a rapport of trust with the other person, and they

4   do things in furtherance of their attacks beforehand.  They buy

5   material.  They often train.  They go out and do paramilitary

6   things.  They do paintball exercise because they think they're

7   soldiers so they do soldierly things.  And none of that was

8   present in this case.

9   **Q.**   After Mr. Alhaggagi cut off contact with the UCE, he

10  eventually was back online and started using the Telegram app

11  again.  Can you explain in your understanding how that came

12  about and why he did that?

13  **A.**   Well, I think that he laid low for about a month and a

14  half after the fifth meeting with the UCE when the UCE

15  basically surprised him on the street and just ran away from

16  him, a month later after that fourth meeting that we spoke

17  about earlier.  And so there he didn't do anything but just

18  being at home and hiding at home but not really even going out.

19      That really got to him and he was bored out of his mind so

20  he started slowly getting back to the Internet, and then he was

21  back full-time on the Internet about a month and a half after

22  the last mishap with the UCE.  Yeah, with the UCE.

23  **Q.**   In your view, is the reason that he -- let me just take a

24  step back.

25      He got back online.  He started using the Telegram app.

He was then, again, in ISIS or ISIS-related chat rooms; is that
your understanding?

**A.**   He was in many chat rooms, and so he was on Shi'a chat
rooms.   He was on ISIS chat rooms.   He was mainly on Yemeni
chat rooms where they tell jokes about Yemen.   And he created
his own chat room to try to invite girls to come so that they
could troll them.

**Q.**   His participation in the ISIS-related chat rooms, from
what you have seen in the evidence and learned from him, was
that a way that he was trying to find a different way of
supporting ISIS because his real-world plans had been thwarted?

**A.**   No.   He basically -- and he clearly said it to his best
friend online, a guy named YMN, which is those three letters,
YMN -- I call it Yemen, but that's how he appears on the
Telegram chat room -- that they would participate in both Shi'a
and jihadi chat rooms and basically say that the other guys are
the enemies in order to get them kicked out of the chat room.
It was a game for them.   And so that's what he did.   He did not
really participate in order to further the goals of ISIS.

         **MR. GUGELMANN:**   Can you put up the next slide?

**Q.**   So on the screen in front of you is a line taken from
Defense Exhibit I, which is a chat between Mr. Alhaggagi using
the handle Zain -- Z-A-I-N -- and the person you referred to as
YMN.

         And in the quote we see here Mr. Alhaggagi is speaking and

**SAGEMAN - DIRECT / GUGELMANN**

1    he says (reading):

2              "I took their identifiers to the *dawa'ish* and told

3         them 'These are Shiites, block them'; and I took it to the

4         Shiites and told them 'These are *dawa'ish*, block them.'"

5         What does the word "*dawa'ish*" mean?

6    **A.**    "*Dawa'ish*" is the four letters in Arabic of the

7    Islamic State of Iraq and we call it Syria but they call it

8    Levant, which is sometimes why we call it ISIL instead of ISIS.

9    And those represent four initials.  But it's a very derogatory

10   way of referring to the Islamic State.  Mostly jihadi call it

11   *dola*, which is in Arabic the state, just the state.  It means

12   the state.  *Dola* so they call it the state.

13        The fact that he refers to them as *dawa'ish* means that he

14   did not think highly of them.  This is what other people kind

15   of refer to the Islamic State when they think in a derogatory

16   way.

17   **Q.**    Is it consistent, in your experience, with having an

18   actual commitment to the ideology of ISIS to use the term --

19   and you corrected my pronunciation -- *dawa'ish* to refer to

20   them?

21   **A.**    No.  It's the contrary.  It's a derogatory term for the

22   Islamic State.  So that means they don't share the same

23   ideology.  They don't share the same belief.  They're very much

24   on the other side.

25   **Q.**    So you explained what you understood to be the context for

1    this quote; and since it's a little bit complicated, I want to

2    go through that a little more step by step.

3        When he says here "I took their identifiers," meaning

4    their screen names, "to the *dawa'ish* and told them 'These are

5    Shiites, block them,'" what is it exactly you understand he is

6    describing there?  What is he doing?

7    **A.**   He's telling the other people on that chat group that the

8    people with the following handles are enemies, they're Shi'a.

9    So this is on an Islamic State chat room.  And you should

10   complain to administrator and have them blocked from Telegram

11   altogether.

12   **Q.**   And then he's saying that he took it, meaning the same

13   identifiers, "to the Shiites and told them 'These are *dawa'ish*,

14   block them.'"  What does that mean?

15   **A.**   It's doing the exact same thing, but on a Shi'a chat group

16   to say that the other guys are jihadis and get them off

17   Telegram.

18   **Q.**   And did he explain to you why he was doing this?  How did

19   this come about that he was posting handles in the ISIS chat

20   rooms and saying "These are Shiites, block them," and doing the

21   same in the Shiite chat rooms?

22   **A.**   He was constantly being kicked out of Telegram by both

23   groups actually and by women, and so he wanted to have revenge

24   and that's -- that was a joke to him.  That was his game.  He

25   and YMN both did that, and they got kicked out or blocked by

1  people, by participants in the respective chat groups that they

2  were trolling.

3  Q.  Was he being blocked, as far as you understand it, because

4  he was espousing a terrorist ideology or being anti-American,

5  or what was the reason that he was being blocked?

6  A.  He was being blocked because -- for many reasons.  Some of

7  the women complained that he was just very rude and insulting

8  to them so they kept blocking him.  And the other two assumed

9  that he was an enemy in their group and tried to block him

10  before -- because of that.

11      I don't think he really talked too much about his ideology

12  in any of those chat groups because actually he doesn't know

13  that much about the ideology.

14  Q.  And do you see any evidence that -- after he got back

15  online after leaving the UCE, did he engage in similar chats,

16  similar to those he had had with the CHS describing attack

17  plans, that sort of thing?

18  A.  No.  That he stopped.  That he stopped.  I didn't see any

19  more reference to attacks in the United States, and he was a

20  little bit more cautious about revealing his true identity, and

21  he had changed his handles.  And he had several handles,

22  including women, feminine handles.

23  Q.  The chat we looked at earlier this morning where his

24  handle was Qurrat al-'Ayn, that's a female name; right?

25  A.  That's correct, yes.

**SAGEMAN - DIRECT / GUGELMANN**

1   **Q.**   What do you understand -- Mr. Alhaggagi ultimately opened

2   social media accounts at the request of two different

3   individuals who he understood to be ISIS followers or

4   supporters.  Can you draw the connection between that conduct

5   and what we were just discussing here on the exhibit with

6   Mr. Alhaggagi's actions in posting user names in ISIS chat

7   rooms?

8   **A.**   Yes.  So both instances happened at the time he was being

9   kicked out of Telegram altogether actually.  The first one

10  happened at the end of October, early November, and the second

11  in the middle of November.  And so he needed to have allies to

12  retaliate for him since he was blocked from the sites.  And so

13  he tried to curry favor with some of the participants, and he

14  told me that the jihadis were by far more aggressive than the

15  Shi'a, and so he basically tried to curry favor with the

16  jihadis on the chat rooms.

17  **Q.**   And how does that relate to his opening the social media

18  accounts?

19  **A.**   Well, the jihadi in the chat room account were asking him,

20  "Well, somebody's going to contact you and we'd like to open an

21  account."  So the first one was Bank Al-Ansar, meaning the bank

22  of followers -- in Arabic bank is B-A-N-K, al-Ansar is A-L and

23  then A-N-S-A-R -- who asked him to open some Facebook and

24  Twitter account I think, and he did so.

25         And then the second was from a fellow who was posting at

```
 1   the same time that he was being kicked out, a guy named
 2   Munasir -- M-U-N-A-S-I-R -- who said that somebody's going to
 3   contact him, and so somebody did.  That person was called
 4   Abu -- A-B-U -- Muharib -- M-U-H-A-R-I-B -- Iraqi --
 5   I-R-A-Q-I -- and that person asked him to open some account.
 6   So he opened about, I guess, five Twitter accounts for
 7   Abu Muharib.  And when he was finished, you know, he said that
 8   he had done enough to curry favor and he ignored further pleas
 9   to open more accounts.
10   Q.   Further requests from Abu Muharib for additional accounts?
11   A.   That's correct.  Yes, that's correct.
12        THE COURT:  So let me ask you about these two
13   openings.
14        THE WITNESS:  Right.
15        THE COURT:  I just need to go through the reasoning
16   again.  You said that he was motivated, in your opinion, by the
17   fact that he had been excluded from what exactly?
18        THE WITNESS:  All right.  I think, Your Honor, if you
19   can show the line of the administrator from Telegram excluding
20   him from Telegram, you will understand why he was so upset for
21   being excluded.
22        THE COURT:  So, in other words, he was excluded from
23   Telegram?
24        THE WITNESS:  Right.  He was --
25        THE COURT:  And what was his understanding of
```

1    Telegram?

2         THE WITNESS:  Well, Telegram is just this software app

3    that there is an administrator.  I think they're Russians.  And

4    when people misbehave, they can limit their account for a

5    certain number of days.  So here I think it's about eight days.

6    It's about eight -- a week.

7         And so, for instance -- and you can see this is on

8    November 1st.  You see on November 1st the administrator of

9    Telegram says to him, sent him in English, and this I could

10   understand because it was in English.  It was not in Arabic.

11   I'll let you read it.

12                    (Pause in proceedings.)

13        THE WITNESS:  So he appealed, and the administrator

14   said, "No.  We investigated you and you did this.  They don't

15   like, you know, being insulted, and so on, so we're going to

16   limit your account for eight days."  So he basically had his

17   account limited, and so he wanted to retaliate.  He wanted

18   revenge.

19        THE COURT:  Revenge against?

20        THE WITNESS:  Against the people who complained

21   against him.

22        THE COURT:  Oh, okay.  So who did he understand were

23   the people who were against him who had complained?  What was

24   his understanding as you understood it?

25        THE WITNESS:  Well, the people who complain have to

1    have a direct relationship with him so he was able to identify

2    them, and so he was going to give their handle to some people,

3    some other people, so they can rally other folks to complain

4    about the people who complained about him to the administrator

5    so their account could be also limited.

6        MR. GUGELMANN:  I think if we put up the next slide, I

7    think that might help illustrate sort of the first step in this

8    process.

9        So that's another interaction between Mr. Alhaggagi and

10   it's called the spambot, and there Mr. Alhaggagi says

11   (reading):

12        "I got into an argument in a public group, and the

13        person I was arguing with got his friends to report me."

14       So I think Dr. Sageman is referring to "the person who I

15   was arguing with" as the enemy.

16       THE COURT:  Was there a particular political

17   affiliation or identification with that individual?  I mean, is

18   it that he got into a dispute with somebody, an individual, who

19   either did or did not represent a point of view or did or did

20   not represent a government or did or did not represent

21   something greater than just the individual themselves?

22       THE WITNESS:  Yeah.  So --

23       THE COURT:  I'm trying to figure out whether it's a

24   personal dispute or whether it's somehow a dispute related to

25   an ideology.

1      **THE WITNESS:**  No, no, no.  So most of the people who

2    were blocking him were women.  And in this instance because he

3    asked for help from jihadis, they were Shi'a were blocking him,

4    but most of them were women.

5         And I think he gave me the name of the woman who was

6    almost on a crusade, if I can say, against him.  He gave me her

7    name and she kind of pops up quite often, and she is against

8    him because he basically was very rude and insulting to her.

9    So it was not about the ideology.

10     **THE COURT:**  But here's what I need to have explained.

11    The defendant pled guilty to the crime of -- well, I don't have

12    it exactly in front of me, but it was to assist other, quote,

13    "terrorists" in promulgating their agenda or their plan or

14    their desires.

15         Okay.  Now what I'm hearing from this witness is really he

16    opened up this account because there was a complaint by some

17    women who he had offended by his message, and I'm trying to --

18    well, that's not -- I mean, whether it be women or men or

19    whatever gender, that's not a crime.  I mean, people get into

20    disputes all the time because somebody believes them to be

21    insulted or believes them to have taken some inappropriate

22    response.  That's not a crime.

23     **MR. GUGELMANN:**  So the issue here is the chronology of

24    events.  His actual crime was the last step in the chronology,

25    which was he was approached by people who he knew or understood

 1    were supporters of ISIS who said to him, "Please open these

 2    accounts."  He did it.  That's enough for material support of

 3    ISIS or attempted material support of ISIS as it's charged.

 4    The discussion that Dr. Sageman was having is the precursor

 5    event to that.

 6            THE COURT:  But then I'm trying to understand this:

 7    Is it the Defense position, or maybe it's -- I know I'm getting

 8    into a lot here, but if I'm having a dispute with somebody for,

 9    quote, what we'll call personal reasons, that's nonideological

10    reasons, and then somebody who I know to be associated with a

11    terrorist organization says to me, "Please open up an account,"

12    and I do so for the purpose of assisting me in my personal

13    dispute with that individual, even though I know that that

14    person is associated with this terrorist organization, does

15    that constitute a crime?

16            MR. GUGELMANN:  The answer is yes if -- so I wasn't --

17    it wasn't entirely clear to me from what the Court just said

18    that the person who asked to open the account is different from

19    the person with whom he has the dispute.

20            THE COURT:  Yes, it is.  As I understand it, those are

21    the facts.

22            MR. GUGELMANN:  Correct.

23            MS. McNAMARA:  Yes.

24            THE COURT:  Okay.

25            MR. GUGELMANN:  But the opening of the accounts, for

1  whatever motivation, if it is done with knowledge that it is

2  assisting a terrorist group is sufficient under the material

3  support statute.

4       THE COURT:  Think about what you said.  And I think

5  this is an argument that was raised in the Supreme Court,

6  but --

7       MS. McNAMARA:  That's right.

8       MR. GUGELMANN:  The *Holder v. Humanitarian Law*

9  *Project*.

10      THE COURT:  I think it's supported sort of the

11 opposite of what I'm going to say, but I think if I go to a

12 terrorist organization for a nonterrorist purpose and I open up

13 that account at the request of the terrorist organization,

14 notwithstanding the fact that my motivation is nonterrorist,

15 that is an act of terrorism.

16      MR. GUGELMANN:  That is an act of material support or

17 attempted support.

18      THE COURT:  Material support of a terrorist

19 organization.

20      MS. McNAMARA:  Yes.

21      THE COURT:  So putting it another way, somebody goes

22 into a restaurant and he's a known member of this organization

23 and he asks for food, he says, "I'm going to pay.  I'd like a

24 sandwich."  And the proprietor gives him the sandwich and gets

25 the money, that would be -- it sustains him knowing that he

 1   needs sustenance.  That would be a material support of a

 2   terrorist organization.

 3        MS. McNAMARA:  Yes.

 4        MR. GUGELMANN:  Under a strict reading of the law,

 5   that's correct.

 6        THE COURT:  That's what the Supreme Court has held.

 7        MS. McNAMARA:  Yes.

 8        MR. GUGELMANN:  Yes.

 9        THE COURT:  Okay.  Thank you.

10        MS. McNAMARA:  Your Honor, if I may, I think the Court

11   has hit on the surprise I think of the material support

12   statute, which is the mental element here is virtually nil.

13   What counts is the provision of support; and that means under

14   the law $1 to ISIS makes you guilty of material support even if

15   you were trying to help ISIS reform itself, even if you were

16   trying to perform humanitarian assistance.  It doesn't matter.

17   You give the dollar, you're guilty of material support.  That's

18   the *Holder versus Humanitarian Law* case.

19        And that is why the statute has been so criticized in the

20   academic literature.  It embraces conduct like building a bomb

21   on the extreme, which is what you would think of as material

22   support, but it also embraces opening up an ISIS account for no

23   ideological reason whatsoever and for an immature motive, which

24   is to try to recruit these jihadis to spam your enemies.  So it

25   embraces conduct at both extremes.

1    We have no defense to it.  This case from the very

2  beginning has been about what's the appropriate sentence to

3  such a heavy charge.

4        **MR. HASIB:**  I think I'll -- I'd like to see where this

5  goes, and then perhaps I can respond about *Holder* --

6        **THE COURT:**  Okay.

7        **MR. HASIB:**  -- in a moment.

8        **THE COURT:**  Thank you.

9  **BY MR. GUGELMANN:**

10 **Q.**   So, Dr. Sageman, I think we had gotten to -- we had

11 discussed the genesis of his opening the accounts and the

12 actual opening of them.

13       In your view, did Mr. Alhaggagi realize the significance

14 of his actions in opening these accounts?

15 **A.**   No.  He did not think it was against the law at the time.

16 **Q.**   Did he do it, in your view, because he was intending to

17 benefit ISIS?

18 **A.**   No.  His view of the Internet is very much if it's on the

19 Internet, it can't hurt anybody.  That's what he told me.

20 **Q.**   I want to ask about some of his other online activity that

21 happened after the UCE -- after the end of the UCE

22 interactions.

23       The Government has pointed to the fact that his search

24 history shows that he searched for Halloween parties.  And just

25 to explain the background of this, one of the statements that

1   Mr. Alhaggagi made to the CHS had to do with using the

2   strychnine plan on Halloween.

3        Does the fact that he searched online for Halloween

4   parties after leaving the UCE tell you anything one way or the

5   other about whether he was intending to carry out that plan?

6   **A.**  Well, like anything else, I try to understand the context.

7   You know, instead of contextualizing every element, I'm trying

8   to understand what's going on.

9        And around the same time he was telling me that -- and

10  that was not connected with the Halloween search.  When I asked

11  him, he was just telling me as an aside as an example of

12  trolling, he got into trolling a wiccan group.  Wiccan group,

13  not weekend.  Wiccan group.  So basically people --

14            **THE COURT:**  You mean wiccan?

15            **THE WITNESS:**  W-I-C-C-A-N.  Wiccans.  They're paganist

16  females often.

17        And they were praying for a hurricane to destroy Florida.

18  And when Hurricane Matthew blew in in early October 2016, he

19  sent them a message saying, "You're welcome."

20        And at the same time he was -- if you look two days later,

21  I think this happened on the 12th of November and on the 15th

22  of November he's searching for satanic cults.

23  **BY MR. GUGELMANN:**

24  **Q.**  October, I believe.

25  **A.**  I'm sorry.  October.  It was October 12th, and

1   October 15th he's looking at satanic cults.

2        But the way he searches, he just kind of Googles it, looks

3   at the Google search and really doesn't go much further than

4   that.  So he's not really -- and the links that he clicked were

5   not really links that a person would be casing such attack

6   would link on.  He was linking TripAdvisor, the Berkeley

7   newspaper, San Francisco tourism, and the whole search lasted

8   for 1 minute and 20 seconds.

9        So to me this was not significant.  I mean, when you want

10  to case a building, you want to case something, you look at the

11  security.  You surveil it for a while to see where police come

12  and go.  I mean, you do your homework, and then you can

13  produce -- the way we were taught, you produce a report, a

14  casing report, it's about 20 pages with pictures to show

15  egress, exit, entry, where you're going to carry your act.

16  This was not this thing.

17       And it's very similar to what he did, this kind of due

18  diligence in a sense, to try to find out what things looked

19  like when he's looking at those electric lighters.  He, again,

20  does that for about a minute, looks at a picture of it.  He

21  says, "Okay.  That's what it is."

22  Q.  And let me just interrupt to ask the question that would

23  have led to that response.

24       One of the things that the Government has pointed to that

25  he searched for in this period after his interactions with the

1  UCE was electric matches and igniters.  So explain that.

2  **A.**   Yeah.  It's the same thing.  Or he did the same thing with

3  the strychnine.  He looked at strychnine, realizes that Alibaba

4  is selling strychnine.  He doesn't know what it looks like so

5  he looks at the site.  He talks to a salesman and says, "Well,

6  what does it look like?"

7       And he says, "It's a powder."

8       "Well, what color?"

9       "It's white."

10      "Ah, okay.  So now I can troll people saying I can mix it

11  with cocaine."

12      So you can see -- but he doesn't buy it.  He just wants to

13  know.  And so you can see this pattern all the time in either

14  his searches or how he does it.  He wants to be a good troll on

15  the Internet, and so he does his homework.

16  **Q.**   Did you see anything in his online activities after he

17  left the UCE that would lead you to believe that he is

18  radicalized or that he was planning violence?

19  **A.**   Well, I'm not sure what you mean by radicalized.  It's not

20  a term that I use.

21  **Q.**   I understand.  Did he -- I know you don't like that term.

22  I apologize.  That he was espousing extremist ideologies.

23  **A.**   No, he definitely was not.  And at the time that I even

24  saw him in jail, I mean, he wasn't religious.  It was during

25  Ramadan.  He wasn't fasting.  He's not that religious so he

SAGEMAN - DIRECT / GUGELMANN

1    doesn't espouse to jihadi ideology and doesn't have the

2    behavior of a jihadi, which is you can look like a jihadi, you

3    have short pants because you have to have your pants above your

4    ankles.  A lot of people wear shalwar kameez, which are the

5    Pakistani look.  Some people have one of those rolled-up hats,

6    which the Tajiks use.  It's called pakul -- P-A-K-U-L -- hat.

7    So he doesn't look like a jihadi and he doesn't behave like a

8    jihadi.

9        He has interactions with women.  He had two girlfriends.

10   Usually this is very much frowned upon by the jihadis.  They

11   don't do that.  They get married.  There is no dating at all,

12   and so that's why they have those musical chair marriage where

13   they can marry, divorce, marry somebody else, divorce, marry

14   somebody else.  But there really is no sex outside of marriage.

15       So I don't see anything that's consistent with jihadi.  So

16   in that sense, he's not radicalized, perhaps your term, but he

17   definitely does not sound like a jihadi, does not look like a

18   jihadi, does not act as a jihadi.

19   Q.   And what about a tendency or an inclination towards

20   violence separate and apart from any jihadi ideology?  Is there

21   anything that you saw in the evidence here or in your

22   interactions with Mr. Alhaggagi that would indicate that?

23   A.   Well, as Your Honor pointed out earlier today, past

24   indicators of violence are the best predictors of future

25   indicators of violence, and this hasn't changed very much.

1    And there is no evidence that he had any kind of criminal

2   record for violence in the past.  He did seem to have a kind of

3   a juvenile background, but it was never adjudicated because he

4   just hung out at Berkeley smoking marijuana.  That's about it.

5   So he never got into trouble with the law.

6    And I -- so the only thing you can say about the

7   probability of violence is really compare it to the base rate,

8   and by that I mean you compare it with the rest of the

9   population.  And if you randomly select an individual from that

10   population, he has a probability of violence.  His is actually

11   lower than this randomly selected individual because he has no

12   background, he has no past violence where that randomly

13   selected individual has a chance of having such a background.

14   So it would be a little bit lower.

15    And besides, he's a coward and so, you know, the reason he

16   just trolls online and not face to face is that he doesn't

17   really want to meet people face to face.  He was very, very

18   alarmed to see the UCE come because it was a potential threat.

19    I mean, if he realized, you know, it was wasting the UCE's

20   time, well, the UCE could get upset and beat him up.  But when

21   he saw the UCE and he said, well, you know, he's bigger than

22   the UCE, well, that threat kind of diminished in his eyes.

23    So to make a long story short, no, I don't think he's more

24   dangerous than a randomly selected individual in the general

25   population.

1   **Q.**   I want to ask you about the allegations that we were

2   discussing this morning concerning Mr. Alhaggagi's conduct

3   after he was arrested, and we'll keep it at sort of the same

4   level of generality that we did this morning in discussing it.

5        Are you familiar with those allegations?

6   **A.**   Yes, I am.

7   **Q.**   And did you review the discovery that related to those?

8   **A.**   Yes, I did.

9   **Q.**   Did you discuss them with Mr. Alhaggagi?

10  **A.**   Yes, I did, because I had that part of the discovery

11  before I saw him.

12  **Q.**   What did he tell you about it?

13  **A.**   Well, he told me that part of it is true; namely, that he

14  did write a letter to his brother to try to help his attorney

15  and decided not to send it because he didn't want to involve

16  his brother.  That part is true.  The rest he said, it's

17  absolutely not true.

18  **Q.**   And did you find that credible?

19  **A.**   Well, I have no way of telling one way or another.  He may

20  have been trolling or it may not have been true; but by the

21  time I saw him, which is a year and a half later -- I mean,

22  this happened in, I guess, February-March, you know, where the

23  report -- I saw the report coming out in 2017.  I saw him in

24  June 2018.

25        By that time he had matured.  So I don't know exactly what

1    he was like when he was arrested and when he was in prison.  I
2    assume he wasn't transformed immediately into a mature human
3    being; but I think, I don't know, a year and a half in solitary
4    confinement and reading a lot and especially having some
5    structure in his life.  I mean, prison gave structure in his
6    life where he actually wasn't wasting doing nothing at home and
7    just on the Internet.  You know, ironically prison benefited
8    this guy.
9         And when I saw him a year and a half later, he seemed to
10   be much more mature.  I don't think that he would have done
11   that when I saw him, but I can't really speak to a year and a
12   half prior.
13   Q.   Do those allegations change your conclusions about his
14   dangerousness at all?
15   A.   No, because he was just trolling the guy if it's true.
16   There is no indication -- I kind of looked at some of the
17   allegations that he had outside help, people are going to send
18   him weapons and bombs.  No, none of that was true.  So that was
19   typical Alhaggagi troll.  So, no, I didn't think that he was
20   dangerous because of that.
21   Q.   And can you just explain why this issue was not addressed
22   in the report that you wrote for the Court?
23   A.   You told me you didn't want it.  So it was in the draft
24   and since it was no longer an issue in October 29th when I
25   wrote this report, I decided, okay, you were right and I didn't

1    think it was relevant and it really didn't affect one way or

2    another my opinion.  It was really a minor thing, and so I took

3    it out of my report, my final report, at the request of the

4    attorney.

5    **Q.**   I just want to ask you questions about the whole scope of

6    his activity and the Government's response to it at the time.

7        Having seen the chats with the UCE -- I'm sorry -- with

8    the CHS, in your view did the Government, the FBI, respond

9    appropriately?  Would you have followed up on those chats as

10   they did?

11   **A.**   Well, the chats would have alarmed me just as it alarmed

12   the government.  I mean, when you have a guy saying "I'm going

13   to do this to someone," you can't take that lightly.  I mean,

14   you have to really respond to it.

15       He's a loner and so it's hard to infiltrate.  If you have

16   a group doing that type of thing, you know, it's much easier to

17   do because you infiltrate somebody there and they passively

18   report what's being said and what's being planned, what's being

19   done; but when you have a single individual, it's much harder

20   to do.

21       So I would have really kind of, as they did, put very

22   intensive surveillance to see if they were -- if any of the

23   things that he claimed that he was doing were true or not.  So

24   intense surveillance would have been my preference.

25       Now, I must say -- I must confess that personally I don't

1    like sting operations.  They're completely outlawed in any

2    other Western countries except the United States.  And, you

3    know, when I talk to my European colleagues, they always tease

4    me about it.  They say, "You guys don't really have, you know,

5    that much terrorism compared to us.  What you have is sting

6    operation.  You cannot basically arrest the low-hanging fruit.

7    The dumb people get entrapped."

8         And so I agree with Justice Brandeis in 1920 also wanting

9    to outlaw sting operation because to him it was a conduct of

10   the individual -- the conduct of the police as state agent as

11   opposed to this mythical predisposition that the defendant has.

12        In academia this notion of predisposition is a nonstarter,

13   Your Honor.  So I don't personally like sting operations.  I

14   think that if you wanted to monitor him better, you can

15   introduce a best friend but it has to be passive.  It cannot be

16   directive.  And the UCE was very directive and he was very

17   forceful with this guy.  He said, "You can't do that.  You

18   can't do that.  You can't do that.  If you are with me, you

19   can't talk to anybody else."

20        You see, this is not a person gathering information.  This

21   is a person who is very active in trying to encourage a

22   criminal act.

23   Q.   Have you been involved in other cases where there was a

24   UCE operation similar to this one?

25   A.   Yes, I have.

1  **Q.**   And --

2         **THE COURT:**  I think in a way -- I mean, I think you

3  can point these things out, but I'm not going to sit here in

4  judgment on the propriety of the Government operating a sting

5  operation with respect to terrorism.

6         **MR. GUGELMANN:**  And that's it -- excuse me.

7         **THE COURT:**  I mean, it just seems to me that that's

8  not what I need to address.

9         **MR. GUGELMANN:**  I agree.

10         **THE COURT:**  So when it gets into, well, don't you

11  realize that sting operations, you know, frequently work their

12  way up the ladder; they try to get, in the drug context, the

13  supplier; and, by the way, isn't a guarantee on the fairness of

14  the sting operation to make sure that the interactions are

15  recorded so that we don't have the word of the agent testifying

16  or the informant, we actually have the actual words that were

17  used in connection with it.  And, you know, we can spend days

18  on how to run an appropriate sting operation.  What are the

19  safeguards?  What are the downsides?

20      I understand that, but --

21         **MR. GUGELMANN:**  And my question is actually slightly

22  different from that, quite different.

23         **THE COURT:**  Okay.  Go ahead.  I just want to tell you

24  I'm not going to spend a lot of time on it.

25         **MR. GUGELMANN:**  Understood and I'm not either,

1    Your Honor.

2    **Q.**    My question is just, in comparison to the prior cases that

3    you've been involved in that involved a UCE acting in a similar

4    manner, how does Mr. Alhaggagi's compare to those?

5    **A.**    It really stands out.

6    **Q.**    And why does it stand out?

7    **A.**    Because he's the only one that did not take the bait.

8    **Q.**    Of how many cases would you estimate that you are familiar

9    with in which someone did take the bait, as you put it?

10   **A.**    Familiar with about 50.  I was personally involved in

11   about 10.  I got information -- I mean, transcripts and so on

12   about 10 others.  So about 20.

13        But I must say that this is a selection process.  I'm on

14   the -- I only see the one that people took the bait because

15   otherwise -- and those go to court.  The one that -- the person

16   who did not take the bait, they don't show up because nobody

17   gets prosecuted.  This is the first one that the guy did not

18   take the bait and he's prosecuted.  I've never seen it before.

19   **Q.**    And why, in your opinion, did he not take the bait, to use

20   your term?

21   **A.**    Because he's not a jihadi.

22        **MR. GUGELMANN:**  I have no further questions of this

23   witness.

24        **THE COURT:**  Okay.  Thank you.

25   ///

<u>**CROSS-EXAMINATION**</u>

**BY MR. HASIB:**

**Q.**   Good afternoon, Dr. Sageman.

**A.**   Good afternoon, sir.

**Q.**   We meet again.  This is not the first time we've met;
isn't that right?

**A.**   No, it's not.

**Q.**   And, in fact, I cross-examined you a few months back in
the case United States versus Adam Shaffy; isn't that right?

**A.**   That's correct, yes.

**Q.**   And we spoke in that trial in the courtroom and then we
spoke outside in the hallway a couple of times during that
trial; but other than that, you and I have never really talked
to each other?  Is that right?

**A.**   No, we haven't.

       **MR. HASIB:**  Your Honor I think indicated this morning
that the Government could go into the post-arrest allegations
in any way that it saw fit; is that correct?

       **THE COURT:**  I'm sorry?

       **MR. HASIB:**  With respect to the post-arrest
allegations, the informants' information, Your Honor suggested
that the Government could go into it?

       **THE COURT:**  If they're relying on it, yes.

       **MR. HASIB:**  We are going to rely on it.  We are going
to go into it, Your Honor.

1    Q.    Dr. Sageman, you were asked a few moments ago about some

2    allegations that came out of the jailhouse where Mr. Alhaggagi

3    was being housed.  Do you remember those questions?

4    A.    Yes.  There were two different informants.

5    Q.    And you explained that that information was initially in

6    your report and then you took it out at the request of counsel?

7    A.    That's correct.

8    Q.    And I think you said a moment ago that you didn't think it

9    was relevant; is that right?

10   A.    I think counsel was telling me it was no longer an issue,

11   and I didn't see it weighing heavily on my opinion and,

12   therefore, I saw no harm in taking it out.

13   Q.    And your opinion was that the defendant's prison record

14   shows no indication of any violence; is that right?

15   A.    That's correct.

16   Q.    So you did not think it was relevant to that assessment to

17   include information from the jailhouse that the defendant had

18   been overheard talking about blowing up this building,

19   450 Golden Gate?

20   A.    That's correct.  There's no violence.  He just -- if it's

21   true -- and, again, I don't know if it's true, because

22   Informant Number 1 is of very questionable reliability

23   according to his probation officer.  It was just a troll.  It's

24   just words.  Just like Mr. Alhaggagi did for everybody else, it

25   was words and nothing in terms of actual violence.

SAGEMAN - CROSS / HASIB

1   Q.   But that's not what you said a few hours ago.  You said
2   you try to collect all the information that's available to you
3   and then make your assessment; isn't that right?
4   A.   And I did in this case as well.
5   Q.   And you decided it was not relevant to your conclusion
6   that the defendant had shown no indication of any violence in
7   prison?
8   A.   No.  You're misquoting me.  I said the attorney said it
9   was not relevant.
10  Q.   You took it out of your report.  It's not in there?
11  A.   And I did not think that it weighed in my opinion enough
12  to really make a difference, and so I accepted -- I agreed to
13  take it out.
14  Q.   So you did not include the facts or the information that
15  an informant had reported that Mr. Alhaggagi was in jail
16  talking about blowing up this building?
17  A.   I did in my draft.  I did not in my final report.
18  Q.   It's not in your final report?
19  A.   I did in my draft.
20  Q.   How about the information that Mr. Alhaggagi was observed
21  drawing a schematic of this building with particular security
22  measures and the end of the schematic ended with an explosion
23  appearing to be of this building?  You didn't think that was
24  important to include?
25  A.   I confronted Mr. Alhaggagi, and he laughed.  He said he

1    doesn't know how to draw so that particularly to him was not

2    credible.

3    **Q.**   The fact that he doesn't know how to draw was reason

4    enough for you not to put that information in your report?

5    **A.**   I did write it in my draft.  I just said I removed

6    everything that had to do with the informant because I was told

7    the informant was not going to be part of the case.

8    **Q.**   Okay.  And the fact that there was information from the

9    jailhouse that Mr. Alhaggagi was talking to other inmates about

10   how to make explosives, that was not important to you?

11   **A.**   Again, I don't really know whether it was true or not, and

12   it's really hard to make explosives in jail.  I thought that

13   was a little bit beyond the pale.

14   **Q.**   Not that he was making explosives in jail, Dr. Sageman.

15   The information was that he was teaching others how to make

16   explosives from jail.  You didn't think that was important

17   enough to include in your report?

18   **A.**   I don't know if actually he did or not.  I mean, this was

19   a troll if he did, but Mr, Alhaggagi does not know how to build

20   bombs.  I know how to build bombs.  He does not know how to

21   build bombs.

22   **Q.**   He does not know how to build bombs?  Let me put before

23   you what's been marked as -- this is a sealed exhibit so I'm

24   not going to put it in front of the public, but what's been

25   marked as Government Exhibit 3 to the Government's sentencing

1    memorandum.

2           THE COURT:  Can you describe it without getting into

3    the contents so that people can follow what it is?

4           MR. HASIB:  It is a translation of a document with

5    photographs.  The first page is labeled "Bombs Deadliest," and

6    it then appears to have various photographs of how to construct

7    a bomb.

8           THE COURT:  Okay.

9    BY MR. HASIB:

10   Q.   Dr. Sageman, would you review that?

11   A.   I've reviewed it.

12   Q.   You have reviewed it?

13   A.   Oh, yeah.

14   Q.   So it's your assessment that someone who has that manual

15   would not know how to make a bomb?

16   A.   He would probably blow himself up.

17   Q.   He'd probably blow himself up?

18   A.   Yes.

19   Q.   You know how to do it safely?

20   A.   Well, not anymore.  20 years ago, 30 years ago, perhaps.

21   But I found this manual very confusing and especially the one

22   on connecting the cell phone to the bomb.  This is a shape

23   charge, which is a fairly complicated way of making a bomb.

24   They call it a directional bomb, but it's kind of a shape

25   charge.  It's a little bit like a Claymore.

1      But I found it very confusing.  If Mr. Alhaggagi read it,

2  I don't think he would have known how to make a bomb.  And --

3  Q.  So this was --

4  A.  -- it was very clear he did not know how to make a bomb in

5  his kind of fun interaction with VIP where they went back and

6  forth.

7  Q.  So it's your understanding that this is not enough to make

8  a bomb?

9  A.  That's correct.

10 Q.  So if someone had this, they would be looking for more

11 information about how to make a bomb; right?

12 A.  I think they would if they wanted to make a bomb or

13 understand how to make one.

14 Q.  Like, for example, if they were to meet someone posing as

15 an Al-Qaeda bomb maker, that might be the kind of person who

16 might be able to help them build a bomb better than the one in

17 this manual; isn't that right?

18 A.  Probably.

19 Q.  Let's go back to the jailhouse.  You did not include in

20 your report information from the jailhouse that Alhaggagi was

21 talking with other inmates about buying and selling guns, did

22 you?

23 A.  I did in my draft.  That was taken out again.  It was

24 about two and a half pages and a few paragraphs in my

25 conclusion, if I recall.  I think about -- my original draft

1    was close to about 50 pages.  As you see here, it's 45.  So I

2    did dwell into it extensively.

3    **Q.**    So you did not include in your report either --

4    **A.**    Final report you mean.

5    **Q.**    -- final report information that Alhaggagi and other

6    inmates were watching a memorial service for a fallen police

7    officer during which Mr. Alhaggagi commented to other inmates

8    that sniper teams should be turned loose on police officers and

9    judges?  You didn't include that in your report either?

10   **A.**    In the final report, no, but I probably did in my draft.

11   **Q.**    But in the final report, your conclusion was his prison

12   record shows no indication of any violence?

13   **A.**    And, again, he showed no violence in prison.  He had a lot

14   of talk about violence but he showed no violence in prison, no

15   actual violence.

16   **Q.**    Now --

17         **THE COURT:**  So let me make sure at least I think I do

18   understand the distinctions that are being drawn.

19         When the information that the Government has just said was

20   first presented to you, you took that information and

21   incorporated it in your draft report?

22         **THE WITNESS:**  That's correct.

23         **THE COURT:**  Okay.  And you, I assume, came to the

24   conclusion, correct me if I'm wrong, in your draft report

25   similar to the conclusion you have come to today in your final

1    report, which is that there is no evidence of violence --

2              THE WITNESS:  That's correct.

3              THE COURT:  -- in the post-arrest --

4              THE WITNESS:  That's correct.

5              THE COURT:  -- period?

6       Okay.

7              THE WITNESS:  He didn't get into a fight.  He

8    didn't -- there was no violence on his part.

9              THE COURT:  Okay.  So I have to plumb that a bit

10   because I understand you took that information out at the

11   request of the lawyer.

12             THE WITNESS:  Yes.

13             THE COURT:  And I assume you were told at that time

14   that the information may not be reliable, but whether you were

15   or not --

16             THE WITNESS:  Actually, so a remark by the probation

17   officer saying this guy's really not reliable so I took it from

18   what the Prosecution probably gave to the Defense team, and it

19   was in evidence in the discovery material.

20             THE COURT:  But putting that aside for the moment and

21   assuming that that information was reliable; that is, that the

22   informants, two of them, said certain things and those things

23   actually did happen.  Okay?

24             THE WITNESS:  Right.

25             THE COURT:  So we'll just assume that.

1              THE WITNESS:  Uh-huh.

2              THE COURT:  Your conclusion would remain the same?

3              THE WITNESS:  That's right.

4              THE COURT:  And the way you define "violence" is did

5      the person do something --

6              THE WITNESS:  That's right.

7              THE COURT:  -- in jail which would be considered to be

8      violent?

9              THE WITNESS:  Yes, Your Honor, that's exactly right.

10             THE COURT:  And then -- but I'm trying to figure out

11     in my own mind why it wouldn't be violent for somebody in jail

12     to say, "I think we ought to shoot police officers and here is

13     how we do it," or, "I think we should bomb the Federal

14     Building" -- this wonderful structure -- "I think we should

15     bomb the Federal Building.  Here is how it should be done."

16         Is it that you wouldn't conclude those are violent acts

17     because you don't think he would go through with it or because

18     the nature of what was said is not violent?

19             THE WITNESS:  No, it would be because of him as a

20     person totality because he did exactly that online, he did that

21     with the UCE.  If he's doing that in jail, it's consistent with

22     what he is but that doesn't really mean that he's a violent

23     guy.  He's just a troller.  And I'm not really sure whether he

24     was totally mature enough right at the time of his arrest, that

25     he continues trolling people; but certainly when I saw him a

1    year and a half later, he just wasn't like that anymore.

2              THE COURT:  Okay.  Well, you say he's changed?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  But I'm going back to before you --

5              THE WITNESS:  I don't know.  Your Honor, I'm not

6    trying to be argumentative.  I just don't know.

7              THE COURT:  You're not at all.

8              THE WITNESS:  I don't know.

9              THE COURT:  You're not at all argumentative.  I'm not

10   suggesting you are.

11             THE WITNESS:  Okay.

12             THE COURT:  I mean, one of the things that have been

13   going on in my mind is that clearly it would be a crime for

14   these -- going from day one throughout this, if the

15   conversations he was having with individuals were not agents of

16   the federal government.  I mean, a conspiracy is an agreement

17   between two people to commit a violent crime and proof of the

18   conspiracy is an overt act; that is, one act taken in

19   furtherance.

20        So there would be things like driving somebody around and

21   saying, "I'm going to plant a bomb there.  Let's plant a bomb

22   here.  Let's do that"; or, "Let's see this"; or, "Let's get a

23   storage house for nitroglycerin," or whatever it is, nitrate

24   ammonia.  I don't know those things.  Those would be crimes.

25   Those would be crimes.  They would not necessarily be terrorist

1  crimes.  They would be general crimes.  Conspiracy to commit a

2  crime is a crime.

3       And, of course, much of the -- you have said that much of

4  the conversations that the defendant had were with people at

5  the time he didn't know --

6            THE WITNESS:  Yes.

7            THE COURT:  -- were Government agents.  So from his

8  point of view, his state of mind, he thought he was talking to

9  somebody who was either going to aid him in it or participate

10  in some manner, and I'm trying to figure out why that would not

11  be a sign of at least dangerousness in terms of what the law is

12  relating to conspiracies.  Because what the law relating to

13  conspiracies is the agreement itself is a crime if it's proven

14  with an overt act.

15       But you have -- the line you draw -- and I appreciate it,

16  I understand it, but I'm looking at it from a legal point of

17  view, you're not looking at it from a legal point of view -- is

18  that unless he had some evidence of following through on these

19  things, you don't consider him to be dangerous from that point

20  of view.

21            THE WITNESS:  Yes.

22            THE COURT:  And that's up until his recent maturity.

23  When I say "recent," I'm not being sarcastic.

24            THE WITNESS:  Yes, Your Honor.

25            THE COURT:  I mean up until today when he seems to

1    have realized a number of things that a mature person would.

2         THE WITNESS:  With a slight clarification to that, and

3    the clarification is that he's never done anything in life that

4    really kind of furthered any of -- he's a fabulist if you want

5    to think of it.  He spins a tale.  He wants to show that he's a

6    mean guy, but he does not do -- he's really a coward so he

7    doesn't really do anything.

8         To me, it's possible that he said that in prison.  I don't

9    know.  But it's very consistent with his character.  Would he

10   have wanted to commit a crime?  I don't think so.  This is just

11   talk as far as I'm concerned given his background and what else

12   he did, and I have a huge amount of facts online and so on.

13   This is very much consistent with him.

14        Now, what the law is, Your Honor, you can teach me.  I

15   don't know.  I'm just trying to understand him as a human

16   being.  That's what I'm here for.

17        THE COURT:  I appreciate that.

18   BY MR. HASIB:

19   Q.   Dr. Sageman, you did not include in your final report that

20   there was a second informant in the jailhouse who had also

21   advised that Alhaggagi was talking about explosives in jail;

22   isn't that right?

23   A.   In the final report it's not there.  In the original, in

24   the draft, it was there.

25   Q.   And you also did not include in your final, but perhaps

1   you included it in the draft, that Alhaggagi was talking with

2   other inmates about how to buy and sell guns, silencers, and

3   homemade grenades using Tor Browsers, the Dark Web, and

4   bitcoin.  You didn't include that either; right?

5   **A.**   I might have in the draft, yes.

6   **Q.**   In the draft?  But you took it out of the final?

7   **A.**   Yeah.  I basically summarized the discovery material that

8   you provided, and so I put all the worse things in it.

9   **Q.**   You put all the worse things in it?

10  **A.**   Yes.

11  **Q.**   Okay.  Let's --

12          **MR. HASIB:**  This is Exhibit C, Your Honor, to the

13  Defendant's sentencing memorandum.  It's Dr. Sageman's final

14  report to the Court.  May I give him a copy of this?

15          **THE COURT:**  Sure.

16          **THE WITNESS:**  I have it here.

17          **MR. HASIB:**  You've got it?  Okay.

18          **THE COURT:**  All right.  Is it going to be introduced?

19          **MR. HASIB:**  It's in evidence.  It's before the Court

20  as a sentencing memorandum exhibit.

21          **THE COURT:**  But it's not -- I mean, okay.  We just

22  leave it at that.  I assume if somebody wants it, they'll

23  introduce it.  If they want it in evidence -- you say it's in

24  evidence.  I'm just trying to figure --

25          **MR. HASIB:**  It's before the Court as an exhibit.

1      THE COURT:  Yeah.  Has the exhibit been publicly

2   released or not?

3         MR. HASIB:  No.  This one was filed under seal.

4         MR. GUGELMANN:  It was filed under seal.

5         MS. McNAMARA:  Under seal.

6         MR. HASIB:  There is one particular portion of it that

7   I intend to ask Dr. Sageman about.  It's a description of one

8   of the undercover meetings.

9         THE COURT:  Well, I think you should read that aloud

10  so that we can follow the discussion.

11  BY MR. HASIB:

12  Q.   Dr. Sageman, your report, it's, let's see, 47 pages; is

13  that right?

14  A.   I have 45 pages.

15                    (Counsel conferring.)

16  BY MR. HASIB:

17  Q.   We think there may be a translation problem between

18  Microsoft Word and Adobe.

19  A.   You mean a transcription problem.

20  Q.   A transcription problem.

21       So why don't I give you this copy so we're talking about

22  the same page numbers.

23  A.   Okay.

24  Q.   Now, in this 47-page report, you described a lot of

25  things.  You described your interviews with the defendant, for

SAGEMAN - CROSS / HASIB

1   example; right?

2   A.    Yes, I did.

3   Q.    And you described the nature of the Government's case;

4   right?

5   A.    What do you mean?

6   Q.    Your review of the discovery materials in this case.

7   A.    Yes.

8   Q.    And you began, in fact, by noting that you had reviewed

9   all the discovery materials in the case?

10  A.    I tried to, yes.

11  Q.    And you went into some detail about particular

12  interactions that Mr. Alhaggagi had with, for example, the FBI

13  confidential human source; right?

14  A.    Yes.

15  Q.    And you went into some detail with some of the

16  interactions that Mr. Alhaggagi had with the undercover agent;

17  right?

18  A.    Yes.

19  Q.    Now, let me direct your attention to page 27 of the

20  exhibit before you, and that is a description of events that

21  occurred on August 6th; is that right?

22  A.    Yes.

23  Q.    Beginning on sort of the middle half of the page?

24  A.    Uh-huh.  Sorry.  Yes.

25  Q.    It begins with a description of interactions that

1    Mr. Alhaggagi had with the confidential human source, right,

2    online?

3    **A.**    You mean the third paragraph?

4    **Q.**    Yes, the third paragraph.

5    **A.**    Yes.

6    **Q.**    Okay.  And then after that you describe that the defendant

7    then met with an undercover agent; isn't that right?

8    **A.**    Yes.

9    **Q.**    And if I could, if I could just caution you not to use the

10   name that's written here for the undercover agent, but we'll

11   just refer to him in the generic as the undercover.

12        You describe for, let's see, about half of that page and

13   then onto the next page the details of what happened on

14   August 6th, 2016, with the undercover agent; right?

15   **A.**    Yeah.  I summarized, I think, a two-hour meeting in an

16   hour plus -- I mean, in a page plus.

17   **Q.**    And a moment ago you said you included all the bad stuff

18   about the defendant; right?

19   **A.**    Yeah.  Most of the bad stuff that I felt significant, yes.

20   **Q.**    Okay.

21                      (Pause in proceedings.)

22   **BY MR. HASIB:**

23   **Q.**    You have reviewed transcripts that were prepared of these

24   undercover meetings; isn't that right?

25   **A.**    Yes, I did.  Sometimes I listened to the conversation.

1  **Q.**   You listened to the recordings and then you reviewed the

2  transcripts?

3  **A.**   I mostly reviewed the transcript, but some things, for

4  instance, that discussion about Zawahiri, I heard that.

5  **Q.**   Okay.  And if you could just take a look at this.  And do

6  you recognize that?

7  **A.**   (Witness examines document.)  That looks like the

8  August 6th -- the transcript of the August 6th meeting, yes.

9  **Q.**   Okay.  That's among the materials that you reviewed as

10  part of this case?

11  **A.**   Yes.

12       **MR. HASIB:**  Your Honor, I'd like to offer this exhibit

13  marked Bates U.S. 007826 through 007867 into evidence as I

14  guess it will be Government's Exhibit 1 for the sentencing

15  hearing.

16       **MR. GUGELMANN:**  No objection, Your Honor.

17       **THE COURT:**  Admitted.

18     (Government's Exhibit 1 marked for identification)

19       **MR. HASIB:**  And, Ms. Scott, may I have the Elmo?

20  **Q.**   Dr. Sageman, you wrote in your report a summary of this

21  meeting; right?

22  **A.**   Yes.

23  **Q.**   And since Your Honor asked, I'll read into evidence the

24  portion of your report that describes this meeting.

25       You wrote (reading):

1          "That same day around 5:48 p.m., Mr. Alhaggagi met

2     again with the undercover agent who said he got a storage

3     unit in a city in the East Bay.  Mr. Alhaggagi showed him

4     the blue handgun.  He said that he was taking a required

5     class for firearms and was going to a shooting range the

6     next day.

7          "The undercover agent said his Sheikh told him to do

8     his operation in the U.S. and then come to Hajj.  He had

9     no plans to ever come back.  He would see his aging

10    parents there and then go to Afghanistan."

11    You're describing what the undercover agent is telling

12    Mr. Alhaggagi; right?

13    **A.**   Yes.

14    **Q.**   (reading)

15         "They eventually returned to the topic of backpack

16    bombs.  Mr. Alhaggagi said that he had told the online

17    source that he wanted to target nightclubs.  He wanted to

18    sneak a backpack bomb in one through an acquaintance that

19    supplied cocaine to clubs in San Francisco.  The bouncers

20    did not search him or his friends.  The plan would be to

21    use him and go in with him with a backpack and leave it

22    behind."

23    And then he wrote (reading):

24         "A bomb could kill 50 to 60 people there."

25    And then you wrote (reading):

1              "The undercover agent suggested using a car bomb to

2        bring down a building."

3        Is that right?

4   **A.**   Yes.

5   **Q.**   Okay.  Let's listen to this recording of --

6              **MR. HASIB:**  Well, I guess I should offer this into

7   evidence as well, Your Honor.  The Government would offer the

8   recording of the August 6th meeting between the undercover

9   agent and Alhaggagi into evidence.

10             **MR. GUGELMANN:**  No objection.

11             **THE COURT:**  Admitted.

12        (Government's Exhibit 2 received in evidence)

13             **MR. HASIB:**  Special Agent Peacock, if you could play

14   the first -- let's make sure the screens are working.

15             **THE COURT:**  Well, are we going to follow it on the --

16             **MR. HASIB:**  We are going to follow it along.

17             **THE COURT:**  So let's get the transcript up and then

18   start.

19             **THE CLERK:**  I don't know if you can do both at the

20   same time.

21             **THE COURT:**  Maybe we can't.

22                        (Pause in proceedings.)

23             **MR. HASIB:**  Only one at a time?

24        Your Honor, since we haven't had a break in a while, this

25   might be a good time for a break, and I'll run down and get our

SAGEMAN - CROSS / HASIB

1   audio equipment.

2          **THE COURT:**  Yeah.  That will be great.

3       Okay.  We will resume at 2:30 -- 2:35.

4          **MR. HASIB:**  2:35, okay.

5               (Recess taken at 2:16 p.m.)

6               (Proceedings resumed at 2:39 p.m.)

7          **THE COURT:**  Okay.  Let the record reflect, the

8   defendant is present, the parties are present.

9       You may proceed.

10          **MR. HASIB:**  Thank you, Your Honor.

11       When we left, Dr. Sageman, I was about to play you a

12   recording from what I think we've called Government Exhibit 2

13   for this hearing, with a transcript from what we're calling

14   Government Exhibit 1 for this sentencing hearing.

15       Your Honor, for Your Honor's information, this is about a

16   five-minute clip, from 26 minutes to 31 minutes in this

17   recording.

18          Special Agent Peacock, go ahead.

19               (Audio was played but not reported.)

20   **BY MR. HASIB:**

21   **Q.**   Dr. Sageman, do you recognize the voices in these

22   recordings?

23   **A.**   Not really actually because I just heard the recording of

24   the first meeting between them, and I haven't heard them for

25   weeks on end.  And so I take it that they probably are the UC

**SAGEMAN - CROSS / HASIB**

1   and Mr. Alhaggagi.

2   **Q.**   So UC -- having reviewed these transcripts previously, did

3   you understand "UC" to stand for undercover agent?

4   **A.**   Yes.

5   **Q.**   And "AA" to stand for Amer Alhaggagi?

6   **A.**   Yes.

7   **Q.**   And you've interviewed Mr. Alhaggagi several times; right?

8   **A.**   Yes.

9   **Q.**   And you've heard his voice?

10  **A.**   Yes.

11  **Q.**   Okay.  Who is it who first brings up the idea of an

12  explosives in a car according to this transcript?

13  **A.**   You'll have to show me the whole transcript.

14  **Q.**   Well, the portion that you just heard, was there

15  discussion about backpack bombs?

16  **A.**   Yes.  But, remember, there was a previous conversation

17  that took place a week prior.

18  **Q.**   Okay.  So you're uncertain who brought up the first idea

19  of a car?

20  **A.**   Of this one, yeah, I probably am uncertain at this point.

21  **Q.**   Okay.  So where it says there the undercover says, "Oh, a

22  lot bigger"; and Alhaggagi asks, "Oh, like real big"; and the

23  undercover says, "Yeah, like not in a backpack"; and where

24  Alhaggagi says, "In a car?  In a trunk," you think that may not

25  have been the first time someone had mentioned a car bomb?

1   A.   They may have mentioned a car bomb the previous meeting.

2        MR. HASIB:  Okay.  Go ahead.

3        (Audio was played but not reported.)

4   BY MR. HASIB:

5   Q.   Dr. Sageman, there's discussion here about Alhaggagi's

6   friend possibly getting hurt.  You didn't mention that in your

7   description of this meeting, did you, in your report?

8   A.   It doesn't seem like.  I basically condensed 11,000 pages

9   of the discovery into 22 pages in my report.

10  Q.   So the fact that Mr. Alhaggagi was suggesting harming his

11  friends, that was not important to you to put in your report?

12  A.   I think discussing bombs and killing people, that's

13  probably far more important.

14       I mean, I could have made my report 11,000 pages, but I

15  didn't.

16  Q.   Well, you did say that you included all the bad stuff;

17  right?

18  A.   I included whatever I think was significant to give you a

19  flavor of exactly what they were talking about.

20  Q.   Okay.  But in here --

21  A.   I think it reflects pretty well --

22  Q.   Go ahead.  Go ahead.  Finish.

23  A.   It reflects pretty well what was said.

24  Q.   In here you did not mention that Alhaggagi talked about

25  what might happen to his friend if he left a backpack bomb

1  there?

2  **A.**    I guess not, no.

3              (Audio was played but not reported.)

4  **BY MR. HASIB:**

5  **Q.**    Again, Dr. Sageman, the fact that Alhaggagi said he didn't

6  mind a friend getting harmed because he wasn't Muslim, that was

7  not in your report; is it?

8  **A.**    No, it's not.  As I said, 10-, 11,000 pages to 22 pages,

9  that didn't make it.

10  **Q.**    And it's your conclusion that the defendant does not

11  have -- let me make sure I use your terminology -- he does not

12  have a jihadi mind-set or he does not have a radicalized

13  mind-set?  You don't like the word "radicalized"; right?

14  **A.**    That's correct.

15  **Q.**    So he doesn't have -- what's the word that you would use?

16  **A.**    He's not a soldier for ISIS.

17  **Q.**    Okay.  He's not a soldier for ISIS.  He does not have that

18  mind-set.

19  **A.**    He doesn't think he is.

20  **Q.**    But you did not include in your report the fact that he

21  was willing to let a friend die because the friend was not

22  Muslim?

23  **A.**    I think that he mentioned that -- I mentioned that in my

24  report, that when -- oh, I'm sorry -- that he had a roommate;

25  and so when the UC asked him, "Well, aren't you afraid that the

1  roommate is going to find out about the backpacks," and he

2  said, "Oh, I'll kill him because he's not Muslim."

3       So it's about the same.  I'm not going to repeat every

4  single time that he says he's going to kill people because

5  they're not Muslim.  And, besides, I think he already said that

6  when he's talking about -- to CHS and they're talking about

7  Mormons and they say "*Kufr* and *Kufr*.  I'll kill them."

8  **Q.**   So now we're concluding in this context that he was

9  talking about a backpack bomb and his friends might end up

10  dying, and he's okay with that because they're not Muslim, that

11  was not worth putting in?

12  **A.**   I said several times in my report that he would kill

13  people but not Muslims.  I don't have to repeat it 10,000

14  times.

15            (Audio was played but not reported.)

16  **BY MR. HASIB:**

17  **Q.**   Dr. Sageman, this discussion that Alhaggagi said, "You

18  know what, we actually missed something.  Today was the first

19  Friday of August.  Yesterday was so crowded.  They closed down

20  some streets in San Francisco and downtown Oakland.  Downtown

21  Oakland was all shut down," you didn't include that in your

22  description of this meeting, did you?

23  **A.**   I didn't specifically, but I did (reading):

24            "On the way back they talked about carrying multiple

25        simultaneous attacks in crowded places."

1          That's what I meant.

2    **Q.**   You didn't include it here in this portion of the

3    conversation?

4    **A.**   Yes, I did.  You underlined it.  It's in my report.

5    **Q.**   We'll get there in a moment.

6              **MR. HASIB:**  Go ahead.

7                   (Audio was played but not reported.)

8    **BY MR. HASIB:**

9    **Q.**   Dr. Sageman, you did describe in your report, you write "A

10   bomb could kill 50 to 60 people there"; right?  In your report,

11   let's see, it's about five lines up from the bottom of page 27.

12   **A.**   Yes.

13   **Q.**   So you write, "A bomb could kill 50 to 60 people there."

14   That was your description of that part of the conversation?

15   **A.**   It may have been.  I can't summarize the whole

16   conversation.

17   **Q.**   You did not attribute -- that sentence about a bomb

18   killing 50 to 60 people, you did not attribute that in your

19   report to the defendant, did you?

20   **A.**   (Witness examines document.)  Yeah.  I think the last

21   person I mention is Alhaggagi.  So when I said "he" and it's

22   really Alhaggagi speaking.

23   **Q.**   Well, that's not what you wrote here.  You wrote simply "A

24   bomb could kill 50 to 60 people there."  You didn't say

25   "Alhaggagi" or "the undercover agent."  You simply said "A bomb

1  could kill 50 to 60 people there"; isn't that right?

2  **A.**   Yeah.  And I think you're taking things out of context;

3  and if you put things into context and you kind of start

4  framing it from the beginning, you see very much that three

5  sentences before it says "Alhaggagi said" and then everything

6  else he wanted, and so that's Alhaggagi speaking because I did

7  not put the undercover saying anything in between.  So all of

8  that, according to convention when you write, that means it's

9  the last person referred to that says the conversation.  So,

10  yes, I did say that Mr. Alhaggagi said that.

11  **Q.**   I see.

12       **THE COURT:**  I think you can move on because actually I

13  got it.

14       **MR. HASIB:**  Keep going.

15       (Audio was played but not reported.)

16  **BY MR. HASIB:**

17  **Q.**   Dr. Sageman, there's a reference here to AT&T Park and the

18  Japanese Tea Gardens always being crowded.  Not in your report;

19  right?

20  **A.**   That's correct.

21       **MR. HASIB:**  Let's move to about 31 minutes into this

22  recording -- I'm sorry -- 32 minutes, 32 minutes 58 seconds.

23       (Audio was played but not reported.)

24  **BY MR. HASIB:**

25  **Q.**   Dr. Sageman, in your report you characterize this part of

1   the conversation as simply the undercover suggested using a car

2   bomb to bring down a building; is that right?

3   **A.**   Yes.

4   **Q.**   And you did not include in your report that it was the

5   defendant who was asking how much damage could that cause;

6   right?

7   **A.**   That's correct.

8           (Audio was played but not reported.)

9           **MR. HASIB:**  Let's move to the next portion, 35 minutes

10  into this exhibit, Government's Exhibit 2.

11          (Audio was played but not reported.)

12  **BY MR. HASIB:**

13  **Q.**   Dr. Sageman, your report -- your final report to the Court

14  did not include any reference about a scheme to set up a fake

15  modeling agency and call over people and then kill them; is

16  that right?

17  **A.**   That's right, yes.

18  **Q.**   And the statement at the bottom there, "'Cause I want to

19  do several types of killing, I want to, like, do the

20  explosives, kill 'em with guns, probably like slaughter 'em

21  with knives," that was also not included in your report, was

22  it?

23  **A.**   Well, in a sense I think the whole paragraph -- that whole

24  paragraph is about killing people different ways, multiple

25  attacks, different places, different locations, boom, boom,

1   boom.  The undercover approved.  That would be careless, man.

2   They laughed.

3       Yes, so the whole idea is here.  Did I give specifics?

4   No, because the report would be 600 pages.

5   Q.   I see.  So you left out statements of the defendant

6   wanting to do explosives, kill them with guns, and slaughter

7   them with knives?

8   A.   No, I did not.  It's in here.

9   Q.   It's in here?

10  A.   Yes.

11  Q.   Where is the statement in your report that he wanted to do

12  the explosives, kill them with guns, and probably, like,

13  slaughter them with knives?

14  A.   Well, they talk about bombs.  They talk about --

15  Q.   Dr. Sageman, if I may, where is that statement that he

16  wanted to do the explosives, kill them with guns, and then

17  probably, like, slaughter them with knives?  Where is that in

18  your report?

19  A.   Oh, that specific phrase, no, it's not there.

20  Q.   Okay.

21       MR. HASIB:  Moving to 1 hour and 2 minutes 43 seconds

22  into this recording.  Go ahead, Special Agent Peacock.

23           (Audio was played but not reported.)

24  BY MR. HASIB:

25  Q.   Dr. Sageman, turning to your report, it appears that you

1    summarized this entire passage with one sentence.  You

2    summarized in the report that you submitted to the Court

3    (reading):

4             "On the way back, they talked about carrying out

5         multiple simultaneous attacks in crowded places."

6         Is that right?

7    A.   Yes.

8    Q.   That's what you wrote in your report?

9    A.   Yes.

10   Q.   You did not think it was important to explain that it was

11   the defendant who was suggesting going out and spreading them

12   everywhere, spreading the bombs everywhere?

13   A.   No.  I think the two of them were egging each other on.

14   Q.   Oh, they're egging each other on?

15   A.   Yes.

16   Q.   And when the undercover agent here says, "Yeah, well," and

17   the defendant replies, "It could be like one night I go out and

18   I just spread all of them, you know, in the areas we target,"

19   he talks about having to hit the San Francisco nightclubs at

20   night, your opinion of this conversation is that it was the

21   undercover who was egging the defendant on?

22   A.   No.  I think that the conversation is a two-hour

23   conversation and they egged each other on, yes.

24   Q.   So they were egging each other on?

25   A.   Yes.  And if you just take one cite, I might be able to

1    look at other instances where it's the undercover that's egging

2    him on.

3    **Q.**  But you've reviewed all the discovery material in this

4    case; right?

5    **A.**  Yes.

6    **Q.**  So are you saying that there are other places where the

7    defendant was egging the defendant on?

8          **THE COURT:**  The undercover?

9          **MR. HASIB:**  The undercover was egging the defendant

10   on.  Thank you, Your Honor.

11          **THE WITNESS:**  Yes.

12          **MR. HASIB:**  Go ahead.

13           (Audio was played but not reported.)

14   **BY MR. HASIB:**

15   **Q.**  Again, Dr. Sageman, you summarized this discussion in your

16   report by saying (reading):

17       "They were going to park a car bomb in the heart of

18       San Francisco and bring down a building."

19       Is that right?

20   **A.**  No, it's not.

21   **Q.**  That's not?

22   **A.**  No.

23   **Q.**  What did you write?

24   **A.**  Let me read you what I wrote, okay?

25   **Q.**  Please.

1    **A.**    All right.  (reading)

2            "On the way back, they talked about carrying multiple

3        simultaneous attacks in crowded places.  15 different

4        locations.  Boom, boom, boom.  Undercover approved.  It

5        would be careless, man.  They laughed.  Mr. Alhaggagi

6        said, 'The whole state would shut down.  Homeland Security

7        is going to come.  The FBI, everybody's going to come.'

8        The undercover agreed.  'They won't know what hit them

9        because it's so different places, not just one.'

10       Mr. Alhaggagi continued, 'It's going to be the biggest

11       attack laugh America laugh since Pearl Harbor.'  They were

12       going to park a car in the heart of San Francisco and

13       bring a building" -- "and bring down a building."

14   **Q.**    Dr. Sageman, who brings up --

15   **A.**    And I think that reflects what it said.

16   **Q.**    Who brings up the idea of bringing down a building?

17   **A.**    As I said, they were egging each other on.

18   **Q.**    Okay.  So --

19   **A.**    It was in the flow of the conversation.  One was really

20   very much egging the other person on.

21   **Q.**    So even after reading this transcript, it's your opinion

22   that these people were egging each other on, it was not the

23   defendant who was talking about bringing down a building?

24   **A.**    I think they were in the flow of the conversation.  One

25   guy did not say, "Oh, no.  We can't do that."  They were egging

1    each other on.  They were great with each other and "Let's go,

2    yeah," and so they very much escalated.

3    Q.   Dr. Sageman, who asks in this conversation "Could it bring

4    down a concrete building?"

5    A.   (Witness examines document.)

6    Q.   Who is it?  Is it the undercover agent?

7    A.   No.  That's Mr. Alhaggagi.

8    Q.   And you did not include in your report that it was

9    Mr. Alhaggagi who asked "Can it bring down a concrete

10   building?"

11   A.   Well, after the undercover said that he needed to do

12   bigger bombs, then they talked about car bombs and they could

13   bring down buildings.  This is kind of the same question that

14   he repeats from the previous.  So, you see, it's a process of

15   egging each other on.  It's not one testimony recording.  It's

16   very much --

17        THE COURT:  I read all this, and I must tell you I

18   don't have the same impression that you have.

19        Looking at car bombs, looking at the poisoning, looking at

20   the fires, and looking at the backpack bombs, all four discrete

21   and very serious criminal activities if pursued, those four

22   ideas came from the defendant as I read it.  It wasn't, like,

23   the agent put that in the defendant's mind.  It was the

24   defendant who suggests it.

25        I mean, this is almost like a reverse sting.  It is almost

1    like the people who are being stinged or stung actually is the

2    Government because it is the defendant who, unbeknownst to the

3    Government, according to what you find, didn't have the

4    intention of carrying things through; but from the Government's

5    point of view, they saw this as a very dangerous threat and it

6    emanated from the defendant, not the Government.

7         So, I mean, I think we have to be somewhat precise here

8    because -- and it may not change your conclusion, it may not

9    change your conclusion, but I think the facts are, as I read

10   them, the facts are that these proposed activities or

11   contemplated activities, notwithstanding the fact that the

12   defendant would never go through with them, were emanated from

13   the defendant and not from the Government; and I think that

14   that is, to me, an important distinction.

15        Now, if you think I'm wrong in my reading of these things,

16   tell me, because --

17             **THE WITNESS:**  All right.

18             **THE COURT:**  -- I'm trying to get it right, not wrong.

19             **THE WITNESS:**  Yes, Your Honor.  I think this is three

20   quarters right and one quarter wrong.

21             **THE COURT:**  Okay.

22             **THE WITNESS:**  The Berkeley hill arson is Alhaggagi.

23   The strychnine is all Alhaggagi.  The backpack bomb is all

24   Alhaggagi.  He did not think of car bombs.  It's only when the

25   undercover said, "Oh, I'm thinking something much bigger," and

1  Alhaggagi said, "Cars?", that's where it comes from.

2           **THE COURT:**  Okay.  Thank you.

3           **THE WITNESS:**  That's all.

4           **THE COURT:**  All right.

5           **THE WITNESS:**  Otherwise we agree.

6           **THE COURT:**  Okay.  Thank you.

7           **MR. HASIB:**  We'll move on, Your Honor.

8  **Q.**  Dr. Sageman, when you and I last met in Judge Orrick's

9  session, I cross-examined you and you were actually quite happy

10 to see that the Government had bought several of your books;

11 right?

12 **A.**  Yes, very much so.

13 **Q.**  And perhaps even happier to know that the Government has

14 read all of your books?

15 **A.**  Yes.  Actually, I am, but it should be the FBI as opposed

16 to the District Attorney.

17 **Q.**  Well, if I may, I'll be happy to offer evidence that the

18 FBI actually has read Dr. Sageman's books.

19 **A.**  Yes, I know they did.

20 **Q.**  Dr. Sageman, first of all, let me ask you, you've

21 published, let's see, this -- you're going to have to correct

22 me if I'm wrong.  Is this your most recent one (indicating)?

23 **A.**  No.  The big one is.

24 **Q.**  *Turning to Political Violence*?

25 **A.**  Yes.

SAGEMAN - CROSS / HASIB

1   Q.   And this is sort of a historical look at terrorism; right?

2   A.   Yes.

3   Q.   There's nothing in here past, say -- what? -- 1940, 1950?

4   A.   19 -- October -- I mean, September 1920.

5   Q.   September 1920 is the last terrorist act discussed in this

6   book?

7   A.   Yes.

8   Q.   Okay.  And then you've got, let's see -- which one came

9   first?  *Understanding Terror Networks* or *Misunderstanding*

10  *Terrorism*?

11  A.   *Understanding Terror Networks*.

12  Q.   *Understanding Terror Networks* followed by *Misunderstanding*

13  *Terrorism*?

14  A.   No.  Followed by *Leaderless Jihad*.  The third one is

15  *Misunderstanding Terrorism* --

16  Q.   Okay.

17  A.   -- and then *Turning to Political Violence*.

18  Q.   *Understanding Terror Networks* and this was written shortly

19  after 9/11?

20  A.   This was written in 2003-2004.

21  Q.   And then came *Leaderless Jihad*.  This was 2008, give or

22  take?

23  A.   2007-2008.

24  Q.   And then *Misunderstanding Terrorism, the* most recent?

25  A.   2016.

1  Q.    Okay.  Let me ask you about *Leaderless Jihad*.  This book

2  was initially the subject of a plagiarism allegation; is that

3  right?

4  A.    Yes, that's correct.  Yes.

5  Q.    And you and I have gone over this before.  We went over it

6  in Judge Orrick's session, and you very candidly admitted that

7  there had been perhaps some mistakes in the bibliography

8  possibly caused by your wife; is that right?

9  A.    Yes.

10  Q.    And is that still your explanation for how those

11  allegations may have come about?

12  A.    There was no plagiarism.  It just was poorly referenced.

13  Q.    Poorly referenced?

14  A.    There was no plagiarism.  The plagiarism idea, I mean,

15  it's a free country.  Anybody can claim anything, but there was

16  nothing.  It was just one allegation.  It was dropped.

17  Q.    You haven't written any sort of retraction or pulled back

18  anything that you wrote in this book; right?

19  A.    No, not really.

20  Q.    It's all still good?

21  A.    No, I don't think so.  My thoughts have evolved.  This was

22  based on my time in the Secret Service looking at all the

23  top-secret traffic every day trying to protect the President,

24  and so I started thinking -- I mean, seeing a new pattern;

25  namely, that you have homegrown terrorists that were becoming

1    more prominent in 2007 and '8.  And, unfortunately, I was right

2    because 10 years later, that's the majority of the cases that

3    we have.

4    **Q.**    Let me just stop you for a second.  Something you said,

5    you said you were working for the Secret Service?

6    **A.**    At the time, yes.

7    **Q.**    And what was your job at the Secret Service?

8    **A.**    Protect the President against group violence.

9    **Q.**    You were protecting the President?

10   **A.**    I was trying to create a strategy to protect the President

11   against group violence; namely, group terrorism as opposed to

12   single loner shooters, which the Secret Service is excellent at

13   doing.

14   **Q.**    Okay.  If I may, I'd like you to read a section of your

15   book *Leaderless Jihad*, and I will preface this as saying it's

16   actually quite prescient I think.  I think you --

17   **A.**    I was criticized heavily, as you know, for writing this

18   book saying it's all nonsense, and the person who criticized me

19   said "The Myths of Homegrown Terrorism."  That was the name of

20   the article that was criticizing me.

21   **Q.**    But you were really one of the first people to be out

22   there saying homegrown terrorism is going to happen, it's a

23   real-live thing and we've got to prepare for it; right?

24   **A.**    Absolutely, yes.

25   **Q.**    And in fact in that book you highlighted the dangers of

1  the Internet in creating homegrown terrorism; right?

2  **A.**   Yes.

3  **Q.**   And if I could just have you look there, it's page 116, I

4  guess the top half of the page, you wrote that previously you

5  had described how a group of guys, a bunch of guys as you call

6  them, could act as an echo chamber, which would progressively

7  radicalize them.  And you wrote "Now the same process is taking

8  place online"; right?

9  **A.**   Yes.

10  **Q.**   And you wrote (reading):

11          "Since physical militant sites, like radical mosques,

12       are closely monitored by law enforcement authorities,

13       militants have moved online."

14  **A.**   Yes.

15  **Q.**   And you wrote (reading):

16          "The new forums have the same influence that these

17       radical mosques played in the previous generation of

18       terrorists.  It is the forums, not the images of the

19       passive websites, which are crucial, crucial in the

20       process of radicalization."

21       You wrote that in 2008; right?

22  **A.**   Yes.

23  **Q.**   And that, in fact, is remarkably accurate; right?

24  **A.**   For about five years.  It's no longer accurate, but it was

25  until about 2013.

1   Q.   You don't think the Internet is used by radicals?

2   A.   Yes, but not website.  It's also social media now and

3   social media -- I didn't see the social media coming in this

4   book, and so I was talking about the websites themselves and

5   the interactive website, but now it's all social media.

6   Q.   So it's moved from just websites to social media?

7   A.   Yes.

8   Q.   That's where the new threat is?

9   A.   Yes.  And so at first it was Facebook, Twitter.  Now

10  Telegram is really a big one.

11  Q.   Telegram is a big place for this radicalization process to

12  happen?

13  A.   Not so much radicalization but communication among people;

14  and, as I said, I don't like the term "radicalization" even

15  though I use it, but it's -- it's really the engine behind all

16  of that group discussion.

17       And so group discussion needs to be face to face.  Here I

18  was describing that it moved online to interactive website.

19  Now the discussions are taking place in social media.  So it's

20  the same engine but with the technology, the discussion has

21  moved elsewhere.

22  Q.   So the new place is Facebook?

23  A.   Yes, very much Facebook, Twitter, and WhatsApp, Telegram.

24  Q.   Telegram.  Any other encrypted messaging applications?

25  A.   I'm sure there's a lot, but I'm a troglodyte and I don't

1    use them.

2    Q.   Ah, that actually brings me to another point.  But, first,

3    the chats and the messages and the communications that you've

4    reviewed in the discovery materials, the vast majority of them

5    occurred on the application Telegram; isn't that right?

6    A.   Some of them, yes.

7    Q.   The ones that you've been referring to today, for example,

8    the chat with YMN and the Shi'a Sunni battles?

9    A.   Those are Telegram, yes.

10   Q.   Those are all Telegram?

11   A.   Yes.

12   Q.   Okay.  Dr. Sageman, let's shift gears a little bit.  You

13   in your report concluded that one of the things that happened

14   in July of 2016 was that Alhaggagi started -- he resolved to

15   find a real job; right?

16   A.   Yeah.  He started looking for jobs.

17   Q.   To sort of leave behind his life of identity theft and all

18   the other nonsense and finally grow up?

19   A.   I didn't say that.  I don't think he was leaving his life

20   of identity theft yet.

21   Q.   No.

22   A.   Because he still continued, as you know.  But, yes, he

23   realized it was time to move on.

24   Q.   July 2016, time to move on, time to find a real job?

25   A.   Yes.

1   Q.   And, in fact, I think if you turn to, in your report,

2   page 42, the first full paragraph there you write (reading):

3          "Two weeks after turning 21 in July 2016,

4       Mr. Alhaggagi resolved to finally look for a real job."

5       Right?

6   A.   Yes.

7   Q.   And you cite there four jobs that he applied for.  One to

8   the Oakland Police Department, a security firm, the Post

9   Office, and a locksmith position; right?

10  A.   Yes.

11  Q.   Now, you're well aware, are you not, Dr. Sageman, of the

12  allegations involved in this case that the defendant was

13  applying for a job at the Oakland Police Department not to get

14  a job at the Oakland Police Department but to steal weapons;

15  right?

16  A.   Yes.  Actually, that's what he said to the confidential

17  informant, CHS.

18  Q.   And then did he also repeat that to the undercover agent?

19  A.   I think so, yes.

20  Q.   Okay.  But you believed him, that he was resolved to find

21  a real job?

22  A.   Yeah, I think so.

23  Q.   Okay.  And the reference to applying for a job for a

24  locksmith, that was also a part of your assessment that the

25  defendant had turned a corner, so to speak, and was trying to

1   get his life straight; right?

2   **A.**   I don't think he turned a corner.  He was trying to turn a

3   corner.

4   **Q.**   Trying to turn a corner?

5   **A.**   I don't think he did yet.

6   **Q.**   And part of that was looking for a real job as potentially

7   a locksmith?

8   **A.**   Yes.

9   **Q.**   Now, you are aware, Dr. Sageman, that there are identity

10  theft allegations along with the terrorism allegations in this

11  case; right?

12  **A.**   Oh, very much so, yes.

13  **Q.**   And you reviewed all the discovery materials in this case;

14  right?

15  **A.**   I think I did, yeah.

16  **Q.**   Did you review the materials from the two identity theft

17  victims who stated that in August of 2016, they believed their

18  identity had been stolen as a result of calling a locksmith in

19  Oakland?

20  **A.**   I may have just glanced over it and not really kind of

21  paid attention to it, but...

22  **Q.**   If you like, I'll --

23  **A.**   No, no.  I trust you.  I trust you.

24  **Q.**   But your assessment in your report was that Mr. Alhaggagi

25  was trying to find a real job and you mentioned, among other

1    things, Oakland Police Department and locksmith?

2    **A.**    A security firm, the Post Office, and I think he wanted to

3    be also an officer in the Air Force.

4    **Q.**    Locksmith was one of those jobs; right?

5    **A.**    Yeah.  There are five.  I only listed four, but there was

6    a fifth one.  I think being an officer in the Air Force.

7    **Q.**    Dr. Sageman, you also write that you were -- you felt that

8    prison has been good to Mr. Alhaggagi; is that right?

9    **A.**    Yeah, I think so.

10   **Q.**    And, in fact, I think you said that just a few minutes

11   ago, that prison has actually been a good thing for him; right?

12   **A.**    Yeah, I think so.

13   **Q.**    And one of the things that you wrote was that it has given

14   him time to reflect on his wasted past life, provided him with

15   some structure to allow him to flourish intellectually and,

16   more importantly, matured?

17   **A.**    Yes.

18   **Q.**    And, again, not to go over stuff that we went over this

19   morning, but you did not include here in your final report

20   discussions that the informant had with Alhaggagi in which

21   Mr. Alhaggagi allegedly talked about blowing up this building;

22   right?

23   **A.**    Yeah.  That was at the very beginning, and I said looking

24   at his prison time for about now 20 months at the time that I

25   interviewed him, that I thought that it actually had

1    transformed him.

2        The allegation were the first two or three months of his

3    imprisonment, and I just said I did not interview him then so I

4    don't know exactly what level of maturity he had, but I thought

5    that 20 months later I was impressed that he probably was not

6    the same guy that he was when he was arrested.

7    **Q.**   And that's based on your interviews with him?

8    **A.**   Yeah, my interviews and kind of -- yeah, and confronting

9    him and seeing how he reacted to confrontation.

10   **Q.**   The interviews where he told you that he did not get a

11   bomb manual?

12   **A.**   He did not what?

13   **Q.**   You're talking about the interviews in which, among other

14   things, he told you that he did not get a bomb manual?

15   **A.**   I think he did tell me, and I think I wrote it in my

16   report.  It's in my report.

17   **Q.**   Let me direct you to --

18   **A.**   I think in --

19   **Q.**   -- page 9.

20   **A.**   I think the next paragraph in my report.  In the next

21   paragraph I tell you how he got the bomb and he assumed that

22   the bomb manual was from ISIS.

23   **Q.**   But it's your testimony that he did not get it from the

24   people that he had written this note for; right?

25   **A.**   That's correct.  So he got it, as I said in the next

1   paragraph, you also notice on the Telegram channel called

2   Science of Explosives.  He accessed it and a PDF document

3   attachment was downloaded to his computer.  It was about 20

4   page long and he read it, which is exactly the manual that you

5   just waved at me a few minutes ago.

6        So -- and he said further, to implicate himself, that the

7   channel owner was someone called Abu something.  So

8   Mr. Alhaggagi believes it was probably a jihadi because the

9   fashion to call themselves Abu someone.  So he thought it was

10  very much an ISIS site and he got it from ISIS.

11  **Q.**   Dr. Sageman, you spoke this afternoon about how the

12  defendant cut off contact with the undercover agent in

13  mid-August of 2016; right?

14  **A.**   Around August 16th with one exception three-hour period

15  between August 31st and September 1st.

16  **Q.**   And it was your testimony, I believe, that the defendant

17  essentially just went home and did nothing; right?

18  **A.**   No.  At that time he still was active.  It's when he

19  met -- he was surprised by the undercover in September that he

20  went home and hid.

21  **Q.**   And one of the things you said is that home would be about

22  the last place you would want to hide; right?

23  **A.**   If you're hiding from the FBI but not from a jihadi.

24  **Q.**   Okay.  Because if you're hiding from the FBI, you might

25  want to not go home; right?  You might want to stay away from

**SAGEMAN - CROSS / HASIB**

1    the places that you're familiar with; right?

2    **A.**   Yes.  You want to run away.

3    **Q.**   You might even want to leave the country or leave all the

4    people you know; right?

5    **A.**   It would be wise, yes.

6    **Q.**   Dr. Sageman, isn't it a fact that on October 7th, 2016,

7    the defendant traveled to Los Angeles?

8    **A.**   Yes.

9    **Q.**   And are you aware that on October 7th, 2016, or

10   thereabouts, he visited the Saudi Consulate?

11   **A.**   No, I don't think that I knew that.

12   **Q.**   You did review all the discovery materials in this case?

13   **A.**   Yeah.  I think so, yeah.

14   **Q.**   So the fact that he visited the Saudi Consulate shortly

15   after cutting off contact with the FBI undercover agent, either

16   you didn't review that or you don't remember it and it wasn't

17   in your report?

18   **A.**   I don't remember it.

19   **Q.**   Okay.

20   **A.**   But the fact is he always came home and he was home most

21   of the time.

22   **Q.**   Dr. Sageman, you talked a great deal this afternoon about

23   the idea of blocking users on Telegram and that really that's

24   what this was all about, that it was sort of a back and forth

25   between groups on Telegram trying to get each other blocked;

1   right?

2   **A.**   Yes.  It seems that a lot of the conversation that I read

3   that was translated seemed to be about that.

4   **Q.**   And you've got one example that you referred to where

5   Alhaggagi tells his friend YMN, I think, that "I outed the

6   *dawa'ish* identifiers to the Shiite group, and I outed the

7   Shiite identifiers to the *dawa'ish* group"; right?

8   **A.**   Yes.

9   **Q.**   Did you ever find that Telegram chat where Alhaggagi outed

10  Shiites to *dawa'ish* and *dawa'ish* to Shiite?

11  **A.**   I think it's there, but the problem is that the Government

12  did not translate the 18,000 pages; and so since I don't speak

13  Arabic, I took it for granted that it was there, especially

14  since he mentions it and the conversations that were translated

15  referred to them.

16      But you did not translate everything and you only

17  translated what was the worst, the most incriminating evidence

18  for the defendant, and that's all I had to rely on with

19  whatever conversation he talks.  So, for instance, the whole

20  conversation 90, the 200 pages were translated I think by the

21  Defense but not by you.  And there he talks a lot about

22  being -- doing exactly that.

23  **Q.**   You had those conversations translated by the Defense, not

24  by us?

25  **A.**   Yeah.  I think that they were not translated by you.  Only

1    10 pages were translated out of 200 and I wanted to see the

2    whole context, and I got them yesterday.

3    **Q.**   And you're still of the opinion that this was all just a

4    mistake about someone possibly getting upset about comments

5    made about women on Telegram?

6    **A.**   It was that.   It was also very much, you know, trolling

7    jihadis, Saudis, and Shi'a.

8    **Q.**   Trolling?

9    **A.**   Trolling, yes.

10   **Q.**   Dr. Sageman, you're not a social media expert, are you?

11   **A.**   A what?

12   **Q.**   You're not a social media expert?

13   **A.**   No, I'm not.

14   **Q.**   I think you just referred to yourself as a troglodyte; is

15   that right?

16   **A.**   Unfortunately, that's accurate.

17   **Q.**   Are you on Telegram?

18   **A.**   No.

19   **Q.**   WhatsApp?

20   **A.**   No -- yes.   I'm on WhatsApp.

21   **Q.**   Viber?

22   **A.**   No.   I'm not on Facebook either.

23   **Q.**   Not on Facebook either?

24   **A.**   I'm not on Twitter.

25   **Q.**   Okay.   But you do know what it means to troll somebody?

1  **A.**    Oh, yes.  I found out when the Russians did it to us in

2  the last presidential election.

3  **Q.**    Okay.  So that's based on your experience in the last

4  election?

5              **THE COURT:**  I have a question.

6              **MR. HASIB:**  Yes, Your Honor.

7              **THE COURT:**  So while you consider yourself a

8  troglodyte, I would be a super-troglodyte.  So tell me, what

9  does it mean -- the use of the word "troll," exactly what does

10  that mean?

11              **THE WITNESS:**  Something that I had to learn.  It means

12  that you accentuate and you basically tell a whole story and

13  then you escalate, you escalate, you escalate, until the other

14  person either stops believing you or you just kind of drop the

15  escalation and the other person is gone.

16        It's really kind of to show the other person that you're

17  smarter than they are, and that's done so often.  I discovered

18  that recently.

19        But this whole thing about egging people on or even trying

20  to polarize a conversation between two groups of people upset

21  at each other and they don't do things, a little bit what

22  happened in the election, where people stopped voting because

23  they were upset and others were motivated to vote, it's a

24  little bit the same thing.  So it's basically telling tall

25  tales in order to get a reaction by the other person, and then

1  you boast about it to your friends to show how smart you are.

2  It's pretty immature.

3  **BY MR. HASIB:**

4  **Q.**   And if I understood your testimony earlier today

5  correctly, you described the trolling by Mr. Alhaggagi not only

6  occurring online but, in fact, when he met the undercover

7  agent?

8  **A.**   Yes.

9  **Q.**   And, again, if I understand you correctly, this was the

10  one occasion where the defendant decided to meet someone in

11  person that he had trolled; is that right?

12  **A.**   Well, he didn't decide.  It was kind of forced on him.

13  **Q.**   It was forced on him?

14  **A.**   Yeah.

15  **Q.**   How was it forced on him?

16  **A.**   Well, I think that the CHS presented him, "Oh, my cousin

17  is driving.  He's on his way right now.  Can you meet him in 10

18  hours?"  And he really felt very guilty about being the cause

19  of it and decided, well, he probably has to meet him.

20  **Q.**   So the one time that Alhaggagi meets someone that he

21  trolled online just happens to be someone representing

22  themselves to be an Al-Qaeda bomb maker with a cousin in ISIS?

23  **A.**    Well, he did not know it was -- what the CHS said is that

24  his brother was very sympathetic for ISIS, and so that's why he

25  was surprised when the undercover said he was Al-Qaeda as

SAGEMAN - CROSS / HASIB

1   opposed to ISIS.

2   **Q.**   Isn't it a fact, Dr. Sageman, that in the discovery

3   materials that you reviewed, the defendant repeatedly said that

4   he was looking for instructions on how to make bombs?

5   **A.**   On various -- yes, several people -- not so much how to

6   make bombs but how do you connect a bomb to a cell phone.  He

7   still doesn't understand that.  I asked him.  He still doesn't

8   understand.

9   **Q.**   That was the critical piece that he was looking for;

10  right?

11  **A.**   When he read the manual, on page 21, there's a diagram in

12  the manual.  I found that very confusing, and so I think he

13  did.  And so I think that he asked several people.  He asked

14  the undercover, I believe, in your second session, I don't

15  think that you played it, "How do you connect a phone online?"

16  I think the undercover tried to explain to him.

17      And then I think even though he was joking with VIP, he

18  said, "Oh, by the way, how do you connect a phone online?"  And

19  VIP tried to explain, and I think VIP's explanation was almost

20  correct, but he did not get it.  It was obvious he did not get

21  from his response.  And I'm not going to tell you how, but --

22  **Q.**   We appreciate that.

23  **A.**   -- but he did not get it.

24  **Q.**   So it's still your testimony that the reason the defendant

25  went to meet the undercover is because he felt bad that the

1    defendant had driven from Salt Lake City?

2    A.   Yes.

3    Q.   It had nothing to do with the fact the defendant was

4    someone who could potentially help him carry out his terrorist

5    attacks?

6    A.   I think that they discussed with the CHS whether they

7    should try to combine and to do things together, and they

8    decided, yes, let's do things together; but he did not know

9    exactly what was the level of the sophistication with the

10   undercover, whether the undercover had any training or anything

11   like that.  The undercover, as far as he was concerned, was

12   this cool dude who was a cousin of the CHS.

13   Q.   Dr. Sageman, let's switch gears for a second.  You talked

14   a little bit today and the Court talked a little bit today

15   about prior criminal history and how that can sometimes

16   indicate someone's future propensity.  Do you recall that

17   discussion?

18   A.   I recall before even my testimony and my discussion of it,

19   yes.

20   Q.   You're familiar with the San Bernardino terrorist attack a

21   couple years ago?

22   A.   Very familiar.  I'm also the expert on that one.

23   Q.   Are you familiar with what the defendants' or the

24   perpetrators' criminal history was in that case?

25   A.   I don't think they had any.

1  **Q.**   Are you familiar with the Orlando Pulse Nightclub

2  shooting?

3  **A.**   A little bit but less.

4  **Q.**   Less so.  Are you familiar with whether that defendant had

5  any criminal history or that --

6  **A.**   I don't know.

7  **Q.**   -- shooter had any criminal history?

8  **A.**   I'm less familiar with that one.  I cannot tell you.

9  **Q.**   Dr. Sageman, let me ask you a little bit more about your

10  interviews with the defendant.  You say in your report that you

11  started your interviews by testing the defendant by telling him

12  that you'd met someone named Sheikh Abdullah Azzam; right?

13  **A.**   That's correct.

14  **Q.**   And given your background and your experience in the

15  counterterrorism world, who is Sheikh Abdullah Azzam?

16  **A.**   Sheikh Abdullah Azzam is basically the person who

17  motivated people to come and join the fight against Soviets in

18  Afghanistan, and he was the one who argued that it was the

19  individual -- it was a duty on the individual to join the jihad

20  and it's not a collective fight.

21       Let me translate that because it's actually very

22  interesting.  Sheikh Abdullah Azzam was saying everybody in any

23  country can join the fight against the infidel when there is a

24  jihad as opposed to government declaring war.  So an individual

25  can actually declare war and go and fight a war.  That was

1    basically the *fard'ayn*, as they call in Arabic, which is

2    F-A-R-D apostrophe A-Y-N, *fard'ayn*.  It is an individual duty

3    to go and fight jihad.

4    **Q.**   This is in the 1980s; right?

5    **A.**   In the 1980s because he was killed on November 24th, 1989,

6    by a car bomb.

7    **Q.**   Let me stop you there for a second.  He was killed in

8    November -- I'm sorry, what year did you say?  1989?

9    **A.**   That's correct.

10   **Q.**   Okay.  And the defendant you're aware was born in 1995; is

11   that right?

12   **A.**   That's correct.  But Sheikh Abdullah Azzam is basically

13   the father of the modern jihad.  He's reputed the mentor of

14   Osama Bin Laden.  People revere Sheikh Abdullah Azzam,

15   especially his books *Join the Caravan*, *Defending Muslim Land*.

16   Those are very, very popular in any language, whether it's

17   French, English, Arabic, and this is very much the father of

18   the modern theory of jihad.

19   **Q.**   He died in 1989; right?

20   **A.**   That's correct.

21   **Q.**   Okay.  You never asked the defendant what he thought

22   about, say, Osama Bin Laden, did you?

23   **A.**   I think he knew about Osama Bin Laden.

24   **Q.**   You think?

25   **A.**   Well, I think he talked about it.

SAGEMAN - CROSS / HASIB

1    Q.    Did you put that in your report?

2    A.    What?

3    Q.    Did you put that in your report?

4    A.    I don't think it was relevant.  He talked about Osama

5    Bin Laden with the undercover.

6    Q.    So you didn't think to ask the defendant what he thought

7    about Osama Bin Laden in your interviews with him?

8    A.    I don't -- I don't think I did, no.

9    Q.    How about, this is a name that's come up a couple of times

10   today, Ayman al -- we'll pronounce it both ways; right? --

11   Ayman al-Zawaraki (phonetic) or Ayman al-Zawahiri if you read

12   it in English.  Did you ask the defendant about that guy?

13   A.    Zawahiri?

14   Q.    Zawahiri.

15   A.    I did not.

16   Q.    Now, you're aware that the name Ayman al-Zawahiri, or

17   however you want to pronounce it, came up in this case; right?

18   A.    Yes.

19   Q.    And, in fact, you're aware --

20   A.    That's the English translation, yes.  I mean, in the

21   transcripts.

22   Q.    You're aware that the defendant asked the undercover who

23   that person was; right?

24   A.    Yes.  In his accent.

25   Q.    But in your interviews, you didn't think it would be

1    important to ask the defendant about Ayman al-Zawahiri?

2    **A.**    I knew he already knew about it because I had read the

3    transcript before saw him -- seeing him.

4    **Q.**    It wasn't important for you to ask him about that for your

5    report, was it?

6    **A.**    I already knew.  There's no point asking a question to an

7    answer I already know.

8    **Q.**    How about Mohammad al-Adnani?  Do you know who that person

9    is?

10   **A.**    Yes.

11   **Q.**    Who was Mohammad al-Adnani?

12   **A.**    He was a spokesman for ISIS before he was killed.

13   **Q.**    And he was killed in roughly 2016; is that right?

14   **A.**    Yes.  In the fall of 2016.

15   **Q.**    And you're aware, are you not, that in the chat messages

16   between the defendant and the confidential source, the

17   defendant sent a confidential source to a link to a speech by

18   this ISIS spokesperson Mohammad al-Adnani; right?

19   **A.**    Yes.  I read that in the discovery material.

20   **Q.**    You did not ask the defendant what he thought about

21   Mohammad al-Adnani, did you?

22   **A.**    No.  I knew that he knew him.

23   **Q.**    So you asked him about Abdullah Azzam but not about any of

24   the names that actually came up in the discovery materials?

25   **A.**    Well, I knew that he knew the other one.  I asked him "Do

1   you know who Abdullah Azzam is?"  Or "I met Abdullah Azzam."

2        He said, "Who is that?"

3        I said, "Oh, he's the father of the modern jihad."  And

4   that's it so I knew he did not know it.  I did not ask the

5   other one because I already knew that he knew it.

6   **Q.**   But the fact that he did not know Abdullah Azzam to you

7   was important because you were concluding here that he's not of

8   a jihadi mind-set; right?

9   **A.**   Every jihadi that I have ever met knew who Abdullah Azzam

10  was.

11  **Q.**   And did you see the name "Abdullah Azzam" anywhere in the

12  discovery in this case?

13  **A.**   I don't think so, except for my report.

14  **Q.**   Except for your report.

15                      (Pause in proceedings.)

16  **BY MR. HASIB:**

17  **Q.**   Dr. Sageman, you spoke this morning a lot about emojis and

18  emoticons; right?

19  **A.**   Yes.

20  **Q.**   And you explained that the emojis and the emoticons were

21  an important way for you to understand the context of

22  conversations that you were reading; right?

23  **A.**   That's correct.  I think they modify what's written,

24  either accentuate, sometimes show that what people say

25  sarcastic, other is just a response.  So, yes, they're very

1  important.

2  **Q.**   And, in fact, you pointed out this morning I think several

3  emojis that looked like sort of a laughing face and crying;

4  right?

5  **A.**   That's correct.

6  **Q.**   And to you that was an indication that whatever was being

7  said was not really serious; right?

8  **A.**   I think there's a facetious element to it, yes.

9  **Q.**   Okay.

10       **MR. HASIB:**  Ms. Scott, could we have the Government's

11  computer now?

12       Okay.  I'm placing before you one of the chat messages.

13       We'll mark this as Government Exhibit 3, Your Honor.

14       (Government's Exhibit 3 marked for identification)

15  **BY MR. HASIB:**

16  **Q.**   And, Dr. Sageman, you've reviewed this chat message;

17  right?

18  **A.**   Yes, I did.

19  **Q.**   And it starts with -- just so we're clear, it's Alhaggagi

20  talking on the left and the CHS on the right?

21  **A.**   That's correct, yes.

22  **Q.**   And it starts with Alhaggagi saying (reading):

23       "Main streets, Mission Boulevard, every club and

24       underground club in the city.  I know I'll probably get

25       near the 500 but my goal is 10,000.  Areas here are very

1    crowded.  There's a lot of traffic everywhere."

2    Right?

3  A.   Yes.

4  Q.   And the FBI online source replies (reading):

5         "That's awesome bro."

6    And then Mr. Alhaggagi replies (reading):

7         "Ah, wallah, I can't wait.  Aki, you know what I did

8    last week?  I applied for a job at the Police Department."

9    And then at the bottom of that are those emojis; right?

10 A.   That's correct.

11 Q.   It's the same emojis that you were looking at earlier;

12 right?

13 A.   Yes, but here it has a different -- it has a certain

14 meaning.  Over there it has a different meaning.  I mean, the

15 emoji just modifies what's said, and what's said depending on

16 who you're talking to, you put some emojis, you know, to kind

17 of emphasize it.

18    So here I think the emojis just means that, "Look, I'm

19 going to fool the Police Department.  I actually applied."

20 And, in fact, he actually did apply the week before to the

21 Police Department.

22 Q.   So this was true?

23 A.   This was true, but I think that the context may have been

24 not -- I mean, I think he really applied to the Police

25 Department seriously because he wanted to be a policeman; but

1   he decided, "Ah, yeah, I'm going to tell this guy that I

2   applied to the Police Department to show how smart I am and how

3   stupid the police is."  And so he put the emojis there to kind

4   of in a way enhance himself on this.

5   **Q.**   But, in fact, this was true, that he had actually applied

6   to a Police Department; right?

7   **A.**   Yes, he did, but not because he wanted to steal their

8   weapons or anything like that.  He wanted to be a policeman.

9        **THE COURT:**  That's why he applied.  Other than a

10  secondary purpose, you concluded that when he applied to the

11  Police Department, he actually wanted to be a police officer?

12       **THE WITNESS:**  Yes.

13       **THE COURT:**  Okay.  Did you also conclude from that

14  that what he would do as a police officer would be strictly

15  lawful; that this was a turnaround for him?  Did you come to

16  that conclusion?

17       **THE WITNESS:**  No.  I don't think it was a turnaround.

18  I think he was trying to turn his life around so he applied to

19  different jobs.  One of them was a police officer.

20       **THE COURT:**  It's meaningful.  The fact that somebody

21  is going to apply to a Police Department is a qualitative

22  decision to -- in the normal course people don't apply to the

23  Police Department because they want to violate the law.  In the

24  normal course, people apply to the Police Department to enforce

25  the law.  In the normal case.

1              THE WITNESS:  Right.  And I think that was the case

2      here.

3              THE COURT:  You thought that -- so that would

4      reflect -- in your opinion, that reflected a change that he was

5      going to abandon his old ways of identity theft and whatever

6      else he was involved in, that this was -- that would be a major

7      change, wouldn't it?

8              THE WITNESS:  Yes, I think so.

9              THE COURT:  But did you conclude that he had made this

10     major change by this decision?

11             THE WITNESS:  I think he was trying to get on that

12     way.  He also applied to security job.  I think that he's

13     fascinated with law-enforcement-type ideas.

14             THE COURT:  What about he applies to be a locksmith or

15     he wants to be educated as a locksmith?  There could be two

16     reasons.  One is he's intrigued by the way locks work and he

17     wants to ensure people's safety.  A secondary reason could be

18     he wants to find out how to pick locks.  Now, did you conclude

19     that it was the former and not the latter?

20             THE WITNESS:  Yes.  Well, I asked him about that, and

21     he said the reason he applied to the locksmith position is that

22     he had a friend who actually was a locksmith, and he owned -- I

23     don't know if he owned but he was a manager in that place.

24     It's a little bit, like, how he got all these jobs, I think, I

25     suspect, a friend maybe Yemeni or something like that.

1    Because up to that point most of the jobs that he had were

2   really under the table.  He never really paid taxes so he kind

3   of got everything scot-free.  I mean, without taxes, just under

4   the table.

5    So this, I think, the locksmith was just an easy job for

6   him to get because the other one he had to apply, he had to get

7   a security clearance, and so on.  So I took that at face value

8   as opposed to learning how to pick locks and then rob people.

9   **BY MR. HASIB:**

10  **Q.**   So I take it, Dr. Sageman, that the defendant did not tell

11  you that he was using his friend as a locksmith to get false

12  credit cards?

13  **A.**   That's correct, he did not tell me that.

14  **Q.**   And -- well, Dr. Sageman, the thrust of your testimony

15  earlier today seems to be, if I can sum it up, essentially all

16  talk, no action; is that fair?

17  **A.**   That's pretty fair, yes.

18  **Q.**   Is it your testimony that downloading a bomb manual is not

19  action?

20  **A.**   I have a few myself.  If you carry yourself, of course you

21  can buy stuff, whether it's an anarchist cookbook or something.

22  No, I don't think it's an action.  If you cannot use a manual

23  in order to build a bomb and you do some acts in furtherance,

24  like you start buying supplies and so on, yeah, then I start to

25  worry; but just having the manual itself, not so much.

1   Q.   To be clear, you have bomb manuals because you are someone

2   experienced in explosives and things of that nature; right?

3   A.   I also collect all what jihadi put out, so, yes, I have

4   most of their bomb manuals.

5   Q.   You collect them for research purposes; right?

6   A.   And also for accuracy.  You know, I want to know what

7   they -- a lot of potential bombers kill themselves and no one

8   else.  It's actually a very dangerous thing so I'm kind of

9   looking at, you know, what are they going to do.  And then also

10  looked at videos on the Internet, how to build bombs; and, you

11  know, if I didn't have any training, I wouldn't do that myself.

12  Q.   Dr. Sageman, you looked at these things because you were a

13  researcher and academic; right?

14  A.   Also I have a certain fascination about this but mostly

15  because I'm an academic, yes.

16  Q.   So you would classify downloading a bomb manual as not

17  necessarily an action in furtherance of a plan, it's still part

18  of all talk?

19  A.   That's right.

20  Q.   And meeting with someone representing themselves to be an

21  actual bomb maker after getting the bomb manual that you

22  described as being sort of confusing, that is also not action

23  in your opinion?

24  A.   No.  That was kind of -- in a sense, he was almost -- how

25  you say? -- almost forced to meet this guy.  It was not his

1   initiative.  It was somebody else told him the guy burned his

2   bridges, just driving to see you.  He said, "Okay.  I'll meet

3   him once."

4   **Q.**   He felt bad; right?

5   **A.**   He felt bad.

6   **Q.**   The guy drove from Salt Lake City, he had to meet him;

7   right?  It had nothing to do with the fact that he was somebody

8   that could conceivably help the defendant carry out his plans?

9   **A.**   Well, I think that -- I don't think he had any plans.  I

10  think he was curious about how far he can go on trolling both

11  the CHS and now this new guy who was showing up.

12  **Q.**   So meeting with the undercover agent was not, as you would

13  say, action?  It was still all talk?

14  **A.**   Yes.

15  **Q.**   Meeting with him the second time after he explained that

16  he was skilled in bomb making, still no action; right?

17  **A.**   Yeah.  At that point I think that he was hesitating but he

18  was bored and said, "Why don't I meet him again," yeah.

19  **Q.**   Going to a shooting range to practice shooting, still no

20  action in your opinion; right?

21  **A.**   I think he had to do that for his job.

22  **Q.**   For the Oakland Police Department job?

23  **A.**   Yeah.

24  **Q.**   Still, not action in your opinion?

25  **A.**   No, it had nothing to do with this jihadi stuff.

SAGEMAN - CROSS / HASIB

Q.    Applying to the Police Department, still no action on your part?

A.    I'm sorry?

Q.    Applying to the Police Department, not an action on your part?

A.    I think he's interested in security and various things like that, applying.  I don't think he would have gotten the job because it seems that the interviewer at the Police Department realized that he was lying about three areas, if I recall.

Q.    Looking online for igniters and electric matches a couple of days before Halloween after having suggested he was going to commit an attack on Halloween, still no action on your part; right?

A.    That's correct.

Q.    All talk?

A.    Yes.

Q.    Dr. Sageman, the conclusion that you seem to reach at the end of your report is that the defendant is, quote, "less dangerous than a randomly picked individual from the United States"; is that right?

A.    Yes, because he has absolutely no background of violence.

Q.    Because he has no background of violence?

A.    Yeah, physical violence, beating people up, hurting people.  He's just talking.

1  Q.  And --

2       THE COURT:  Well, let me ask you this:  You don't hold

3  yourself out -- or maybe you do -- as an expert in what one

4  would say the general population -- in terms of what percentage

5  of the general population has criminal records for violence?  I

6  mean, do you know the statistics?  Have you seen the

7  statistics.

8       THE WITNESS:  I know the homicide rate 4.7 per hundred

9  thousand.  I'm looking really for just homicide because most

10 crime is not reported so it's very -- most statistics are not

11 very good except for homicide so I just look at homicide.

12      THE COURT:  As Government counsel is pursuing, I

13 probably should let him finish, but I was interested in your

14 testimony as if you take the random person, that random person

15 in a population of 350 million people is more likely to have a

16 criminal record for violence than the defendant.

17      THE WITNESS:  That's correct.

18      THE COURT:  And the question is:  What statistical

19 basis do you reach that conclusion?  Upon what is the evidence

20 that you reach that conclusion?

21      THE WITNESS:  Well, I think that the prison population

22 is almost like 1 percent of the population.  Often there is

23 always some criminal record.  Granted, most of it is drugs, but

24 there's some violence.

25      So he doesn't have anything.  He's a complete blank slate

1   in terms of violent criminal offense, and so because he's lower

2   than the base rate of the population, his probability is

3   actually lower.

4          THE COURT:  I understand that.  That's a conclusion.

5   I'm trying to figure out how you come to the conclusion what

6   the evidence is of the random -- I don't know whether it's

7   called average or not -- that the random individual selected

8   out of the population of the United States has a greater

9   likelihood of having a record for a violent action than this

10  defendant.

11         After all, this defendant -- you testified this defendant

12  had a number of incidences as a youth getting into fights and

13  so forth.  So I'm not counting any of that.  I'm counting

14  criminal convictions for violence.  And it comes as a surprise

15  to me that the percentage of Americans -- or not Americans --

16  people who are subject to the criminal justice system in the

17  United States would lead one to the conclusion that this

18  defendant is less likely.

19         THE WITNESS:  Right.  So, Your Honor, you have to look

20  at base rates, and the base rates of people convicted for

21  violent crimes is nonzero.  It's not zero.  We have people who

22  are convicted.

23         THE COURT:  Yes.

24         THE WITNESS:  His is zero and, therefore, his is lower

25  than the base rate of a randomly selected person because we're

1    talking about probability.  We're not saying that --

2              THE COURT:  Okay.  I understand.

3              THE WITNESS:  So it's a base rate.  It's a base-rate

4    argument.

5              THE COURT:  Okay.  All right.  Thank you.  That

6    supplies the evidence -- I mean, that supplies the reasoning.

7    BY MR. HASIB:

8    Q.   Let me go back for a moment, then I want to come back to

9    this idea about the randomly picked individual.

10        Dr. Sageman, you spoke this morning about the magazine

11   *Inspire*.  Do you remember that?

12   A.   Yes.

13   Q.   And you explained that that is a magazine that is widely

14   viewed by, as you would say, jihadis; right?

15   A.   English speaking.

16   Q.   English-speaking jihadis?

17   A.   Yes.

18   Q.   And that's because *Inspire* is written in English; right?

19   A.   That's right.

20   Q.   And it's pretty slickly presented?  It looks likes a

21   magazine?

22   A.   Yes.

23   Q.   A very sort of compelling look at the life of Al-Qaeda and

24   what they do; right?

25   A.   Yeah.  It's a very showy magazine.

**SAGEMAN - CROSS / HASIB**

1  **Q.**   Okay.  And the fact that the defendant, in your

2  estimation, had not heard of *Inspire*, that was a signal to you

3  that he had not become a jihadi or had a jihadi mind-set; is

4  that right?

5  **A.**   No.  It signaled to me that he was different from

6  English-speaking jihadis, all of whom had probably downloaded

7  or read one copy of *Inspire*.

8  **Q.**   Are you familiar with a magazine called *Dabiq*, D-A-B-I-Q?

9  **A.**   Yes.

10  **Q.**   Just describe for us, what is *Dabiq*?

11  **A.**   It's very similar to *Inspire* but it's for -- it's printed

12  by ISIS -- I mean, it's published by ISIS.

13  **Q.**   And is it, again, sort of presented in a magazine format?

14  **A.**   Yes.  It's very similar.  It's copied on *Inspire*.

15  **Q.**   And does it praise ISIS' acts, for example, of martyrdom?

16  **A.**   Yes.

17  **Q.**   Does it praise their use of child soldiers, for example?

18  **A.**   The particular issue you're talking about, Issue 8, has

19  one article about not so much child soldier but child

20  executioner.

21  **Q.**   Child executioner?

22  **A.**   Yes.

23  **Q.**   And that's something that's sort of publicized in *Dabiq* as

24  "Look at what a great job ISIS is doing"; right?

25  **A.**   In that issue, yes.

**SAGEMAN - CROSS / HASIB**

1  **Q.**   And are you aware that Issue 8 of *Dabiq* was found among

2  the defendant's electronic devices?

3  **A.**   Yes.

4  **Q.**   And you're still of the opinion that the fact that he did

5  not view *Inspire* is indicative of his lack of a jihadi

6  mind-set?

7  **A.**   No.  *Inspire* is lack of an English-speaking jihadi

8  mind-set because, for instance, in France the jihadis in France

9  were much more numerous than American jihadis, factor of 10 to

10  a hundred even.  They never heard of English-speaking magazine

11  because they speak French, and so that's why I say English

12  speaking.

13       Now, *Dabiq* most now the more recent, because they are

14  published at different dates -- *Inspire* was published, the

15  first one issue was published in the summer of 2010 it came

16  out; *Dabiq* came online about four years ago, three years ago.

17  It's pretty recent.  So if you are really jihadi, you probably

18  have a lot of -- several issues if you're really interested.

19  Just one issue, this could have been downloaded from any kind

20  of link in Telegram because that's how it's disseminated.  So,

21  no.

22  **Q.**   So there's an innocent explanation, in your opinion, for

23  having a copy of *Dabiq*?

24  **A.**   Yes.

25  **Q.**   You didn't include that in your report to the Court, did

1   you?  There's no mention of *Dabiq* in here, is there?

2   **A.**   I don't think I mentioned it, no.

3   **Q.**   Was that because having the ISIS magazines was not

4   important in your assessment as to whether the defendant had

5   taken the turn towards political violence?

6   **A.**   It wasn't so much that.  It was not knowing that even

7   *Inspire* existed, and that to me was significant as opposed to

8   having a copy or not.  So if you don't even know about *Inspire*,

9   you don't know much about English-speaking jihad.

10  **Q.**   I see.  And did you ask him about *Inspire*?

11  **A.**   Yeah, I think I did, because I was kind of surprised.  I

12  said, "You didn't know?"  He knew now because it was put out by

13  Anwar Awlaki who is a Yemeni; and as soon as he found out that

14  it was Anwar Awlaki, he said he was going to get it, but I

15  didn't see that in his discovery material.

16  **Q.**   So the fact that the defendant did not recognize *Inspire*

17  was important to you to put into your report but the fact that

18  he actually had a copy of *Dabiq*, that was not important enough

19  to put into your report?

20  **A.**   Yes.

21  **Q.**   Dr. Sageman, let's go back to the idea of the randomly

22  picked individual.  Is a randomly picked individual from the

23  United States likely to have a copy of *Dabiq* in their

24  electronic devices?

25  **A.**   Probably not.

SAGEMAN - CROSS / HASIB

1    **Q.**    Is a randomly picked --

2    **A.**    The base rate is pretty low.

3    **Q.**    Is a randomly picked individual from the United States

4    likely to have discussed planting a car bomb outside a gay

5    nightclub with someone they just met?

6    **A.**    Maybe not.

7    **Q.**    Is a randomly picked person from the United States likely

8    to have taken a complete stranger on a tour of the Berkeley

9    hills pointing out the areas where they wanted to start fires

10   in residences?

11   **A.**    Probably not.

12   **Q.**    Is a randomly picked individual from the United States

13   likely to have made up statements about calling over their

14   non-Muslim friends to their house so that they could tie them

15   up and execute them?

16   **A.**    Probably not.

17   **Q.**    But it's still your conclusion that a randomly picked

18   individual from the United States is more dangerous than

19   Mr. Alhaggagi?

20   **A.**    Yes.  Because if you look at a chart of rates and since

21   it's nonzero, it's actually higher.

22   **Q.**    Dr. Sageman, you're being paid here for your testimony

23   today, are you not?

24   **A.**    Absolutely not.  I'm never paid for my testimony.

25   **Q.**    I'm sorry.  I misspoke.  You're being paid in your

SAGEMAN - REDIRECT / GUGELMANN

1   services as an expert; right?

2   **A.**   No.  I'm paid for my time.

3   **Q.**   You're paid for your time?

4   **A.**   Yes.

5   **Q.**   You're getting paid as a result of being here today?

6   **A.**   Absolutely.

7   **Q.**   Okay.  What's your hourly rate?

8           **THE COURT:**  Well, I'm aware of it.

9           **MR. HASIB:**  Okay.  In that case, I have no further

10  questions, Your Honor.

11          **MR. GUGELMANN:**  Just briefly, Your Honor.

12                         **REDIRECT EXAMINATION**

13  **BY MR. GUGELMANN:**

14  **Q.**   There was a lot of discussion about what was in your draft

15  report versus what was in your final report as it relates to

16  the informant testimony of post-arrest conduct; is that right?

17  **A.**   Yes.

18  **Q.**   And you explained that it was in -- these allegations were

19  discussed in your draft report.  They were taken out at

20  counsel's request, at our request.  They're not in the final

21  report.

22  **A.**   That's correct.

23  **Q.**   Do you recall discussing -- so we provided you the

24  discovery as it related to those informants; correct?

25  **A.**   Yes.

**SAGEMAN - REDIRECT / GUGELMANN**

1   **Q.**   And we asked you to discuss that with Mr. Alhaggagi and

2   offer an opinion on it?

3   **A.**   I don't think you asked me.  That's what I do.  You don't

4   have to ask me.

5   **Q.**   We then informed you that we had gotten the Government's

6   statement to Probation and the issue of the informants was not

7   raised?

8   **A.**   That's correct.

9   **Q.**   And asked you to take it out of the report?

10   **A.**   Yes.  I think we had a discussion on the phone about this.

11   **Q.**   There was some discussion about the term "egging on."  You

12   said you thought Mr. Alhaggagi and the UC were egging on.  The

13   Court asked you a question about who was actually generating

14   these ideas.  Do you recall that?

15   **A.**   Right.

16   **Q.**   And your testimony, I think, was that you agreed with the

17   Court that it was Mr. Alhaggagi who was generating at least the

18   vast majority of these ideas?

19   **A.**   Three out of the four.

20   **Q.**   Three out of the four that the Court mentioned --

21   **A.**   Yes.

22   **Q.**   -- but there were other ideas that were brought up in the

23   course of these discussions beyond the ones that the Court

24   specifically mentioned?

25   **A.**   Yes, and some were blacked out so I'm not going to mention

SAGEMAN - REDIRECT / GUGELMANN

1    them in court; but starting fires, for instance.

2    **Q.**    For example.  Mr. Alhaggagi generated those ideas as well;

3    right?

4    **A.**    What do you mean?  The starting fire was Mr. Alhaggagi.

5    How to do it was the undercover.

6    **Q.**    So I'm just trying to get at your use of the term "egging

7    on" and what that meant.  Did you see any instances where

8    either the CHS or the undercover said, "Let's not do that"?

9    **A.**    No.

10   **Q.**    Did you see instances where the CHS or the undercover were

11   enthusiastic about those various plans mentioned by

12   Mr. Alhaggagi?

13   **A.**    Yeah.  When Mr. Alhaggagi talked to me, he said he was

14   frankly surprised that they kept going along with him.  The

15   more absurd ideas he had, the more they agreed with it and

16   encouraged him, yeah.

17   **Q.**    And is that what you were referring to when you said that

18   the two of them were egging each other on?

19   **A.**    That's correct.

20   **Q.**    You were also asked -- there was a discussion with counsel

21   about what had been translated by the Government and what had

22   been translated by the Defense.

23   **A.**    Correct.

24   **Q.**    And you said that Session 90, of which we saw the short

25   excerpt in Government Exhibit 8, was translated in full by the

1    Defense at your request?

2    **A.**    Not at my request, but I wanted to see it.

3          THE COURT:  I'm not concerned who translated what.

4          MR. GUGELMANN:  Understood.

5        The general -- I'd like to introduce a copy of Chat 90.

6          THE COURT:  All right.

7          MR. GUGELMANN:  I lost my stickers, but I think we're

8    at Number 3.

9          THE COURT:  Exhibit next in order admitted.

10         MR. GUGELMANN:  Exhibit next in order.

11       (Hearing Exhibit 3 received in evidence)

12   **BY MR. GUGELMANN:**

13   **Q.**    I just want to ask you about -- this is the chat that

14   includes the bomb-making discussion that we talked about this

15   morning.

16   **A.**    Yes, on November 27th.

17   **Q.**    And I just want to ask you about the general tenor of this

18   whole discussion from your perspective.

19   **A.**    It's filthy and obscene is probably how I can characterize

20   it.  It's about being very disgusting to women, people -- women

21   that they add on to that site by just adding them and women,

22   say, "How did I get here," and so on and they kind of start

23   trolling the women who just appear.  So the whole group Chat 90

24   or 3078, as it is in the original, is pretty filthy and

25   disgusting.

**SAGEMAN - RECROSS / HASIB**

1  **Q.**   And so was it significant to you to understand more of the

2  context of the bomb chat that Chat 90 provided for you to

3  render your opinions here?

4  **A.**   Very much so.

5        **MR. GUGELMANN:**  I don't have any further questions,

6  Your Honor.

7        **THE COURT:**  Okay.  Thank you.

8     Anything further?

9        **MR. HASIB:**  Briefly, Your Honor.

10                        <u>**RECROSS-EXAMINATION**</u>

11  BY MR. HASIB:

12  **Q.**   You said a moment ago that you did not see any instances

13  that the UC or the confidential source said "Let's not do

14  that."  Is that what you said?

15  **A.**   In terms of attacks, but "Let's not cross boarders,"

16  "Let's not beat up some guy," that, he did, that, he certainly

17  did, but it was all to enhance the attacks.

18        **MR. HASIB:**  Thank you, Your Honor.  Nothing further.

19        **THE COURT:**  Thank you.

20     Doctor, thank you so much.

21        **THE WITNESS:**  Do you have any questions for me?

22        **THE COURT:**  Sorry?

23        **THE WITNESS:**  Do you have any questions for me?

24        **THE COURT:**  Oh, I have no questions.  Thank you.

25        **THE WITNESS:**  All right.  Thank you, then.  Thank you,

**PROCEEDINGS**

1    Your Honor.

2         **THE COURT:**  And thank you for being available to

3    testify.  I know that you do have a busy schedule and I

4    appreciate it.

5         So now let's figure out a little bit where we are on this.

6         You're excused.  You can step down now.

7         **THE WITNESS:**  I'm just packing up, Your Honor.

8         **THE COURT:**  I would definitely escape while you can

9    because I may think of a question.

10                    (Witness excused.)

11        **THE COURT:**  So go ahead, Mr. Hasib.

12        **MR. HASIB:**  Your Honor, we've discussed, Ms. McNamara

13   and Mr. Gugelmann and I, and we are in the process of

14   contacting the two informants through their counsel.  It has

15   been difficult thus far, frankly, to get in touch with them,

16   but we think we found them.  We think we've got -- we've got in

17   contact with them, and we believe we can have them here by

18   January 8th, and that's the date that we consulted with the

19   court and seems to be agreeable to everybody.

20        **THE COURT:**  All right.  That's fine.

21        What about some of the other issues?  I'm just wondering

22   whether we can take care of them in the interim, the ones that

23   I raised.

24        **MS. McNAMARA:**  The terrorism enhancement?

25        **THE COURT:**  Pardon me?

1        **MS. McNAMARA:**  The terrorism enhancement, Your Honor,

2   or --

3        **THE COURT:**  The terrorism enhancement, the criminal

4   history, whether a departure -- well, I think any insight you

5   can give to the Court on why it's Level VI automatic and how

6   does that fit with the framework of what a criminal history

7   category is supposed to do and whether it can be the basis for

8   a departure.  That would be an interesting subject to address.

9        I'm also interested -- and maybe the Government has access

10  to this information or maybe not -- in the number of cases that

11  have been sentenced under this statute.  The question in the

12  Court's mind is how many of those defendants did something

13  other than what the defendant pled guilty to.

14       I mean, clearly there is a similarity, I get it, that a

15  defendant who is convicted of this statute committed a criminal

16  act prohibited by the statute and in that regard, there's a

17  similarity or identity, but that doesn't mean any of the

18  details are the same.

19       And so that would be interesting to the extent there are

20  any reported decisions or anything that the parties can direct

21  the Court's attention to either by way of reported decisions or

22  by way of submissions otherwise.  I mean, I don't know how

23  things are memorialized as a general rule, if the Government

24  has greater access to that information.

25       So there it is.  I mean, that would be helpful to the

1  Court.

2          **MR. HASIB:**  I certainly can't answer that question now

3  off the top of my head, and I also suspect that the answer may

4  be difficult to find just because of the nature of these cases.

5  Sometimes a lot of what's going on in the background is never

6  discussed in a nonclassified setting.  So there may be

7  information out there that someone is having communications

8  with ISIS directly and they end up being arrested for something

9  like identity theft or some other seemingly benign offense.

10         **THE COURT:**  But then there wouldn't be the 12-level

11  enhancement.

12         **MR. HASIB:**  Not necessarily.  I mean, it depends on

13  the circumstance of the arrest.  I think -- let me make sure I

14  understand Your Honor's question correctly.

15         **THE COURT:**  Well, sure.  I can address it again.

16      What I want to do is find out those people who have been

17  convicted of this particular crime, the terrorist crime.  I'm

18  interested in, one, the sentences they received to the extent

19  it's known; and, two, what, if it's also known, were the

20  circumstances of that conviction or sentencing that resulted in

21  whatever sentence the person received.

22      We know a couple of things.  We know the statute under

23  which a person is convicted and we know the sentence.

24  Nothing's secret there.  Now, as you point out, because of

25  national security concerns, there could be additional

1    information that would justify, when brought to the Court's

2    attention, would justify the particular sentence that the

3    person received.

4         I don't know what light you can shed on it.  It's

5    peculiarly in the -- I mean, the Government knows.  The

6    Government knows.  The Department of Justice knows.

7    Terrorism -- I don't know how things are set up in the DOJ.

8    There has to be a terrorist unit.

9         **MR. HASIB:**  The National Security Division.

10        **THE COURT:**  Yeah.  They know the answer to that

11   question.  They either know immediately or they have access to

12   that information.  So to the extent you can disclose that, I

13   would appreciate it.  And you have the option of disclosing

14   those matters under -- you can do so under seal.  And you can

15   also do so subject to a protective order if it's warranted

16   under certain circumstances.  Maybe not.  But I'm giving you a

17   couple of options of how to comply with the Court's request.

18        **MR. HASIB:**  So the --

19        **THE COURT:**  And I'm also saying it's not essential.  I

20   mean, you do what you do, but the Court's interested in it.

21        **MR. HASIB:**  So the ask is cases in which the terrorism

22   enhancement was applied --

23        **THE COURT:**  Right.

24        **MR. HASIB:**  -- where the circumstances may have been

25   different from the conduct that was engaged in.

1            THE COURT:  Different or similar.

2            MR. HASIB:  Okay.  Okay.  Understood.

3            THE COURT:  And I guess also, if the Government is

4    aware of any cases in which the terrorism enhancement was not

5    applied yet the facts of the case are the same here insofar as

6    they reflected the defendant's providing access to known

7    terrorists, access to Twitter, Facebook, social media accounts

8    to known terrorists.  So either way I'd like to know.

9            MR. HASIB:  Whether the enhancement was applied or

10   whether it was not applied?

11           THE COURT:  Yeah.  When it was applied, when it was

12   not applied.

13           MS. McNAMARA:  I can tell the Court that we've done a

14   search.  We can't find similar cases.

15       And just to put a couple of data points in front of the

16   Court at this point, it's a very strange case.  The Court

17   started with that observation.  I think we all agree.

18       I think it's particularly important to understand here

19   that in terms of the granular facts, I imagine this is going to

20   be unique because even with the opening of the ISIS-related

21   accounts, Mr. Alhaggagi didn't know necessarily what they'd be

22   used for.  The Government's own brief at page 42 shows the

23   entirety of the exchange between Mr. Alhaggagi and Muharib, the

24   person he opened one set of accounts for.

25       And I can just say to the Court that there's nothing in

**PROCEEDINGS**

1    here from Mr. Alhaggagi's, you know, position where he's

2    extolling the virtues of ISIS.  What there is is, at the very

3    end on page 42, four lines from the bottom, Muharib saying to

4    Mr. Alhaggagi, "I think you read about the invasion that I

5    want, brother."  And, by the way, "invasion" here is PR, a

6    propaganda invasion.  It's not a physical invasion.  I think

7    the Government agrees with that.

8        Mr. Alhaggagi's response is, "No, I didn't read about it."

9        And then Muharib says, "Go to the group, brother, and

10   read."  And then, "Oh, dear.  Add the biggest number of

11   accounts, brother," says Muharib.

12       And Mr. Alhaggagi doesn't do anything after that.  There's

13   no opening of accounts afterwards.

14       So the record, I think, is Mr. Alhaggagi knows Muharib is

15   an ISIS sympathizer.  Muharib comes to him because another chat

16   named Munasir says, "You're the person to help."  And this all

17   comes through an ISIS chat room.

18       But the actual mechanics of what happened here are simply

19   Muharib saying, "Please, open these accounts."  And

20   Mr. Alhaggagi saying, "Yes."  And Muharib saying, "Here's where

21   to put them," and saying, "I need to have e-mail accounts in

22   order to authenticate Twitter accounts."  You can't open a

23   Twitter account without having an e-mail.

24       That's what's at the heart of it.  So to say that

25   Mr. Alhaggagi opened accounts for ISIS, absolutely correct.  He

1    did it at the request of an ISIS sympathizer, absolutely

2    correct.

3         What is entirely unproven is that Mr. Alhaggagi knew what

4    messages would be transmitted.  I think it's fair to say he

5    must have known they would be used for some sort of propaganda

6    purpose, but precisely what we don't know.

7         And what -- or at least what he didn't know and what we

8    know about what got said is really not exhortations to violence

9    or exhortations to commit terrorist acts.  It's much more in

10   the nature of "Here's what happened on the battlefield today"

11   or "People have been talking about our positions in the

12   battlefield.  Don't do it."  It's not the kind of thing that I

13   think the Court might fear being put out here.

14        And one other thing I would say to the Court is Muharib,

15   the person who is asking for this, is a 17-year-old hacker

16   himself.  We have in discovery that he had thousands of these

17   accounts.  So Mr. Alhaggagi's contribution is about eight

18   accounts overall.  And when Muharib says, "Read about my

19   invasion, my plans about these accounts," we have no evidence

20   Mr. Alhaggagi did so and there is evidence he did not open any

21   further accounts.

22        So the offense conduct here, which is what makes this case

23   so strange, is very limited in time and limited in scope but,

24   yet, the entirety of today has been taken up with everything

25   that he said before all of this.

1    I don't think there is a case out there of the like.  So

2    while I think the Court's asking for something entirely

3    reasonable and something we would very much like to find,

4    unless there's some trove in the Government's basement, I'm not

5    optimistic we'll find much.

6        **THE COURT:**  Well, whatever we find, we find.  I think,

7    though, it is the Government's position that this isn't -- that

8    all this stuff isn't just speech, that he did take certain

9    actions.  So I think rather than getting into a debate now

10   about what the evidence shows or what it doesn't show, I mean,

11   I'm quite sure it's the Government's position that certain

12   actions were taken.

13       **MR. HASIB:**  It's absolutely the Government's position

14   that certain actions were taken.  And, in fact, it's the

15   Government's theory, and had this gone to trial we would have

16   argued this, that this is really all one course of conduct;

17   that it starts in July of 2016 with the defendant getting on an

18   ISIS website and talking about weapons and can people get him

19   weapons, and it quickly snowballs from there into him talking

20   with the FBI online source about what he wants the weapons for

21   and the attacks that he's going to engage in.  It then

22   obviously snowballs into the meetings with the undercover and

23   the gruesome, gruesome details that he describes about what he

24   wants to do in the Bay Area.

25       Then -- and I understand that we have a very different

**PROCEEDINGS**

1    view of why the defendant broke off contact with the

2    undercover, but it's the Government's position that the

3    defendant smelled a rat.  He had been savvy enough to talk

4    about people being undercover from the very earliest moments

5    that he was talking with the confidential source.  So this was

6    something that was very clearly on his mind and he was worrying

7    about it.

8         THE COURT:  Well, I think it would be their point

9    that -- the question is really to divine purpose and to that

10   you look at the circumstantial evidence, and what they are

11   saying is that they have a perfectly rational explanation of

12   why he canceled --

13        MR. HASIB:  Right.

14        THE COURT:  -- his relationship with him consistent

15   with his view that he never wanted to do anything, didn't want

16   to take the additional steps.

17        Now, on the other side of the ledger is the fact that he

18   did take a number of steps, including meetings, including

19   drive-bys, including things like applying as a police officer

20   or as a locksmith, areas that are fraught with uncomfortable

21   implications given the Government's view of his mind-set, let's

22   say that.

23        Because these are -- we have his mind-set.  I don't think

24   that's in dispute.  We have the things he said.  That's not in

25   dispute.  The question is:  Would he carry out any of these

1   things?

2       And then the Government says, yes, there's a distinct

3   possibility he would, and they point to things that are of some

4   concern in support of their statement that he would carry out

5   these things.

6       Anyway, this is going to be some argument between the

7   parties and we don't need to have it today.  It's in the record

8   and testimony has been taken.

9       So do I understand -- we can do a couple of things.  It

10  being this week, I want to give the parties the opportunity to

11  brief the subject or submit anything in writing that they wish,

12  and I'm trying to figure out since it's a good idea to have

13  some dates in mind.

14      Well, my question is:  When do you think you can get

15  something in writing on the various issues that I raised?  Not

16  tonight.

17          **MR. HASIB:**  No, no, no.  I was looking to see what

18  date it was actually because I know there's holidays coming up

19  and whatnot.  Today is the 17th.

20          **MS. McNAMARA:**  Yes.

21      And may I ask?  Your Honor, the Court's clear it wants to

22  have from the Government if there's any case that could shed

23  light on a similar sort of fact pattern.  From the Defense,

24  does the Government want additional briefing on the application

25  here of the terrorism enhancement?

**PROCEEDINGS**

1    **THE COURT:**  Yes, especially the second part which

2  talks about retaliation --

3    **MS. McNAMARA:**  Retaliation, yes.  Okay.

4    **THE COURT:**  -- because I don't think that was fully

5  developed in the briefs.

6    **MS. McNAMARA:**  Very good.

7    **THE COURT:**  So I'd like that and anything else you

8  want.  I think the Government should file first.

9    **MS. McNAMARA:**  Very good.

10   **MR. HASIB:**  Okay.

11   **THE COURT:**  I mean, you can do simultaneous but that

12  just doubles the work.  Why doesn't the Government file first;

13  then you respond to it and anything else; and then the

14  Government, if they have something else they want to advance,

15  they can.  And it's up to you how you want to do it.

16    So I turn to you, Mr. Hasib.  When do you want?

17   **MR. HASIB:**  For dates?  You know, it may not have come

18  across earlier today, but the parties have actually been in

19  very close communication and have enjoyed a good relationship

20  throughout this process.

21   **THE COURT:**  No, it does.

22   **MR. HASIB:**  We'll get together and pick upcoming

23  dates.

24   **THE COURT:**  Why don't you just agree amongst

25  yourselves.

**PROCEEDINGS**

1          **MR. HASIB:**  Yeah.

2          **MS. McNAMARA:**  Thank you, Your Honor.

3          **MR. HASIB:**  Okay.

4          **THE COURT:**  You don't have to do it in front of me,

5    and just let me know what we're doing.

6          **MR. HASIB:**  Yeah.

7          **MS. McNAMARA:**  Very good.

8          **MR. HASIB:**  Okay.

9          **THE COURT:**  As far as I'm concerned, we'll continue

10   the sentencing hearing until January 8th.

11         **MR. HASIB:**  January 8th.

12     Okay.  Thank you, Your Honor.

13         **MR. GUGELMANN:**  Thank you, Your Honor.

14         **MS. McNAMARA:**  Thank you for the Court's time.

15             (Proceedings adjourned at 4:25 p.m.)

16                     ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, December 20, 2018

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25