DAVID L. ANDERSON (CABN 149604)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

S. WAQAR HASIB (CABN 234818)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7261
    FAX: (415) 436-6982
    waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>AMER SINAN ALHAGGAGI,<br><br>    Defendant. | CASE NO. 17-CR-387-CRB<br><br>**UNITED STATES' SUPPLEMENTAL SENTENCING MEMORANDUM** |

On December 17, 2018, a sentencing hearing was held in the above-referenced matter. During the hearing, the Court posed several questions regarding the applicability of the 12-level terrorism enhancement under U.S.S.G. § 3A.14. Specifically, the questions the Court asked the following questions:

(1) U.S.S.G. § 3A1.4 contains two prongs, one for cases where the offense was "calculated to influence or affect the conduct of government by intimidation or coercion," the second for cases where the offense was "calculated… to retaliate against government conduct." Does the second prong apply to this case? (Transcript, Dec. 17. 2018, at pg. 4, lines 11-24).

(2) U.S.S.G. § 3A1.4 requires that in "each case, the defendant's criminal history category… shall be Category VI." Why is Category VI automatically applied, how does that fit with the framework of what a criminal history category is supposed to do, and can that be the basis for a departure? (Transcript, Dec. 17, 2018, at pg. 199, lines 3-8).

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM                          1
17-CR-387-CRB

(3) To the extent that there are any cases where defendants engaged in conduct similar to the conduct at issue here, was the terrorism enhancement applied, and what kinds of sentences did courts impose in those cases?  (Transcript, Dec. 17, 2018, at pgs. 199-202).

As requested by the Court, the government addresses each of these three questions below.  In addition, the government asks the Court to disregard the report and testimony of Dr. Marc Sageman as inherently untrustworthy.

### 1. The "Retaliation" Prong Of The Terrorism Enhancement Applies To This Case

The 12-level enhancement set forth in U.S.S.G. § 3A1.4 applies if the offense at issue involved or was intended to promote a "federal crime of terrorism."  As the Court correctly explained during the December 17 hearing, a "federal crime of terrorism" is an offense that is either 1) "calculated to influence or affect the conduct of government by intimidation or coercion; or 2) "calculated… to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).[1]  During the December 17 hearing, the Court indicated that it wanted further briefing on the second prong, i.e., the retaliation prong.  For the reasons discussed below, this second prong is plainly applicable to this case.[2]

At the outset, it is important to understand what Section 2332b's "retaliation" prong requires of the government, and what it does not require.  Specifically, the "retaliation" prong does not require the government to prove that the defendant was *motivated* to engage in the offense to retaliate against the government.  Rather, the critical inquiry is whether *the offense itself was calculated* to retaliate against government conduct, regardless of the defendant's particular motive.  The seminal case rejecting this "motivational" reading of Section 2332b was the Second Circuit's decision in *United States v. Awan*, 607 F.3d 306 (2d. Cir.), *cert. denied*, 562 U.S. 1170 (2011)(finding error and vacating sentence where district court required government to prove defendant's motive for providing material support to

---

[1] In addition, the offense must be one that is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B).  It is undisputed that the defendant here pled guilty to one of those specifically enumerated statutes, 18 U.S.C. § 2339B (attempting to provide material support to a designated foreign terrorist organization, to wit, the Islamic State of Iraq and the Levant, or ISIL).  Moreover, the Court did not ask for further briefing on this issue.  Accordingly, the government does not address it here.

[2] By making this argument, the government by no means waives or concedes any argument that the first prong, the "intimidation or coercion" prong, also applies.  To the contrary, the government maintains that *both* prongs apply.  Nonetheless, this Court asked for briefing only on the second prong.  Accordingly, the government does not repeat its "intimidation or coercion" argument here, and relies on those arguments set forth in its initial sentencing memorandum.  See Gov't. Sentencing Memorandum, Docket No. 90, at pgs. 52-56.

terrorists). The government relied on *Awan* in its argument in its initial sentencing memorandum, but focused mainly *Awan*'s relevance to the "intimidation or coercion" prong. Gov't. Sentencing Memorandum, Docket No. 90, at pgs. 52-56. However, in light of this Court's questions during the December 17 hearing, the government stresses that *Awan* is equally applicable to both the "intimidation or coercion" prong and the "retaliation" prong. *Awan*, 607 F.3d at 317 (reasoning that whatever the defendant's motive might have been, the terrorism enhancement applied "so long as the government shows by a preponderance of the evidence that [the defendant] had the specific intent to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, *or to retaliate against government conduct*," and concluding that "[c]ontrary to the district court's analysis, [the defendant's] motive is simply not relevant")(internal citations and quotations removed)(emphasis added). Numerous district courts both in the Second Circuit and elsewhere have relied on the reasoning in *Awan* to apply the terrorism enhancement.[3]

As far as retaliation goes, the mere act of opening social media and email accounts may at first blush seem innocuous, but is in fact integral to the process by which ISIL spreads its message, recruits adherents, and trains or directs attackers.[4] In other words, the defendant was not just opening any social media and email accounts. He was opening accounts for people whom he believed, *and who actually were*, members of ISIL. It is inconceivable that he could have engaged in this conduct without calculating that his actions would help ISIL retaliate against (or for that matter, intimidate or coerce) the many governments ISIL identified as its enemies. After all, retaliating against government conduct was one of the primary means that ISIL used to first vault itself into prominence on the world stage.[5] The

---

[3] *See*, *e.g.*, *United States v. Elshinawy*, 2018 WL 1521876 at *11 (D.Md. 2018); *United States v. Muhtorov*, 329 F.Supp.3d 1289 (D.Colo. 2018).

[4] Dr. Lorenzo Vidino, director of the Project on Extremism at George Washington University, described the use of social media by ISIS adherents in the United States:

American ISIS sympathizers are particularly active on Twitter, where they spasmodically create accounts that often get suspended in a never-ending cat-and-mouse game. Some accounts (the "nodes") are the generators of primary content, some (the "amplifiers") just retweet material, others (the "shout-outs") promote newly created accounts of suspended users.

ISIS in America: From Retweets to Raqqa, December 2015 at ix. Available at https://cchs.gwu.edu/sites/g/files/zaxdzs2371/f/downloads/ISIS%20in%20America%20-%20Full%20Report_0.pdf. (Last accessed February 4, 2019).

[5] *See*, *e.g.*, Translation of speech by ISIL leader Abu Bakr al Baghdadi, July 1, 2014: "So raise

Court will recall that in August of 2014, then-President Obama ordered air strikes against ISIL targets across northern Iraq, in response to reported acts of genocide committed by ISIL members against religious minorities in Iraq's Sinjar province. At that time, most Americans had not heard of ISIL. That would soon change. In direct retaliation for those air strikes, on August 18, 2014, ISIL members brutally beheaded an American freelance journalist, James Foley, and recorded the murder on video. Entitled "A Message to America," the video depicted Foley kneeling in an orange jumpsuit at the feet of a masked ISIL fighter[6], who then pulled out a knife and said in perfect English with a British accent that Foley's execution was in retaliation for the recent U.S. airstrikes. After beheading Foley, the video showed another American journalist, Steven Sotloff, also kneeling in an orange jumpsuit. The man with the knife explained, "the life of this American citizen, Obama, depends on your next decision." *See* "Militant Group Says it Killed American Journalist in Syria," by Rukmini Callimachi, *New York Times*, August 19, 2014 (last accessed February 2, 2019, at https://www.nytimes.com/ 2014/08/20/world/middleeast/isis-james-foley-syria-execution.html). The chilling video was posted by ISIL members on social media websites, including YouTube.[7] According to the SITE Intelligence Group, an American company that tracks online activity of jihadist and other hate groups, in the three hours after the graphic video was uploaded, there were over 2,000 posts on Twitter from ISIL jihadists

---

your ambitions, O soldiers of the Islamic State! For your brothers all over the world are waiting for your rescue, and are anticipating your brigades. It is enough for you to just look at the scenes that have reached you from Central Africa, and from Burma before that. What is hidden from us is far worse. So by Allah, *we will take revenge*! By Allah, *we will take revenge*! Even if it takes a while, *we will take revenge*… So let the world know that we are living today in a new era. Whoever was heedless must now be alert. Whoever was sleeping must now awaken. Whoever was shocked and amazed must comprehend. The Muslims today have a loud, thundering statement, and possess heavy boots. They have a statement that will cause the world to hear and understand the meaning of terrorism, and boots that will trample the idol of nationalism, destroy the idol of democracy and uncover its deviant nature." Available at https://news.siteintelgroup.com/Jihadist-News/islamic-state-leader-abu-bakr-al-baghdadi-encourages-emigration-worldwide-action.html. (Last accessed February 2, 2019)(emphasis added).

[6] The ISIL fighter would later be identified as Mohammed Emwazi, and became known in the press as "Jihadi John." He was killed in a joint U.S./U.K. air strike in November of 2015. "Jihadi John: "US Reasonably Certain Strike Killed IS Militant," November 13, 2015, available at https://www.bbc.com/news/uk-34805924 (last accessed on February 2, 2019).

[7] The use of YouTube by ISIL is particularly relevant. When the defendant here opened Gmail accounts in 2016 at the request of ISIL members, the defendant specifically told them that those Gmail accounts could be used to engage in activity on YouTube. Gov. Sentencing Memorandum. Docket No. 90 at pg. 39, line 22 (where "Barud," the defendant, passes several Gmail usernames and passwords to "Abu Muharib Iraqi" and says "We can use them for YouTube.")

gloating over Foley's death, and calling it retribution for the U.S. air strikes. *Id.* By the next day, ISIL was making headlines across the world.

A few weeks later, on approximately September 2, 2014, ISIL distributed a second video, entitled "Second Message to America." In this second video, an ISIL fighter made good on the previous threat against Sotloff, beheading him while explaining, "I'm back, Obama, and I'm back because of your arrogant foreign policy toward the Islamic State… you, Obama, have yet again, through your actions, killed yet another American citizen."[8] The ISIL fighter then threatened to kill yet another hostage, this time a British aid worker, David Haines. *See* "Steven Sotloff: ISIS Video Claims to Show Beheading of US Journalist," by Paul Lewis, Spencer Ackerman, and Ian Cobain, *The Guardian*, September 3, 2014, available at https://www.theguardian.com/world/2014/ sep/02/isis-video-steven-sotloff-beheading (last accessed February 2, 2019). The "Second Message to America" video was again distributed via social media networks, and ISIL claimed responsibility for it on Twitter. Haines too would later be executed, in retaliation for the British government's support for U.S. air strikes, with a video of the murder posted on social media and distributed through Twitter, among other networks. This string of gruesome killings retaliating against the United States and its allies, and ISIL's savvy use of social media, including Twitter, YouTube, and other U.S.-based social media networks to broadcast those beheadings, brought ISIL as an organization to the forefront of the global war on terrorism. Indeed, ISIL became well-known worldwide for its skills in using social media networks to achieve its goals of radicalizing and recruiting fighters.[9] This is the group for whom the defendant would later

---

[8] *Dabiq*, an online magazine published by ISIL in a number of languages, discussed the Sotloff beheading:

[American hostage Steven Sotloff's] killing was the consequence of US arrogance and transgression which all US citizens are responsible for as they are represented by the government they have elected, approved of, and supported, through votes, polls, and taxes."

Available at http://www.ieproject.org/projects/dabiq4.html. (Last accessed February 5, 2019).

[9] For example, in August of 2016, just before the defendant here started opening social media accounts for his associates in ISIL, the U.K. Home Affairs Committee issued a report concluding that "[n]etworks like Facebook, Twitter and YouTube are the vehicle of choice in spreading propaganda and they have become the recruiting platforms for terrorism." U.K. House of Commons, Home Affairs Committee Report, "Radicalisation: The Counter-Narrative And Identifying The Tipping Point," available at https://publications.parliament.uk/pa/cm201617/cmselect/cmhaff/135/135.pdf (last accessed February 2, 2019).

In addition, numerous scholarly articles have been written analyzing ISIL's exploitation of social

knowingly, willingly, and gladly helped open social media accounts. Clearly, anyone assisting ISIL's social media operation could not have done so for any benign, altruistic purpose, without calculating that such assistance would help ISIL retaliate against the many governments fighting it.

Indeed, the retaliatory element of the defendant's social media activities is plainly apparent from discussions in the chat rooms on encrypted messaging applications in which the defendant participated. For example, as the government described in its initial sentencing memorandum, in one chat room, identified on the defendant's telephone as Session 56, on November 11, 2016, a user identifying himself as "*Hijrah*[10] Commando" posted the following:

> 11/11/2016 12:08:41 AM (UTC+O), (*Hijrah* Commando) 228315951
>
> The bleeding wound a letter from one of the brothers:
>
> A letter from one of the brothers:
>
> To the owners of the invasion channels, we want Tweets in English on American hashtags that are against or pro-Trump. It appears that the situation among the Americans is worsening
>
> We want racist Tweets against or pro-Trump.
>
> Let us kindle strife and chaos in their country. Perhaps that will be a reason for them to withdraw their armies from our dear country or become too preoccupied to be concerned about us. Strengthen your determination, deliver it to the brothers.

As the government argued in its initial sentencing memorandum, the main thrust of this post was to "intimidate or coerce" by "kindl[ing] strife and chaos" in the United States. However, there was clearly a retaliatory element as well: to take revenge on the United States for having its "armies" in "our dear country." Just a few days after this post, the defendant agreed to open up Twitter accounts for Abu Muharrib Iraqi, a person whom he believed to be, and who in fact was, an actual ISIL member. Gov't

---

media, and Twitter in particular. *See*, *e.g.*, *The ISIS Twitter Census*, by J.M. Berger and Jonathon Morgan, Center for Middle East Policy at the Brookings Institution, March 2015, available at https://www.brookings.edu/wp-content/uploads/2016/06/isis_twitter_census_berger_morgan.pdf (last accessed February 3, 2019).

[10] *Hijrah* is an Arabic word normally used to refer to migration, but which is also used by ISIL supporters to refer to traveling to the Middle East to engage in *jihad* .

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM                                                        6
17-CR-387-CRB

Sentencing Memorandum, Docket No. 90, at pg. 54.  In other words, the act of opening Twitter accounts for Abu Muharrib Iraqi was very much an offense calculated not only to "intimidate or coerce," but to retaliate against the United States' "armies" for fighting against ISIL.

In fact, although under *Awan* the government need not show that the defendant was motivated by retaliation against government conduct, the defendant's own words show that such retaliation was very much on his mind.  As the government argued in its initial sentencing memorandum, the defendant resorted to aiding ISIL in the virtual world only after his initial efforts to aid ISIL in the real world were thwarted by a quick-thinking FBI undercover agent and an online confidential human source (CHS).  In conversations in which the defendant described the attacks he wanted to carry out in the San Francisco Bay Area, the defendant commented that

> You know how Saudi has a lot of our scholars locked up… what we could do is threaten Saudi in exchange for American [UI]… Like every day passes by with you guys releasing our brothers a bomb is going to blow up… with you guys not* releasing

In other words, the defendant was contemplating carrying out attacks against Americans in San Francisco, in retaliation for the Saudi Arabian government's imprisonment of ISIL "scholars."[11]  Thus, the words of the defendant himself abundantly demonstrate that aiding ISIL was, for him, an act calculated to retaliate against government conduct.  *See*, *e.g.*, *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018)(concluding that defendant's statements on social media were sufficient to prove that defendant's attempted travel to Syria was calculated to retaliate against government conduct).

**2. <u>The Category VI Criminal History Calculation Is Appropriate, and The Only Departure Contemplated by the Guideline Regarding That Calculation Is An Upward One</u>**

During the December 17 hearing, this Court asked the government to provide "any insight… on why it's Level VI automatic, and how does that fit with the framework of what a criminal history

---

[11] There is no requirement that the government against whom a defendant is seeking to retaliate must be the United States.  *See*, *e.g. United States v. Muhtorov*, 329 F.Supp.3d 1289, 1298 (D. Colo. 2018)(citing *Awan* and concluding that defendant qualified for terrorism enhancement because his conduct was calculated to influence, affect, and retaliate against Uzbek government).

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM                                                        7
17-CR-387-CRB

category is supposed to do and whether it can be the basis of a departure.  That would be an interesting subject to address." Transcript, Dec. 17, 2018, pg. 199 at lines 3-8.

The Second Circuit has directly addressed the issues raised by the Court, in *United States v. Meskini*, 319 F.3d 88 (2nd Cir.), *cert. denied*, 538 U.S. 1068 (2003).   There, the defendant, Mokhtar Haouri, a secondary figure in the so-called millennium plot to plant a bomb at Los Angeles International Airport during the 2000 New Year celebrations, provided money and false documents to the main figure in the plot, Ahmed Ressam.  Haouri also arranged for an escape route from the United States to Algeria, then Pakistan and Afghanistan.  Haouri was convicted at trial of conspiracy to provide material support to a terrorist act, among other things.  The district court applied the sentencing enhancement, including the increased criminal history category, and sentenced the defendant to 288 months in prison. *Meskini*, 319 F.3d at 90-91.

On appeal, the defendant argued that U.S.S.G. § 3A1.4 violated his due process rights by double-counting the same criminal act, once by increasing the offense level to 12, and a second time by increasing his criminal history category to VI.  *Id.*    The Second Circuit squarely rejected this argument.

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.  Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*Id.* at 92.  The Second Circuit also rejected the defendant's argument that automatically increasing the criminal history category to Level VI would potentially imprison a first-time offender with no prior criminal behavior to the same sentence as that of a lifelong terrorist with a lengthy criminal history:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

*Id.*  Thus, *Meskini* is particularly applicable to the instant case, where the defendant has no prior criminal record.[12]

---

[12] In addition, as even the defendant's expert witness Dr. Marc Sageman conceded during the December 17 hearing, some of the most notorious ISIL-related attacks in the United States have been

The only departure contemplated by the terrorism enhancement is an *upward* departure, in cases where conduct may not fall strictly within the definition of a "federal crime of terrorism," but which may nevertheless merit a significant sentence, if, for example, the crime was calculated to intimidate a civilian population, rather than government. U.S.S.G. § 3A1.4 at Application Note 4. As for downward departures used to negate the Sentencing Commission's automatic criminal history category increase in terrorism cases, the Second Circuit cautioned that such departures should be used only in exceptional cases:

> A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing. U.S.S.G. § 4A1.3. Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, *with downward departures permitted in exceptional cases*.

*Id.* (emphasis added). The Second Circuit ultimately concluded that the defendant in *Meskini* did not present such an exceptional case, because he had an extensive history of crime, despite apparently having no previous convictions in the United States. Here too, the defendant in the instant case may not have any previous convictions, but he was plainly involved in a wide range of identity theft, and also most likely involved in some degree of drug trafficking as well. *See, e.g.*, Gov't Sentencing Memorandum, Docket No. 90, at pg. 27, noting that defendant appeared to be engaging in some kind of drug deal in Ukiah, California. In short, he is far from the kind of "exceptional case" contemplated by the Second Circuit in *Meskini* that might warrant a departure for an over-represented criminal history.

The Ninth Circuit has not squarely addressed the issue of the criminal history increase involved in the terrorism enhancement. However, in *United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) the Court found a district court's 22-year sentence was substantively unreasonable for Haouri's co-conspirator Ahmed Ressam, the primary figure in the LAX millennium bombing plot. Though the issue of the automatic criminal history increase was apparently not before the Court, in vacating the district court's sentence, the Court suggested that it shared the Second Circuit's concerns regarding the difficulty in rehabilitating terrorists. "Terrorists, even those with no prior criminal behavior, are unique

---

carried out by individuals with no criminal history. Transcript, Dec. 17, 2018, at pg. 172.

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM                                         9
17-CR-387-CRB

among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Ressam*, 679 F.3d 1069 at 1091, *quoting United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011), *quoting Meskini*, 319 F.3d at 92.  There is no reason for the defendant here to be treated any differently than the defendants in *Meskini* and *Ressam.*

**3. Similar Cases**

This Court asked during the December 17 hearing whether there were any cases involving similar fact patterns, particularly relating to defendants providing access to social media accounts to known terrorists, whether the terrorism enhancement was applied in those cases, and what sentences were imposed.  The short answer is that the instant case is unique, for several reasons.  First, the technology used by the defendant to provide support to ISIL is relatively new, as is the particular encrypted messaging application at issue in this case that was favored by the defendant and by ISIL for communication purposes.  Moreover, social media companies have only recently begun policing their networks and shutting down account promoting terrorism, so the phenomenon of needing to create multiple social media accounts is a relatively new one.  Thus, there simply has not been much opportunity for these technologies to be the subject of prosecutions, much less published case opinions.  Second, this case involves particularly unique, egregious antecedent conduct that occurred before the defendant opened any social media accounts on behalf of ISIS (i.e. the defendant's plots to conduct terrorist attacks around the San Francisco Bay Area) and particularly egregious post-arrest conduct, (i.e. the defendant's plot to explode a bomb at this courthouse).  Thus, even if there were other cases involving defendants who opened up social media accounts for known members of ISIL, those cases would be distinguishable.

That said, the government appreciates that the Court may be looking for guideposts upon which to fashion a sentence in this case.  With that in mind, after consulting with the Department of Justice's National Security Division, the government offers the following cases which may be of some relevance and assistance to the Court.

  *a. United States v. Mohammed Elshinawy* (District of Maryland, 16-CR-009-ELH)

Mohammed Elshinawy was a 32-year old U.S. citizen who resided in Maryland.  He accepted

approximately $8,700 from individuals in ISIL to help finance a purported attack in the United States which never took place (much in the same way that the defendant here accepted a bomb-making manual from ISIL to help carry out a purported attack in the United States which never took place) . *United States v. Elshinawy*, 2018 WL 1521876 at *11 (D.Md. 2018). There was some limited evidence that Elshinway had done online research about potential attack targets in the Baltimore area online, which is similar, though not as extensive, as the defendant here, who went so far as to take pictures of potential targets, apparently at the request of ISIL members. As in the instant case, Elshinawy's use of social media was "extensive and revealing." *Id.* Among other things, Elshinawy used the very same encrypted messaging application relied on by the defendant here to communicate with ISIL members. *Id.* at *13. As in the instant case, in *Elshinawy* Dr. Marc Sageman opined on behalf of the defendant, in testimony remarkably similar to his testimony in the instant case, that while the defendant may have at one point posed a dangerous threat of conducting an attack in the United States, he had given up those plans by the time he was arrested. *Id.* at *19. And, like the defendant here, who claims that he was just "trolling" ISIL members online, Elshinawy claimed that he took money from ISIL members just to "scam" them. *Id.* at *18. In other words, the fact pattern in *Elshinawy*, though not identical, is analogous in many ways. After a lengthy analysis, the district court applied the terrorism enhancement. Elshinawy was sentenced to 20 years.

 b. *United States v. Mehanna* (District of Massachusetts, 09-CR-10017-GAO)

Like the defendant here, Tarek Mehanna was convicted, among other things, of conspiring to providing material support to al-Qaeda in violation of § 2339B. Mehanna was a 21 year old American citizen living in Massachusetts who flew to Yemen in search of a terrorist training camp, but returned to the United States after he learned that there were no longer any such camps in Yemen. *United States v. Mehanna*, 735 F.3d 32 at 43-45 (1st Cir. 2013). This is similar to the defendant here, who sought out training in explosives from someone whom he believed was an al-Qaeda-trained bombmaker, but then spurned that bombmaker upon suspecting (correctly) that the bombmaker was in fact an undercover FBI agent. Mehanna, upon returning to the United States, set his sights on another manner of providing material support to al- Qaeda – that is, recruitment of others to fight for al-Qaeda and kill American

soldiers by translating propaganda materials and posting them on the internet.  This conduct is similar to the defendant here, who resorted to aiding ISIL online with social media accounts, after his efforts to learn how to make bombs failed.  *Id.* at 41.  Much like the defendant in *Mehanna*, who translated and edited material on behalf of al-Qaeda members, there is no dispute here that the defendant opened social media accounts specifically at the behest of individuals whom he believed, and who in fact were, members of ISIL.  Government's Sentencing Memorandum, *United States v. Mehanna*, 09-CR-10018-GAO, Docket No. 430 (Filed April 10, 2012).  The district court in *Mehanna* applied the terrorism enhancement.  Mehanna was sentenced to 17 years and 6 months in prison.

    c. *United States v. Nicholas Young* (Eastern District of Virginia, 16-CR-00265-LMB)

Nicholas Young was a police officer in Washington, D.C., who provided gift cards to an individual whom he believed was in ISIL, but who in fact was an FBI confidential human source (CHS).  *See generally* Position of the United States with Respect to Sentencing Factors, Docket No. 220, *United States v. Young*, 16-CR-00265-LMB (E.D.Va.)(filed February 16, 2018).  The gift cards that Young provided to the CHS totaled the unimpressive figure of $245, much as the defendant here has argued the act of opening a handful of social media accounts was relatively insignificant. *Id.* at. pgs. 12-13. Young was charged with providing material support to ISIL, and with three counts of obstruction of justice, based on lies that Young told the FBI about his interactions with the FBI CHS.  *Id*. Young boasted of using his access and knowledge as a police officer to ISIL's advantage, which is similar in some respects to the defendant's attempts here to join the Oakland Police Department.  *Id.* at pg. 14-15.  Unlike the defendant here, though, Young apparently had no actual contact with anyone in ISIL, only with an FBI CHS.  The sentencing memoranda filed by both parties indicate that the Court applied the terrorism enhancement to Young, and that his guideline range was 360 months to 720 months.  *See*, *e.g.*, Sentencing Memorandum of Nicholas Young, Docket No. 219, *United States v. Young*, 16-CR-00265-LMB (filed February 16, 2018).  Young was sentenced to 15 years on all counts, to be served concurrently.

    d. *United States v. Jalil Ibn Ameer Aziz* (Middle District of Pennsylvania, 15-CR-309)

Jalil Ibn Ameer Aziz was a 19 year-old U.S. citizen residing with his parents in Harrisburg,

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM            12
17-CR-387-CRB

Pennsylvania. According to the government's sentencing memorandum, Aziz used a variety of Twitter accounts to post thousands of tweets, retweets, and photographs depicting ISIL's violent acts. Government's Sentencing Memorandum, Docket No. 137, at pg. 6, *United States v. Aziz*, 15-CR-309 (M.D.Pa.)(filed October 11, 2017). He also communicated directly with at least two ISIS recruiters. *Id*. He also reposted a list that ISIL had distributed, which contained the names and home addresses of United States service members. *Id.* at pg. 8. Aziz pled guilty pursuant to a plea agreement to one count of providing material support to ISIS, in violation of 18 U.S.C. § 2339B and one count of transmitting a communication containing a threat to injure, in violation of 18 U.S.C. §§ 875(c) and 2. Unlike the defendant here, Aziz never opened social media accounts for actual ISIL members, though. In addition, unlike the defendant here, Aziz did not engage in any plots to carry out actual terrorist attacks in the United States. Moreover, Aziz apparently began his flirtation with ISIL on Twitter while he was a juvenile, at least according to Aziz's sentencing memorandum. Defendant's Sentencing Memorandum, Docket No. 135, *United States v. Aziz*, 15-CR-309 (M.D.Pa.)(filed September 25, 2017). Finally, unlike the defendant here, Aziz pled guilty pursuant to a negotiated plea agreement; as part of that plea agreement the government dismissed charges against him. The parties agreed in that plea agreement that the terrorism enhancement applied. Plea Agreement, Docket No. 105, pg. 8, *United States v. Aziz*, 15-CR-309 (M.D.Pa.)(filed January 27, 2017). Aziz was sentenced to 8 years and 4 months on the material support charge, and 6 years on the threat charge, to be served consecutively for a total sentence of 13 years and 4 months.

   e.  *United States v. Mohamud* (D. Oregon, 10-CR-00475-KI)

  Mohamud was a U.S. citizen who plotted to explode a bomb at a Christmas tree-lighting ceremony in Portland with individuals whom he thought were al-Qaeda-trained bombmakers, but in fact were FBI undercover agents. *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016). Mohamud was ultimately charged under a different statute than the defendant here – 18 U.S.C. § 2332a, attempted use of a weapon of mass destruction. Nonetheless, there are a number of similarities between the defendant's bomb plot here and the one at issue in *Mohamud*. For example, in both cases the targets were selected by the defendants: Mohamud selected a crowded area of Portland, Pioneer Courthouse

Square during a Christmas tree lighting ceremony, while the defendant here selected a slew of crowded targets, including a gay nightclub in San Francisco and parts of the University of California Berkeley campus. *Id.* at 427. Both Mohamud and the defendant here were obsessed with learning how to make bombs that would cause the most casualties possible. *Id.* at 427-429. Mohamud rented a storage locker at the instruction of undercover agents to store attack-related supplies; in the instant case, the defendant visited a storage locker rented by the FBI to inspect bombmaking materials stored within. *Id.* Mohamud, of course, went as far as he could with his plot, exploding a test device with agents and attempting to explode a device in Pioneer Square that he thought was real, but in fact had been rendered inert by FBI agents. In the instant case, the government maintains that the defendant would have reached that same point, had the undercover agent here not risked compromising his identity one night, trying to dissuade the defendant from engaging in a random act. *See* Government's Sentencing Memorandum, Docket No. 90, at pgs. 28-33. Moreover, in the instant case, the defendant had been in contact with actual members of ISIL, had obtained bomb-making manuals from them, and had written a suicide note for them, claiming responsibility for his attacks on behalf of ISIL. In contrast, in *Mohamud* the defendant there wrote a script and recorded a video explaining his attacks at the behest of undercover agents, not actual ISIL members. *Mohamud*, 843 F.3d at 428. In short, while there are obviously some differences between *Mohamud* and the instant case, there are enough troubling similarities and parallels that *Mohamud* nonetheless serves as a useful guidepost for sentencing purposes. The district court in *Mohamud* applied the terrorism enhancement. Transcript of Sentencing Proceedings, Docket No. 529 at pg. 52, *United States v. Mohamud*, 10-CR-00475-HZ, filed December 8, 2014 (D. Oregon). Mohamud was sentenced to 30 years in prison.

### 4. The Court Should Disregard the Report And Testimony of Dr. Marc Sageman As Inherently Untrustworthy

Lastly, the government asks the Court to disregard the report and testimony of Dr. Marc Sageman. Dr. Sageman testified that in his opinion, the defendant – who spoke of blowing up gay nightclubs in San Francisco, tying up his friends and murdering them, and planting backpack bombs on

routes used by first responders - was less dangerous than a randomly-picked American.[13]  Dr. Sageman was able to reach this outlandish conclusion by writing a report that cherry-picked helpful facts, entirely omitted harmful ones, and downplayed, mischaracterized and minimized the nature of the defendant's conduct.  As just one example of the many faults with Dr. Sageman's report, he opined that the defendant was not likely to ever engage in terrorism because, among other things, he was trying to turn a corner in life and wanted to seek employment as a locksmith.  Transcript, Dec. 17. 2018, at pg. 162.  Yet Dr. Sageman failed to mention in his report that the defendant had been using his contacts in the locksmith industry to steal identities and engage in identity theft.  *Id*.   Similarly, Dr. Sageman wrote his report in such a manner to mislead its reader into thinking the undercover agent suggested to the defendant the idea of exploding a bomb capable of bringing down a concrete building, when in fact the evidence is clear is that it was the defendant who first brought up the topic – the undercover agent was merely playing along, doing his job as an undercover.  *Id*. at pg. 152.

To illustrate how unreliable Dr. Sageman's report is, consider for a moment if the tables were turned.  That is, suppose the government submitted Dr. Sageman's report as part of a search warrant affidavit to establish probable cause that the defendant was *not* involved in terrorism, say as part of an investigation to prove that some other individual was actually responsible for all of the defendant's actions.  Surely a reviewing court would be offended if a law enforcement officer represented in an affidavit that a particular person was unlikely to engage in terrorism, while neglecting to mention that that person had a recent copy of ISIL's propaganda magazine *Dabiq* on his electronic devices, replete with images of beheaded bodies and child soldiers.  Transcript, Dec. 17, 2018, at pg. 190-91.  That is the kind of material omission that successful *Franks* suppression motions are made of.

Equally troubling to the government is the manner in which Dr. Sageman presented himself as a kind of roving expert on various topics.  For example, Dr. Sageman opined, among other things, about

---

[13] This is not the first time Dr. Sageman has reached this type of conclusion.  In another case, involving an individual who attempted to travel to Syria through Turkey to join ISIL, Dr. Sageman wrote a report on behalf of the defendant in which he concluded the defendant was "at no greater risk than the normal population of being a danger to the public." *United States v. Tounisi*, 2018 WL 3983387 at *2 (N.D.Ill. 2018).  The defendant was sentenced to 180 months, the statutory maximum. *Id.* at *3.

the meaning of emojis and their use on social media, despite admitting that he was an internet "troglodyte" who had never been on Facebook, Twitter, or Telegram. Dec. 17 Transcript at pg 168. He also opined on the significance and meaning of "trolling" on the internet, despite admitting that he had never even heard of the term until 2016, and even then only as a result of his general interest as a citizen in Russian interference with the U.S. general election, not because of anything related to jihadist terrorism. *Id.* at 168-69. He also opined that he thought the bombmaking manuals the defendant obtained from ISIL were not very effective, without ever explaining why or how he is an expert in explosives. *Id.* at 125. Indeed, at one time Dr. Sageman has even suggested he is an expert on being an expert. See "How to Find, Select, and Evaluate a Mental Health Professional for Trial," by Marc Sageman, M.D., Ph.D, in *The Practical Litigator*, Vol. 9, pg. 27 (1998). In another recent trial, Dr. Sageman described himself as being the "brain trust" of the United States Secret Service. *See* Testimony of Dr. Marc Sageman, *United States v. Adam Shafi*, September 5, 2018, 15-CR-582-WHO at Vol. 6, pg. 766 (N.D.Cal.). By the end of the December 17 hearing, the Court had clearly picked up on the seemingly endless bounds of Dr. Sageman's "expertise":

> Court: Well, let me ask you this: *You don't hold yourself out -- or maybe you do -- as an expert* in what one would say the general population -- in terms of what percentage of the general population has criminal records for violence? I mean, do you know the statistics? Have you seen the statistics?

Dec. 17 Transcript at pg. 186 (emphasis added). Perhaps not surprisingly, Dr. Sageman had an opinion about the statistics.

Most troublingly, though, Dr. Sageman repeatedly mischaracterized and downplayed the defendant's interactions with the FBI undercover agent in this case. The Court flatly rejected Dr. Sageman's description of these interactions. When Dr. Sageman insisted, for example, that it was the undercover who planted ideas about conducting attacks inside the defendant's head, the court interjected:

> I don't have the same impression that you have. Looking at car bombs, looking at the poisoning, looking at the fires, and looking at the backpack bombs, all four discrete and very serious criminal activities if pursued, those four ideas came from the defendant as I read it. It wasn't, like, the agent put that in the defendant's mind. It was the defendant who suggests it.
>
> I mean, this is almost like a reverse sting. It is almost like the people who are being

stinged or stung actually is the Government because it is the defendant who, unbeknownst to the Government, according to what you find, didn't have the intention of carrying things through; but from the Government's point of view, they saw this as a very dangerous threat and it emanated from the defendant, not the Government. So, I mean, I think we have to be somewhat precise here because -- and it may not change your conclusion, it may not change your conclusion, but I think the facts are as I read them, the facts are that these proposed activities or contemplated activities, notwithstanding the fact that the defendant would never go through with them, were emanated from the defendant and not from the Government; and I think that that is, to me, an important distinction.

The Court is correct – it *is* an important distinction, and one that Dr. Sageman is incapable of recognizing. His bias against and utter disdain for FBI undercover operations permeates through and poisons every conclusion he offered in this case. *See*, *e.g*. December 17 Transcript at pg. 117-118.[14] This Court should reject his report and his testimony in their entirety.

DATED:                                                         Respectfully submitted,

                                                               DAVID L. ANDERSON
                                                               United States Attorney


                                                                  /s/                           
                                                               S. WAQAR HASIB
                                                               Assistant United States Attorney

---

[14] Sageman testified, "I must confess that personally I don't like sting operations. They're completely outlawed in any other Western countries except the United States. And you know, when I talk to my European colleagues, they always tease me about it. They say, "you guys don't really have, you know, that much terrorism compared to us. What you have is sting operation. You cannot basically arrest the low-hanging fruit. The dumb people get entrapped… [T]he UCE [in the instant case] was very directive and he was very forceful with this guy. He said, "you can't do that. You can't do that. You can't do that. If you are with me, you can't talk to anybody else. You see, this is not a person gathering information. This is a person who is very active in trying to encourage a criminal act."

The Court responded entirely appropriately: "I'm not going to sit here in judgment on the propriety of the Government operating a sting operation with respect to terrorism… and by the way, isn't a guarantee of the fairness of the sting operation to make sure that the interactions are recorded so that we don't have the word of the agent or informant, we have the actual words that were used in connection with it."

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM                                    17
17-CR-387-CRB

UNITED STATES' SUPPLEMENTAL SENTENCING
MEMORANDUM 18
17-CR-387-CRB