IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AMER SINAN ALHAGGAGI,<br><br>Defendant. | Case No. 17-cr-00387-CRB-1<br><br>**ORDER RE TERRORISM ENHANCEMENT** |

In 1994, Congress directed the Sentencing Commission to create a sentencing enhancement for any felony involving or intending to promote terrorism. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022. The Sentencing Commission did so, and over time, that enhancement evolved into its current form. See James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Inequality 51, 51–52 (2010) (explaining evolution of terrorism enhancement); U.S.S.G. § 3A1.4(a) (2018). When it applies, the enhancement dramatically increases the sentences imposed on individuals convicted of federal crimes of terrorism. See McLoughlin (describing enhancement as "draconian"). It does so in an unusual way—increasing not only the offense level, but also a defendant's criminal history category, automatically, to the highest possible number (VI). See U.S.S.G. § 3A1.4(a).

The terrorism enhancement provides that:

(a) If the offense is a felony that involved, or was intended to

>> promote, a federal crime of terrorism, increase by 12 levels;
>> but if the resulting offense level is less than level 32,
>> increase to level 32.
>>
>> (b) In each such case, the defendant's criminal history category
>> from Chapter Four (Criminal History and Criminal
>> Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4(a). Application Note 1 to that Guideline explains that a "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5), and that statute has a two-part definition. First, a federal crime of terrorism means an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Second, the offense must be a specific violation of a statute listed in 18 U.S.C. § 2332b(g)(5)(B). Id.

Defendant Amer Sinan Alhaggagi, a 23-year old Berkeley High School graduate with "zero" criminal history, see Presentence Investigation Report ("PSR") (dkt. 84) at 3, 14, 99, pled guilty to all of the counts in the Indictment in this case, including Count 1, violation of 18 U.S.C. § 2339B(a)(1), Attempting to Provide Material Support of Resources to Designated Foreign Terrorist Organization. See Indictment (dkt. 33)[1]; Change of Plea Hearing (dkt. 76); Plea Application (dkt. 77). In approaching sentencing, the parties took vastly divergent positions: while Defendant urged a sentence of 48 months, the government urged a sentence of 396 months. See D. Sentencing Memo. (dkt. 87) at 29; Gov. Sentencing Memo. (dkt. 90) at 61. Much of what drove the difference in the parties' proposed sentences was their views of the Defendant—whether he was merely "an immature prankster," D. Sentencing Memo. at 1, or "a violent threat to the community, whose imagination and appetite for evil knows no bounds," Gov. Reply (dkt. 101) at 1. And much of what drove the parties' disparate sentencing recommendations was their views of the terrorism enhancement.

---

[1] Count 1 charged Defendant with violation of 18 U.S.C. § 2339B(a)(1), Attempting to Provide Material Support of Resources to Designated Foreign Terrorist Organization; Count 2 charged Defendant with violation of 18 U.S.C. § 1029(a)(4), Possession of Device Making Equipment; Count 3 charged Defendant with violation of 18 U.S.C. § 1029(a)(2), Using an Unauthorized Access Device; and Count 4 charged Defendant with violation of 18 U.S.C. 22 1028A(a)(1), Aggravated Identity Theft. See Indictment.

Unsurprisingly, Defendant argued that the terrorism enhancement should not apply to his case, see D. Sentencing Memo. at 25; D. Reply (dkt. 100) at 13–21, while the government argued that it should, see Gov. Sentencing Memo. at 51–57); Gov. Reply at 7.[2] Because the list of violations in 18 U.S.C. § 2332b(g)(5)(B)(i) includes the material support statute to which Defendant pled guilty, see 18 U.S.C. § 2332b(g)(5)(B)(i) (including 18 U.S.C. § 2339B); Change of Plea Hearing; Plea Application, the parties' disagreement centered on whether Defendant's material support offense constituted an offense that "is calculated [1] to influence or affect the conduct of government by intimidation or coercion, or [2] to retaliate against government conduct." See D. Sentencing Memo. at 25; D. Reply at 13–21; Gov. Sentencing Memo. at 51–57; Gov. Reply at 7; 18 U.S.C. § 2332b(g)(5)(A). The parties focused more on the first, "influence of affect," prong of 18 U.S.C. § 2332b(g)(5)(A), and so the Court requested and received additional briefing on, among other things, the second, "retaliation," prong of that section. See Transcript of 12/17/2018 (dkt. 116) at 4–5; Gov. Supp. Memo. (dkt. 123) at 2–7; D. Supp. Memo. (dkt. 124) at 5–11.

Sentencing in this case took place on February 26, 2019. See Minutes of 2/26/2019 (dkt. 133). In calculating the appropriate guidelines range, the Court held that the terrorism enhancement applied. That holding resulted in an offense level of 36 and a criminal history category of VI, making Defendant's guideline range 324 to 405 months. The Court then departed downward, concluding that Defendant's criminal history should be I, rather than VI, pursuant to U.S.S.G. § 4A1.3(b)(1) (over-representation of the seriousness of Defendant's criminal history). That resulted in a sentencing guidelines range of 188 to 235 months. The Court sentenced Defendant to a total sentence of 188 months on Counts 1, 2, 3 and 4 of the Indictment. See Minutes of 2/26/2019. At the sentencing hearing, the Court provided its reasoning for the 188 month sentence, and the

---

[2] The Probation Officer also did not recommend that the Court apply the terrorism enhancement, although she noted that "should the Court determine that the terrorism enhancement . . . applies, a below-guideline sentence might be warranted. . . ." PSR at 24, Addendum.

3

United States District Court
Northern District of California

1 Court will not repeat those remarks here. The Court writes now, as it indicated that it
2 would, to explain both its application of the terrorism enhancement, and its decision to
3 depart from the enhancement's automatic criminal history category of VI.

### A. Application of the Enhancement

Having carefully reviewed the parties' arguments, the facts of this case, and the controlling law, the Court concludes (1) that Defendant's material support offense was "calculated to influence or affect the conduct of government by intimidation or coercion," and, in the alternative, (2) that it was calculated "to retaliate against government conduct." See 18 U.S.C. § 2332b(g)(5)(A).

### 1. "Influence or Affect"

The Indictment charged Defendant in Count 1 with "opening social media accounts understanding and intending that such accounts were to be used by, and for the benefit and promotion of, ISIS, and personnel, in the form of himself, to a foreign terrorist organization, namely, ISIS, knowing that ISIS was a designated foreign terrorist organization and that ISIS engages and has engaged in terrorist activity and terrorism. . . ." Indictment ¶ 6. In pleading guilty to that Count, Defendant admitted that he participated in several Arabic and English language chat rooms on Telegram. Plea Application (Factual Basis) at 2. One of those chats "was a pro-ISIS chat entitled (in Arabic) 'Allah is with those who endure.'" Id. Defendant "re-posted pro-ISIS messages that [he] had found on other Telegram chats to this chat." Id. He was then approached by two individuals, whom he believed were (and apparently actually were) supporters of ISIS. Id. They asked him to set up social media accounts for ISIS. Id.

On October 31, 2016, Defendant had a one-on-one conversation with the first individual, and told that individual that he was "ready to create accounts." Id. The individual asked him to create and send two accounts. Id. Defendant sent the individual usernames and passwords for two Facebook accounts and two Gmail accounts. Id. The individual asked Defendant if Defendant "supported the Caliphate" and Defendant admits, "I told him that I did." Id. On November 14, 2016, a second individual approached

4

Defendant with a private message on Telegram, telling Defendant that he had been referred by an individual with the username "Supporter of the Caliphate." Id. The second individual asked Defendant to open Twitter accounts, which Defendant understood "might be used to disseminate statements sympathetic to ISIS using the Twitter app." Id. Defendant sent him usernames and passwords for three Gmail accounts and usernames for three Twitter accounts. Id. Defendant later sent the second individual usernames and passwords for two more Gmail accounts and two more Twitter accounts. Id. at 2–3. He agrees that opening those social media accounts for individuals whom he believed were ISIS sympathizers constituted the provision of a "service" within the meaning of 18 U.S.C. § 2339A(b)(1). Id.

The government notes that the chatroom Defendant admitted to participating in, "Allah is with those who endure," "is replete with posts from other users declaring hatred and violence towards the United States, the Syrian government, the Iraqi government and a host of other enemies of the Islamic States, and seeking to affect [] the conduct of those governments." Gov. Sentencing Memo. at 54–55. It provides two examples of posts in the chatroom. Id. One is from an individual named Migration Commando, who posted on November 11, 2016: "A letter to the brothers: To the owners of the invasion channels, we want Tweets in English on American hashtags that are against or pro-Trump. . . . Let us kindle strife and chaos in their country. . . . Let us turn the next week into hell on America. . . . You never know, o supporter, a Tweet from you could cause a divine conquest for your State." Id. A second is from an individual named Publisher, who posted on November 13, 2016: "Brothers. . . Open accounts in Twitter . . . And invade the American tags . . . . Spread disorder! And intensify the spark[.] Allah bless you!" Id. at 55.

Defendant responds that there is no evidence that he ever saw these particular posts, and that they could not have inspired him because he had already opened accounts for the first ISIS sympathizer on October 31, before these posts appeared on November 11 and 13. D. Reply at 16–17; D. Supp. Memo. at 6–7. But it is not particularly exculpatory that Defendant had already opened social media accounts for an ISIS sympathizer, and agreed

5

that he supported the Caliphate, before these posts appeared in the chatroom. See Plea Application (Factual Basis) at 2. These posts reinforce the government's argument that the purpose of the social media accounts was no mystery, but the posts are not necessary in the context of Defendant's online activity or the chatroom itself.[3] Defendant need not have seen these two particular posts in order to have understood that the purpose of creating social media accounts for ISIS sympathizers, who approached him in a pro-ISIS chatroom after he had posted pro-ISIS messages, see Plea Application (Factual Basis) at 2, was to bolster support for ISIS's terrorist attacks on government and to recruits adherents, thus affecting the conduct of government by intimidation or coercion. Indeed, what other purpose would the accounts serve? Defendant splits hairs in asserting that "it can be safely presumed that he understood [the accounts] would be used (if at all) to spread information sympathetic to ISIS. But he did not know that they would be used to influence government conduct by coercion or intimidation." See D. Sentencing Memo. at 19. Spreading information sympathetic to ISIS strengthens ISIS, which combats hostile governments through intimidation and force. This is a rather straightforward cause and effect, and not nearly as convoluted as Defendant contends. See D. Reply at 21 (bemoaning the "lengthy chain of causation the government draws").

Moreover, Defendant need not have had the particular motivation of influencing or affecting government conduct. He need only have had the specific intent to commit an offense that was calculated to influence or affect government conduct by intimidation or

---

[3] Nor in the context of all of the relevant conduct that the parties addressed at length in their sentencing memoranda and in argument, which demonstrated to the Court the Defendant's dangerousness and stark lack of empathy for the people of his community, as well as his understanding of ISIS. See generally Gov. Sentencing Memo. at 51–52, 56–57 (highlighting some of Defendant's conduct); see also Gov. Sentencing Memo. Ex. 3 (ISIS bomb manual on Defendant's computer); Gov. Sentencing Memo. Ex. 5 (Defendant's "suicide note," found on his computer, describing three categories of terror plans ("lethal poison in the drinks of infidels"; setting fire to the Berkeley Hills; and planting explosive devices all over the Bay Area") and stating unambiguously, "This is a terrorist operation that bears the pure fingerprints of the State."); Gov. Sentencing Memo. Ex. 9 (Defendant's video of car fire in which he narrates, "We warned you, Americans, you scoundrels, God damn you, that this Caliphate is in-in America, in the state of California."). Again, the Court addressed these issues in its oral remarks at sentencing and will not revisit them here.

coercion. See United States v. Awan, 607 F.3d 306, 317–18 (2d Cir. 2010); see also D. Reply at 14 (acknowledging, based on Awan, that whether a defendant is motivated to influence government is not important, as the statute focuses not on the defendant but on the offense). Defendant's assertion that he opened the accounts not out of an allegiance to ISIS but because he was engaged in a "retaliatory game" of internet trolling and wanted help "block[ing] his enemies" online, see D. Sentencing Memo. at 22–23; id. Ex. C (Sageman Report) is therefore irrelevant. See Awan, 607 F.3d at 318 ("A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics.").

Defendant argues next that the accounts he created were in fact used to spread "battlefield news and generic exhortations in praise of ISIS." Id. at 19; see also D. Supp. Memo. at 11 ("[t]he accounts were used to send updates on the status of the Battle of Mosul and generic messages in praise of ISIS"). Again, this distinction falls flat. "Battlefield news" is a euphemism for battlefield propaganda. See Gov. Sentencing Memo. at 55–56 (news included how many martyrdom operations ISIS had carried out, how many opposing soldiers had been killed, etc.), Ex. 6 (example). Defendant also ignores the reality of who ISIS was fighting on those battlefields: legitimate governments. The Battle of Mosul was a major military campaign by the U.S.-backed Iraqi military to liberate the city of Mosul from ISIS. See Dan Lamonthe et al., Battle of Mosul: How Iraqi forces defeated the Islamic State, THE WASHINGTON POST, July 10, 2017, https://www.washingtonpost.com/graphics/2017/world/battle-for-mosul/?utm_term=.31a73a928f12. It does not help Defendant's case that ISIS used the accounts to spread propaganda about its battles against legitimate governments and to garner support more broadly.

Accordingly, the Court concludes that the government has demonstrated by clear and convincing evidence that in opening social media accounts for ISIS sympathizers, Defendant had the specific intent to commit an offense that was calculated to influence or

7

affect government conduct by intimidation or coercion. See United States v. Jordan, 256 F.3d 922, 926 (9th Cir. 2001) (requiring clear and convincing evidence for sentencing factor with "extremely disproportionate" effect on sentence relative to offense); Awan, 607 F.3d at 317–18 (explaining specific intent requirement); 18 U.S.C. § 2332b(g)(5)(A).

### 2. "Retaliate"

In the alternative, and for essentially the same reasons, the Court finds that the government has demonstrated by clear and convincing evidence that in opening social media accounts for ISIS sympathizers, Defendant had the specific intent to commit an offense that was calculated to "retaliate against government conduct." See id.[4] As the government asserts, "[i]t is inconceivable that [Defendant] would have engaged in this conduct without calculating that his actions would help [ISIS] retaliate against (or for that matter, intimidate or coerce) the many governments [ISIS] identified as its enemies." Gov. Supp. Memo. at 3.

Retaliation against government conduct is one of the central features of ISIS. See id. at 3–6 (recounting 2014 speech by ISIS leader repeatedly threatening, "we will take revenge!", beheading of American journalist James Foley in retaliation for 2014 American air strike, beheading of American journalist Steven Sotloff in retaliation for claimed American "arrogant foreign policy toward the Islamic State"). Retaliation is also a central feature of the propaganda ISIS distributes through social media. Id. Moreover, retaliation was a theme in the chatroom Defendant frequented, as evidenced by the Migrant Commando post discussed above, which included the language, "Let us kindle strife and chaos in their country. Perhaps that will be a reason for them to withdraw their armies from our dear country or become too preoccupied to be concerned about us." Id. at 6.

Defendant argues that "it was the crimes themselves that were committed in retaliation for U.S. actions, not the videos of the crimes, not spreading of those videos through social media, not opening accounts that would eventually be used to spread the

---

[4] This prong of 18 U.S.C. § 2332b(g)(5)(A) does not include the "by intimidation or coercion" language from the first prong, and so is arguably easier to meet.

8

videos. . . ." D. Supp. Memo. at 7. But as discussed above, Defendant concedes that "he understood [the accounts] would be used (if at all) to spread information sympathetic to ISIS." See D. Sentencing Memo. at 19. Spreading information sympathetic to ISIS strengthens ISIS and recruits adherents to ISIS, which leads to retaliation against governments[5] with acts of terror. While the act of opening social media accounts for ISIS is clearly distinguishable from (and less horrific than) the act of beheading journalists, the Court is unpersuaded that the two are unrelated. See D. Supp. Memo. at 11 ("It is not clear how opening a social media account could ever be an act of retaliation"). The Court therefore holds that the government has also met the second, "retaliation," prong of 18 U.S.C. § 2332b(g)(5)(A).

Because Defendant's offense satisfies both parts of 18 U.S.C. § 2332b(g)(5), the offense involves a "federal crime of terrorism," and the terrorism enhancement applies. See U.S.S.G. § 3A1.4(a) (2018).

## B. Enhancement's Treatment of Criminal History

Nevertheless, as the Court held at sentencing, the enhancement's treatment of criminal history—automatically assigning to all terrorism defendants a criminal history category of VI—is inappropriate based on the seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant, warranting a downward departure.

### 1. Inappropriate Based on Seriousness of Crime

The Sentencing Guidelines are a remarkable system, developed over the course of decades to achieve "effective, fair sentencing" that serves the goals of honesty, reasonable uniformity, and proportionality. U.S.S.G. Part A Introduction and Authority (2018) at 2–3. The Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[5] That the government cannot articulate with precision which one government was the target of retaliation, see D. Supp. Memo. at 9–10, is irrelevant. There is no such requirement, nor would one make sense when dealing with a terrorist organization that targets many governments.

9

community over a long period of time. . . ." See Rita v. United States, 551 U.S. 338. 350 (2007). They are not static, but continue to evolve under the stewardship of the Sentencing Commission. See U.S.S.G. Part A Introduction and Authority at 13 (describing Sentencing Commission's "ongoing responsibilities to monitor the guidelines" and to "submit to Congress appropriate modifications of the guidelines" given "application experience, as new criminal statutes are enacted, and as more is learned about what motivates and controls criminal behavior."). The Guidelines should be based, above all, on empirical data. See id. at 5 ("the guidelines represent an approach that begins with, and builds upon, empirical data."); see also Kimbrough v. United States, 552 U.S. 85, 108–09 (2007) (Sentencing Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience. . . .'"); Sameer Ahmed, Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1549–50 (2017) ("The legitimacy of the Guidelines is derived from the belief that they are based on reliable data and principles.").

Though the Guidelines are advisory, see United States v. Booker, 543 U.S. 220, 259–60 (2005), a court must take them into account when sentencing, id. at 264, and must accurately calculate the guideline range, even if it ultimately sentences above or below that range, see United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006). In the normal course, a district court calculates the appropriate guideline range by determining the offense conduct and the corresponding base offense level, after considering any relevant offense characteristics from Chapter Two of the Guidelines. See U.S.S.G. § 1B1.1 (Application Instructions). The court then applies any applicable adjustments from Chapter Three and determines the defendant's criminal history category from Chapter Four of the Guidelines. Id. Using the offense level and the criminal history category, the court determines the guideline range. Id.; Sentencing Table. Finally, the court considers whether any specific offender characteristics or sentencing departures warrant consideration in imposing sentence. See U.S.S.G. § 1B1.1.

"The terrorism enhancement takes a wrecking ball to this carefully constructed

edifice." See George D. Brown, Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014). As discussed above, the terrorism enhancement both increases a terror defendant's offense level, and increases his or her criminal history category to the highest possible number (VI). U.S.S.G. § 3A1.4(a). The argument for doing so is presumably that terrorism is an extremely serious crime. See, e.g., United States v. Meskini, 319 F.3d 88, 92 (2d Cir.), cert. denied, 538 U.S. 1068 (2003) ("act of terrorism represents a particularly grave threat"). Of course it is. But it is the offense level that reflects the seriousness of a charged offense. See United States v. Martinez, 931 F.2d 851, 852 n.1 (11th Cir. 1991) ("The total offense level 'reflects the seriousness of the offense of conviction adjusted for relevant conduct'"); see United States v. Parker, 136 F.3d 653, 655 (9th Cir. 1998) (citing Martinez).

A defendant's criminal history category reflects something different. See Martinez, 931 F.2d at 852 n.1 ("the distinction between the calculation of the offense level and the calculation of the criminal history category is important insofar as 'each calculation concerns a conceptually separate notion related to sentencing.'") (quoting United States v. Goolsby, 908 F.2d 861, 863 (11th Cir. 1990)). Criminal history "'evaluates the need to increase [the offender's] sentence incrementally to deter him from further criminal activity.'" Id. (quoting United States v. Scroggins, 880 F.2d 1204, 1210 (11th Cir. 1989)); see also Nichols v. United States, 511 U.S. 738, 751 (1994) (Souter, J., concurring) ("Prior convictions . . . serve under the Guidelines to place the defendant in one of six 'criminal history' categories; the greater the number of prior convictions, the higher the category. . . . the Guidelines seek to punish those who exhibit a pattern of 'criminal conduct.'"); U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A – Criminal History Introductory Commentary ("A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. . . . Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation."); see also United States Sentencing Commission, "A Comparison of the

11

Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, Jan. 4, 2005, available at https://www.ussc.gov/research/research-publications/comparison-federal-sentencing-guidelines-criminal-history-category-and-us-parole-commission-salient (last visited March 6, 2019) at 1–3 (goals for criminal history instrument are "to predict recidivism" and "reflect offender culpability" in the form of "harsher punishments for offenders with aggravated prior criminal backgrounds"). If terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes. But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions.

### 2. Inappropriate Based on Recidivism

It is also inappropriate to automatically increase a defendant's criminal history based on unsubstantiated assumptions about recidivism. "The terrorism enhancement is not backed by any empirical evidence." See United States v. Jumaev, No. 12-cr-00033-JLK, slip op., 2018 WL 3490886, at *10, id. n.15 (D. Colo. July 18, 2018) (citing United States v. Salim, 690 F.3d 115, 126 (2d Cir. 2012) (district court not required to reject terrorism enhancement because it was allegedly not the product of empirical research, but "may give a non-Guidelines sentence where she disagrees with the weight the Guidelines assign to a factor.")). As James McLoughlin, Jr. noted in his article, "when U.S.S.G. section 3A1.4 was adopted, the number of [] anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline." See McLoughlin at 112; see also id. at 115 ("[t]here is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist."); Ahmed at 1550 ("no statistically sound evidence was

12

used") (citing McLoughlin)[6]; see also Symposium, Convicted Terrorists: Sentencing Considerations and Their Policy Implications, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016) (Hon. Gerald Bruce Judge Lee: "The guidelines are not based on any empirical research. There has been no study to determine how much time a terrorist should have").

Courts that have signed off on the terrorism enhancement's treatment of criminal history have done so by concluding:

> Congress and the Sentencing Commission had a rational basis for concluding than an act of terrorism represents a particularly grave threat because of the dangerousness of the crime <u>and the difficulty of deterring and rehabilitating the criminal</u>, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

Meskini, 319 F.3d at 92 (emphasis added)[7]; see also United States v. Jayyousi, 657 F.3d 1085, 1117–19 (11th Cir. 2011) ("[A]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. 'Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" (quoting Meskini, 319 F.3d at 92)); United States v. Ressam. 679 F.3d 1069, 1091 (9th Cir. 2012) (quoting Jayyousi, which quoted Meskini). But the court in Meskini cited no authority for its assertion that "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." See Meskini, 319 F.3d at 92. Repetition of that assertion might give it the ring of truth, but does not make it true. See Illusory truth effect, THE DECISION LAB,

---

[6] Ahmed also explains that "[t]he idea that those convicted of terrorism offenses cannot be rehabilitated or deterred stems from the belief that, unlike other criminal conduct, the primary motivation of terrorism is ideological." Id. at 1536. He argues that that assumption is unfounded. Id. at 1548.

[7] Meskini was addressing, and rejecting, the defendant's argument that the terrorism enhancement "violated his right to due process by impermissibly double counting the same criminal act, once for the offense level and once for the criminal history category." Id. at 91. This Court is not making such an argument.

13

https://thedecisionlab.com/bias/illusory-truth-effect/ (last visited March 8, 2019) (describing principle that "repetition is often conflated with validity.").

In addition, there is some evidence that first-time terrorism offenders are no more likely to reoffend than individuals who commit other crimes. As a general matter, individuals with little or no criminal history are much less likely to commit additional crimes once released than those with lengthier criminal histories. See United States Sentencing Commission, "Recidivism and the 'First Offender' (May 2004) at 26, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last visited March 6, 2019). And "[w]hile 'the question of recidivism after terrorism-related detention is empirically fraught,' the very limited data suggests that individuals convicted of terrorism offenses do not recidivate at higher rates than those convicted of other crimes." See Ahmed at 1550. Sameer Ahmed writes that "[o]f the more than 300 prisoners who have completed their terrorism sentences since 2001," there were only "'a handful of cases in which released inmates had been rearrested, a rate of relapse far below that or most federal inmates.'" Id. (quoting Scott Shane, Beyond Guantanamo, a Web of Prisons for Terrorism Inmates, N.Y. TIMES, Dec. 10, 2011)). Ahmed also describes the success that other countries have had in rehabilitating individuals convicted of terrorism offenses. Id. at 1552–53 ("Many of these programs have been successful in rehabilitating terror offenders and helping them adjust back into society.").

Accordingly, the Court concludes that automatically increasing a defendant's criminal history to reflect an untested concern about recidivism is inappropriate.

### 3. Inappropriate as to this Defendant

Finally, and most importantly, the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing, and is inappropriate as to this Defendant. "The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence." McLoughlin at 116. As Judge Kane wrote in the Jumaev case, "The

14

1    circumstances of individuals convicted of crimes of terrorism . . . differ greatly, and
2    sentencing them without crediting those differences results in disproportionate sentences
3    and disparities in sentencing." 2018 WL 3490886, at *11. Judge O'Toole Jr. made a
4    similar observation, holding that, due to the 12-level adjustment to offense level and the
5    automatic assignment of criminal history category VI, the enhancement "is actually, in my
6    view, contrary to and subversive of the mission of the Guidelines which is to address with
7    some particularity the unique facts of the given case." Transcript of Disposition (dkt. 439)
8    at 69, United States v. Mehanna, No. 09-10017-AO (D. Mass. 2012). He continued:

> Moreover, the automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. <u>It can, as it does in this case, import a fiction into the calculus</u>. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have.

Id. (emphasis added). Judge O'Toole contrasted the terrorism enhancement with the career offender guideline, which makes a similar adjustment, but does so "precisely because [a defendant] has a certain criminal history." Id. at 69–70. He concluded that the terror enhancement's criminal history adjustment was "simply a way of 'cooking the books' to get to a score and a desired sentencing range," at least in his case. Id. at 70.

The terrorism enhancement treats all terrorism defendants as if they are career criminals. See U.S.S.G. § 3A1.4(b); McLoughlin at 57 ("The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair. . . ."). Career criminals—individuals who have repeatedly demonstrated their refusal or inability to follow the law—have a higher likelihood of recidivism. See United States v. Segura-Del Real, 83 F.3d 275, 277 (9th Cir. 1996) ("But category VI is different from the other categories. Defendants are placed in category VI because they are the most intractable of all defendants."); see also id. at 279 n.1 ("defendants in Category VI, the highest criminal history category, are,

15

not surprisingly, the defendants who demonstrate the most limited likelihood of successful rehabilitation and the greatest likelihood of recidivism"); United States v. Bad Marriage. 392 F.3d 1103, 1117 (9th Cir. 2004) (Callahan, J., dissenting) ("all category VI defendants have lengthy criminal records. 'It is the very circumstances of their recidivism which puts them in this category.'") (quoting Segura-Del Real, 83 F.3d at 277).

Defendant is not a career criminal. Indeed, he has "zero" criminal history. See PSR at 14. Absent the enhancement, he would have a criminal history category of I. Id. (citing U.S.S.G. Chapter 5, Part A – Sentencing Table). Automatically assigning him a criminal history of VI would be illogical and unjust. Fortunately, the guidelines provide that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." See U.S.S.G. § 4A1.3(b)(1).

Even Meskini, 319 F.3d at 92, the Second Circuit case that included the much-quoted line about terrorists with no prior criminal history being "unique among criminals" in their likelihood of recidivism, noted that "[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward at sentencing." Meskini suggested, however, that a judge should only do so "in exceptional cases." Id. That was not an exceptional case, apparently: the defendant had "an extensive history of crime," including "an extensive history of fraud" akin to the fraud employed to support the terrorist plot at issue, and he "conceded that he was a long-time criminal." Id. The court observed that the defendant's "complaint that § 3A1.4(b) is unfair to defendants without a criminal history rings particularly hollow." Id.

The government contends here that, as in Meskini, and despite "not having any previous convictions," Defendant has an extensive history of crime. See Gov. Supp. Memo. at 9. But its support for this point is that "he was plainly involved in a wide range of identity theft, and also most likely involved in some degree of drug trafficking as well."

16

1  Id. (citing Gov. Sentencing Memo. at 27, describing telephone conversation in the UCE's
2  presence that the UCE surmised was about a drug deal in Ukiah, California, after which
3  surveillance agents observed Defendant driving to Ukiah to meet with unknown
4  individuals). An uncharged, unproven drug deal, and identity theft that might or might not
5  go beyond the identity theft crimes to which Defendant pled guilty in this case, see
6  Indictment; Change of Plea Hearing; Plea Application, is hardly analogous to the
7  defendant's history in Meskini, 319 F.3d at 92, and hardly justifies treating Defendant as a
8  category VI offender.

Given Defendant's actual criminal history, the other 18 U.S.C. § 3553(a) factors discussed by the parties in their briefing, the probation officer in the PSR, and the Court at sentencing, and the absence of any evidence of an unusual likelihood of recidivism, the Court concludes that a departure to category I is appropriate. See United States v. Muhtorov, 329 F. Supp. 3d 1289, 1300 (D. Colo. 2018) ("I am aware of no evidence indicating that, solely based on the crimes Muhtorov has committed, he is the most likely of all offenders to recidivate."). Indeed, a departure is necessary to reach a fair, individualized sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See 18 U.S.C.A. § 3553; Brown at 521 ("answer" to problems with sentencing enhancement is "to affirm the discretion of trial judges to modify the enhancement's application in individual cases."); United States v. Stewart, 590 F.3d 93, 154 (Calabresi, J., concurring) ("When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in [Booker].").

### C. Conclusion

Defendant's crime was serious, and the Court gave Defendant a serious sentence. The Court applied the terrorism enhancement because it concluded that the offense involved a "federal crime of terrorism." See U.S.S.G. § 3A1.4(a). But the Court declined to apply the terrorism enhancement's automatic criminal history category of VI, which is

17

deeply flawed and at the very least does not fit this defendant. See U.S.S.G. § 4A1.3(b)(1).

**IT IS SO ORDERED.**

Dated: March 8, 2019



CHARLES R. BREYER
United States District Judge