1  Mary McNamara, SBN 147131
   August Gugelmann, SBN 240544
2  SWANSON & McNAMARA LLP
   300 Montgomery Street, Suite 1100
3  San Francisco, California 94104
   Telephone: (415) 477-3800
4  Facsimile: (415) 477-9010

5  Attorneys for Defendant
   AMER ALHAGGAGI

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                              Plaintiff,

        vs.

AMER SINAN ALHAGGAGI,

                              Defendant.

Case No.  CR 17-0387 CRB

**DEFENDANT'S RESENTENCING MEMORANDUM**

1

2

## <u>**TABLE OF CONTENTS**</u>

I.    Introduction ................................................................................................ 1

II.   Factual background ..................................................................................... 1

III.  Sentencing guidelines ................................................................................ 3

IV.   The Probation Officer's recommended 70-month sentence is reasonable ............................ 5

   A.   A 70-month sentence is reasonable in light of Mr. Alhaggagi's conditions of
        confinement and post-sentencing conduct. ............................................. 6

   B.   A 70-month sentence is reasonable in light of comparable cases. .................................. 13

      i.   Waheba Dais ....................................................................................... 13

      ii.  Jason Ludke and Yosvany Padilla-Conde ......................................... 15

   C.   A 70-month sentence is reasonable in light of the nature and circumstances of  Mr.
        Alhaggagi's offense. ................................................................................. 17

V.    Conclusion ................................................................................................ 21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Pepper v. United States*, 562 U.S. 476 (2011) ........................................................ 11

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) ................................... 1, 3, 5

*United States v. Dais*, 482 F.Supp.3d 800 (ED Wis. 2020) ............................ 12, 13, 14

*United States v. Olawoye*, 477 F.Supp.3d. 1159 (D.Or. 2020) ............................... 11

*United States v. Rodriguez*, 492 F.Supp.3d 306 (S.D.N.Y., 2020) .......................... 11

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ........................................... 11

### **FEDERAL STATUTES**

18 U.S.C. § 1028A ..................................................................................................... 3

18 U.S.C. § 1029 ....................................................................................................... 3

18 U.S.C. § 2332b ..................................................................................................... 3

18 U.S.C. § 2339B ..................................................................................................... 3

## I.   Introduction

Amer Alhaggagi appears before this Court for resentencing on his convictions for attempted material support, possession of device-making equipment, use of an unauthorized access device, and aggravated identity theft.  He faces a guidelines range of 75-87 months (including the 24-month mandatory consecutive term for aggravated identity theft) and respectfully requests that the Court follow the recommendation of probation and impose a 70-month sentence.  In light of the nature of his offense conduct, the harsh conditions of his imprisonment for the last five years, his rehabilitative efforts, and the sentences handed down in similar cases, such a sentence is sufficient, but no greater than necessary, to meet the statutory goals of sentencing.

## II.   Factual background

The Court is familiar with the facts of this case, and Mr. Alhaggagi will provide only a summary overview here.  Mr. Alhaggagi was born in Lodi and spent his childhood moving back and forth between Lodi and Yemen, the birthplace of his parents.  *United States v. Alhaggagi*, 978 F.3d 693, 695 (9th Cir. 2020).  He was raised in an observant Muslim household but was himself "not religious and adhered to few religious traditions." *Id.*  In response to his "strained relationship" with his parents, he spent a lot of time online, where he "developed a sarcastic and antagonistic persona," one which he also displayed in the real world – "people could never tell whether he was serious." *Id.*

Around age 21, he developed an interest in the Islamic State and began participating in chatrooms used by ISIS adherents.  *Alhaggagi*, 978 F.3d at 695.  He participated "both in Sunni group chats sympathetic to ISIS and Shia group chats that were anti-ISIS," and he "trolled users in both groups, attempting to start fights by claiming certain users were Shia if he was in a Sunni chatroom, or Sunni if he was in a Shia chatroom." *Id.*  He also made grandiose and disturbing claims about his "ability to procure weapons," his "plans to carry out attacks against '10,000 ppl' in different parts of the Bay Area," and about having "ordered strychnine online using a fake credit card." *Id.*  Although in his view these claims were "'pure bullshit and full of absurdities

and contradictions,'" they understandably alarmed an FBI confidential human source (CHS). *Id.* at 695-96.

The FBI launched a "a months-long investigation, including 24-hour surveillance," and the CHS arranged for Mr. Alhaggagi to meet with an undercover agent (UCE). *Alhaggagi*, 978 F.3d at 696. "At the UCE's request," they met on several occasions over approximately two months. *Id.* During those meetings, Mr. Alhaggagi "shared the same plans he had discussed with the CHS on Telegram," and they also "discussed bomb-making, a topic in which the UCE claimed to have experience." *Id.* The UCE procured a space to store supposed bomb-making material, which the FBI stocked with barrels of mock explosives. *Id.*

After the UCE showed Mr. Alhaggagi these items, Mr. Alhaggagi "began distancing himself from the CHS on Telegram and the UCE." *Alhaggagi*, 978 F.3d at 696. He "skipped meetings intended to practice the attacks with the UCE, and ignored many attempts by the UCE to contact him." *Id.* As he explained, "'it only hit me at that moment that I've been talking to these people for far too long and had no idea what I've gotten myself into and now I'm kinda freaked out ... I never took it seriously and I never realized how serious he was until he was ready to make a bomb (so I believed at the time) which I wanted no part of!'" *Id.*

Mr. Alhaggagi's final contact with the UCE was in September 2016, when the UCE approached him on the street and asked for a meeting. *Alhaggagi*, 978 F.3d at 696. Mr. Alhaggagi "agreed, but said he needed to get something from his house first. He never returned to meet the UCE, and they never communicated with each other again." *Id.*

Although the many months of constant surveillance had yielded no evidence of terrorist activity, the FBI did learn of Mr. Alhaggagi's identity theft activities, which consisted of stealing credit card information and using it to buy himself clothes. In November 2016, the FBI arrested Mr. Alhaggagi for this conduct. *Alhaggagi*, 978 F.3d at 696. Examination of electronic devices seized from his home revealed that he had again been using Telegram to participate in Sunni and Shia chat rooms. *Id.* In the course of those communications, he was asked to "open social media and email accounts for purported ISIS members" and agreed, "believing he needed to curry favor with certain users to continue his trolling and retaliatory games." *Id.* at 696-97. He opened a

total of six Twitter accounts and "passed along the account information." *Id.* at 697.  Mr. Alhaggagi never used the accounts he opened.  However, some of them were later used by others "to report ISIS attacks in Mosul, Iraq, destroyed tanks, planes, and Humvees, and the deaths of Peshmerga and Iraqi soldiers" in postings attributed to "ISIS's propaganda organization." *Id.*

Mr. Alhaggagi was arrested and taken into custody on November 29, 2016, on identity theft charges.  The government indicted him in July 2017 and charged him with attempting to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B(a)(1) (Count One), possessing device-making equipment in violation of 18 U.S.C. § 1029(a)(4) (Count Two), using an unauthorized access device in violation of 18 U.S.C. § 1029(a)(2) (Count Three), and aggravated identity theft in violation of 18 U.S.C. § 1028A (Count Four).  In July 2018, he entered an open plea to all counts.  On February 26, 2019, the Court sentenced him to 188 months (15.6 years) in custody.

Mr. Alhaggagi had no previous criminal history and has been in continuous custody since his arrest in November 2016.  He has thus spent approximately five years and two months in prison.  He has served all but the initial eight months (when he was held on the identity theft charges only) in highly punitive conditions (segregation in county jail or in the Atwater penitentiary) due to the material support charge and/or application of the terrorism enhancement. He is now 26 years old.

### III.    Sentencing guidelines

Mr. Alhaggagi understands the government intends to argue that the Court should again impose the terrorism enhancement found in section 3A1.4 on the same basis as before, i.e., that Mr. Alhaggagi knew the accounts he created were going to be used for ISIS, which produces propaganda to recruit and indoctrinate people.  *See* Supp. PSR, 2.  As the Ninth Circuit held, however, the enhancement does not apply here.

The terrorism enhancement "does not automatically apply to all material support offenses."  978 F.3d at 699.  Instead, it applies only where the defendant committed one of a

series of enumerated terrorism crimes[1] with the specific intent that his actions would "influence or affect the conduct of government by intimidation or coercion" or "retaliate against government conduct."  18 U.S.C. § 2332b(g)(5); *Alhaggagi*, 978 F.3d at 700 (discussing specific intent requirement).  In this case, that means the government must prove by clear and convincing evidence that Mr. Alhaggagi specifically intended that his act of opening six Twitter accounts would intimidate, coerce, or retaliate against a government.  *Id.* at 702.  Mr. Alhaggagi had no such intent, and the government cannot prove otherwise.

As the Ninth Circuit explained, it is not enough that Mr. Alhaggagi "knew he was providing support to ISIS sympathizers and . . . knew that ISIS is a terrorist organization."  *Id.* at 701.  Nor is it enough that the accounts Mr. Alhaggagi opened "inured to the benefit of ISIS and its terrorist purpose in the long run."  *Id.* at 702.  Although these facts establish guilt on the underlying offense, they cannot demonstrate the specific intent required for the enhancement.  *Id.* at 701 (explaining that, while "any support given to a terrorist organization ultimately inures to the benefit of its terrorist purposes," applying the enhancement based on the defendant's knowledge of the ultimate benefit to a terrorist organization "fails to properly differentiate between the intent required to sustain a material support conviction . . . and the intent required to trigger the terrorism enhancement").  Because "one can open a social media account for a terrorist organization without knowing how that account will be used," the enhancement applies only if the government proves "that Alhaggagi knew the accounts were to be used to intimidate or coerce government conduct."  *Id.* at 702.  There is no such evidence here.

The Ninth Circuit solidly rejected the government's arguments to the contrary.  The fact that Mr. Alhaggagi participated in an online forum in which other users – but not he – may have posted messages indicating an intent to coerce or intimidate government is insufficient because "there is no evidence that Alhaggagi saw those posts, opened the accounts because of those posts, or had contact with the authors of the posts."  *Alhaggagi*, 978 F.3d at 703.  Mr. Alhaggagi did nothing to "indicate that he hoped or intended that those accounts would be used to spread

---

[1] Attempted material support, Mr. Alhaggagi's offense of conviction in Count One, is one of the crimes potentially subject to the enhancement.  18 U.S.C. § 2332b(g)(5)(B)(i).

any specific type of content." *Id.*  "Alhaggagi himself did not post to the social media accounts, he did not control how those accounts would be used, and his statements contemporaneous to the opening of the accounts demonstrate that he did not know how the accounts would be used. (Muharib: 'I think you read about the [social media campaign] that I want, brother.' Alhaggagi: 'No, I did not read about it.')." *Id.*  There is nothing in the record to indicate that Mr. Alhaggagi "harbored retaliatory intent against any particular government, or that he posted retaliatory messages from the social media accounts he created, that he had a particular purpose in mind as to how the accounts would be used, or that he knew how ISIS sympathizers would use them." *Id.* at 704.  In short, there is no evidence, much less clear and convincing evidence, on which to base the terrorism enhancement.[2]

Mr. Alhaggagi's combined adjusted offense level for Counts One (attempted material support), Two (possession of device-making equipment), and Three (use of an unauthorized access device) is thus 26.  PSR ¶ 59.  Although the government declined to move for the third acceptance point, he is entitled to a two-point reduction for acceptance of responsibility.  At Criminal History Category I, a final offense level of 24 yields an advisory guidelines range of 51-63 months.  Mr. Alhaggagi also faces a mandatory two-year consecutive sentence on Count Four (aggravated identity theft), resulting in a total guidelines range of 75-87 months.

## IV.     The Probation Officer's recommended 70-month sentence is reasonable.

The Supplemental PSR recommends a total sentence of 70 months' imprisonment. Having now twice met with Mr. Alhaggagi and having spoken with the agents who investigated him, the Probation Officer continues to view Mr. Alhaggagi "as an immature young man who bragged online about being a dangerous terrorist to impress the gullible young men communicating with him."  Further, the Probation Officer believes that he has made progress while in prison in terms of "insight and understanding of his own behavior."  Supp. PSR, 3.  The Probation Officer also notes that Mr. Alhaggagi's Adverse Childhood Experience ("ACE")

---

[2] The government did not respond when asked to explain its basis for seeking application of the terrorism enhancement despite the Ninth Circuit's ruling.  Accordingly, Mr. Alhaggagi reserves the right to file a response to the government's sentencing memorandum.

1    assessment score (new in this PSR Supplement) reflects childhood trauma and places him at risk

2    of major chronic physical, mental, economic, and social health issues.  Supp. PSR, 6.[3]

3         The previous PSR recommended a 48-month sentence; the supplemental report explains

4    that because Mr. Alhaggagi has already served more than 60 months, a 70-month sentence would

5    afford time for him to establish a release plan.  Supp. PSR, 3.  The defense agrees with this

6    recommendation for the reasons in the Supplemental PSR and for the reasons set forth below.

7         **A.    A 70-month sentence is reasonable in light of Mr. Alhaggagi's conditions of
            confinement and post-sentencing conduct.**

8

9         The recommended 70-month sentence is reasonable in light of the harsh conditions of

10   Mr. Alhaggagi's confinement and the rehabilitative efforts he has nonetheless managed to

11   undertake.

12        Undersigned counsel engaged Jack Donson, a former Bureau of Prisons correctional

13   officer, correctional treatment specialist, and case management coordinator, to review Mr.

14   Alhaggagi's BOP records.  *See* Exh. 1 to Affidavit of Jack Donson ("Donson Decl.").  The BOP

15   designates inmates based on a numerical score, with factors such as severity of the offense of

16   conviction, age, and criminal history being assigned points.  Donson Decl. ¶¶ 4-5.  Using this

17   score, BOP designates inmates to facilities in one of four security levels (minimum, low,

18   medium, and high), with higher points resulting in a higher security level.  *Id.*

19        The highest security facilities are United States Penitentiaries (USPs).  These house only

20   about 12% of the BOP inmate population – generally those convicted of violent acts such as

21

22   [3] The original PSR details Mr. Alhaggagi's difficult childhood and the tension at home leading
     up to the offense conduct.  A hyperactive boy, who was "too much" for his mother, he was
23   shuttled between his mother and siblings in the U.S. and his father in Yemen.  He had a "terrible
     relationship" with his father that persisted until the offense conduct, but both parents were
24   exceedingly strict.  As a child, he was too afraid to tell his parents anything that he had done
     "wrong," from missing the bus for school to breaking a limb.  As a coping mechanism, he reports
25   that he "made a conscious decision to not take anything too seriously.  He saw it as a way to
     escape the tension in the house."  That personality trait was noted in the letters from friends and
26   community members submitted to the court.  PSR ¶¶ 78-80, 85, 103.  Despite all of this, he was
     neither antisocial nor bitter.  He was the class clown and liked school a lot including nearly all of
27   his teachers.  *Id.* at ¶ 103. Of note, despite the notoriety of his case, one of his high school
     teachers joined the many friends and community members who wrote letters on his behalf to the
28   Court.  The teacher stated that Mr. Alhaggagi "is a good young man, who cares deeply about his
     family and his Yemeni Community."  *Id.* at ¶ 85.

murder, those with extensive, violent criminal histories, and those that are otherwise considered riotous, assaultive, or predacious.  *Id.* at ¶¶ 4, 14.  Due to the populations they house, USPs have the highest degree of control and supervision of all BOP facilities, and lockdowns are frequent. *Id.* at ¶ 14.  They also have the highest rates in the system of both inmate-on-inmate and inmate-on-staff violence.  *Id.*  Mr. Donson notes that "[i]t is difficult to contextualize penitentiary behavior for justice professionals who have not worked in the federal prison system, because assaults and facility lockdowns are rarely covered in the media."  *Id.* at ¶ 15.  "The reality is that USP inmates live by a different sub-cultural code" than other BOP inmates.  *Id.* at ¶ 15.  "Daily life features the potential for serious violence, manipulation, extortion, and altercations," and inmates frequently witness violence and often arm themselves for protection.  *Id.*  "It is especially difficult to navigate within the [USP] environment for someone who has never been incarcerated and has no affiliation with a group or gang for protection."  *Id.* at ¶ 16.

Not surprisingly, young, non-violent inmates with no criminal history are generally not designated to USPs.  This is because BOP policy dictates that inmates should be assigned to the least restrictive environment possible.  *Id.* at ¶ 11.  That was not the case with Mr. Alhaggagi.  At 21 years old with no criminal history, he scored 16 points on the BOP scale, and a total of 8 points, or half his total, were assigned solely because was under 25.  *Id.* at ¶ 7.  A score of 16 is on the cusp between a low and a medium security designation (7-15 points corresponds to low designation and 16-23 to medium).  *Id.* at ¶ 5.  Thus, the raw score just qualified Mr. Alhaggagi for a medium-security facility but was 8 points below a USP designation (24+ points).  *Id.*  The policy of using the least restrictive facility possible should have resulted in the BOP's reducing his classification from medium to low because his score was driven primarily by his youth (under 25 years old).  *Id.* at ¶ 10.  Thus, in Mr. Donson's opinion, Mr. Alhaggagi should have been designated to a low, or at most medium-security prison.  *Id.* at ¶ 3.  But the BOP not only did not reduce his security level, it drastically increased it.  BOP applied management variables to send Mr. Alhaggagi to USP Atwater.  *Id.*  Mr. Donson believes the BOP overrode its own internal guidance because, despite the PSR's conclusion that youth and immaturity were the

drivers of Mr. Alhaggagi's offense conduct, the BOP considered him "no different from an international terrorist." *Id.* at ¶ 3.

Mr. Donson notes that "[a] youthful offender designated to a USP who has no criminal history or prison experience is extremely rare unless they are an escape risk, a Lifer, a disruptive group (gang) member, a high-level cartel member or a terrorist." *Id.* at ¶ 4.  Mr. Alhaggagi qualifies in none of these categories.  There has been no finding that Mr. Alhaggagi is a terrorist. As noted in the original sentencing papers, Mr. Alhaggagi never swore allegiance to ISIS, had no jihadist tendencies, and took no actions in furtherance of his supposed (and often wildly contradictory) "plans."  *See* Sageman Report (Exh. C to Dkt. 87), 9, 44.  Mr. Donson explains that BOP appears to have "seized on a portion of the PSR summarizing some of Mr. Alhaggagi's statements as 'U.S. Citz. Plot to 'blow up' multiple targets in CA,' [quoting BOP documentation] but ignored the overall context of his behavior, youth and immaturity as well as the *lack of formal ties to any terrorist group*."  *Id.* at ¶ 11 (emphasis added).

Even among USPs, Atwater is notorious.  *Id.* at ¶ 17.  Inmates there have murdered a staff member, taken another hostage, and assaulted many more.  *Id.* at ¶ 18.  "Internal reviews of these incidents have found USP Atwater to have been in near chaos with active gangs, tolerance of alcohol use, widespread weapon possession amongst the inmates, a broken disciplinary system, and an overflowing special housing unit (SHU)."  *Id.*  It is considered a hardship posting for employees, with BOP offering bonuses to incentivize employees to work there.  *Id.* at ¶ 17. As a young, first-time offender with a terrorism-related conviction, Mr. Alhaggagi has served very hard time at Atwater.  On arrival, after a physically grueling 16 plus hour bus journey while shackled at the wrist, waist and legs (McNamara Decl. ¶ 3), he was confronted by gang members who demanded to know his affiliation.  They marked him as an undesirable when he denied having any gang affiliation, rendering him a target who had to look over his shoulder any time he was outside his cell.  Donson Decl. ¶ 21.  He confined himself to his cell out of fear.  Going to the shower required a guard escort through the hostile atmosphere of a unit populated by much older inmates serving lengthy sentences for violent crime, often gang related.  McNamara Decl. ¶ 4; *see* Donson Decl. ¶¶ 15-16.  Mr. Alhaggagi could not even rely on prison staff because they

8

made his charges known to other inmates, and he was subjected to "hostile scrutiny by both inmates and staff" as a supposed terrorist.  *Id.* at ¶¶ 21, 23.  BOP regulations forbid inmates pressuring others "to produce or display court documents," but that did not stop the "gang attempts to determine the particulars of [Mr. Alhaggagi's] conviction."  *Id.* at ¶ 22.  In an effort to avoid the confrontations (which were statistically likely to involve shivs and other weapons), Mr. Alhaggagi secluded himself in his cell.  *See* Donson Decl. ¶¶ 16, 18.

In a confidential telephone conference with the USPO, Mr. Alhaggagi described prison as "'horrible'" and Atwater as "'a brutal place' where he mainly kept to himself as there were 'no morals and no self-respect' among the inmates;" his coping strategy has been to adopt a "'please leave me alone, I am not interested'" attitude.  Supp. PSR, 5.  It should be noted that Atwater monitored Mr. Alhaggagi's attorney-client calls until a complaint resulted in the guards being removed from the room while Mr. Alhaggagi spoke with undersigned counsel.  McNamara Decl. ¶ 4.  In these monitored calls and even later in the apparently unmonitored ones, Mr. Alhaggagi was reluctant to speak openly about his experiences but stated that the prison was a very difficult environment, and he was trying his best to avoid other inmates.  *Id.*

Conditions were of course only made worse by the COVID-19 pandemic.  As the supplemental PSR describes, Mr. Alhaggagi reports that "he has tried to focus on what he can accomplish and 'create something better,' and that he has "tried to program as much as he can, but that the pandemic changed his access to programming."  Supp. PSR, 5.  Throughout his time in custody, he has been "confined to a cell for 20 to 24 hours a day," and "24-hour lockdown has been his experience through much of the pandemic."  *Id.*  Mr. Alhaggagi reports that he used the time in his cell to "meditate[] 'a lot' in order to maintain his mental health," observing to the probation officer that he has come to see life as "'more internal than external.'"  *Id.*[4]  This radical isolation came after two years of Administrative Segregation custody in the county jails while his

_____

[4] After two years at Atwater, Mr. Alhaggagi's security classification was reduced to "low," because at age 25 and his score has dropped by 8 points.  However, his housing was only reduced to medium security, still above his proper designation.  Donson Decl. ¶ 36.  He is now housed at FCI Mendota, where he was moved in the second half of 2021.  *Id.* at ¶ 31; McNamara Decl. ¶ 7.  As Mr. Donson explains, FCI Mendota, a medium security facility, still has some of the elements of the USP environment in terms of security, albeit with a "vastly different, less violent population."  Donson Decl. ¶ 36.

9

case was pending (during which time he was shackled at the wrists, waist, and legs even during attorney-client visits).  McNamara Decl. ¶¶ 2, 4.

Remarkably, Mr. Alhaggagi's incarceration at Atwater was almost entirely free of disciplinary infractions, despite the inhumane environment and the all-pervading fear of violence.  The only alleged infraction occurred when Mr. Alhaggagi was ordered out of his cell to the yard (which he tried to avoid going to), and on his way there was bumped by another inmate.  McNamara Decl. ¶ 4.  This raised suspicions that the inmate had passed him drugs, which he was accused of ingesting.  *Id.*  A three-day stint in a so-called "dry cell" where he was forced to have bowel and bladder output monitored, followed by a toxicology screen, demonstrated that he had done no such thing.  Supp. PSR, 6-7: Donson Decl. ¶ 29.[5]  While this allegation was pending, Mr. Alhaggagi was confined in the Special Housing Unit ("SHU") at Atwater.  McNamara Decl. ¶ 4.

Mr. Alhaggagi's only other violation occurred when he was not given hygiene items during transit and traded the use of phone credits for them.  Donson Decl. ¶ 30; Supp. PSR, 7. The PSR Supplement states that Mr. Alhaggagi refused to participate in the Inmate Financial Responsibility Program (IFRP) starting in June 2021 (Supp. PSR, 7), but Mr. Alhaggagi did not in fact refuse.  He was instead coded as having refused because his transfer from Atwater to Mendota resulted in there being insufficient funds on his account to make the quarterly payment. McNamara Decl. ¶¶ 6-8.[6]

---

[5] Mr. Alhaggagi was instead found to have refused an order when he did not stop when commanded to do so by an officer during the same incident.  As Mr. Donson explains, this type of violation – which ordinarily would not have merited a hearing but would have been informally resolved – illustrates the dilemma faced by young inmates in a place like Atwater, because "had Mr. Alhaggagi complied with the staff member's order in front of the other inmates, he would have been subject to repercussions from the population."  Donson Decl. ¶ 29.

[6] IFRP payments are drawn from money on prisoners' accounts; typically (and in Mr. Alhaggagi's case), that money comes from family.  McNamara Decl. ¶ 9.  In advance of his transfer from Atwater, Mr. Alhaggagi asked his family to stop sending money until he arrived at FCI Mendota.  *Id.* at ¶ 7.  In so doing, he assumed the BOP's quarterly draw of IFRP funds would occur after his transfer.  *Id.*  But the BOP attempted the withdrawal while he was still in the Atwater SHU (*id.* at ¶ 7), and when there were insufficient funds, it was coded as a "refusal." Upon arrival at Mendota in October 2021, Mr. Alhaggagi signed onto the IFRP again, but his reenrollment was not processed until January 10, 2022.  *Id.* at ¶ 8.  During those three months, he was denied commissary as a punishment for his supposed refusal to participate in IFRP.  *Id.* at ¶

Even more impressively, Mr. Alhaggagi has managed to use his time in BOP custody productively.  Despite the severe restrictions on programming caused by the pandemic, he has completed a number of classes.  He completed a drawing course, a 40-hour drug education class, a 104-hour vocational building trades course comprising "work in general construction, carpentry (framing), basic residential wiring and carpentry (finishing)" (Donson Decl. ¶ 25), and earned a legal assistant/paralegal certificate from the Blackstone Career Institute, completing that training "with distinction."  PSR Supp., 6.  He told the probation officer that he is "most proud of completing [the] paralegal program and participating in the Prison Mathematics Project (a nonprofit program that seeks to reduce recidivism by inspiring and providing prisoners the resources to explore mathematics)."  *Id.* at 5-6.  In counsel's last contact with him, Mr. Alhaggagi reported that he is taking a business law class.  McNamara Decl. ¶ 7.

A sentence of 70 months is reasonable in light of the appalling conditions Mr. Alhaggagi has suffered in custody.  Neither the parties nor the Court could have anticipated that the BOP would send a 24-year-old with no priors and no history of violence to one of the most notorious penitentiaries in the system, nor that Mr. Alhaggagi would serve approximately four years in isolation in either Administrative Segregation at the county jails or in de facto isolation in his cell at USP Atwater.  McNamara Decl. ¶ 2.  Nor, of course, could anyone have anticipated that a global pandemic would make conditions in prison so much worse than even the "near chaos" of pre-pandemic USP Atwater.  As Mr. Donson notes, Mr. Alhaggagi, a young offender with no previous criminal history, has endured a more punitive sentence than was necessary given that the USP population includes members of organized street gangs and people serving life sentences and is thus one of the most predatory populations in the federal system.  Donson Decl. ¶ 3.  The Court should take into consideration that "the severity of the conditions of confinement . . . increase[s] the severity of the punishment and the amount of deterrence associated with a given term of imprisonment."  *United States v. Stewart*, 590 F.3d 93, 144 (2d Cir. 2009) (affirming district court's downward variance based in part on conditions of confinement).

9. Mr. Alhaggagi's family has now made good not only on the missing payment but has paid off the remaining balance on Mr. Alhaggagi's special assessment.  *Id.* at ¶ 10.

Especially in the context of COVID, many courts have recognized that harsh conditions result in more punishment than they originally intended a defendant to suffer and have reduced sentences accordingly. *See*, *e.g.*, *United States v. Rodriguez*, 492 F.Supp.3d 306, 311 (S.D.N.Y., 2020) (reducing sentencing in part because the COVID-19 pandemic "has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case"); *United States v. Olawoye*, 477 F.Supp.3d. 1159, 1166 (D.Or. 2020) (granting compassionate release in part because the "sentence defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing").

A 70-month sentence is also reasonable in light of Mr. Alhaggagi's disciplinary record and rehabilitative efforts. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) (holding that courts may consider post-sentencing conduct at resentencing). The Court is doubtless aware that it is an extraordinary feat to maintain a clean record at a violent and dangerous institution like Atwater, where defensive weapons possession is almost *de rigeur*. Donson Decl. ¶ 18 (weapons possession "widespread" at USP Atwater; internal review of violent incidents found Atwater to have been in "near chaos;" inmate safety "remain[s] [a] challenge[] at USP Atwater"). It is extraordinarily easy to run afoul of prison rules and regulations in such places. *Id.* (Atwater SHU found to have been "overflowing.") In such an atmosphere, inmates are therefore subject to discipline for measures they reasonably might view as necessary self-protection against predatory inmates, such as possession of a weapon or refusal to cooperate with guards. Even outside the animalistic environment of a penitentiary like Atwater, inmates can be disciplined for a variety of minor infractions such as participating in an unauthorized meeting, using "obscene language," and being "untidy." *See* BOP Program Statement 5270.09; Donson Decl. ¶ 28. That even in the face of all of this, Mr. Alhaggagi – once the hyperactive class clown who never applied himself in school (PSR ¶ 103) – has remained virtually discipline-free and has willed himself to study and earn a paralegal certificate, excel in a math course, and now take a business law class underscores the reasonableness of the 70-month sentence recommended by Probation.

**B.     A 70-month sentence is reasonable in light of comparable cases.**

Mr. Alhaggagi's conduct in this case is sui generis.  Counsel has still been unable to find a single other case in which a defendant was convicted of attempted material support based on opening social media accounts, much less one in which the defendant did not even know how the accounts would be used.  But since the first sentencing hearing in 2019, at least one court has sentenced defendants in cases involving online activity that bears some resemblance to Mr. Alhaggagi's.  These cases, both before Judge Adelman in the Eastern District of Wisconsin, provide helpful comparisons.  Each featured claims of terror plots and outrageous online behavior, and in each, the court was faced with the same question this Court had about Mr. Alhaggagi: how dangerous was the defendant actually?  In each, the defendant's conduct was more egregious than Mr. Alhaggagi's.  But because the court concluded that the defendants did not pose a real-world danger commensurate with their outrageous online conduct, the sentences ranged from 66 to 90 months.

**i.     Waheba Dais**

Ms. Dias pleaded guilty to attempting to provide material support to ISIS.  *United States v. Dais*, 482 F.Supp.3d 800 (ED Wis. 2020).  Like Mr. Alhaggagi, she was active on social media and engaged in talk with an undercover FBI agent about bombings and poisonings.  *Dais*, 482 F.Supp.3d at 804.  But Dais's online activity was far more serious and extensive.  Dr. Lorenzo Vidino of the Georgetown Program on Extremism examined her and concluded that she was "an active recruiter who groomed others, connected people to others she claimed to know, and acted as a 'devil on the shoulder' encouraging so-called lone wolves." *Id.* at 806.  She "used multiple social media platforms and hacked social media accounts to promote ISIS ideology, recruit adherents to ISIS, collect information on how to make explosives and biological weapons and on how to conduct terrorist attacks, and distribute that information to individuals interested in conducting attacks on behalf of ISIS." *Id.* at 803.  She "repeatedly hacked into Facebook accounts" and used them to distribute pro-ISIS information, and she "pledged her allegiance to ISIS on numerous occasions." *Id.*  She had specific conversations with one person about a planned attack in France.  *Id.*  Like Mr. Alhaggagi, she engaged in identity theft; but where Mr.

13

Alhaggagi stole identities to buy clothes, she hacked accounts and stole users' identities to promote ISIS.  *Id.* at 806.  And while Mr. Alhaggagi did download a bomb-making manual, he never posted or distributed it; Dais, by contrast "basically maintained an encyclopedia of lone wolf tactics" and "distributed information about explosives and biological weapons on Facebook and other social media platforms . . . for use by people who want to commit violent acts in the name of ISIS."  *Id.* at 804.  Mr. Alhaggagi had no followers, while Dais had many, one of whom was arrested "after law enforcement thwarted his plan to bomb a worship center in Pittsburgh." *Id.* at 806.

As with Mr. Alhaggagi, in Dais's case "[t]here really was no dispute about *what* defendant did; the key issue for sentencing purposes was *why*."  *Id.* (emphasis in the original). Ms. Dais said she was bored and lonely and convinced herself that none of the people she communicated with would actually do anything.  *Id.*  The government countered that her dedication, the volume of her online posts, and her support of ISIS by facilitating lone wolf attacks were all hard to square with the idea that she was "fooling around."  *Id*. at 807. Emphasizing the seriousness of the offense, the government sought the statutory maximum of twenty years; the defense, citing her mental health problems and history of abuse, requested a two-year sentence.  *Id.* at 802.

For Judge Adelman, the key question was how much "this defendant actually 'meant.'" *Id.* at 805.  He cited a psychological report that painted a complex picture, finding on the one hand that Dais suffered from PTSD, major depression, obsessive-compulsive disorder, and generalized anxiety, but on the other hand impulsivity, limited capacity for self-control, and risky decision-making.  *Id.* at 807.  While these conditions were not an excuse, the court accepted them as evidence that Dais needed mental health treatment and concluded that Dais was not "a hardened jihadist who could not be reformed and thus must be separated from the public for most of the rest of her life."  *Id.* at 807-08.  He disagreed with both the government and defense recommendations.  Observing that maximum sentences should be reserved for the worst offenders, the court found "it was hard to see how this defendant fell into that category" because Dais had no record and "provided information only, not actual weapons or funds for weapons,

14

and there was no proof anyone used her information to carry out an actual attack[.]"  *Id*. at 807.

Judge Adelman imposed a sentence of 90 months with three years of supervised release, finding

that given the absence of any prior record, a lengthier term of supervision was not warranted,

"particularly after serving the prison sentence."  *Id.* at 808.

### ii.      Jason Ludke and Yosvany Padilla-Conde

Like Mr. Alhaggagi, Jason Ludke communicated online with undercover agents about

ISIS and, in his case, his desire to travel to ISIS territory to fight because he hated "infidels" and

wanted to live under Shariah law.  RT (Ludke Sentencing), CR 16-175 LA (ED Wis. 2016),

(Exh. 3 to McNamara Decl.), 15.  In communications with an undercover agent, he uttered the

Islamic creed, pledged his allegiance to the leader of ISIS, and sent videos to the undercover

agent in which he again swore allegiance to ISIS and expressed his intent to travel to join ISIS.

*Id*.  He traveled to Mexico with the intent of going from there to the Middle East.  *Id*. at 16.  Like

Mr. Alhaggagi, he made outrageous and false claims to agents, including about his martial arts

prowess and about his codefendant's (Padilla-Conde) having received firearms training from the

Cuban military.  *Id.* at 14-15.

At 38, however, Ludke was much older than the 21-year-old Mr. Alhaggagi at the time of

the offense conduct, and he had a very serious criminal history.  Even without application of the

terrorism enhancement, he was in Criminal History Category VI.  Before his arrest, he had spent

all but six months of the previous eighteen years in prison.  He had been convicted of sexual

assault of a 14-year-old child as well as burglary and theft.  At the time of his offense, he was on

supervised release after serving time in prison for threatening to kill a federal judge and bomb a

federal courthouse.  Before his arrest on that charge, Ludke was interviewed by the FBI and

bragged that he had bought guns, explosives, and bulletproof vests to rob a bank for funds to

establish a Muslim community and attack federal facilities.  As with his boasts in the material

support case however, investigators found no evidence that he had actually done any of this.  *Id.*

at 18-19.  While in pretrial custody on the material support case, he attempted to plot with fellow

inmates to kill an FBI agent and took some steps, including seeking to have associates use social

media to arrange for the agent's murder and discussing the plan with a face-to-face visitor. *Id.* at 16-17.

The government sought the statutory maximum 20-year sentence, arguing his behavior "could hardly be worse." *Id.* at 5-6. Judge Adelman agreed that Ludke's conduct was very serious and went beyond mere talk, but he noted that Ludke had neither means nor a plan to actually leave North America. The court's primary concern was the same that this Court raised with Mr. Alhaggagi: whether the defendant actually meant the things he had said.

> The real issue here, it seems to me, is how seriously to take the things the defendant says. Whether it's a commitment to join or fight for ISIS or an attempt to get someone to harm a federal agent or whether it's a threat to a federal judge and his staff, the defendant is plainly willing to say terrible and threatening things. But is he a danger to act on them?

*Id*. at 25. The court ultimately agreed with the defense that Ludke fell into the category of "aspirational not operational" and that Ludke's claims to the agent were "hot air":

> We know he didn't actually hurt or attempt to hurt anyone. He didn't possess or attempt or possess any weapons. He didn't acquire any weapons. He didn't provide any weapons or money or information to others to facilitate an attack. It appears that what he did say to the undercover employee about how helpful he could be given his martial [arts] training and his co-defendant's firearms training was all hot air. There's no evidence that any of that stuff that he said to the agent was true.

*Id*. at 25-26. As to the "plot" to murder the FBI agent, "much, if not most of what he said while detained was either delusional or [boasting]." *Id*. at 26. The court found that Ludke was something of a fabulist, noting that "[n]o one seems to believe, for example, that he participated in battles against the Mexican Army, which is one of the things he said," and that he had made the apparently false claim of having bought guns, explosives, and bullet proof vests to rob a bank and use the proceeds to target the government. *Id*.

While providing personnel, including oneself, "is no doubt serious," the court disagreed with the government that "the nature and circumstances of the offense could hardly be worse." *Id*. at 26-27. It concluded that the type of harsh sentence sought by the government "should be reserved for the most culpable behavior otherwise, there's little room left above the defendant's sentence for those who commit the offense in more harmful ways." *Id*. at 27. Cautioning against

16

"succumbing to the temptation of using this defendant as a means for expressing our horror and outrage at what ISIS has done," the court imposed a sentence of 84 months. *Id*. at 29-30.

Yosvany Padilla-Conde pleaded to aiding and abetting Ludke's material support. Padilla-Conde was a 32-year-old Cuban immigrant with a criminal history that included robberies committed while he was a juvenile. He had suffered a traumatic childhood, abused alcohol and drugs, and was a gang member. RT (Padilla-Conde Sentencing) (Exh. 4 to McNamara Decl.), 4. He met Ludke in prison and joined in Ludke's conversion to Islam, and the two moved in together after Ludke's release. *Id*. at 6-7. With the help of an undercover operative, Padilla-Conde made videos pledging allegiance to ISIS. *Id*. at 10. He drove with Ludke from Wisconsin to Texas and knew that Ludke was attempting to join ISIS by traveling to Mexico and then on to ISIS-controlled territory. *Id*. at 22.

As it had with Ludke, the government sought the statutory maximum of 20 years. Judge Adelman imposed a 66-month sentence, approximately a quarter of what the government sought. In so doing, the court noted that the defendants' attempt to join ISIS was "fanciful." The plan was to drive from Wisconsin to Texas and then on to Mexico, but it was unclear what they would have done then. There was no evidence that they acquired any weapons or materials to assist ISIS. *Id*. at 22. They had no particular skills that would assist a terrorist organization, and no specific plan to harm anyone. *Id*. at 22-23. Although Padilla-Conde made videos in support of ISIS, the court found he did so at Ludke's urging and that Ludke was himself responding to demands from the undercover agent, finding it unclear how much Padilla-Conde in fact subscribed to Ludke's jihadist fantasies. *Id*. at 23-24.

### C.     A 70-month sentence is reasonable in light of the nature and circumstances of Mr. Alhaggagi's offense.

Mr. Alhaggagi was just 21 years old at the time of the offense conduct, far younger than Dais, Ludke, or Padilla-Conde. He had no criminal history and, as Dr. Amanda Gregory noted, was immature even for his young age. *See* Gregory Report (Exh. D to Dkt. 87), 11. He was not religious, much less radicalized, and never identified with ISIS, committed to its ideology, or pledged allegiance to the organization. He never distributed bomb-making instructions, much

17

less did he maintain and publish an "encyclopedia" of lone-wolf tactics. Again unlike any of the others, his online life included trolling attacks mocking both Sunnis and Shias. And in the real world, while he had both the means and the opportunity to travel to ISIS's territory, he never even took an actual step in that direction. *See* Sageman Report, 45 ("[T]here is no hint that he tried to travel to the Middle East to join the Islamic State, despite the fact that he went to Saudi Arabia in April 2016, from which it would have been relatively easy for him to go to either Jordan or Turkey to join either the Iraqi or Syrian front. He had his own money (in fact he paid for his family expenses) but did not do that."). He stole identities, but he used them to buy himself fancy clothes, not to support ISIS. He bragged about acquiring weapons, poisons, and bomb-making materials, but he never did any of it. And when presented with what he thought was an opportunity to carry out an actual attack, he distanced himself and ultimately ran away from the UCE.

Mr. Alhaggagi was a cereal box ISIS expert who cobbled together enough in his online pseudo-studies to sound knowledgeable. He was a prodigious talker who did not think about the consequences of what he was saying. What he wanted was amusement, to provoke outrage and poke fun at people's sincerely held beliefs, especially if they were religious beliefs. He was amazed that he got the seemingly rapt attention of the online users, among them one who turned out to be the CHS. He played to this audience by coming up with ever more outrageous claims.

Mr. Alhaggagi never committed to anything, much less a violent attack. To explain his lack of follow-through, the government theorized that he must have discovered the true identity of the undercover and cunningly avoided the trap by going underground. The Court rightly rejected this notion. RT (Feb. 26, 2019), 190-91. In fact, Mr. Alhaggagi went offline for fear that the UCE and CHS would continue to press for an actual attack. But unfortunately, he managed this internet abstinence for only a few weeks before he got bored and went back online. Once back in his stomping ground of Telegram chatrooms, he engaged in no terror plotting or claims about weapons acquisition. Instead, he instigated another infantile spat, this time between Shia and Sunni Telegram users, the latter of whom included ISIS supporters. He posted blasphemous statements in Sunni chat rooms while posing as Shia and vice-versa, and then

suggested the offended members "attack" the accounts of opposing chat room members to get them banned from the platform.  When certain Sunni ISIS supporters took his claims of support for their cause at face value and asked him for a handful of social media accounts, he agreed.[7]  Afterall, they had been useful idiots in his online troll war.  But, as with everything he did, he lost interest in that game too and simply stopped.  He provided only six social media accounts to the Sunni users, ignoring their requests for more.

While the government made much of Mr. Alhaggagi's post-arrest behavior at North County Jail, it really involved just one more bit of performativity.  For the first eight months of his incarceration, Mr. Alhaggagi was housed in general population on an identity theft complaint.  McNamara Decl. ¶ 2.  In the face of his sudden notoriety as a supposed terrorist, Mr. Alhaggagi's adaptative technique was to one-up older inmates with the same "dare-you-to-believe-it" antics that had proved effective online.  He spoke with faux expertise about guns, bombs, contraband cigarettes.  He bragged about his time in Yemen (in fact, he had spent a few years in childhood there being mercilessly bullied for being "American").  Sageman Report, 2.  The Court heard testimony on all of this from inmate RJ, an older serial supervised release violator who took Mr. Alhaggagi under his wing.  RJ reported that Mr. Alhaggagi became "more boisterous" when around inmates his age and that they would "feed[] off each other" in conversations about supposed plots.  RT (Feb. 26, 2019), 27, 31.  Mr. Alhaggagi had of course no ability to source guns or bombs or attack the Federal Building when he was out of custody, much less from jail.

In short, Mr. Alhaggagi was a committed and devoted troll, willing to say almost anything to shock and get a response from his audience, whether online or in person.  But he is not, and never was, a committed jihadist.  He had no actual plans or desire for violence, despite

---

[7] Agents apparently informed the probation officer that Mr. Alhaggagi "The defendant specifically communicated with an individual on Telegram who revealed that he was a member of ISIS media."  Supp. PSR, 2.  This was not the case.  Two individuals, using the handles Muharib and Bank Al-Ansar, asked Mr. Alhaggagi to open accounts.  Neither of them told Mr. Alhaggagi that they were members of "ISIS media," although Muharib did reference an "invasion," meaning a social media campaign.  Mr. Alhaggagi knew nothing about these individuals other than that they purported to be ISIS supporters.

his claims – as evidenced by his withdrawal once the possibility arose of carrying out a real-world attack.

It may be difficult to understand why anyone would dedicate the time and attention Mr. Alhaggagi did to building a fake online persona and posing as an ISIS supporter.  But he is not alone in such conduct.  Ludke's fabulist actions were similar, and a parallel can also be seen in the hoaxer at the center of the now-debunked *New York Times* podcast "Caliphate."  In "Caliphate," Canadian citizen Shehroze Chaudhry gave a compelling account of his time as an ISIS police officer in Syria, including his training, his murder of two people, and his ultimate disillusionment and return to Canada.  The podcast was a smash hit, garnered a Peabody, and was a finalist for the Pulitzer Prize.  But it was built on sand.  *See* James Harkin, *Sign of the Times: Caliphate and the perils of reporting online* (Harper's Magazine, May 2021).[8]  As the *Times'* executive editor explained after Mr. Chaudhry's extensive falsehoods came to light, "I think we were so in love with [the story] that when we saw evidence that maybe he was a fabulist, when we saw evidence that he was making some of it up, we didn't listen hard enough."  Nicholas Quah, *L'Affaire Caliphate* (Vulture, Jan. 5, 2021).[9]  Canadian authorities ultimately charged Mr. Chaudhry with perpetrating a terrorist hoax.  The case was dismissed in exchange for Mr. Chaudhry's admitting his lies in court, "suggest[ing] that prosecutors and the judge concluded that Mr. Chaudhry was not a danger but more of 'an immature young man who basically made up a lot of stuff and tried to convince people that he was far more influential than he was.'"  Ian Austen, *Canadian Admits Fabricating Terrorism Tale Detailed in New York Times Podcast* (New York Times, Oct. 9, 2021).[10]

Mr. Alhaggagi was never as sophisticated as Mr. Chaudhry, who created a unified and coherent ISIS fantasy that fell apart only when the *New York Times* belatedly scrutinized the details.  Mr. Alhaggagi's claims of sourcing guns from Mexican cartels or via FedEx from Nevada were absurd on their face, and the FBI's investigation immediately showed he was

---

[8] https://harpers.org/archive/2021/05/sign-of-the-times-caliphate-the-perils-of-online-reporting
[9] https://www.vulture.com/2021/01/caliphate-controversy-new-york-times-podcast.html
[10] https://www.nytimes.com/2021/10/09/world/middleeast/shehroze-chaudhry-caliphate.html

carrying out no terrorist activities and had none of the real-world connections he claimed online. But both Mr. Chaudhry and Mr. Alhaggagi were young, feckless, and non-violent, and both were drawn to making things up for the sake of attention.  It is now fair to say that five years and two months of hard time have made Mr. Alhaggagi grow up.  He has now reached the age – 26 - when the brain is fully developed.  Gregory Report, 11-12.  The Probation Officer notes that in her most recent interaction with him, "it is also apparent that he has gained some insight and perspective – being incarcerated in a high security facility during a global pandemic, which required lockdown much of the time, has created a soberness in the defendant that was not previously present.  He not only appears more mature, but he also appears to have a greater awareness of the gravity of his actions and the impact it will have on him and his family for years to come."  Supp. PSR, 2.

## V.     Conclusion

As the Court recognized at the last sentencing hearing, "words matter."  RT (Feb. 26, 2019), 192.  Mr. Alhaggagi's words mattered, and deserve punishment, because "while he may think it's a joke, he may not have intended it, the other person may not know it's a joke," and the consequences could be devastating.  *Id.* at 193.  Mr. Alhaggagi did not himself harbor terroristic tendencies or attempt violence, but he was reckless and dangerous in potentially encouraging those tendencies in others.  The probation officer's recommended sentence of 70 months, especially given the extremely harsh conditions under which he will have served most of that time, combined with his determined efforts to reform himself is adequate to reflect the seriousness of his conduct and to act as a powerful deterrent both to Mr. Alhaggagi and others.

Dated: January 19, 2022                                 Respectfully submitted,

                                                                         ___/s/_____
                                                                         Mary McNamara
                                                                         August Gugelmann
                                                                         SWANSON & McNAMARA LLP
                                                                         Attorneys for Amer Alhaggagi