Mary McNamara, SBN 147131
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant
AMER ALHAGGAGI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>          vs.<br><br>AMER SINAN ALHAGGAGI,<br><br>                              Defendant. | Case No.  CR 17-0387 CRB<br><br>**DECLARATION OF MARY McNAMARA IN SUPPORT OF DEFENDANT'S RESENTENCING MEMORANDUM** |

I, Mary McNamara, hereby declare as follows:

　　　　1)　　I have knowledge of the facts stated in this declaration based on personal observation or on information and belief, and if called to testify, I could and would testify consistently with this declaration.

　　　　2)　　On May 26, 2021, I spoke by telephone with my client, Amer Alhaggagi, who was then incarcerated at USP Atwater.  Mr. Alhaggagi told me that when he was initially arrested on November 29, 2016 and held on identity theft charges at North County Jail, he was housed in the general population.  It was there that he had interactions with RJ, who testified at the sentencing hearing.  When, on July 21, 2017, he was indicted on the attempted material support charge, he was moved into Administrative Segregation at North County Jail and held in isolation until after sentencing.  He was then moved to Santa Rita Jail.  While at Santa Rita Jail,

he was also held in isolation in the Administrative Segregation Unit.  When he was transferred into Bureau of Prisons (BOP) custody in August 2019, he had served two years in Administrative Segregation units.

3) In the May 26, 2021, telephone call with Mr. Alhaggagi, he told me that the transfer from Santa Rita Jail to USP Atwater entailed a physically difficult journey by bus for 16 hours to a transfer jail at Pahrump, Nevada.  Mr. Alhaggagi was restrained in hand and feet shackles, with his hands further shackled to his waist during the entire journey.  He suffered red welts on his wrists as a result.  Mr. Alhaggagi was then transported by bus from Pahrump to another jail and then on to USP Atwater, again while similarly restrained.

4) Over the course of several telephone calls with Mr. Alhaggagi while he was incarcerated at USP Atwater, Mr. Alhaggagi was reluctant to speak openly because he told me and, as a result, I believe, that a correctional officer was in the room with him during the calls.  After complaint to USP Atwater, the correctional officers were removed and I am informed by and believe from Mr. Alhaggagi that he was then alone in the room while on attorney-client calls.  I perceived Mr. Alhaggagi to still be reluctant to speak openly about the conditions at USP Atwater, but he communicated to me that the prison was a very difficult environment and he was trying to avoid the other inmates to the best of his ability.  He related that taking a shower entailed a 15 minute process of armed escort through the unit from his cell to the shower and back to his cell.  Other than showering, he tried to never to leave his cell, including to go to the yard.  He told me that on the day of his interaction with the guard that resulted in the sole instance of discipline at Atwater (Supp. PSR page 6; Donson Decl., ¶ 29) he had been ordered to go to the yard and while obeying that order, another inmate bumped into him, prompting suspicion by the guards that the inmate had passed drugs to Mr. Alhaggagi.  Mr. Alhaggagi told me that he was then confined to a special cell where his bowel and bladder movements were monitored, but he passed no drugs and he was negative on a drug test.  While this matter was pending, Mr. Alhaggagi was confined to the SHU.

5) During my attorney-client visits with Mr. Alhaggagi after July 2017 (when he was indicted on attempted material support), I observed Mr. Alhaggagi to be restrained in hand and

feet shackles with his hands further shackled to his waist during the entire time of each my visits. Mr. Alhaggagi had not been so restrained in the eight or so months before the July 2017 indictment.

6)      On January 11, 2022, I spoke by telephone with Mr. Alhaggagi, who currently is incarcerated at FCI Mendota, a medium security facility.  In that conversation, Mr. Alhaggagi told me that he had not refused to participate in the Inmate Financial Responsibility Program (IFRP).  Rather, Mr. Alhaggagi stated, there had been a timing mismatch in BOP's withdrawal of IFRP funds such that his account lacked sufficient funds to satisfy the quarterly payment.

7)      Mr. Alhaggagi told me that he had misunderstood the timing of  BOP's quarterly withdrawal of funds into the IFRP, thinking it would occur after his transfer from USP Atwater to FCI Mendota in the second half of 2021.  In advance of his transfer, while he was in the Atwater Special Housing Unit (SHU) awaiting adjudication of his disciplinary matter there, he asked his family to stop sending him money with the plan to resume when he arrived at FCI Mendota.  Unfortunately, BOP attempted to withdraw funds while he was still in the SHU at Atwater and there were insufficient funds to satisfy that quarter's draw.

8)      Mr. Alhaggagi told me that after he arrived at Mendota, he signed onto the IFRP again in October 2021.  Mr. Alhaggagi also told me that BOP staff told him that his signature was not processed until January 10, 2022, a lag of three months. During that three month period, despite having signed back onto the IFRP, he was denied commissary because his signature on the contract had not been processed.

9)      Also on January 11, 2022, I spoke with BOP expert Jack Donson about the IFRP. Mr. Donson told me that inmates typically pay into the IFRP in the same way that Mr. Alhaggagi had been doing, i.e., via funds sent to them from family.  While the BOP terms the IFRP a voluntary program, in effect, it has coercive aspects because failure to participate/pay is coded as a "refusal," and the inmate is denied access to commissary.  Mr. Donson conjectured that the delay in BOP's processing of Mr. Alhaggagi's signature on the IFRP contract at Mendota might be explained by the fact that Mr. Alhaggagi is on a quarterly withdrawal cadence and that BOP

processed his signature only as the next withdrawal became due.  The effect of this delay however, was that Mr. Alhaggagi was denied commissary until his signature was processed.

10)     On January 12, 2022, to make up for the missed payment, Mr. Alhaggagi's family made a payment to the IFRP via the district court's finance portal.  Attached as Exhibit 1 is a true and correct copy of the receipt issued by pay.gov. Mr. Alhaggagi's family paid a total of $75, more than the missed payment, in order to pay off Mr. Alhaggagi's full special assessment of $400.  According to the Finance Unit, this payment will be recorded on the docket as full satisfaction of the special assessment once it is reconciled with the Financial Litigation Unit. Attached as Exhibit 2 is a true and correct copy of email correspondence from the district court clerk's office to my office verifying this information.

11)     In my January 11 telephone call with Mr. Alhaggagi, he told me that he is currently enrolled and has almost completed a course entitled "Fundamentals of Business Law" via Blackstone Career Institute, where he earned a "legal assistant/paralegal certificate" with distinction.  Supp. PSR, page 6.

12)     Mr. Alhaggagi served a total of two years at USP Atwater before being transferred to FCI Mendota.

13)     Attached hereto as Exhibit 3 is a true and correct copy of the transcript of sentencing hearing dated February 26, 2019, in the matter of *United States v. Jason Ludk*e, CR 16-175 LA (ED Wis. 2016).

14)     Attached hereto as Exhibit 4 is a true and correct copy of the transcript of sentencing hearing dated August 7, 2019, in the matter of *United States v. Yosvany Padilla-Conde*, CR 16-175 LA (ED Wis. 2016).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct or, as to matters stated on information and belief, that I believe them to be true and correct.

Executed at San Francisco, California, this 19th day of January, 2022.

/s/
_____
Mary McNamara

4

# EXHIBIT 1

| | |
|---|---|
| **From:** | notification@pay.gov |
| **To:** | Amy McGuigan |
| **Subject:** | Pay.gov Payment Confirmation: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments |
| **Date:** | Wednesday, January 12, 2022 3:13:12 PM |

 An official email of the United States government

Pay.gov logo

Your payment has been submitted to Pay.gov and the details are below. If you have any questions regarding this payment, please contact CAND Finance at (415) 522-4621 or CAND_Finance@cand.uscourts.gov.

Application Name: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments
Pay.gov Tracking ID: 26UK9UBM
Agency Tracking ID: 76189910085
Transaction Type: Sale
Transaction Date: 01/12/2022 06:13:05 PM EST
Account Holder Name: Amer Alhaggagi
Transaction Amount: $75.00
Card Type: Visa
Card Number: ************7786

Defendant Name: Amer Alhaggagi
Case Number: DCAN317CR000387-001
Payer's Name: Amer Alhaggagi
Payer's Address, City, State, Zip: ███████████████████████
Payer's Telephone: Home: ██████████
Payer's Email: ████████████
Type of Payment: Other - $75.00 Remaining balance on special assessment

THIS IS AN AUTOMATED MESSAGE. PLEASE DO NOT REPLY.

Pay.gov is a program of the U.S. Department of the Treasury, Bureau of the Fiscal Service

# EXHIBIT 2

| | |
|---|---|
| **From:** | Rachelle Heaney |
| **To:** | Amy McGuigan |
| **Subject:** | RE: Pay.gov Payment Confirmation: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments |
| **Date:** | Wednesday, January 12, 2022 4:56:31 PM |
| **Attachments:** | image001.png |

Good afternoon Amy,

I checked his case and he owes $75 for his Special Assessment.

Once we process this $75 payment via pay.gov then it should make his SPA Paid In Full. We will docket eventually once we reconcile with the Financial Litigation Unit.

*Rachelle Heaney*
*Finance Specialist II*
*United States District Court*
*Northern District of California*
*Ph* ███████

---

**From:** Amy McGuigan ██████████
**Sent:** Wednesday, January 12, 2022 3:58 PM
**To:** CAND Finance <CAND_Finance@cand.uscourts.gov>
**Subject:** FW: Pay.gov Payment Confirmation: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments

**CAUTION - EXTERNAL:**

Hello- will we be able to get some form of receipt that this will cover the balance of Mr. Alhaggagi's special assessment?  We need to show his probation officer that the balance has been paid.   Will it show on the docket?


Capture

Amy Jo McGuigan, CEDS
Senior Paralegal
Certified e-Discovery Specialist
Swanson & McNamara LLP
300 Montgomery St., Suite 1100
San Francisco, CA 94104
Telephone: (415) 477-3800
Fax: (415) 477-9010
████████████████

www.smllp.law

CONFIDENTIALITY NOTICE: This transmission is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the recipient, you are hereby notified that any disclosure, distribution or copying of this information is strictly prohibited. If you have received this transmission in error, please notify us immediately and permanently delete the message and any attachments from your computer.

**From:** notification@pay.gov <notification@pay.gov>
**Sent:** Wednesday, January 12, 2022 3:13 PM
**To:** Amy McGuigan
**Subject:** Pay.gov Payment Confirmation: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments



An official email of the United States government

Pay.gov logo

Your payment has been submitted to Pay.gov and the details are below. If you have any questions regarding this payment, please contact CAND Finance at (415) 522-4621 or CAND_Finance@cand.uscourts.gov.

Application Name: NDCA Criminal Debt, Civil and Criminal Bonds, and Other Payments
Pay.gov Tracking ID: 26UK9UBM
Agency Tracking ID: 76189910085
Transaction Type: Sale
Transaction Date: 01/12/2022 06:13:05 PM EST
Account Holder Name: Amer Alhaggagi
Transaction Amount: $75.00
Card Type: Visa
Card Number: ************7786

Defendant Name: Amer Alhaggagi
Case Number: DCAN317CR000387-001
Payer's Name: Amer Alhaggagi
Payer's Address, City, State, Zip:
Payer's Telephone: Home:
Payer's Email:
Type of Payment: Other - $75.00 Remaining balance on special assessment

THIS IS AN AUTOMATED MESSAGE. PLEASE DO NOT REPLY.

Pay.gov is a program of the U.S. Department of the Treasury, Bureau of the



Fiscal Service

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

UNITED STATES OF AMERICA,      )
                                     )
                Plaintiff,     )      Case No. 16-CR-175 &
                                 )      09-CR-222
     vs.                        )
                                 )      Milwaukee, Wisconsin
JASON LUDKE,                 )      February 26, 2019
                                 )
                Defendant.     )      11:00 a.m.
                                 )

----------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff<br>UNITED STATES OF AMERICA: | United States Department of Justice<br>By: Benjamin P Taibleson<br>Office of the US Attorney<br>517 E Wisconsin Ave - Rm 530<br>Milwaukee  WI 53202<br>Ph: (414)297-1727<br>Fax: (414)297-1738<br>benjamin.taibleson@usdoj.gov |
| For the Defendant<br>JASON LUDKE:<br>(Present) | Federal Defender Services<br>By: Joshua Uller & Thomas Phillip<br>517 E Wisconsin Ave - Rm 182<br>Milwaukee  WI 53202<br>Ph: (414)221-9900<br>Fax: (414)221-9901<br>Josuha_uller@fd.org |
| U.S. Probation Office: | Daniel Dragolovich |
| U.S. Official Reporter:<br>Transcript Orders: | SUSAN ARMBRUSTER, RPR, RMR,<br>Susan_Armbruster@wied.uscourts.gov |

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

 1          THE COURT:  16-CR-175 and 09-CR-222, U.S. versus

 2     Ludke.  Appearances, please.

 3          MR. TAIBLESON:  Good morning, Your Honor.  Benjamin

 4     Taibleson for the United States.

 5          PROBATION AGENT:  Dan Dragolovich for U.S. Probation.

 6          MR. ULLER:  Good morning, Your Honor.  Jason Ludke

 7     appears in person with Joshua Uller and Thomas Phillip.

 8          MR. PHILLIPS:  Good morning.

 9          THE COURT:  Okay.  We're here for sentencing and a

10     revocation.  The defendant previously pleaded guilty to Count 1

11     of the Indictment in the new case, but it appears the violations

12     set forth in the November 16, 2016 Updated Revocation Hearing

13     Report haven't been formally adjudicated.  Mr. Uller, I assume

14     your client admits the three violations in that report?

15          MR. ULLER:  Yes.

16          THE COURT:  And Mr. Ludke, you've gone over this

17     hearing report dated November 16th with your client, I mean,

18     with your lawyer; you understand the violations; and if you

19     wanted to have a hearing, you could; and you could present

20     evidence and witnesses and question adverse witnesses, and you

21     could have your lawyers there.  I'd appoint a lawyer, if

22     necessary.

23          And if I find you violated your release terms, I could

24     revoke your supervision, put you in prison up to two years and

25     re-impose supervised release up to three years less any period

1    of imprisonment.  Understanding these rights, you admit the

2    alleged violations?

3              DEFENDANT:  Yes.

4              THE COURT:  And nobody's threatened you or promised

5    you anything to get you to admit them?

6              DEFENDANT:  No.

7              THE COURT:  All right.  I find the defendant has

8    knowingly and voluntarily admitted the violations as alleged,

9    and I assume both sides agree that revocation is required.  And

10   given that, I'll find that you violated your release terms, that

11   revocation is really the only realistic alternative, so I'll

12   revoke supervised release as of today.

13             And if nobody objects to the guideline calculations,

14   they are Grade A, Criminal History VI, 33 to 41 months range

15   with 24 months statutory maximum, and one to three years

16   supervised release less any period of imprisonment.  And then

17   there's a $50 assessment, which is an unsatisfied condition.

18             And then on the new case, Mr. Uller, you've gone over

19   the presentence with your client, I assume?

20             MR. ULLER:  Yes, Judge.

21             THE COURT:  And do you have any objections to

22   anything?

23             MR. ULLER:  No.

24             THE COURT:  And you waive full reading of supervision

25   conditions?

1          MR. ULLER:  We do, Your Honor.

2          THE COURT:  And the Government, any objections?

3          MR. TAIBLESON:  No, Your Honor.

4          THE COURT:  All right.  Then, I'll adopt the facts in

5     the P.S.R..  The guidelines are Level 39, Criminal History VI,

6     240 months range, two years to life supervised release, 50,000

7     to 250,000 fine, $100 assessment.

8          And if we're ready to proceed to sentence, Mr. Uller,

9     I'll hear from you and/or your client, and then I'll here from

10    Mr. Taibleson.

11         MR. ULLER:  Thank you, Judge.  Ordinarily, I wouldn't

12    submit 50 pages of materials to a Court in advance of

13    sentencing.  I think doing so in this case is important.  While

14    the Government doesn't really draw a distinction, the reality is

15    that not all terrorism cases are the same.

16         There are cases where defendants are actual terrorists

17    and inflict or try to inflict mass pain and suffering and fear.

18    And then there are cases like this where people like Mr. Ludke

19    who were, perhaps, sympathetic to an ideology, get caught up in

20    a moment of relatively, I will concede, waywardness.  This case

21    is the later.  And Mr. Ludke while certainly not a saint is not

22    a terrorist.  He's not a threat to national security.

23         Looking at the conduct he engaged in in this case, he

24    never talked about violence.  He never talked about Jihad or

25    killing people.

4

1          Many of ISIS's attacks have been domestic acts of

2     really random violence.  We look at the post-nightclub shooting

3     in Orlando; San Bernardino shooting in California, attacks in

4     Manchester; Nice, France.  These were crimes committed by people

5     with a will to hurt other people, and that's not who we're

6     dealing with.

7          Every indication is that Jason Ludke, like so many

8     other disillusioned people, was drawn to this idea of a utopian

9     caliphate.  We're, obviously, dealing with someone who's

10    mentally ill.

11         The story of how Jason Ludke became who he is and as

12    mentally ill as he is is as sad as any I've seen.  I understand

13    he's not someone that most people look at and feel that he's a

14    sympathetic figure.  I find it impossible not to feel sympathy

15    for him.  He was abused as a fetus and born into this unwelcome

16    and harmful environment.  He didn't stand a chance in life.  He

17    was physically and emotionally abused, neglected at

18    unprecedented levels.

19         So it's not really a surprise that within months of

20    becoming an adult, for purposes of Wisconsin's criminal justice

21    system, he was branded a criminal.  It's not a surprise that

22    once he was in the criminal justice system, he was imprisoned.

23    And it's not a surprise that given his low functioning, he

24    couldn't get out of the system's grip.

25         In its sentencing memorandum, the Government claims

5

1    that both Ludke's offense and his record could hardly be worse.

2    That's just not true.  I'm not going to justify his crime.

3    Mr. Ludke doesn't justify his offense.  But the suggestion that

4    this is a serious offense possible is preposterous.

5           As to his criminal record, we've submitted that his

6    criminal record is overstated.  And the reality is that the

7    Court, this Court, sees people with worse criminal records on an

8    almost daily basis.

9           It comes down to the fact that Mr. Ludke had some

10   significant limitations, and we can understand why.  His crimes

11   are manifestations of those limitations.  He doesn't know how to

12   cope, and he doesn't know how to express himself.  He ends up

13   saying some crazy things that understandably scare people, but

14   the vast majority of those things are nothing more than hot air.

15          The Government says that Mr. Ludke hates non-Muslims.

16   Jason Ludke doesn't hate anybody.  He's worked effectively with

17   this Jewish lawyer for over two-and-a-half years.  He's worked

18   effectively with Mr. Phillips for almost ten years.  He may have

19   some gripes with U.S. policies, and he has a complex as a

20   political prisoner.  But I can understand why Mr. Ludke feels

21   that way.  He's struggled his entire life to assimilate.

22          It's an identity that he's really imparted on himself.

23   He's a complicated person, Judge.  And the goal of sentencing

24   isn't trying to make sense out of him.  The goal is to determine

25   whether he's a danger of harming other people, and he has a

1    40-year track record of not doing so.  It's just not who he is.

2    He doesn't just lack the capacity or wherewithal to hurt people.

3    He lacks the sophistication to do so in a manner that the

4    Government believes he's a threat.

5            He's likely in the future undoubtedly to say something

6    stupid.  He's likely to say something that's going to scare

7    people, but the bottom line is that he's unlikely to engage in

8    violence in the future because he's never engaged in violence

9    thus far.

10           For -- Based on all the factors and the sentencing

11   memorandum that we've provided to the Court, the social history

12   we provided to the Court, the presentence report, factors under

13   3553, Your Honor, a sentence of five years in this case is

14   sufficient but not greater than necessary.

15           There are few, I guess, logistical things that we're

16   asking for.  We're asking that he be designated to the

17   Mid-Atlantic Region within the Bureau of Prisons.  We're asking

18   that the address on the judgment be a family member's address in

19   that region, and that's to facilitate a smoother release than he

20   dealt with during his last period of release.  That address is

21   438 South Spencer Road in Campton, Kentucky, Zip Code 41301.

22   And we're also asking that the judgment include, as the

23   Indictment does, under his name his A.K.A., and that's Muhammad

24   Abdun Nassir.

25           Judge, we're asking in addition to the five-year

7

1   sentence that the Court imposes in -- in the new case, the

2   16-CR-175, we're asking for the supervised release conditions

3   that in addition to what's in the presentence report, the

4   special conditions that we've identified in the defense's

5   sentencing memorandum.  Those also go to great length to

6   minimize the danger that Mr. Ludke's presence in the community

7   might hold.

8          Finally as to the revocation, we're asking that the

9   Court impose a two-year sentence in that case and run it

10  concurrent to the sentence it has imposed on 16-CR-175.  The

11  Government has indicated to us it doesn't take a position on

12  whether the revocation be concurrent or consecutive, so we're

13  asking the Court run it concurrent given the overlapping conduct

14  between the two matters.  Thank you, Your Honor.

15          THE COURT:  So what's the name of that town in

16  Kentucky again?

17          MR. ULLER:  Campton, C-a-m-p-t-o-n.

18          THE COURT:  What's the Zip Code?

19          MR. ULLER:  40301.

20          THE COURT:  I don't quite understand this address

21  business.  That's -- that's -- You want that address on there,

22  is that the idea on the -- on the charges?  I mean, isn't this

23  sort of what, kind of a technical matter?

24          MR. ULLER:  Yeah, I think it's to -- When the Bureau

25  of Prisons -- If the address listed for him is a Green Bay

8

1    address, which it currently is, his release will be processed

2    through Green Bay.  And given the concerns about, you know,

3    Green Bay's sex offender limitations, you know, Mr. Ludke spent

4    his community time in Green Bay living in the county jail.

5            THE COURT:  Okay.  What's the -- What's this A.K.A.?

6    It's Michael?

7            MR. ULLER:  Muhammad Abdun, A-b-d-u-n, Nassir,

8    N-a-s-s-i-r.  I believe it's on the Indictment.

9            THE COURT:  Okay.

10           MR. ULLER:  Mr. Ludke, Judge, over the course of after

11   his previous sentencing, he submitted several requests to the

12   Court to amend the judgment to include that name.  I guess I'm

13   sort of hoping to preemptively have the judgment reflect that

14   largely to -- for both his sake, but also so the Court may not

15   have to deal with repeated pro se requests to -- to modify

16   things.

17           THE COURT:  The second name is A-b-u-d, is that it?

18           MR. ULLER:  A-b-d-u-n.

19           THE COURT:  All right.

20           MR. ULLER:  It's listed in the revised presentence

21   report on page 2.

22           THE COURT:  All right.  Does your client want to say

23   anything?

24           MR. ULLER:  I believe so, Your Honor.

25           DEFENDANT:  Judge Adelman, I take responsibility for

9

1   my actions.  I know I messed up, man.  And I did a lot of things

2   irrationally.  I don't want to sit here, like, and recite you a

3   bunch of empty excuses that I imagine you've probably heard over

4   all the years.  My attorney's kind of summarized a lot of my

5   issues going on, and I apologize to you, man.  I apologize to

6   Mr. Taibleson and the Government for me being inicolated (sic)

7   as propaganda, things on line.  And it just got to, like,

8   disillusioning my whole vision about our problems in life, and

9   it skewed my whole world.

10          And this time has really let me sit down and kind of

11   evaluate how irrational I was acting out there, and I just fell

12   into a big downward spiral, man, and it just went out of

13   control.  So with that, I apologize, man, and I accept my

14   punishment, you know.

15          THE COURT:  Okay.  Thank you.

16          MR. TAIBLESON:  Thank you, Judge.  As Your Honor

17   knows, it is rare for our office to recommend a statutory

18   maximum term of imprisonment.  I never have until today.  But a

19   statutory maximum term of imprisonment is necessary here.  It's

20   necessary here because Jason Ludke has spent the last 20 years

21   proving that if he is not in prison, he's hurting or trying to

22   hurt or terrorizing other people.

23          I'm going to say a little bit about his offense of

24   conviction, his relevant conduct, his criminal history by way of

25   getting at the nature and circumstances of the offense, and the

1   history and characteristics of the defendant.

2          His offense of conviction is about as bad as it gets.

3   ISIS circle when he was trying to join was wholesale

4   slaughtering people.  As the supreme court says, the material

5   support statute is on its face about preventing attacks.  This

6   is not about an attack itself, of course, or otherwise we'll be

7   dealing with a very different situation with respect to the

8   statutory maximum and the Government's approach here.

9          It doesn't mean it's not real.  It is not theater.  It

10  was very real.  Mr. Ludke was not just a teenager mouthing off

11  in an on-line discussion board.  He went to great lengths.  He's

12  a man in his mid-30's who went to great lengths to try to join

13  ISIS, cutting off the bracelet he was wearing because he was on

14  federal supervision, and traveling over the course of days to

15  Texas to try to cross to Mexico to try to fly to the Middle East

16  to join ISIS.

17         You know, a bank robber who might have a momentary

18  lapse in impulse control for 15 minutes might commit a bank

19  robbery.  This was days of him very intentionally trying to get

20  to the border so he could fly to the Middle East.

21         The history of characteristics of the defendant.  He's

22  a Category VI even without the terrorism enhancement.  That is

23  an astonishing achievement for someone who has only spent a

24  matter of months out of custody in the last 20 years.

25         His criminal history includes, as Your Honor is aware,

1   sexually assaulting a little girl, threatening to kill Chief

2   Judge Griesbach, threatening to kill Judge Griesbach's family

3   and his staff.  That is why he's a Registered Sex Offender

4   because he sexually assaulted that little girl when he was in

5   his twenties.

6        He argues that his property crimes are petty.  They

7   include stealing a car.  It's a fairly serious offense.  There's

8   no doubt that Mr. Ludke had an awful childhood and is deserving

9   of our sympathy, and that is relevant to the extent that it

10  affects Your Honor's interest in retribution when choosing a

11  sentence, which I can candidly probably is not a primary

12  motivator in this courtroom in any event.

13       Okay, maybe he is deserving of our sympathy and so

14  deserves less retribution because his childhood rendered him

15  such that he cannot control himself from behaving this way.  If

16  that is right and he cannot control himself, he cannot stop

17  himself from doing things like sexually assaulting children and

18  trying to join ISIS and threatening to kill judges and their

19  families, then he must be incapacitated.  He must be in prison,

20  if all that is right.

21       Relevant conduct.  If we were to draw up ex-ante, the

22  worst possible relevant conduct a defendant could commit after

23  being incarcerated for trying to join ISIS, we might imagine

24  that he tried to kill the F.B.I. agent who stops people from

25  joining ISIS, and that is what he did.  He attempted through

1   sending multiple letters through other inmates, through meeting

2   with an undercover source, to have an F.B.I. agent murdered.

3   His response to being stopped from joining ISIS was not

4   contrition.  It was a new attempted murder.

5        There may be cases where it makes sense to vary, for

6   policy reasons, from the terrorist enhancements.  This is not

7   it.  Multiple courts have said that the variety of material

8   support in which an individual attempts to join an organization

9   himself is, perhaps, the most aggravated version of this

10  offense, worse than just giving money.

11       The Government submits he is a relatively aggravated

12  offender.  Again, he was not arrested in his basement where he

13  was posting mean language on line.  He traveled across the

14  entire country after cutting off his supervision bracelet to do

15  this.  The worst possible offense of conviction.  The worst

16  possible criminal history.  The worst possible relevant conduct.

17       It is a tragedy that a 240 month sentence is necessary

18  here.  It is absolutely necessary here to stop him from hurting

19  people.  The Government also submits that a life term of

20  supervised release is necessary thereafter.  Thank you.

21       THE COURT:  Okay.  Thank you.  Okay.  I considered the

22  3553(a) factors, which include the nature and circumstances of

23  the offense, history and characteristics of the defendant, the

24  needs of the public and any victims, the sentencing guidelines

25  and policy statements and the avoidance of unwarranted

13

1    disparity.

2           I must then impose a sentence sufficient but not

3    greater than necessary to comply with purposes of sentencing,

4    which are just punishment, deterrence, protection of the public

5    and rehabilitation of the defendant.

6           As to the nature of the offense.  In September 2016,

7    an F.B.I. undercover employee received a friend request from the

8    defendant who was using the name Abuz Sayyaf on social media,

9    and the undercover employee accepted the friend request and

10   thereafter had a private conversation with the defendant during

11   which defendant stated that he is from the United States and

12   wanted to make hijdra, which is migration away from darul kufr,

13   the land of the infidel.

14          On September 28, 2016, the defendant had another

15   private conversation with the undercover employee during which

16   he stated he was making plans to come there but was traveling

17   first to Mexico.  And defendant said he had family in Mexico,

18   and he'll be able to purchase papers to travel.

19          The defendant and the undercover employee exchanged

20   e-mail addresses, and the defendant sent two pictures of himself

21   to the undercover employee's e-mail address.  The defendant told

22   the undercover employee that he had training in jiu-jitsu and

23   computers, which defendant believed would be a benefit to ISIS

24   once he joined.

25          The defendant also stated that his co-defendant,

1   Yosvanni Padilla-Conde, had received firearms training while in

2   the Cuban military, and that defendant believed that

3   Padilla-Conde's firearms training would benefit ISIS.  Both of

4   those statements appeared to have been false.

5          On September 28th of 2016, the defendant had a voice

6   chat with the undercover employee and said that he had a

7   brother-in-law in Mexico who can help them get from the United

8   States and into Mexico.  And the undercover employee asked the

9   defendant to wait for further instructions before making any

10  attempt to leave the United States.

11         The defendant agreed to wait while the undercover

12  employee consulted with persons who can help defendant get into

13  Raqqah, Syria and then into Mosul, Iraq.  The defendant uttered

14  the Islamic creed, pledged his allegiance to the leader of ISIS,

15  stated that he wants to live under Shariah law, that he rejects

16  tyranny and Kuffar, which is infidels, and that he believes in

17  Al-Wala'wa Al-Bara', love Muslims and hate infidels for Allah's

18  sake, and that he is ready to make Hijrah, migration, to join

19  ISIS as he knows they are on the path of Haq, which is truth.

20         On September 29, 2016, the defendant sent a video to

21  the U.C.E. in which he made similar statements.  Later on

22  October 1, 2016, the defendant appeared in a video recorded and

23  sent to the U.C.E. by the co-defendant in which the co-defendant

24  swore allegiance to ISIS and expressed his intent to travel to

25  the Middle East to join ISIS.  In the second video, defendant

1    supports and endorses this co-defendant's intent to join ISIS.

2           On October 3, 2016, the undercover employee got an

3    e-mail from the defendant saying, "Brother we making Hijrah so

4    just update me if ikhwan have brothers Mexico I can talk to for

5    help.  Was salaam."

6           Two days later, the U.C.E. or undercover employee, I

7    should say, conducted an on going e-mail conversation with

8    defendant and defendant informed the undercover employee that he

9    was traveling in Texas and was on his way to El Paso.  The

10   defendant stated that his brother-in-law, a Palestinian Muslim,

11   advised that he go to El Paso in order to cross into Mexico.

12          On October 5, 2016, law enforcement located defendant

13   and Padilla-Conde in San Angelo, Texas heading southwest -- I'm

14   sorry -- southeast towards the Mexican border.  The defendant

15   was arrested on an outstanding warrant from Milwaukee for

16   violating his supervised release, which he was on for this

17   conviction for writing threatening letters to Judge Griesbach.

18   And he'd been on GPS monitoring, but he cut off his bracelet

19   before leaving Wisconsin on route to Mexico.

20          And then on June 5, 2017, the F.B.I. got information

21   via the U.S. Marshal Service that defendant, while detained on

22   the instant offense and on revocation of the supervised release,

23   was attempting to initiate a plot to kill the undercover

24   employee.  Specifically, he was trying to get fellow inmates to

25   send letters out of the jail for him and to make phone calls to

1  outside parties for him with the aim of convincing outside

2  parties to utilize social media to arrange for this homicide.

3          On June 15, 2017, the F.B.I. took possession of two

4  letters that defendant gave to a fellow inmate at the Dodge

5  County Detention Facility.  The defendant asked him to send the

6  letters to someone on the outside on defendant's behalf.  But

7  instead of doing that, the inmate turned the letters over to law

8  enforcement.  In one letter, defendant says he got busted

9  because a fake Muslim on line had set him and his co-defendant

10  up.  The letter included a name for the targeted undercover

11  employee and said to the reader, "You know what to do."  The

12  letters further instruct the reader to destroy his or her phone

13  status and sims card after receiving the letter.  The letter --

14  That letter bears the signature Abu Syyaf and is dated January

15  20, 2017.

16          The F.B.I. also obtained an audio recording of a

17  conversation between the defendant and a face-to-face visitor,

18  which occurred at the Dodge county facility on September 6,

19  2017.  Although defendant and the visitor used coded language

20  during the conversation, investigators believe it is apparent

21  that they are discussing a plan to kill the undercover employee.

22          In a statement to the presentence writer, the

23  defendant cited, "I admit that in approximately September 2016,

24  I began communicating with individuals I thought were associated

25  with ISIS.  I admit that I conspired with my roommate,

17

1   Padilla-Conde, to try to go overseas to join the ISIS group.  I

2   am sorry.  I apologize for my irrational behavior, and I accept

3   responsibility for my poor decisions and irrational decision

4   making."

5          According to the defense, the brother-in-law referred

6   to in the offense conduct, who was the individual that the

7   defendant planned to meet in Mexico, was the ex-boyfriend of the

8   defendant's sister, and that person had previously been deported

9   from the United States.

10         So turning to the character of the defendant.  He's

11  38.  He's got a lengthy record dating back to 1998 as set forth

12  in Paragraphs 39 to 47 of the P.S.R..  Earlier matters involved

13  thefts and burglaries.  But more seriously in 2002, he was

14  convicted of second degree sexual assault of a child arising out

15  of an incident in which he gave a 14 year-old girl vodka so that

16  he could take advantage of her sexually.

17         In 2010, the defendant was convicted of mailing

18  threatening communications based on letters he sent from the

19  Brown County Jail threatening to kill Judge Griesbach and his

20  staff and bomb the courthouse.  When authorities searched his

21  cell, they found several letters addressed to other federal

22  judges which contained similar threats.

23         In June 2009 prior to the letters being sent, the

24  defendant had been interviewed by an agent from the F.B.I.

25  regarding a bank robbery.  The defendant told the agent he was

1    planning to renounce U.S. citizenship and join Hizballah group

2    in Iran.  He further stated that prior to that term of

3    incarceration in the Brown County Jail, he had bought guns,

4    explosives and bullet proof vests in order to rob a bank, the

5    proceeds of which he would use to establish a Muslim community

6    to target the United States government, specifically to bomb

7    federal offices and army recruiting centers.

8            Investigators interviewed a number of other

9    individuals in regard to the defendant's statement about

10   purchasing explosives, firearms and bullet proof vests, and they

11   were unable to find any evidence that he'd actually done any of

12   these things.

13           Defendant's federal prison term for the threat case

14   began when his state prison term ended on November 22, 2013.

15   Prison records show that defendant recorded no disciplinary

16   violations while he was in federal prison.  He was placed in a

17   halfway house in November of 2015, and he was found in

18   possession of a cell phone, which had nude photographs.  And

19   shortly thereafter in January of 2016, he absconded from the

20   facility, and he was apprehended three days later, and he was

21   put in the Brown County Jail until he was released in March

22   of 2016.

23           And then in March of 2016, the court added a condition

24   requiring 120 days at a residential re-entry center due to

25   defendant's earlier termination from the halfway house in order

19

1   to assist with his re-entry.  The defendant obtained employment

2   at Tufco Technologies in Green Bay.

3            On April 6, 2016, he failed to report back to the

4   facility after his work shift at Tufco ended.  He reported the

5   next morning in violation of his schedule.  And then on

6   April 30th, he reportedly became angry while working his shift,

7   and he walked off the job and then he failed to report back to

8   the facility and he absconded from supervision.  And then he was

9   apprehended by a Fugitive Task Force on May 12th of 2016.

10           Then on June 2016, he appeared before the court for

11  revocation hearing, and he was continued on supervised release

12  with the condition that he reside up to 180 days in the Rock

13  County -- I'm sorry -- the Rockey Valley Community Program

14  Transitional Housing Facility.

15           On July 26, 2016, the condition was further modified

16  holding the remaining time in abeyance and imposing GPS

17  monitoring for up to 180 days.  And then he was placed on GPS

18  monitoring the next day and he had some violations for being out

19  of range for short periods of time and he didn't submit activity

20  logs and he traveled to unauthorized addresses twice.

21           But then on October 2nd, he -- That's when he removed

22  his bracelet without permission and he absconded and then nobody

23  knew where he was, and he was arrested in Texas as I've

24  described on October 5th.  And so these violations form the

25  basis for the revocation on the '09 case.

20

1              So the presentence report and the defendant's social

2      history report describe defendant's very difficult childhood.

3      He lived with his mother to the age of five when he was placed

4      in foster care due to his mother's substance abuse issues and

5      her neglect.  The defense reports details the numerous -- The

6      defendant's report details the numerous instances in which the

7      authorities were contacted.

8              When the defendant was eight, he went to live with his

9      father.  His father, apparently, didn't drink or use drugs, but

10     he was physically abusive.  According to the defendant's sister

11     Jennifer, their father started kicking the defendant out of the

12     house when he was under the age of ten.  The father would tell

13     the defendant, "I fucking hate you, I wish you were dead."

14     Sometimes when the father kicked the defendant out, he would go

15     stay with their mother, but the mother -- her alcohol abuse

16     would continue.  And that the father, according to the sister

17     Jennifer again, the father frequently beat both her and Jason.

18             Defendant's mother died in 2017.  And his father

19     indicated that the defendant isn't a terrorist, that he believes

20     his son's conversion to Islam was a result of being incarcerated

21     for so long.  The father theorized that the son might hate the

22     United States because the amount of time he's been in prison.

23     He added that his son was in prison for most of his life.  And

24     when he was in the community, he struggled to find a place to

25     live because he had the sex offender tag based on the previous

1    incident.

2          Despite this, he believed that his son did well in the

3    community for a while noting that he was able to maintain some

4    type of employment.  Defendant's father further stated that

5    defendant had a difficult childhood, and his mother was an

6    alcoholic.

7          Defendant has no children.  He's not involved in a

8    relationship.  He denied being involved in a relationship prior

9    to his arrest for the instant offense.  He hopes to live with

10   his maternal aunt, Linda Hall, in Kentucky when he's next

11   released from prison.

12         So there are definite correctional treatment needs

13   here including mental health discussed in Paragraphs 74 through

14   76 of the presentence.  The defendant also has substance abuse

15   issues, mostly marijuana, as indicated in Paragraphs 80 through

16   86.  The defendant did get a high school equivalency degree in

17   2005, and he completed some programming in state and federal

18   prison as indicated in Paragraph 88.  But his work record in the

19   community is pretty limited, which isn't that surprising given

20   how much time he spent in custody.

21         The guidelines default to 20 years, which is what the

22   Government recommends.  Let me first address the guidelines

23   recommendation, and then I'll turn to the 3553(a) factors and

24   the specific arguments of the parties.

25         In cases relating to federal crimes of terrorism,

1    guideline 3A1.4 requires that the offense level be increased by

2    12.  And if the resulting level is less than 32, that it be

3    increased to 32.  The guideline further provides that the

4    Criminal History Category be deemed six regardless of the

5    defendant's prior record.  This means that a defendant in a

6    2339B case will face a guideline range of 360 months to life,

7    well in excess of the statutory maximum of 20 years regardless

8    of what he specifically did and regardless of whether he has no

9    prior record or a terrible record.

10          In this sense, guideline 3A1.4 resembles the Child

11   Pornography Guideline, which has been roundly criticized by the

12   courts in that it recommends sentences near or above the maximum

13   even in mine-run cases.  This is contrary to the purposes of

14   sentencing in 3553(a), including the notion that sentences

15   should be individualized and proportionate, and that we should

16   distinguish between the worse offenders and those who are less

17   dangerous.  See *United States v. Dorvee*, D-o-r-v-e-e, 616 F.3rd

18   174 at 186-87, (2nd Cir. 2010).

19          As the one court has noted in discussing this

20   guideline, material support cases can involve a wide range of

21   conduct.  Yet guideline 3A1.4 results in a nearly identical

22   guideline range in each case regardless of the underlying

23   conduct.  *U.S. v. Jumaev*, J-u-m-a-e-v, 2018 U.S. District Lexus

24   119, 916 at 28-29 (D. Colo. July 18, 2018).  As the *Jumaev* court

25   further noted, this guideline was enacted pursuant to a

23

1    congressional directive.  And absent the empirical evidence,

2    such guidelines do not exemplify the commission's exercise of

3    its characteristic institutional role, see *Kimbrough,*

4    *K-i-m-b-r-o-u-g-h, v. United States*, 552 U.S. 85 at 109, (2007),

5    and are generally entitled to less respect, see *United States v.*

6    *Reyes-Hernandez*, 624 F.3rd 405 at 418, (7th Cir. 2010), *United*

7    *States v. Tesillos*, T-e-s-i-l-l-o-s, 965 F.Supp.2d 1037 at

8    1040-41 (E.D. Wis. 2013).

9         That is a guideline that's based on the commission's

10   presumed expertise and its study of a particular issue is

11   treated with less respect than a guideline that was enacted

12   pursuant to a congressional directive and which is not supported

13   by any empirical evidence or any expertise applied by the

14   Sentencing Commission, which is presumably designated for that

15   role because of its expertise.

16        That said, I do find that a substantial prison

17   sentence is needed in this case to reflect the seriousness of

18   the offense, which is further aggravated by defendant's

19   post-arrest attempts to have somebody harm the F.B.I. agent.

20   The situation is further aggravated by the fact that defendant

21   committed the offense about six months after he was released

22   from federal prison and while he was on federal supervision.

23        Defendant also has a substantial prior record, and

24   he's been to prison several times, yet he continues to violate

25   the law.  He's in Category VI based on points without

24

1    considering guideline 3A1.2(b), and he has a poor history on

2    community supervision, so there is a need for specific

3    deterrence and protection of the public, and there's also a need

4    to deter others.

5         There's no doubt that ISIS has committed atrocities,

6    as the Government notes in its sentencing memo, and there's also

7    no doubt that ISIS attempts to recruit foreign nationals.  The

8    real issue here, it seems to me, is how seriously to take the

9    things the defendant says.  Whether it's a commitment to join or

10   fight for ISIS or an attempt to get someone to harm a federal

11   agent or whether it's a threat to a federal judge and his staff,

12   the defendant is plainly willing to say terrible and threatening

13   things.  But is he a danger to act on them?

14        As the Government notes, the defendant's conduct in

15   this case went beyond talk.  He cut off his GPS monitoring, and

16   he traveled from Wisconsin to Texas.  But where he was actually

17   going to go and what he was actually going to do after that is

18   not entirely clear.  He hadn't purchased any ticket to the

19   Middle East.  And as far as I can tell, he had no means or

20   specific plan to leave North America.

21        The defense memo argues with some force that he lacked

22   the capacity, sophistication and resources to do much of

23   anything helpful to ISIS.  He certainly appears to fall into the

24   category of "aspirational not operational" discussed in the

25   defense memo.  Put another way, Mr. Ludke was not ISIS's top

1    recruit.  We know he didn't actually hurt or attempt to hurt

2    anyone.  He didn't possess or attempt to possess any weapons.

3    He didn't acquire any weapons.  He didn't provide any weapons or

4    money or information to others to facilitate an attack.  It

5    appears that what he did say to the undercover employee about

6    how helpful he could be given his marshal training and his

7    co-defendant's firearms training was all hot air.  There's no

8    evidence that any of that stuff that he said to the agent was

9    true.

10          It further appears his communications were not with

11   actual ISIS members but with F.B.I. agents who had him under

12   surveillance.  Finally, it appears that much, if not most, of

13   what he said while detained was either delusional or boosting as

14   indicated on Page 9 of the defense memo.  No one seems to

15   believe, for example, that he participated in battles against

16   the Mexican Army, which is one of the things he said.

17          When the F.B.I. looked into the 2009 claim that he

18   bought guns, explosives and bullet proof vests in order to rob a

19   bank to obtain proceeds to establish a Muslim community to

20   target the U.S. Government, the F.B.I. wasn't able to find any

21   evidence that he purchased any of those materials or he'd done

22   anything along those lines.  Providing personnel, including

23   oneself, is no doubt serious as indicated in the cases cited on

24   Pages 4 and 5 of the Government's submission.  However, I don't

25   think we can say, as the Government does on Page 4 of its brief,

1   that the nature and circumstances of the offense could hardly be

2   worse.

3          As the Government correctly notes in the next

4   paragraph, 2339B covers a range of conduct.  And as the Seventh

5   Circuit has noted, sentencing judges should be aware of the

6   concept of marginal deterrence; that is, that the harsher

7   sentences should be reserved for the most culpable behavior;

8   otherwise, there's little room left above the defendant's

9   sentence for those who commit the offense in more harmful ways.

10  See *United States v. Newsom*, N-e-w-s-o-m, 402 F.3rd 780, 785-86

11  (7th Cir. 2005).

12         The parties list sentences imposed in other cases.

13  The *Jumaev* court also discussed the sentences imposed in other

14  cases.  I see an array of numbers, perhaps, reflecting the

15  different circumstances of each case.  It does appear that a

16  number of judges have declined to follow the guidelines in these

17  cases.

18         As I discussed earlier, following the guidelines in

19  cases like this would avoid disparity but only because just

20  about everybody gets maxed out.  Avoidance of disparity is a

21  factor I must consider, but it's hard to glean a lot from these

22  cases other than that material support cases can vary a lot in

23  their facts and severity.

24         Looking at the defendant's history, his prior record

25  includes the sexual assault case, which was a very serious

27

1    matter, but he does not have a history of violence.

2          His earlier priors are relatively minor property

3    offenses committed when he was a teen.  As defendant notes in

4    his memo, his more recent criminal conduct since the 2002-case

5    consists of saying things that are inappropriate as opposed to

6    doing things that are inappropriate or doing anything violent.

7          I'll also take into account the defendant's history

8    and characteristics.  Aside from his criminal record, likely

9    fetal alcohol exposure, neglect and abuse as a child, which is

10   detailed in the Defense Social History Report, then brushes with

11   the law as a teenager.  After he failed on probation, he was

12   sent to prison ending up in segregation where his mental health

13   deteriorated.  It was at that point that he discovered Islam.

14         There's reason to wonder how much of his conduct is

15   due to a desire to follow a particular strain of Islam and how

16   much is due to mental instability.  When he got out, sex

17   offender -- When he got out of jail, Sex Offender Registration

18   requirements made stable housing for the defendant nearly

19   impossible.  He ended up living with the co-defendant.  It also

20   appears that during this time he was using marijuana, and it was

21   at that point that he began communicating via social media with

22   this F.B.I. operative.

23         The defense memo indicates that he was vulnerable to

24   recruitment due to mental health issues, social isolation,

25   identity issues, and it appears that this defendant over the

1   years has identified with all kinds of religious or of different

2   religions, including Muslim, Jewish, Rastafarian.  So Mr. Ludke

3   has been, apparently, committed to different religions at

4   different times in his life.

5        So given these factors, I do think that treatment and

6   monitoring in the community, can ameliorate his risk of

7   re-offending.  I will as conditions of supervised release

8   include drug and mental health treatment and include a computer

9   monitoring program as recommended on Page 14 of the defense

10  memo.  Ultimately, I have to balance several things.  This is a

11  serious offense, no doubt about it, but defendant's conduct

12  falls toward the mitigated end of the spectrum.

13       The defendant has a lengthy record.  But the recent

14  violations appear to stem almost completely from mental

15  instability and social isolation rather than any violent or

16  predatory disposition.  And there is a need to promote respect

17  for the law and to deter others, but doing that without

18  succumbing to the temptation of using this defendant as a means

19  for expressing our horror and outrage at what ISIS has done.

20       So under all the circumstances, I find the total

21  sentence of 84 months sufficient but not greater than necessary

22  to satisfy the purposes of sentencing.  This sentence is based

23  on 3553(a), would be the same regardless of the guidelines.  The

24  violations in 09-CR-222 are based on the same conduct as in

25  16-CR-175, and I see no need to impose consecutive time, see

29

1    *U.S. v. Husko*, H-u-s-k-o, 275 F.3rd 600 at 603, (7th Cir. 2001).

2              I've considered as an aggravating circumstance

3    defendant's status on supervision.  And the total sentence I've

4    imposed is sufficient to punish, protect the public and deter.

5    Therefore, the defendant is committed to the Bureau of Prisons

6    for 84 months in Case No. 16-CR-175, and 24 months in Case No.

7    09-CR-222 running concurrent.

8              I recommend that he be placed in the Mid-Atlantic

9    Region as requested.  Based on his financial condition, I'm not

10   going to impose any fine.  Upon release, he's on supervised

11   release for ten years in 16-CR-175.  I want to impose a lengthy

12   term to ensure that he's monitored, treated and gets a

13   legitimate job.

14             While he's on release, he can't commit any crimes.  He

15   can't illegally possess or use any controlled substances.  And

16   from the P.S.R., he has to comply with Conditions 1 through 15

17   with any payments conditioned on ability to pay.  The defendant

18   shall also allow the probation officer to install computer

19   monitoring software on any computer as defined in 18 U.S.C.

20   1030(e)(1) that he uses.  To ensure compliance with the computer

21   monitoring condition, the defendant must allow probation to

22   conduct initial and periodic unannounced searches of any

23   computers subject to computer monitoring.

24             The defendant must warn any other people who use these

25   computers that the computers may be subject to searches pursuant

1    to this condition.   The defendant shall pay all costs of

2    participation in the computer monitoring program conditioned on

3    his ability to pay.

4            Special assessment is $100 due immediately in Room

5    362.   The defendant has a right to appeal if he thinks there's

6    something unlawful.   Counsel has a duty to advise him of his

7    right, and he knows the appeal has to be filed within 14 days of

8    the entry of judgment.

9            If the defendant wants to appeal, can't afford to, he

10   can ask for leave to appeal as a poor person.   And as to the

11   other requests about the defendant's name and family address,

12   those -- I'll grant those.   Anything further?   Okay.   Thank you.

13   Good luck to you, Mr. Ludke.

14            (Whereupon proceeding was concluded.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


       I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter

for the United States District Court for the Eastern District of

Wisconsin, do hereby certify that the foregoing pages are a true

and accurate transcription of my original machine shorthand

notes taken in the aforementioned matter to the best of my skill

and ability.


Signed and Certified March 4, 2019.

/s/Susan Armbruster

Susan Armbruster


            Susan Armbruster, RPR, RMR
          United States Official Reporter
         517 E Wisconsin Ave., Rm 200A,
            Milwaukee, WI 53202
       Susan_Armbruster@wied.uscourts.gov

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )      Case No. 16-CR-175
                                   )      Milwaukee, Wisconsin
      vs.                          )
                                   )      August 7, 2019
YOSVANG PADILLA-CONDE,             )      1:35 p.m.
                                   )
                 Defendant.        )
                                   )
----------------------------------------------------------------

**TRANSCRIPT OF SENTENCING**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:
  For the Plaintiff
  UNITED STATES OF AMERICA:     United States Department of
                                Justice
                                By: Benjamin P Taibleson
                                Office of the US Attorney
                                517 E Wisconsin Ave - Rm 530
                                Milwaukee , WI 53202
                                Ph: (414)297-1727
                                Fax: (414)297-1738
                                benjamin.taibleson@usdoj.gov
  For the Defendant
  YOSVANG PADILLA-CONDE:        Kohler Hart Powell SC
  (Present)                     By: Craig S Powell
                                735 N Water St - Ste 1212
                                Milwaukee, WI 53202-4105
                                414-271-9595
                                Fax: 414-271-3701
                                Email:
                                Cspowell@kohlerhartpowell.com

  U.S. Probation Office:        Maria Mahmoudi


  U.S. Official Reporter:       SUSAN ARMBRUSTER, RPR, RMR,
  Transcript Orders:            Susan_Armbruster@wied.uscourts.gov

 Proceedings recorded by computerized stenography,
 transcript produced by computer aided transcription.

1

1                    P R O C E E D I N G S

2            THE COURT:  Case No. 16-CR-175, U.S. v. Yosvany

3    Padilla-Conde.  Appearances, please.

4            MR. TAIBELSON:  Good afternoon, Your Honor.  Benjamin

5    Taibelson for the United States.

6            PROBATION AGENT:  Good afternoon.  Maria Mahmoudi on

7    behalf of the probation office.

8            MR. POWELL:  Yosvany Padilla-Conde in person with

9    Attorney Craig Powell.  Good afternoon, Your Honor.

10           THE COURT:  Okay.  Mr. Powell, have you gone over the

11   presentence with your client?

12           MR. POWELL:  I have.

13           THE COURT:  Any objections?

14           MR. POWELL:  No, sir.

15           THE COURT:  You waive reading of the supervision

16   conditions?

17           MR. POWELL:  I do, Your Honor.

18           THE COURT:  Government, any objections?

19           MR. TAIBELSON:  No, Judge.

20           THE COURT:  Okay.  I'll adopt the facts in the PSR.

21   The guidelines are level 37, Criminal History II, 235 to 240

22   months range, two years to life supervised release, 40,000 to

23   250,000 fine, $100 assessment.

24           If we're ready to proceed to sentence, Mr. Powell,

25   I'll hear from you and/or your client.

1          MR. POWELL:  Thank you, Your Honor.  I filed a

2    memorandum with the Court.  I'll do my best not to repeat much

3    of what I provided the Court in there, but Mr. Padilla-Conde is

4    here today, Your Honor, stands before you for the crime of

5    aiding and abetting Jason Ludke's attempt to provide material

6    support to ISIS.

7          The Government has asked this Court to treat

8    Padilla-Conde like a real terrorist and imprison him for 20

9    years.  But when you do that they, in my estimation, fail to

10   acknowledge Mr. Padilla-Conde's individual characteristics and

11   the actual conduct and circumstances of the offense and how

12   those ought to set him apart from aggravated cases of this type.

13         In short, I think the Government treats these offenses

14   as one size fits all.  And anyone convicted under this

15   particular statute, the material support statute, should receive

16   20 years, but I think that's antithetical to the law regarding

17   the imposition of individualized sentences.  I think it flies in

18   the face, Your Honor, of the fact that this is about as

19   mitigated of a material support case as you can get.

20         Mr. Padilla-Conde was not and is not a terrorist.  He

21   was not and is not a sympathizer to extreme Islam viewpoints,

22   and he did not try to join them in 2016.

23         When he was arrested, he was not a danger to the

24   community then in 2016, and as he sits here today, Judge, he's

25   not a danger to the community now.

3

1          We look at the history and characteristics of

2    Mr. Padilla-Conde.  You see what I would describe as a very

3    rough childhood.  He was born in Cuba, and his father was shot

4    and killed when he was very young, nine years old.

5          At that time, his mother and father had divorced, and

6    his mother had remarried, and his stepfather did not allow him

7    to attend his biological father's funeral, which was toward the

8    beginning of an abusive pattern by that first stepfather.  And I

9    say first because as the PSR notes, Mr. Padilla-Conde's mother

10   engaged in what is best described as serial marriages and

11   divorces and relationships that lent Mr. Padilla-Conde's

12   childhood to great upheaval and no stability whatsoever.

13         He came to the U.S. when he was, I believe, nine or

14   ten years old and moved from Florida to Louisville to Las Vegas

15   to Milwaukee to Cleveland back to Milwaukee, always moving,

16   never stationary, never with the same family structure, and that

17   sort of instability really had a deleterious effect on

18   Mr. Padilla-Conde.  He was abused by several of these boyfriends

19   and husbands and reacted by running away at various points in

20   time.

21         One of those instances, as the PSR notes, was in

22   Louisville when he ran away from home and was offered the

23   assistance by a taxi cab driver who then took advantage of him

24   and sexually abused him.

25         Ultimately in one residence in Cleveland,

4

1   Mr. Padilla-Conde ran away from there and made his way here to

2   Milwaukee where he was placed in foster care, and those agencies

3   got in contact with his mother who then came to Wisconsin to be

4   with him.

5           As I noted in my sentencing memorandum by then, I

6   think a lot of the damage to this young developing child had

7   been done.  He was developing mental health issues and extreme

8   impulsivity issues, and he found himself in the criminal justice

9   system, the juvenile justice system, at the age of 14 after

10  being engaged in operating motor vehicle without owner's consent

11  and armed robberies, crimes he committed with BB guns.

12          Still, serious and dangerous crimes; although, not

13  deadly crimes based on the weapons he had with him at the time,

14  but he struggled there on supervision, and he was in juvenile

15  detention, secure detention, for a couple of years at Lincoln

16  Hills.

17          As the PSR notes, he struggled in the rehabilitative

18  component of the juvenile program for a long time.  But when he

19  was released, he was back now in the adult system even though he

20  was by all other legal standards a child at the age of 17, was

21  involved in another armed robbery where he was the lookout.  And

22  for that infraction and crime, he was sent to adult prison again

23  at a very young age.

24          There are pluses and minuses to that particular period

25  of confinement.  The plus, if there is one, is that his mental

5

1   health issues were finally recognized, Your Honor.  He spent

2   some time at this Wisconsin Resource Center where they diagnosed

3   him with depression and paranoid schizophrenia and sought to

4   help him about through medication to address those issues.

5          He did show some improvement there.  The prison is

6   also, however, where he met Jason Ludke who at the time had

7   converted to Islam.

8          Mr. Padilla-Conde was raised of the Christian faith, a

9   Catholic from the young age, and he joined with Mr. Ludke and

10  converted to Islam.  And for the most part, as I write in the

11  sentencing memorandum, that was positive for Mr. Padilla-Conde.

12  He was released after serving five years.

13         His initial reentry was a little rough, and he was

14  revoked relatively quickly, but he was released again in 2013,

15  and then you saw some forward movement and progress by

16  Mr. Padilla-Conde.  He met his wife, Brooke.  They had a child,

17  a son, and he was working when he could at various jobs and, you

18  know, keeping himself out of the criminal justice system.

19         Some people might say, well, he doesn't deserve a big

20  pat on the back for that.  But given his childhood at that point

21  and how he was doing, I think it was a forward momentum and

22  progress.

23         But as we note, one of the difficulties in his

24  employment situation then when he was married and trying to

25  raise a young family is that Mr. Padilla-Conde was ordered

6

1    removed after his adult armed robbery conviction.  But because

2    of the lack of diplomatic relations between Cuba and the U.S.,

3    he could not be deported.  So he had no legal status here.  He

4    would get occasional work permits to work, but those were not

5    always around, and he frequently lost jobs or left jobs due to

6    in part to that difficulty.

7         He was also still struggling with his mental health

8    issues and would occasionally revert back to substance abuse

9    issues, particularly alcohol and marijuana, which as the PSR

10   notes he had been using for some time as a matter of self

11   medicating.  So he was doing okay, but it wasn't terrific, and

12   his marriage was having some difficulties.

13        And in the midst of that, those difficulties in

14   employment and in his family life, Mr. Ludke reappeared fresh

15   out of federal prison for his threats to Judge Griesbach.  He

16   contacted Mr. Padilla-Conde saying he needed some place to stay

17   and live, and Mr. Padilla-Conde's wife was not too thrilled

18   about that given Mr. Ludke's history, his status as a registered

19   sex offender.  But Mr. Padilla-Conde took him in, and that

20   hailed the end of Mr. Padilla-Conde's marriage and the beginning

21   of the current troubles that have him seated before Your Honor

22   today.

23        That brings me to the nature and circumstances of the

24   offense for why we're here.  Again, that's, you know, Conde, you

25   know, aided and abetted Mr. Ludke's I call fanciful attempt to

7

1   join ISIS through Mr. Ludke's contact with this undercover

2   agent.

3          I think it bears noting that none of this was real,

4   Your Honor.  Mr. Ludke's contacts with this recruiter were an

5   undercover agent.  None of it was real.

6          Mr. Ludke would spend his time, it appears through

7   discovery, on various on-line cites and social media platforms

8   yelling from the mountain top that he believed in these extreme

9   views and wanted to travel somewhere, and that quickly and quite

10  easily caught the attention of an undercover agent with one

11  friend invite got in contact with Mr. Ludke.

12         I highlight it was Mr. Ludke in these conversations

13  because Mr. Padilla-Conde most certainly was not.  And when we

14  look through the discovery provided in this case, which included

15  downloads of Mr. Padilla-Conde's phones that showed his social

16  media use, his messaging apps usage, his web browser history,

17  there is not extremism within Mr. Padilla-Conde's views

18  appearing anywhere in these platforms up until basically right

19  before they leave on this trip to Texas.

20         There are frequent texts and websites and videos in

21  which Mr. Padilla-Conde denounces his view of ISIS or Al-Qaeda.

22  In one message on September 10th of 2016, mere weeks before they

23  leave, he responded to one person that chatted he did not count

24  them as Muslims.  There's visit to pages where he's looking at a

25  book entitled, The Persistent Threat:  The Evolution of Al

8

1    Qa'ida and Other Salafi Jihadists.  When he was arrested and the

2    agents went to talk to his wife, Brooke, she confirmed with the

3    FBI agent that he had no extremist views that she ever saw.

4         He would download and watch run-of-the mill lectures

5    by again run-of-the mill imams and lecturers, nothing extreme.

6    They contacted Linda Villarreal, who is one of Mr. Conde's

7    ex-girlfriends.  She made similar observations and comments

8    about Mr. Padilla-Conde's lack of harboring these extremist

9    views.

10        And Ms. Villarreal is an interesting person in this

11   situation because when Mr. Padilla-Conde was arrested in Texas,

12   Your Honor, he described to those agents that he was down there

13   in Texas to try to get to Mexico so he could try and begin some

14   semblance of a life down there without the difficulties that he

15   experienced here because of his immigration status.

16        His wife here had left him, and he couldn't work, and

17   so he thought that may be a way to restart.  Ms. Villarreal is

18   important in that respect because her grandparents owned a ranch

19   in Monterrey.

20        Mr. Padilla-Conde spoke to her about that.  She said

21   he could likely stay there if he could get into Mexico.

22   Mr. Padilla-Conde told the agents this.  They talked to

23   Ms. Villarreal, and she confirmed it.

24        And so that is the mindset of this man on this trip.

25   And it's a different mindset from the one that Mr. Ludke had.

9

1    Mr. Ludke I think clearly has his own mental health issues, but

2    he was harboring or at least was consistently echoing these

3    extreme views of Islam that Mr. Padilla-Conde didn't share.

4         The Government in its sentencing memorandum, and I

5    suppose they would probably talk to the Court about these videos

6    in which they say Mr. Padilla-Conde pledged his allegiance to

7    ISIS, but those videos were created at the direction of the

8    undercover agents.  They were -- Mr. Ludke was told to create

9    those videos as a way to get their assistance, their being the

10   is assistance of these ISIS brothers to cross the border into

11   Mexico.

12        Mr. Ludke in turn told Mr. Padilla-Conde to do the

13   same.  And one I think written communication and text between

14   Ludke and Padilla-Conde that I think sort of establishes

15   Mr. Padilla-Conde's reticence to do so was that Mr. Ludke told

16   Yosvany just make the video without showing your face.

17        And of note about those videos, there were several,

18   but there were several because Mr. Padilla-Conde wasn't making

19   them to the undercover agent's liking.  At one point, he told

20   the undercover agent in this video pledging allegiance that he

21   was going to Brazil, and that wasn't going to cut it.

22        He was told in a Facebook message I believe to make a

23   better one that showed he knew what "the plan was".

24        So to the extent the Government would argue these

25   videos show he didn't, in fact, harbor these views, I think

10

1    that's not an accurate reading of what they do show.

2            And I think lastly on that point, Your Honor, while

3    this case was pending in 2017, Mr. Ludke was apparently making

4    overtures to other inmates in the Dodge County Detention Center

5    to have the undercover agent involved in this case killed before

6    trial.

7            That prompted an investigation by federal agents.  As

8    part of that investigation, they sent an undercover agent to the

9    Waukesha County Jail to meet with Mr. Padilla-Conde to describe

10   this plan to have this agent killed.  And as I quoted in my

11   sentencing memorandum, Mr. Padilla-Conde was having none of

12   that.  He wrote a letter back to that agent immediately, which

13   was intercepted by the federal government, provided to us in

14   discovery, where he rejected that, said it was dumb talk, didn't

15   want to hear it.  He told that agent to tell the same thing to

16   Jason Ludke and said that's not true Islam.

17           So I think the weight of what's here, Your Honor,

18   would tend to show that the actor in this case with those

19   harboring extremist views is Mr. Ludke, not Mr. Padilla-Conde.

20   I think that's important because ultimately it goes to several

21   things, including his potential dangerousness in the future.

22           I'll note when he was arrested by agents in Texas, he

23   was forthcoming with them.  He immediately talked to them on two

24   different occasions and offered to help them identify and locate

25   this ISIS recruiter who at the time he did not know was an

1    undercover officer.

2            So that's what happened here.  Mr. Ludke had these

3    ideas.  Mr. Padilla-Conde wanted to go to Mexico for different

4    purposes, and he brought Mr. Ludke with him down there, and they

5    were arrested in Texas after communications with the undercover

6    agent.

7            He knew what Mr. Ludke's views were.  He knew he was

8    talking to the agents, so he knew what Mr. Ludke was up to in

9    that respect.  That's why he's guilty of aiding and abetting.

10   But in the grand scheme and the big picture, Your Honor, I think

11   this is a relatively, significantly mitigated case.

12           And so Mr. Padilla-Conde, as I said, I believe is not

13   a danger to the community.  His prior convictions while violent

14   in nature, nobody is hurt.  They are armed robberies, which are

15   necessarily of violent nature.  They occurred while he was

16   teenager.

17           Since 2013, he was on supervision for three of those

18   years, got through just fine, discharged from supervision there

19   and was doing what he could.  Although as I've said before, his

20   financial struggles were significant and due in large part to

21   his immigration status.

22           But of note I think there, Your Honor, even though he

23   had a young family and was struggling significantly financially,

24   he did not return to crime to try and make money to care for his

25   family.  He decided to try and restart somewhere else.

12

1    He's been in the Waukesha County Jail, Your Honor, for

2    33 months of extremely difficult time in the county jail

3    setting, very little programming, doesn't get outside.  He's

4    done what he could with the programming available, and there's

5    an exhibit attached to the sentencing memorandum that indicates

6    all that he's done, including having a poem published, and he's

7    been a model inmate at the Waukesha County Jail.

8    Under all those factors, Your Honor, I don't think

9    that Mr. Padilla-Conde belongs in prison for 20 years.  I was

10   struck by something that the Court said at Mr. Ludke's

11   sentencing, which I think is worth repeating here.  It was,

12   "There was a need to promote respect for the law and to deter

13   others, but doing so without succumbing to the temptation to use

14   this defendant as a means for expressing horror and outrage of

15   what ISIS has done."  I think that was apt for Mr. Ludke who the

16   Court sentenced 84 months, and I believe it is equally apt for

17   Mr. Padilla-Conde.

18   I believe, Your Honor, a sentence of 33 months, which

19   is effectively time served, is sufficient but not greater than

20   necessary to achieve the purposes of sentencing.  I would note

21   when he was is released from the sentence, whatever the Court

22   imposes, he will likely stay in ICE custody until his

23   immigration status can be resolved one way or another either

24   through some mechanism by which he would actually be removed to

25   Cuba, which seems unlikely, or after a period of confinement

13

1   released back into the community under the supervision of ICE

2   and whatever supervised release the Court imposes in this case,

3   which I would argue to the Court I believe two years is

4   sufficient.

5           It certainly will give him structure and assistance in

6   making sure he has the appropriate permits so that he can work

7   and to make sure he's attending to his mental health needs.  I

8   think that is sufficient, Your Honor, and so I would ask the

9   Court to impose a sentence of 33 months of initial confinement.

10          THE COURT:  Does your client want to say anything?

11          MR. POWELL:  He has submitted a lengthy allocution in

12  writing to the Court.  He does want to make a brief statement

13  this afternoon, Your Honor.

14          THE COURT:  Okay.

15          DEFENDANT:  I would like to say that I'm sorry for

16  those that I affected, mainly my family, my son, myself and

17  those in this courtroom.  I regret being part of any way with

18  Jason.  I'm against any way of this belief.

19          I had many choice in my life, and I think running away

20  from them was the answer.  And doing that I made a mistake and

21  that I wouldn't commit or be involved again.

22          I would like the opportunity to reunite with my

23  family, provide for my son and do good to the people around me.

24  Thank you.

25          THE COURT:  Okay thank you.  Government.

14

1           MR. TAIBELSON:  Thank you, Judge.  Your Honor, the

2     United States and the defendant have a fundamental disagreement

3     over how serious of an offense it is when a person in the United

4     States tries to help ISIS.

5           Yosvany Padilla-Conde was trying to provide ISIS

6     personnel at a time when ISIS was wholesale slaughtering people,

7     using rape as a political tool.  That really happened.  That was

8     real.  So to are attempts real.  This was a real attempt.  It

9     was not fanciful.  Foreign travelers are absolutely essential to

10    ISIS' efforts.  That was true at the time.  It's true today.

11    It's not theater.

12          Now, we're not prosecuting an attack itself.

13    Mr. Padilla-Conde is not death penalty eligible.  As the Supreme

14    Courtroom has instead stated, the material support statute is on

15    its face a very preventative measure.  It criminalizes not

16    terrorist attacks themselves, but aid that makes the attacks

17    more likely to occur.  That's *Holder v. Humanitarian Law*

18    *Project*.

19          Mr. Padilla-Conde drove across the country.  He slept

20    in his car.  He had to beg food from acquittances in order to

21    try to help ISIS.  He was willing to leave behind his young

22    family, willing to leave behind his son in order to travel to

23    the border to try to help ISIS.  He must sincerely have wanted

24    to help ISIS.  He must sincerely have believed he was helping

25    ISIS.

15

1           It is meaningless that, for example, he hadn't
2   purchased plane tickets.  That wasn't the plan.  The plan was to
3   meet with the ISIS recruiter who would fly him to the Middle
4   East where he and Mr. Ludke could join ISIS.
5           So to weapons.  It's meaningless he hadn't purchased
6   weapons.  The plan was for the ISIS recruiter to fly them to the
7   Middle East to join ISIS who have weapons, and it's meaningless
8   he only communicated with law enforcement and not with ISIS
9   itself.  He believed he was communicating with an ISIS
10  recruiter.
11          To his credit once caught, he agreed to cooperate
12  against the person he believed -- he truly believed was an ISIS
13  recruiter, and he made that offer because he believed that would
14  be valuable to law enforcement because he believed that was an
15  ISIS recruiter he had been communicating with.
16          In some sense, it's correct that he created videos
17  pledging allegiance to ISIS at the direction of the person he
18  believed was an ISIS recruiter, but only in the sense that the
19  ISIS recruiter told him, you may only join ISIS if you make
20  these videos at which point he made those videos.
21          Now, the following comes in as well on conduct because
22  Mr. Padilla-Conde was convicted of supporting ISIS by providing
23  Jason Ludke to them or attempting to, not by providing himself.
24  But as to relevant conduct, the claim that Mr. Padilla-Conde
25  never intended to join ISIS himself and instead his intent was

16

1    to temporarily join ISIS as far as the recruiter knew and then

2    to desert once he got to Mexico is facially observed.

3          If he wanted to go to Mexico, he would do what

4    everyone else does in that circumstance is go across to Mexico.

5    He would not join ISIS to do so.  The idea he had a better

6    opportunity to work there is also facially observed.  He has no

7    legal status in Mexico either, so why it would be easier for him

8    to find work there is hard to understand.

9          One of two things is possible.  Either he was telling

10   the truth when he made those videos and the Court wasn't

11   watching and he's minimizing now or he's minimizing -- you know

12   or the opposite, and I think the Court can reach its conclusion

13   there.

14         I recognize this Court imposed an 84 sentence on

15   Mr. Padilla-Conde's coactor Jason Ludke.  The Court explained

16   that it was rejecting the United States Sentencing Guidelines

17   and imposing a much more lenient sentence than that called for

18   by the guidelines.  Because as is permissible under *Kimbrough*,

19   this Court had a *Kimbrough* policy-based disagreement with the

20   amount of prison time called for by the United States Sentencing

21   Guidelines.  And in doing so, this Court case cited *Jumaev*.

22         This case and *Jumaev* are miles apart.  In *Jumaev*, a

23   man wrote a single $300 check to a foreign terrorist

24   organization.  Here, Mr. Padilla-Conde was attempting to provide

25   personnel to ISIS.  Courts have consistently said providing

17

1   personnel is more serious than providing financial support.

2           *Jumaev* had no criminal history of any kind not just no

3   violent criminal, but no criminal history at all.

4   Mr. Padilla-Conde committed gun-to-head armed robberies.   That's

5   highly violent.   The statutory maximum penalty in *Jumaev* was 15

6   years.   It's now 20 years.

7           Even *Jumaev* received 76 months in prison for writing

8   that one check in a case where the judge there rejected the

9   guidelines for policy-based reasons, 76 months.   It's about 100

10  months under what the guidelines would be in that case for a

11  single-count violation of Section 2339.   Even 100 months under

12  the guidelines here would be about 130 month sentence, about 100

13  months more than the defendant requests.   *Jumaev* does not

14  support defense's requested sentence here.

15          This Court, as the Court knows, must consider the need

16  to avoid unwarranted sentence disparities among defendants with

17  similar records who have been found guilty of similar conduct.

18  Section 3553(a)(6).

19          It would be a truly good thing of comfort if this had

20  all been play acting, if this were all merely a fiction, but

21  it's not.   He attempted to provide material support to ISIS,

22  material support of a kind that is the heart and sole of ISIS'

23  terror.

24          So as we said we would in Mr. Padilla-Conde's plea

25  agreement, the United States asks this Court impose a within

18

1    guideline 235 month sentence.  Thank you, Judge.

2         THE COURT:  Thank you.  In imposing sentence, I

3    considered 3553(a) factors and I impose a sentence sufficient

4    but not greater than necessary to satisfy the purposes of

5    sentencing.  We pretty much discussed the nature of the offense.

6    I don't have to add a lot.

7         The -- During the presentence interview, the defendant

8    acknowledged that his involvement in the instant offense was a

9    big mistake.  He wanted to help this Ludke who he had met in

10   state prison, and he feels embarrassed and remorseful that he

11   can't provide for his child.  He indicates that in the future,

12   he'll choose better friends and focus on things that matter.

13        As to the character of the defendant, he's 32.  He

14   does have a pretty serious record.  The -- But, he's got a

15   robbery when he was actually 14 years old, and then operating a

16   vehicle without consent.  That's when he was 16.  Another

17   robbery when he was 17.  And but the prior -- The serious prior

18   convictions are pretty, pretty old.  He's what 32 now I guess.

19        He was born in Cuba.  His parents divorced when he was

20   four due to his father's alcohol issues.  His father was later

21   murdered.  His mother remarried, but the stepfather was abusive.

22   The family moved to the United States in 1993.

23        The defendant was seven and then the mother separated

24   from the second husband in 1997, and then she had a string of

25   other relationships.  As the PSR indicates that the defendant's

1   childhood was rather chaotic.

2          And then defendant was ordered deported.  But because

3   of I guess the situation with Cuba, they can't remove him, so he

4   sort of in some ways I guess is sort of a man without a country.

5   He married in 2015, and he has a child.  He has a lot of

6   correctional needs.  His probation indicates he has mental

7   health issues, which is not surprising.  He has substance abuse

8   issues.  He dropped out of school but to his credit, he did get

9   his high school equivalency when he was at Lincoln Hills.  He

10  has some work record.  Not great, but somewhat.

11         You know, the guidelines, as the Government indicated,

12  are -- as actually both sides indicated are pretty high.  As I

13  noted when I sentenced the co-defendant Ludke, who was really

14  more culpable than this defendant, the guideline range in these

15  cases is driven by the applicability of Guideline 3A1.4, which

16  requires that the offense level be increased by 12.

17         The guideline also says that the Criminal History

18  Category should be deemed VI regardless of what the prior record

19  is of the defendant.  The PSR did not apply that increase here.

20  But in any event, the offense level adjustment means that a

21  defendant in one of these 2339 cases related to terrorism will

22  face a guideline range that's at or above the statutory maximum

23  regardless of what he did and regardless of whether he has a

24  prior record or regardless of pretty much anything.

25         And this is contrary to the purposes of sentencing in

1    3553(a) including the notion that sentences should be

2    individualized and they should be proportionate.  And that we

3    should distinguish between the worst offenders and those who are

4    less dangerous.

5           The guideline was also enacted pursuant to a

6    congressional directive and without any empirical evidence and

7    contrary to the Sentencing Commission's proper institutional

8    role.  What I mean by that, the Commission supposedly have some

9    kind of expertise based on their knowledge of sentencing.  So

10   when the Congress tells them just apply this particular

11   guideline without any -- taking into consideration any actual

12   empirical data, that's not the appropriate role of the

13   Sentencing Commission and the guideline that's enacted pursuant

14   to a congressional directive without any study or data is

15   entitled to very little respect.

16          See *U.S. v. Alhaggagi*, A-l-h-a-g-g-a-g-i, 372 F. Supp.

17   3d 1005, Northern District of California 2019.  *U.S. v. Jumaev*,

18   J-u-m-a-e-v, 2018 U.S. District Lexus 119916, District of

19   Colorado, July 18, 2018.  See also *Kimbrough*, K-i-m-b-r-o-u-g-h,

20   552 U.S. 85 at 109, 2007, and *U.S. v. Dorvee*, D-o-r-v-e-e, 616

21   F.3rd 174 at 186 and 87, 2d Cir. 2010.

22          Less significant but also suspect under the facts of

23   this case is the increase called for under Guideline

24   2M5.3(b)(1)(E) based on defendant's alleged firearms training,

25   which he didn't actually have.  And Ludke, the co-defendant's

1  alleged Jujitsu training, which he apparently didn't have

2  either.  Neither of these defendants had any particular skills

3  that would have made them useful in committing violent acts for

4  ISIS.

5          Absent these enhancements which I just talked about,

6  the final offense level would actually be 23, which would

7  produce a guideline range of 51 to 63 months in Criminal History

8  Category II, which would be the category that would apply.

9          So considering the 3553(a) factors, there's no doubt

10  that this is a serious offense.  ISIS has done terrible things,

11  and its ideology is abhorrent, and no one disagrees with that.

12  The Government's brief on those points I totally concur with,

13  but I do have to consider the specific conduct of the defendant

14  before me.  And I also have to consider the context in which

15  that conduct occurred.  Defendant is convicted of aiding and

16  abetting Ludke's attempt to join ISIS.

17          Defendant calls Ludke's attempt to join ISIS fanciful,

18  and I really can't disagree with that characterization.  These

19  two men traveled from Wisconsin to Texas planning to go to

20  Mexico, but it's unclear what could have happened next.  As far

21  as I can tell, Ludke had no means to leave North America, nor is

22  there any evidence that either of these defendants acquired any

23  weapons or any other materials to assist ISIS.

24          There's no evidence that either of them had any

25  particular skills that would assist a terrorist organization or

1    that they provided or had the means to provide resources.

2    Neither man hurt or attempted to hurt anyone or made any

3    specific plans to do so.

4            In thoroughly reviewing his history, I noted in

5    sentencing Ludke that he was more "aspirational" than

6    "operational".

7            Finally, Ludke's communications were with an

8    undercover agent not an actual ISIS operator or recruiter.  And

9    it is to defendant's credit that when he was arrested, he

10   explained his situation to the agents offering to help them

11   identify and arrest the recruiter, still not knowing that that

12   person was actually an undercover agent.  Defendant's actual

13   conduct entailed driving Ludke to Texas.

14           Defendant indicates that his plan after helping Ludke

15   get to Mexico was to work on a ranch; although, that likely

16   wasn't going to work either as he didn't have a valid passport.

17           Regarding the videos he created, defendant indicates

18   he did so at Ludke's assistance who was in turn responding to

19   demands from the undercover agent.

20           The Government doesn't buy the defendant's version

21   indicating that if he wanted to cross the border to Mexico, he

22   could have simply done so without first pretending to join ISIS,

23   recording videos swearing his allegiance.

24           The extent to which defendant actually subscribed to

25   Ludke's Jihadists fantasy at this time is not really totally

1   clear.

2          We do know that when Ludke after his arrest indicated

3   that he wanted to harm the undercover agent, that defendant

4   declined indicating this is not what Islam is about.

5          In any event as the Government notes, defendant did

6   assist Ludke's attempt to join, which defendant did believe was

7   sincere.  And while the recruiter was an undercover agent, the

8   defendant did believe that he was real, and this is a serious

9   matter.  I repeat that.

10          Defendant suggestion of a 33 month sentence fails to

11   reflect that.  It fails to promote respect for the law, and it

12   fails to deter others.

13          On the other hand, considering defendant's actual

14   conduct and the context in which it occurred, a sentence well

15   below the guideline range is sufficient to provide just

16   punishment.  Defendant has been detained in local jail for about

17   three years since his arrest and time is such -- and time in

18   that kind of a facility is much harder than time spent in the

19   federal prison.

20          And defendant has nevertheless completed the limited

21   programming available to him as reflected in the certificates

22   attached to the defense memorandum.  He also declined to involve

23   himself in Ludke's plan to harm the undercover agent as

24   indicated on Page 5 of the memorandum, and the defendant

25   stresses that he doesn't really share any Jihadists views.

24

1          So in considering defendant's character and background

2    and the need to protect the public and to deter, defendant

3    stresses his difficult childhood, but he's now in his thirties.

4    And when he decided to become involved in this conduct, and so I

5    certainly agree that he had a very stressful, difficult

6    childhood, but it's hard to place too much weight on that at

7    this point.

8          And I also have to consider his prior record;

9    although, I accept that the convictions are a lot older.

10   Apparently, the most recent serious one he was a lookout in this

11   2004 robbery when he was 17, so he was a lookout in a robbery 15

12   years ago.

13         That's serious.  But as -- But for the sort of unusual

14   guidelines here, his Criminal History Category would be much

15   lower.  So despite the challenge imposed by his immigration

16   status, he has had periods of prosocial activity, and -- No, I'm

17   sorry.  I misspoke about the Criminal History Category.  He's a

18   II, and that's appropriate, so I strike that statement.  I was

19   mistaken in that statement.

20         Despite the challenge imposed by his immigration

21   status, he has had periods of prosocial activity working and

22   caring for his family.  He does definitely need substance abuse

23   and mental health treatment, and I might add that the probation

24   report does emphasize that he does need those treatments, and

25   probation also indicates -- recommends a sentence far below the

1    sentencing guidelines.

2           Under all the circumstances and considering the need

3    to avoid unwarranted disparity with the 84 month sentence that I

4    imposed on Ludke who played a more significant role and had a

5    longer record than this defendant, I find a sentence of 66

6    months sufficient but not greater than necessary to satisfy the

7    purposes of sentencing.

8           The Government notes sentences imposed in other

9    terrorism cases but without further details about the risk posed

10   by those defendants and their records, it's hard to really make

11   clear comparisons.

12          The sentence here is based on 3553(a) and would be the

13   same regardless of the guidelines.  Therefore, defendant is

14   committed to the Bureau of Prisons for 66 months.  Is there any

15   request for a prison recommendation?  If not, then I won't make

16   one.  No fine.  Bond release.  Defendant is on supervised

17   release for ten years.  I impose a lengthy term of supervised

18   release to make sure that the defendant avoids troublesome

19   associations, whether that be with somebody like Ludke or gang

20   associates, and that he maintains legitimate employment.

21          The Government suggests life, but I think that's

22   greater than necessary.  His prior record is serious but not

23   that lengthy, and he's had periods of success in the community

24   and will certainly know in ten years if he's made a commitment

25   to living a law-abiding life.

1           While on release, the defendant can't commit any

2    crimes, can't illegally possess or use controlled substances.

3    From the PSR, he has to comply with conditions 1 through 14,

4    with any payments conditioned on ability to pay.  Special

5    assessment is $100 due immediately in Room 362.

6           Defendant has a right to appeal.  If he thinks there's

7    something unlawful, counsel has a duty to advise him of his

8    rights.  He knows the notice of appeal has to be filed within 14

9    days of the entry of judgement.  If the defendant wants to

10   appeal and can't afford to, he can ask for leave to appeal as a

11   poor person.  I recommend after conferring with the defendant,

12   counsel file -- Never mind that.  I'll dismiss Count 1.  And is

13   there anything else?

14           MR. POWELL:  I would ask for a recommendation that he

15   be placed in Wisconsin or as close to the Eastern District of

16   Wisconsin as possible.

17           THE COURT: That's fine.  Okay.  Good luck to you.

18      (Whereupon proceeding was concluded.)

19

20

21

22

23

24

25

27

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified August 3, 2021.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov