UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| Plaintiff | ) ) | Docket No.    CR 17-00387 CRB |
| v. | ) ) ) | **AFFIDAVIT OF** |
| | ) ) | **JACK DONSON** |
| AMER SINAN ALHAGGAGI, | ) ) | |
| Defendant | ) ) | |

I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct:

## STATEMENT OF EXPERTISE

1. I provide the Court my attached *Curriculum Vitae* (Exhibit 1) reflecting over 23 years of meritorious service in the Federal Bureau of Prisons (BOP), my work as an expert in federal district courts across the country and my education.

## SCOPE OF THE REVIEW

2. I was asked to evaluate the institutional adjustment and classification of Amer Alhaggagi to determine if he was appropriately classified at the time of his designation and whether he suffered excessive punishment by serving his sentence in a high security prison environment based on his overall profile and security needs. My evaluation was determined by reviewing the Presentence Report (PSR) and various BOP documents including his initial designation data, classification form, program review reports, disciplinary information and education data.

## SUMMARY OF FINDINGS

3. Upon examining the records, I concluded that Mr. Alhaggagi's security classification, originally scored at the very bottom range of medium security, indicates that he should have been placed in a medium or low security Federal Correctional Institution (FCI). The BOP instead designated him to a high security United States Penitentiary (USP). In my professional opinion and experience, this was done because the BOP considered Mr. Alhaggagi no different than an international terrorist. As a result of this decision, Mr. Alhaggagi, a young offender with no previous criminal history, has endured a more punitive sentence than was necessary given that the USP population includes members of organized street gangs and people serving life sentences and is thus one of the most predatory populations in the federal system.

1

**BOP CLASSIFICATION CONTEXT**

4.  There are four (4) levels of security assigned to inmates by the BOP: Minimum, Low, Medium and High. In my experience, it is rare for youthful inmates without a history or violence, gang affiliations or sentences over thirty years to be designated to a USP. I review USP cases on a regular basis for compassionate release applications, and they commonly involve people convicted of violent acts such as murder, people with extensive prior criminal histories including violence, and/or people serving life sentences. USPs represent only 12.3% of the BOP's entire inmate population (about 157,000) and inmates under the age of 25 routinely comprise approximately 5.4% (around 8,500 according to the BOP's own website on inmates - as of December 25, 2021). A youthful offender designated to a USP who has no criminal history or prison experience is extremely rare unless they are an escape risk, a Lifer, a disruptive group (gang) member, a high-level cartel member or a terrorist.

5.  The BOP primarily relies upon information in the Presentence Report (PSR) and Judgement in a Criminal Case (A0-245) to determine a security classification. The classification system, referred to as BRAVO, includes a point system used to calculate a person's security level as dictated by the BOP Classification Manual (CPD/CPB, Number P5100.08, *Inmate Security Designation and Custody Classification*). Some of the factors used in the classification system include the age of the offender, history of violence and/or escape, characteristics of the instant offense and criminal history points. The more points, the higher the classification (see table below from BOP Classification Manual):

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

Security points alone do not determine a specific security level as there are also Public Safety Factors (PSF) that can elevate a person's classification outside the security scoring, provided there is a logical rationale for such an increase. There is a PSF for a "Greatest Severity Offense," meaning the offense type falls into the category of serious offenses which precludes minimum security (camp) placement. Another PSF is applied based on the length of a sentence.

6.  Aside from PSFs, there are also "Management Variables," which allow the BOP to designate offenders above or below their scored security classification level. Two common management variables are Lesser Security (reduces the classification) and Greater Security (increases the classification). The classification manual (Chapter 5, page 5) encourages the designating official to apply a Lesser Security Management Variable when "*age is largely the contributing factor*" in the inmate's placement. The reason for this is that younger inmates are most

vulnerable and likely to be influenced and exploited by older inmates who have an extensive criminal orientation.

## OPINION ON MR. ALHAGGAGI'S SECURITY LEVEL

7.  When the BOP calculated Mr. Alhaggagi's initial security classification, he was assigned sixteen **(16)** security points (see attached Exhibit 2, BP-337), which corresponds to medium security (only 1 point above low security). Eight **(8)** of these security points were attributed to Mr. Alhaggagi's young age because at the time as he was under 25 years old.

8.  Mr. Alhaggagi was appropriately assigned sixteen security points under the BRAVO classification system. Based on the information in the PSR and overall assessment and recommendations by the U.S. Probation Officer, Mr. Alhaggagi should have been considered for placement in a low security FCI. It is clear from the PSR that Mr. Alhaggagi was not an escape risk or an international terrorist, making USP placement inappropriate.

9.  Two PSFs were assigned to Mr. Alhaggagi. Neither required that he be housed in a USP. The first, Greatest Severity Offense, was based on the nature of his conviction and precluded camp placement, but it did not mandate USP designation. The second was for sentence length. That PSF also did not require designation to a USP (and has since been removed because Mr. Alhaggagi is within ten years of release). Inmates with over ten years to serve are required be housed in at least a low security facility unless the PSF is waived.

10. Even more perplexing is that BOP did not assign Mr. Alhaggagi a Lesser Security Management Variable (thereby reducing his security classification) based on his age. As described above, this is the policy where "age is largely the contributing factor" for classification. For Mr. Alhaggagi, eight out of sixteen points were attributable to his being under 25, making a Lesser Security Management Variable appropriate at the time of his designation. This is particularly true because within approximately one year of designation, he would turn 26 and lose four of the eight age-based points, potentially lowering his classification to twelve points, near the range of minimum security which is eleven points.

11. BOP practices emphasize that inmates should be assigned to the least restrictive environment given their classification needs. Contrary to that practice, Mr. Alhaggagi was assigned a discretionary greater security management variable, resulting in his designation to a USP. The probation officer who wrote the PSR viewed Mr. Alhaggagi as a non-religious, impulsive and immature young adult who was neither a jihadist nor a member of a terrorist organization. In the face of this, the BOP not only applied the greater security management variable, but there is also a notation in the BOP computer (designation remarks) which includes the remark "*CTU rvw'd*," indicating that BOP's counterterrorism unit (CTU) had input into the designation. The CTU appears to have seized on a portion of the PSR summarizing some of Mr. Alhaggagi's statements as "*U.S. citz. plot to 'blow up' multiple targets in CA,*" but ignored the overall context of his actual behavior, youth and immaturity as well as the lack of formal ties to any terrorist group.

12. The PSR concluded that although Mr. Alhaggagi's offense was serious, he is "*an immature young man, who bragged online about being a dangerous terrorist to impress the gullible young men communicating with him*" and whose "*overall lack of maturity at the time of the offense*" affected his ability "*to understand the full impact of his actions.*" (PSR Sentencing Recommendation, 2-3). Information like this should have been considered in the classification but does not seem to have been taken into account. This stands out more when it is considered that Mr. Alhaggagi had no prior criminal history and is simply not a terrorist.

13. In my opinion, this information along with his age should have led the BOP to consider the application of a Lesser Security Management variable and placement in a Low security facility or at most a medium security facility commensurate with the scored classification right at the threshold of Low security.

## HIGH SECURITY FACILITIES (USP)

14. USPs involve the highest degree of control and supervision in the federal system aside from the Florence, Colorado "super-max" administrative unit (ADX) and the Special Management Unit at USP Thomson, Illinois. USPs include maximum custody inmates which are described by policy as riotous, assaultive, predacious and/or a serious escape risk. Many inmates in the population have either life sentences or sentences exceeding their natural life expectancy, which leaves little incentive for them to change their behavior. This population has higher occurrences of both inmate-on-inmate and inmate-on-staff assaults. USPs are often locked down due to critical incidents like disturbances and/or assaults, which limits all inmates' ability to participate in educational and other programs.

15. It is difficult to contextualize penitentiary behavior for justice professionals who have not worked in the federal prison system, because assaults and facility lockdowns are rarely covered in the media. The reality is that USP inmates live by a different sub-cultural code than in medium or low security facilities. Daily life features the potential for serious violence, manipulation, extortion, and altercations. Inmates routinely witness violence, and many arm themselves with sharpened instruments.

16. Those who are young, with less criminal history, and placed in high security environments can be pressured into gang membership, sexually exploited, carry weapons for self-defense, move contraband, and extorted for protection. Each day in a USP is dangerous for both inmates and staff. It is especially difficult to navigate within the environment for someone who has never been incarcerated and has no affiliation with a group or gang for protection.

## USP ATWATER

17. Among high security prisons, USP Atwater has a notorious reputation for violence and is known as one of the worst places in the BOP system to serve a sentence. It is also a difficult place to staff, which has caused the agency to offer bonuses to attract employees.

18. In the past thirteen (13) years, inmates at Atwater brutally murdered a correctional officer, took another hostage to protest gang control over cell assignments, and assaulted still more. Board

4

of Inquiry Report, June 20, 2008 Homicide of Correctional Officer Jose Rivera United States Penitentiary Atwater California, dated April 17, 2009. Internal reviews of these incidents have found USP Atwater to have been in near chaos with active gangs, tolerance of alcohol use, widespread weapon possession amongst the inmates, a broken disciplinary system, and an overflowing special housing unit (SHU). Inmate care, contraband and safety remain challenges at USP Atwater.

19. Concerns about BOP understaffing, contraband possession and medical care continue to be identified by the DOJ even in 2019 and 2020 reports entitled *Top Management and Performance Challenges.* In the 2019 report, inmate safety and security, contraband, understaffing and increasing suicide rates were identified as the number one challenge by the DOJ. In the 2020 report little had apparently changed. Maintaining a safe, secure and humane prison system was the fourth challenge listed for the DOJ and included concerns about contraband, staffing and medical care oversight, among others.

## MR. ALHAGGAGI'S INCARCERATION AT USP ATWATER

20. Due to the high number of violent incidents at Atwater, Mr. Alhaggagi reported that his unit was in frequent lockdown status, meaning he was confined to the cell he had shared with a succession of different inmates.

21. I am informed by Mr. Alhaggagi's counsel that he was subjected to gang hostility at Atwater. On arrival, gang representatives demanded to know his "identity" for purposes of pressuring him to associate with them. When he indicated that he did not associate with any gang, he was marked as an undesirable. Gangs gain strength through numbers in a penitentiary.

22. Mr. Alhaggagi also reports that his conviction on a terrorism-related charge has made him notorious and subjected him to hostile scrutiny by both inmates and staff. With respect to the inmates, he reports having been subjected to gang attempts to determine the particulars of his conviction. It is a typical and especially stressful phenomenon when inmates attempt to vet a person to determine details about the conviction and any cooperation. This vetting process has been so problematic that the BOP recently added a High Severity Prohibited Act code to Program Statement 5270.09, *Inmate Discipline Program* (Change Notice dated November 18, 2020), Code 231- "*Requesting, demanding, pressuring, or otherwise intentionally creating a situation which causes an inmate to produce or display his own court documents for any unauthorized purpose to another inmate.*" While this new infraction recognizes the problem, it will do very little to discourage the behavior and it will be difficult to enforce.

23. With respect to staff reactions to his offense, I am informed that staff made Mr. Alhaggagi's offense of conviction known to other inmates – a serious conduct violation and monitored Mr. Alhaggagi's attorney-client communications (correctional officers sitting in the room during attorney calls) as well as opened and read legal correspondence. It is my understanding Mr. Alhaggagi's is not under Special Administrative Measures (SAMS) and such monitoring of attorney-client communications was improper.

## ACHIEVEMENTS IN AN ADVERSE ENVIRONMENT

5

24. Despite these harsh and dangerous conditions, Mr. Alhaggagi has managed to maintain an overall satisfactory disciplinary record. He has completed several courses, including a Vocational Building Trades course and an outside correspondence course to obtain a paralegal certificate.

25. The BOP offers voluntary vocational programs referred to as "occupational" programs for inmates with a high school diploma or who have met the GED requirements. Inmates who have participated in up to one hundred hours of occupational training are considered to have achieved an exploratory level. Inmates who receive over one hundred hours of instruction in actual hands-on training are considered to have achieved a "marketable skill." Mr. Alhaggagi completed a Vocational Building Trades course at the marketable skill level which included live work in general construction, carpentry (framing), basic residential wiring and carpentry (finishing). He later completed a twelve-hour VT course in Drawing 2.

26. He also enrolled and completed a thirty-one-lesson correspondence course with the Blackstone Career Institute to earn a Legal Assistant/Paralegal certificate and is enrolled in a Prison Mathematics correspondence course.

27. It should be noted that the BOP Covid-19 protocols have impacted all BOP programming due to the initial nationwide lockdown and subsequent isolation and quarantine procedures implemented on a facility-by-facility basis dependent on the outbreak of the virus.

## DISCIPLINARY

28. The BOP categorizes disciplinary incidents into four (4) categories by severity level including Greatest, High, Moderate and Low. A common example of a greatest severity report is Possessing a Dangerous Weapon, and an example of a high severity offense is fighting. A person can be charged with a low severity offense for using abusive language (swearing) or feigning illness.

29. Mr. Alhaggagi incurred no disciplinary infractions from his sentencing until June 2021, when he received a moderate level incident report for Refusing to Obey an Order. The report alleges that another inmate entering the recreation yard was being searched and handed a white bindle to Mr. Alhaggagi who refused to stop when commanded by a correctional officer. According to Mr. Alhaggagi, staff believed he had ingested contraband, so he spent several days in a "dry cell," which has equipped to monitor bowel and bladder output, but he did not pass any bindle or drugs. Mr. Alhaggagi also reports that he subsequently passed a drug screen. In my experience, the sustained charge of Refusing an Order, on its own, would not have merited a hearing by the discipline hearing officer (DHO) but would instead have been handled through his unit disciplinary team. This incident exemplifies the USP environment and the stressful issues a person faces daily. Had Mr. Alhaggagi complied with the staff member's order in front of the other inmates, he would have been subject to repercussions from the population.

30. In addition to this violation, Mr. Alhaggagi has disclosed that he more recently sustained an additional violation for "phone abuse." This occurred when Mr. Alhaggagi was transferred after two years from Atwater to FCI Victorville while he awaited ultimate transfer to FCI Mendota (his current designation). He reports that, due to having been moved, he had no

6

money and exchanged his phone credits with another inmate for personal hygiene and other items. He sustained a" 297 – phone abuse" for this conduct.

31. Mr. Alhaggagi's security classification has recently been reduced from Medium to Low security but he continues to be housed in a medium security facility (FCI Mendota) for greater security purposes.

## PSYCHOLOGICAL & COUNSELING

32. The Bureau operates a structured Drug Abuse Treatment Program to identify inmates in need of substance abuse treatment. This multi-pronged treatment delivery system accommodates the entire spectrum of inmates in need of substance abuse programs through the Drug Abuse Education Course, the Non-residential Treatment Program, Residential Drug Abuse Programs (RDAP), Follow-up Treatment in general population, and Community Transitional Drug Abuse Treatment (TDAT). It features some components of cognitive therapy.

33. Mr. Alhaggagi completed the Drug Education Course. This program is usually completed prior to the more intensive residential and non-residential drug treatment programs. At Atwater, he was on the waiting list for the Non-Residential program which is a voluntary program with similar content as the 500-hour Residential Drug Program (RDAP). Treatment staff are required to use the most recent treatment journals, facilitator guides, manuals, and resource materials. Self-help programs such as Alcoholics Anonymous (AA), Narcotics Anonymous (NA), and Rational Recovery (RR) may be offered as part of an institution's drug abuse program effort and are most often associated with non-residential (NR) treatment. DAPs are conducted 90 to 120 minutes a week for a minimum of 12 weeks and a maximum of 24 weeks.

**34.** Mr. Alhaggagi recently completed three program modules conducted by a psychology clinician entitled Coping, Preparing to Change and Attitudes.

35. He participated in the Challenge Program at USP Atwater, a program designed for those with drug and/or mental health disorders. Mr. Alhaggagi did not complete this program. In my professional opinion, he should have not been referred to the program in the first place based on the records I have reviewed and it is no surprise he withdrew. It should be noted that Mr. Alhaggagi's only drug use concerned marijuana and he does not have a mental health disorder.

## CONCLUSION

36. In my professional opinion, based on the context of the instant offense behavior in the PSR, the BOP should not have increased the classification of Mr. Alhaggagi to high security for designation to a USP. He is not an international terrorist, nor an escape risk and did not (and does not) require greater security than dictated by his classification. For approximately two years, he was confined in a predatory environment alongside prisoners with more of a criminal history orientation including gang affiliations and the propensity for violence. Despite this adversity, he has participated in re-entry related programs and has had satisfactory conduct when viewed in context of the environment. He now finds himself with security points commensurate with a "Low" security classification, yet he continues to be housed in a medium

FCI (Mendota) which still has some of the elements of the USP environment in terms of security but has a vastly different, less violent population. Should the court impose a sentence that requires him to serve any more time in prison, it would be beneficial for the court to make a non-binding judicial recommendation for the BOP to place Mr. Alhaggagi in a facility commensurate with his scored security level and clarify in the Statement of Reasons that he is not a member of an international terrorist organization.

Executed on this 5th day of January 2022.

_____
Jack T. Donson

# EXHIBIT 1

Jack T. Donson

**Personal Information**
Education: BS-Sociology/Anthropology, MS-Criminal Justice
Offices in New York & Pennsylvania

**Personal Statement**

I have worked directly with justice involved individuals for over 35 years at the county, state and federal levels. I educate justice professionals on federal prison system policy and process to obtain better outcomes in representation and legislation. Most of my career, I managed a caseload within the trenches of the federal prison system as a Correctional Treatment Specialist.  I also served in administrative capacities conducting facility audits, involvement in local and national policy writing work groups, program oversight and the training of institutional staff in classification and correctional programs. My unique perspective on justice issues is derived from applying policy in diverse prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units.  I received three national awards during my federal service and over 30 other monetary performance awards for my performance  and other accomplishments. I continue to have a pulse on the agency and my understanding of BOP policy, nuances and culture is extraordinary.

In 2011, I founded "*My Federal Prison Consultant*", LLC, after witnessing people being taken advantage of by high priced, predatory and uninformed prison consultants.

In 2014, I co-founded a company with Walt Pavlo of Forbes called *"Prisonology"* which provides training on federal prison topics to Federal Defenders and CJA Panel Attorneys. We have also conducted several training sessions with federal judges and probation officers.

I serve pro bono on several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity)

I am a member of the Corrections Committees of the National Association of Criminal Defense Lawyers (NACDL) and the American Bar Association (ABA) where I serve as the chair of a sub-committee on federal prison policy.

I have testified in federal district courts throughout the United States and the United Kingdom. I was a lecturer at the University level and have taught several courses including "The American Prison".

My passion is prison reform and my mantra in advocacy is that many proactive prison reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency. My analytical ability in combination with my practical experience provides me with insights into prison policy and culture which is advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on CNN, Fox News, CNBC and have been quoted by numerous national media outlets relative to federal prison

issues. I have authored chapters on two ABA Books and have had Op Eds published in The Hill as a "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor".

## Current Work Experience

*My Federal Prison Consultant, LLC*- President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

*Prisonology*, VP- Operations & co-founder, Develop CLE's which are conducted with federal defenders, judges and CJA panel attorneys. September 2014-Present,   www.prisonolgy.com

*FedCURE*, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011-present, www.fedcure.org

*Out4Good, LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013-present (initiatives on hold pending funding & Africa project) www.out4good.org

*Marywood University*, Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections", "Shadow and Service" and "The American Prison".   January 2013-January 2019

*Choosing Integrity,* Board Member – CI staff have been visiting federal prisons and local jails for the past 10 years pro-bono offering classes in Forgiveness and mentoring the incarcerated. We recently were tasked with coordinating the Pike County, PA commissioners' re-entry task force.    https://www.choosingintegrity.org/about/

## Prior Work Experience:

*Federal Bureau of Prisons*, Correctional Treatment Specialist & Case Mgt. Coordinator- I was responsible for the counseling, classification and re-entry preparation. I coordinated several institution programs and trained staff in classification & correctional programs related areas.
- Special expertise with high profile Organized crime figures, the Witness Protection (WITSEC) program & White-Collar Crime offenders
- Alternate Case Management Coordinator 1991 to 2011
- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups
- Annual Training Instructor in the areas of security designation and classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiations Team in the capacity of Lead Negotiator.
- Received 3 **National** Awards for Excellence in Administration & Detention Procedures National Correctional Treatment Specialist of the Year & Excellence in Training Award.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor and trainer for college interns and newly appointed case managers and counselors

11

- Held assignments as <u>Camp Administrator, Case Management Coordinator, Unit Manager</u> and held the position of <u>Assistant Case Management Coordinator.</u>
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in <u>minimum, low, medium, administrative</u> (including high security) & <u>Witness Security</u> (WITSEC) units

***Federal Bureau of Prisons*** <u>Correctional Officer-</u> Responsible for working various corrections posts throughout the prison including inmate housing units, compound and perimeter patrol. (Medium facility-FCI)

***Commonwealth of Pennsylvania,*** <u>Probation and Parole Officer-</u> Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. Also Interned with Scranton District Office of the PA Board of Probation and Parole.

: **<u>Army National Guard,</u>** SGT, Easton, PA 1986-1995 (Trained in Germany & Holland)

- **<u>Military Police</u>** (MP-95 Bravo), Ft. McClellan, AL
- **<u>Stinger Missile Gunner</u>**   (16 Sierra), Ft. Gordon, Ga.

## Education

Marywood University, Scranton, Pennsylvania
- **<u>Master of Science in Criminal Justice</u>** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania
- **<u>Bachelor's Degree in Sociology/Anthropology</u>** 1985

## Awards
- 1998 National Community Corrections Award
- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- Received 32 other monetary personal achievement awards

## Other Activities/memberships

- Testified on Capitol Hill to the <u>Colson Task Force on Federal Corrections</u>
- <u>AOUSC Instructor</u> 2019 Austin, Tx (Winning Strategies Seminar-BOP Mental Health)
- Published an Article on BOP Restrictive Housing in the <u>Federal Sentencing Reporter</u>
- Authored Chapter's in Elizabeth Kelly's books on Autism Spectrum Disorders (2019) & Suicide and It's Impact on the Criminal Justice System (2021)- (ABA)
- Provide training on Federal prison issues to federal defenders & CJA Panel

- Developed and provided federal prison training to federal judges and USPO's
- Numerous media appearances for commentary on CNN and Fox News
- NACDL Corrections Committee since 2011
- ABA Corrections Committee 2012- Chair of Standing sub-committee on BOP Policy
- Monthly contributor to the Sentencing Partners Newsletter from Joaquin & Duncan
- Authored articles published in the "News & Views" (AO) and "The Debt Beat"
- FedCURE member of the Prison Reform, Sentencing Reform & Re-entry Work Groups (PRWG)
- Member of the PA Prison Society
- Overall offender advocacy & general Federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

## References, testimonials and award letters available upon request and at www.mfpcllc.com

14

# EXHIBIT 2

14

PPG0                                                                    Page 1 of 1


```
  USPYN  600.00 *            SECURITY/DESIGNATION      *     02-16-2021
  PAGE 001        *                 DATA               *     16:03:23
      REGNO: 23832-111  NAME: ALHAGGAGI, AMER SINAN              ORG: DSC
RC/SEX/AGE: W/M/25  FORM D/T: 06-13-2019/1322  RES: OAKLAND, CA 94612
OFFN/CHG..: CR-17-00387-001 CRB;ATT PROVIDE MATERIAL SUPPORT/RESOURCE TO
            TERRORIST ORG;FRAUD POSS ACCESS DEVICE;ID THEFT;188MOS/10Y SRT
CUSTODY..: IN          BIL:           CITIZENSHP: UNITED STATES OF AMERICA
CIM CONS.: SEPARATION                        USM: FCAN
JUDGE....: BREYER      RECFACL/PGM: CLST NORTH CA/OMDT MH DST*   VOLSUR: NO
VS DT/LOC:                          MOS REL: 133  SEVERITY: GREATEST
CHP/CHS/S: 000/00/PSI  VIOLENCE: NONE           ESCAPES.: NONE
DETAINER.: NONE        AGE: < 25   EDUC LV: HS/GED VERIFIED       HGC: 12
DRUG/ALC.: < 5YRS AGO  TOTAL: 16   SEC LVL: MEDIUM
PUB SAFTY: GRT SRV,SENTLEN         CAR MD/MH: SCRN1/SCRN2-MH   OMDT REF: NO
CCM RMKS.: 5/BAC.US CITZ.PLOT TO 'BLOW UP'MULTIPLE TARGETS IN CA;FND POSS
            ID OF 25 VTCS,FRD US CRDT CRDS APPROX LOSS $5273.82.NO PRIOR
            OR PENDING CHARGES.NO MED/PSYCH.DRG=MJ.*JUD REC-EDUCATIONAL &
            VOCATIONAL PROG.*SKILL=BOX(AGE 15-18),TAEKWONDO,JUDO,JUJITSU*
DESIG: ATWATER USP          DSC DFJ 06-14-2019 RSN: MGMT   MSL: HIGH
MGTV/MVED.: GRTR SECU 06-14-2021
DESIG RMKS: JUD COMPLY FOR REC FACL; CIU RVW'D; OMDT CLR'D.


G0002      MORE PAGES TO FOLLOW . . .
```